**UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC, | Case No. 21-30589 (JCW) |
| Debtor. | |

**MOTION OF THE MDL PLAINTIFFS' STEERING COMMITTEE TO
TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1412 AND JOINDER IN
BANKRUPTCY ADMINISTRATOR'S MOTION TO TRANSFER VENUE**

The Plaintiffs' Steering Committee (the "**PSC**") in the *In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Multi-District Litigation* (MDL No. 2738) before the United States District Court for the District of New Jersey (the "**MDL**"), by its undersigned counsel, hereby (i) submits this Motion (the "**Motion**") in response to the Court's *Order to Appear and Show Cause Why Venue Should Not be Transferred to Another District*, dated October 26, 2021 [Dkt. No. 208] and (ii) joins in the *Motion of the Bankruptcy Administrator to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(a)(1) in the Interest of Justice or for the Convenience of Parties* [Dkt. No. 205] (the "**BA Transfer Motion**"). By this Motion, the PSC seeks entry of an order pursuant to 28 U.S.C.§ 1412 transferring venue of the above-captioned chapter 11 case (the "**Case**") of LTL Management LLC (the "**Debtor**") to the District of New Jersey and respectfully represents and alleges as follows:

**PRELIMINARY STATEMENT**

1.      The notion that the Debtor is a North Carolina company with ties to this District is truly an artifice. The Debtor was created and incorporated in North Carolina for one reason—to shield Johnson & Johnson ("**J&J**") from potentially billions of dollars in liability to those

women who have been irreparably harmed by J&J's conduct.  The overwhelming majority of those harmed—in excess of 35,000—are plaintiffs in the MDL.  The PSC represents the interests of those women and their families who have been pursuing J&J and the Debtor's predecessor in the MDL for the last five years.

2.      The MDL is pending in New Jersey and seeks to hold J&J and its subsidiaries— virtually all New Jersey-incorporated and New Jersey-operated companies—liable for their misconduct.  In fact, when the federal actions that had been pending around the country were consolidated into the MDL, it was the MDL Defendants, including J&J and Johnson & Johnson Consumer Companies, Inc. ("**Old JJCI**"), that proposed the District of New Jersey, a court in its own backyard, as a possibility for centralization.  Later, J&J even sought to modify the automatic stay in another talc related bankruptcy (*Imerys*) pending in Delaware, so that it could proceed to litigate in the MDL in New Jersey.  Now, after years of litigation, as these women and families are nearing the start of trials, *commencing in New Jersey*, J&J is trying to pull the rug out from under them by attempting to move the resolution of their claims to the Western District of North Carolina, a place to which neither the MDL Plaintiffs nor their adversaries have any meaningful connection.

3.      The Debtor's connections to North Carolina are contrived and tenuous at best:

- the Debtor reincorporated in the state approximately 48 hours before filing for bankruptcy;

- the Debtor has no offices in North Carolina;

- the Debtor has no employees working or living in North Carolina;

- the Debtor has no operations in North Carolina;

- the Debtor has no physical assets in North Carolina;

- the Debtor's equity interest in its subsidiary Royalty A&M LLC ("**Royalty**") is arguably a connection to North Carolina, but

2

Royalty itself was formed as a North Carolina company mere days before the bankruptcy filing and also has no operations in the State. As far as the Debtor's pleadings indicate, Royalty owns revenue streams from the sale of LACTAID®, MYLANTA® / MYLICON® and ROGAINE®, none of which have any apparent connection to North Carolina apart from being sold at local grocery stores; and

- the Debtor's bank account with Bank of America, while perhaps opened in North Carolina, is accessible from any jurisdiction in the United States.

4. By contrast, the Debtor has significant connections to New Jersey:

- the Debtor's offices are located in New Jersey;

- the Debtor's officers are located in New Jersey;

- Old JJCI, the Debtor's indirect predecessor (before the Texas Two-Step) has only ever been located in New Jersey (for several decades in New Jersey against the Debtor's 48 hours in North Carolina); and

- the overwhelming majority of talc liability cases—the reason for the Debtor's filing—are pending in New Jersey.

5. The Debtor was first formed as a Texas LLC as the product of a divisional merger. The Debtor was then reincorporated as an LLC in North Carolina. The Debtor could have reincorporated anywhere, including New Jersey, where it has significant connections and has in other instances chosen to litigate. Indeed, the other Texas entity that emerged from the divisional merger immediately reverted back to being a New Jersey entity by virtue of a merger into its New Jersey parent company (New JJCI).

6. Instead, J&J chose to reincorporate the Debtor in North Carolina, a place in which its scant connections were manufactured mere days before filing, and for which no business justification has been offered. Such blatant forum shopping should not be countenanced. The

facts and circumstances here, particularly at this early stage of the case, justify a transfer of

venue to New Jersey,[1] both in the interest of justice and for the convenience of the parties.

## JURISDICTION

7.      This Court has subject matter jurisdiction to consider this matter pursuant to 28

U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory authority

for the relief requested is 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy

Procedures (the "**Bankruptcy Rules**").

## BACKGROUND

### A.      The Texas Two-Step

8.      Old JJCI initiated a set of corporate maneuvers called a "Texas Two-Step" in the

days prior to the Petition Date.  The goal of these corporate transactions was to create a special

purpose vehicle into which Old JJCI (but not J&J) would dump all of its talc-related liabilities

along with a smidgen of assets, preparatory to that special purpose vehicle filing for bankruptcy

protection in this Court.  The Texas Two-Step process only affected Old JJCI's liabilities; J&J's

own direct liabilities were never assigned to any other party.

9.      Either on October 7, 2021 or October 11, 2021 (just days before the

commencement of the LTL Bankruptcy Case),[2] the Debtor's predecessor, Old JJCI, formed

Royalty in the State of North Carolina.  The totality of Royalty's "operations" consists of no

more than collecting royalty streams based on third party sales and potentially reinvesting the

---

[1]      While the Trenton division in the District of New Jersey seemingly would be the appropriate division in
view of the MDL, the transfer to any division in New Jersey would be acceptable and the PSC defers to the sound
discretion of this Court or the courts in New Jersey.

[2]      The Articles of Organization for Royalty were filed with the North Carolina Secretary of State on October
7, 2021.  *See BA Transfer Mot.*, Ex. G to Abel Declaration.  The First Day Declaration, however, states that Royalty
was organized on October 11, 2021.  *First Day Declaration*, at ¶ 22.

income to acquire new third-party royalty streams. *See Declaration of John K. Kim in Support of First Day Pleadings* (the "**First Day Declaration**") [Dkt. 5, at ¶18].

10.     Shortly after Royalty was formed, Old JJCI converted into a Texas limited liability company to utilize Texas's divisive merger statute, which enables a business entity to split into two or more successor entities and assign its assets and liabilities as it wishes among the successor entities. *See First Day Declaration*, at ¶ 23.[3]  In the mass tort context, as here, the intent and design of the divisive merger is crystal clear: to segregate all of Old JJCI's problematic talc liabilities in one special purpose entity ("**BadCo**"), untethering those liabilities from Old JJCI's valuable assets and profitable operations, which in turn were assigned to an entirely separate entity ("**GoodCo**").

11.     The following day, October 12, 2021, Old JJCI formed the Debtor in Texas as the BadCo and transferred to it all of Old JJCI's talc-related liabilities and certain intangible assets related thereto (*e.g.*, contracts, records, and privileges associated with Old JJCI's talcum powder business). *See First Day Declaration*, at ¶¶ 18, 24.  The same day, the Debtor re-domiciled in North Carolina. *Id.*  Old JJCI also transferred to the Debtor a portion of its remaining assets— ownership of Royalty, a bank account with approximately $6 million in cash and the rights under a funding agreement (the "**Funding Agreement**"). *Id.*  These assets are grossly inadequate to cover the Debtor's liabilities.

12.     Thus, on the same day, October 12, 2021, but only after the Debtor was re-domiciled in North Carolina, the Debtor was given ownership of Royalty.  The Debtor estimated that the value of its interest in Royalty is approximately $373 million, primarily comprised of the

---

[3]     Technically, to facilitate the Texas Two-Step, Old JJCI merged with and into Chenango Zero LLC, a newly created J&J indirect subsidiary, prior to the divisional merger. *See First Day Declaration*, at ¶ 23.  The President of Chenango Zero is listed as Michelle Goodridge, who is also the President of Johnson & Johnson Consumer Inc.  *See BA Transfer Mot.*, Ex. A to Abel Declaration (*Certificate of Divisional Merger*).

fair market value of the royalty streams. *See First Day Declaration*, at ¶ 26. The Debtor has no

business operations of any sort; it exists solely as a vehicle to allow J&J to use the bankruptcy

process to attempt to impose a sharply discounted resolution of its talc liabilities on talc

plaintiffs.

13.     Simultaneously, Old JJCI organized another Texas entity, which immediately

thereafter merged into a New Jersey corporation, called Johnson & Johnson Consumer, Inc.

("**New JJCI**") as the GoodCo, to which Old JJCI's other assets and liabilities were assigned.

New JJCI, the Debtor's immediate parent company, "manufactures and sells a broad range of

products used in the baby care, beauty, oral care, wound care and women's health care fields, as

well as over-the-counter pharmaceutical products." *First Day Declaration*, at ¶ 19.

14.     On October 14, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition

(the "**Petition**") for relief under chapter 11 of title 11 of the United States Code (the

"**Bankruptcy Code**"). While other Texas Two-Step cases in this District involved debtors that

were domiciled in North Carolina for months before filing, in contrast, Debtor was established in

North Carolina for just 48 hours.

**B.**     **The Debtor's Connections All Lead Back to New Jersey**

15.     The Debtor's so-called "operations" are being performed by Johnson and Johnson

Services, Inc., a New Jersey company ("**J&J Services**"), on the Debtor's behalf. The Debtor's

First Day Declaration states that:

> [t]o ensure that the Debtor has access to services it needs to effectively operate its
> business, in connection with the 2021 Corporate Restructuring, the Debtor entered
> into a [sic] services agreements (the "Services Agreements") with J&J Services.
> Pursuant to the Services Agreement, J&J Services has agreed to provide the
> Debtor with certain corporate and administrative services, including treasury and
> procurement, corporate finance, accounting, human resources, information
> technology, legal, risk management, tax and other support services. In addition,
> the Debtor and J&J Services entered into a secondment agreement pursuant to

which J&J Services has agreed to second to the Debtor certain of its employees, including the Debtor's Chief Legal Officer, on a full-time basis to manage the Debtor's business.

*First Day Declaration*, at ¶ 29.

16.    As part of its services, J&J Services provides access to office space and other facilities for use by the Debtor.   Specifically, the Services Agreement between the Debtor and J&J Services states:

> Office Space and Access to Shared Facilities: Rental of office space and access to shared facilities for (i) the Provider employees seconded to Recipient pursuant to the Secondment Agreement, dated as of the date hereof, between Provider and Recipient, and (ii) any directors, managers, officers, employees and consultants of Recipient or its subsidiaries. Includes building, grounds and site infrastructure and all utilities and services provided to the offices, including, without limitation, electricity, telephone service and internet service, printers and facilities such as meeting rooms, cafeterias, fitness facilities and parking at the following locations:
>
> - One Johnson & Johnson Plaza, New Brunswick, NJ 08933
> - 410 George Street, New Brunswick, NJ 08933
> - 501 George Street, New Brunswick, NJ 08933

*Amended & Restated Services Agreement*, Ex. A.

17.    Royalty entered into a similar services agreement with J&J Services (collectively, the "**Services Agreements**"),[4] pursuant to which J&J Services agreed to provide certain corporate and administrative services.   *First Day Declaration*, at ¶ 20.   Accordingly, by the Debtor's own acknowledgement, whatever purported "operations" it may have are all run out of New Jersey.   This was reiterated at the October 22, 2021 hearing in which Mr. Kim was cross-examined about his First Day Declaration, during which time it became clear that the Debtor had little if any connections to North Carolina, but, rather, had significant connections to New Jersey:

      a.    For approximately twenty-one years prior to becoming the Debtor's Chief Legal Officer on October 12, 2021, Mr. Kim was employed by J&J, in New Brunswick, New Jersey.   Mr. Kim was head lawyer for product

---

[4]    These Services Agreements are attached as **Exhibit A** to the Declaration of Melanie L. Cyganowski (the "**Cyganowski Declaration**"), filed contemporaneously herewith.

liability at J&J before being seconded to the Debtor (through J&J Services). *Oct. 22 Hearing Tr.*, at 43:16–44:8, 46:16–47:6.

b.  Mr. Kim currently lives in New Jersey and has never lived in North Carolina. *Id.* at 44:12–18.

c.  The Debtor does not have an office in North Carolina, but, rather, its office address is in New Brunswick, New Jersey. *Id.* at 45:2–8*; see also Petition*, at p. 1.

d.  The Debtor's two other officers—President, Bob Wuesthoff and Chief Financial Officer, Richard Dickinson—never worked in North Carolina, but, rather, worked for J&J based in New Jersey. *Oct. 22 Hearing Tr.*, at 45:9–46:12.

e.  J&J has been based in East Brunswick, New Jersey since it was formed in 1887.  J&J was the corporate parent of Old JJCI, a company that was based in Skillman, New Jersey. *Id.* at 48:4–15, 49:25–50:2.

18.    The Debtor's only assets are (1) a bank account with $6 million cash; (2) Old JJCI's interests in the Funding Agreement with New JJCI and J&J; (3) all contracts of Old JJCI related to its talc litigation; (4) the equity interests in Royalty; (5) causes of action related to the assets and liabilities transferred to the Debtor; (6) privileges that relate to the transferred assets and liabilities; and (7) records that relate to the transferred assets and liabilities.  *First Day Declaration*, at ¶ 24.  None of these assets are geographically connected to the Debtor's chosen venue.  None of the Debtor's assets involve operation of a business in North Carolina or elsewhere.  With the Debtor's offices located in New Jersey and with no physical location whatsoever in North Carolina, all books, records and relevant contracts are presumably located in New Jersey.

**C.    The Talc MDL**

19.    Importantly, the majority of the litigation pending against the Debtor, which is precisely what brought the Debtor to file for bankruptcy, is based in New Jersey.  As of the Petition Date, the Debtor's predecessor, Old JJCI had been subjected to "approximately 38,000

ovarian cancer cases pending against the Debtor, including approximately 35,000 cases pending in a federal multi-district litigation in New Jersey, and approximately 3,300 cases in multiple state court jurisdictions across the country" *First Day Declaration*, at ¶ 42.

20.     The PSC represents the interests of approximately 35,000 plaintiffs in the MDL (the "**MDL Plaintiffs**") with direct tort claims against the Debtor, Old JJCI, J&J and others for undisclosed life-endangering health risks from use of J&J's talcum powder products.

21.     The MDL has been pending in the United States District Court for the District of New Jersey for five years.  The venue of the MDL was not accidental.  Rather, J&J and Old JJCI proposed New Jersey as the appropriate venue to consolidate and litigate the federal actions.  *See Transfer Order* ("Defendants Johnson & Johnson, Johnson & Johnson Consumer Companies, Inc., Imerys Talc America, Inc., and Personal Care Products Council propose centralization in either the District of New Jersey or the Western District of Oklahoma.").[5]  The United States Judicial Panel on Multidistrict Litigation agreed, concluding:

> [T]he District of New Jersey . . . [is an] appropriate transferee district in this litigation.  The district is a convenient and accessible forum for this nationwide litigation, and is located in close proximity to a large number of state court actions pending in New Jersey and other jurisdictions on the East Coast of the United States.

*Transfer Order*, p. 3.

22.     J&J's decision to litigate with the MDL Plaintiffs in New Jersey continued to be its preference up until very recently.  For example, in 2020, J&J sought to modify the automatic stay in the *Imerys* bankruptcy case in the United States Bankruptcy Court for the District of Delaware, so that it could defend against talc claims, including those in the MDL in New Jersey.  *See Johnson &Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 For Entry of Order Modifying Automatic Stay to Permit J&J to*

---

[5]     The Transfer Order is attached as **Exhibit B** to the Cyganowski Declaration.

*Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Protocol*, *In re Imerys Talc America, Inc.*, Case No. 19-10289-LSS (Bankr. D. Del. Mar. 20, 2020), Dkt. No. 1567 (the "***Imerys* Stay Relief Motion**").[6]

### D.    Other New Jersey Litigation

23.    While the MDL represents the most significant number of cases, there are thousands of others pending around the country, including, as of the June 23, 2021, 1,291 cases filed in New Jersey state courts.  Of that number, at least 400 of these state court plaintiffs reside in New Jersey.  There is no evidence of a significant number of cases—if any at all—pending in North Carolina.

24.    Litigation over the Debtor's insurance coverage is also pending before the New Jersey Superior Court of Middlesex County.  In May of 2019, certain of the Debtor's third-party insurers filed a lawsuit against J&J and Old JJCI seeking a declaratory judgment regarding the insurers' obligation to pay defense and indemnity costs.  *See First Day Declaration*, at ¶ 54.

### ARGUMENT

25.    The Court should exercise its discretion and transfer venue to the District of New Jersey either "in the interest of justice or for the convenience of the parties." 28 U.S.C. § 1412; Fed. R. Bankr. P. 1014(a); *see In re Dunmore Homes, Inc.* 380 B.R. 663, 670 (Bankr. S.D.N.Y. 2008) (noting that transfer under § 1412 is discretionary).[7]

26.    While the interest of justice and the parties' convenience are independent grounds for transfer, courts generally apply a number of overlapping factors to determine their

---

[6]    The *Imerys* Stay Relief Motion is attached as **Exhibit C** to the Cyganowski Declaration.

[7]    To the extent that the Debtor is successor in interest to Old JJCI, Old JJCI's status as a New Jersey corporation for much longer than the 180 days before the Debtor filed for bankruptcy should be attributed to the Debtor.  In that event, the Debtor is more properly considered as domiciled in New Jersey for 178 of the 180 days immediately prior to the Petition Date and venue in this District would be improper.

applicability to a particular case. *See, e.g.*, *In re Bestwall LLC*, 605 B.R. 43, 51–53 (Bankr. W.D.N.C. 2019) (applying multi-factor tests for each ground under § 1412). The factors are not weighted equally in each case, however, and overarching, independent concerns may justify transfer in certain cases. Critically, in considering whether to transfer venue courts have recognized "the importance of deferring to the collective wisdom of the parties with 'money on the line.'" *In re Patriot Coal Corp.*, 482 B.R. 718, 748 (Bankr. S.D.N.Y. 2012) (quoting *In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. 122, 124 (Bankr. S.D.N.Y. 2012)). Here, the interest of the PSC—the party with the most to lose in this Case—in moving this Case to New Jersey cannot be overlooked. For that reason, and because the other relevant factors support transfer to New Jersey, transfer is warranted here.

I.    **Transfer of Venue to New Jersey is Appropriate for the Convenience of the Parties**

27.    The sheer volume of the connections of the parties-in-interests to New Jersey is overwhelming. By contrast, there are virtually no connections among these parties—the Debtor included—to North Carolina. These facts militate in favor of transfer most clearly in the context of the convenience of the parties.

28.    To determine whether transfer is appropriate for the convenience of the parties, this Court and others have relied on the factors set forth in *In re Commonwealth Oil Ref. Co.*, 596 F.2d 1239, 1242 (5th Cir. 1979) ("*CORCO*"), which include:

(1) the proximity of creditors of every kind to the court;

(2) the proximity of the Debtor to the court;

(3) the proximity of the witnesses necessary to the administration of the estate;

(4) the location of the assets;

(5) the economic administration of the estate; and

(6) the necessity for ancillary administration if a liquidation should occur.

*CORCO*, 596 F.2d at 1247; *see also In re Grand Dakota Partners*, 573 B.R. 197, 201–02 (Bankr. W.D.N.C. 2017); *In re Lakota Canyon Ranch Dev., LLC*, Case No.11-03739-8, 2011 WL 5909630, at *3 (Bankr. E.D.N.C. 2011).

29.    In total, the Debtor's relationship to North Carolina is (i) its formation as an LLC in the State two days after its original formation in Texas as the divisional merger successor to Old JJCI, (ii) its ownership of membership interests in Royalty, which was itself formed as a North Carolina entity only days before the filing and which has no hard North Carolina assets of its own, and (iii) that it has a third-party registered agent in the *Eastern* District of North Carolina.  According to Mr. Kim's testimony, none of the Debtor's corporate officers live or work in the State, nor does the Debtor maintain an office in the State.  *See Oct. 22 Hearing Tr.*, at 44:12–18, 45:2–8, 45:9–46:12.  While the Debtor may point to its Bank of America account as an asset tying it to North Carolina, as the BA correctly points out, this account is the smallest of the Debtor's assets and is accessible from any jurisdiction in the United States—and virtually anywhere in the word—without any difference in the timing of funds availability.

30.    The Debtor holds a host of meaningful connections to New Jersey.  Not only does the Debtor list a New Jersey address on its Petition, but New Jersey is its nerve center.  Mr. Kim and at least one other of the Debtor's three officers work in the State.  And while the Debtor has none of its own employees, those employees seconded to the Debtor under the Services Agreement are from J&J Services, which is based in New Jersey.  Moreover, the Services Agreement also provides access to office space for the Debtor—*in New Jersey*.

31.    Even the Debtor's assets are closely connected to New Jersey.  Like the Debtor, Royalty's operations are run out of New Jersey.  More significantly, the Debtor's largest asset—

the Funding Agreement—is with J&J and JJCI, both of which are headquartered in New Jersey.
*See In re Mainline Contracting, Inc.*, 2009 WL 3785568, at *2 (Bankr. E.D.N.C. 2009)
(concluding that location of intangible personal property is situs of account debtor or party with
obligation to perform).

32.    Furthermore, other than the attorneys of Rayburn Cooper and Durham, P.A., none
of the Debtor's primary bankruptcy attorneys shown on the Court's docket are licensed in North
Carolina or maintain an office in North Carolina.  All appear before the Court via *pro hac vice*
admission.

33.    In weighing the convenience of New Jersey in this case, it is critical to consider
the "business" of this debtor, or lack thereof.  The Debtor is a shell, created solely to defend
against talc related lawsuits, to act as a shield to its parents, and to be the entity subjected to the
Bankruptcy Code.  Thus, the Debtor's "business" exists wherever the Debtor is in litigation,
which for many years has been New Jersey, its home state.

34.    Just as the Debtor is most closely connected to New Jersey, so too are its
creditors.  The PSC represents the interests of approximately 35,000 plaintiffs in the MDL that
has been pending in New Jersey for the last five years.  As the BA explains, the existence of the
MDL connects this case to New Jersey and demonstrates that transfer to New Jersey could prove
beneficial to administration of the estate.  *BA Transfer Mot.*, at pp. 10–13. (citing *In re Asset
Resolution LLC*, No. 09–16142 (AJG), 2009 WL 4505944, at *3 (Bankr. S.D.N.Y. Nov. 24,
2009)).  Indeed, not only did J&J and JJCI request New Jersey as an appropriate forum for the
MDL, but the Judicial Panel on Multidistrict litigation has already concluded that New Jersey
was "convenient and accessible" for the parties involved in the MDL—by and large the same
parties involved in this case.  Moreover, if this Case were transferred, the bankruptcy court and

the district court in New Jersey could easily coordinate issues of exclusive and concurrent jurisdiction and facilitate the claims estimation process.

35.     As noted above, the MDL is not the only litigation pending in New Jersey.  As of June 23, 2021, an additional 1,291 cases had been filed in New Jersey state courts.

36.     In view of these considerations, New Jersey is a preferable venue for the creditors.  The 35,000 creditors in the MDL, in particular, are accustomed to appearing and litigating before the District of New Jersey, where they have spent the last five years. Participating in a bankruptcy in that District would enable meaningful participation—and be far more sensible and cost effective—than doing so here, where neither these creditors nor the Debtor have any connection of consequence.

37.     Ultimately, because of these New Jersey connections by both the Debtor and a large constituency of its creditors, transferring this Case to the District of New Jersey would not simply shift the burden from one constituency to another, but would benefit all stakeholders in this Case.  *Cf. Great Am. Resources, Inc.*, 85 B.R. 444, 445–46 (Bankr. N.D. Ohio 1988) ("The statutory term 'for the convenience of the parties' under Sec. 1412 and its predecessors has been held to mean that venue decisions should not merely shift the inconvenience from one party to another.").  This overwhelming, shared connection to another district differentiates this Case from other "Texas Two Step" cases in this District, including *Bestwall,* in which the debtor owned real estate in North Carolina and had been incorporated for months in the State before the filing.  *See Bestwall*, 605 B.R. at 53 (noting that transfer to Delaware was not justified because "Delaware is no more convenient to asbestos claimants than North Carolina.").  Likewise, the District Court's familiarity with the underlying claims and the fact that this bankruptcy is still in its early stages also eliminate concerns about delay, expense, and the transferee court's "learning

curve" that were present *Bestwall*. *See id.* at 52 (noting administrative difficulties that would result from transferring the bankruptcy after it had been pending for a year in the Western District of North Carolina).

## II.     This Case Should be Transferred to New Jersey in the Interest of Justice

38.     The interests of justice standard "is a broad and flexible standard that is applied based on the facts and circumstances of each case." *In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002). This standard encompasses situations where, as here, a debtor has manufactured circumstances to create venue within a district. *See Patriot Coal*, 482 B.R. at 746.

39.     In this Case, J&J made the Debtor in the image of several other "Texas Two-Step" cases filed within the District by the same law firm as represents the Debtor, and J&J is attempting to ride those cases' coattails to unprecedented effect—and to the detriment of the bankruptcy system. *See id.* Yet, "the conduct of bankruptcy cases not only should be right but must seem right." *Id.* (quoting *Winn-Dixie Stores Inc.*, Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. Apr. 12, 2005)). Here, the goal of this case cannot seem right to any objective party.

40.     Beyond these considerations, courts also examine a variety of additional factors under the interest of justice standard, such as:

(1) whether transfer promotes the economic and efficient administration of the bankruptcy estate;

(2) whether transfer facilitates judicial economy;

(3) the parties' ability to receive a fair trial in either venue;

(4) whether either forum has an interest in deciding controversies within its jurisdictional borders;

(5) whether transfer would affect the enforceability of any judgment rendered; and

(6) whether the debtor's original choice of forum should be disturbed.

*See, e.g.*, *Brown v. Wells Fargo, NA*, 463 B.R. 332, 338 (M.D.N.C. 2011).

15

41.     Principal among these is the first, which also appears among the factors relevant to the convenience standard—the promotion of economic and efficient administration of the bankruptcy estate. *See Dunmore*, 380 B.R. at 672. This factor entails a number of considerations, including the location of potential financing, the location of a debtor's key decision-makers, and the expense of the parties. *See, e.g., id.* at 673. As explained above, each of these weighs in favor of transfer to New Jersey. To be sure, the Debtor's financing will be obtained from J&J and New JJCI, both headquartered in New Jersey; its offices are in New Jersey; its officers primarily live and work in New Jersey; its books and records appear to be in New Jersey; and both the Debtor's predecessors and its creditors have invested substantial time and resources in New Jersey in connection with the MDL and state court actions pending there.

42.     The other factor most relevant to this Case is judicial economy. The impact of a case on a court's docket is recognized as a crucial consideration. *See Armstrong World Indus., Inc. v. Congoleum Corp.*, Civil Action No. 09-3618, 2009 WL 10739028, at *6 (Bankr. E.D. Pa. Dec. 29, 2009) (noting that court congestion is a "serious" concern in considering venue transfer); *Zazzali v. 1031 Exchange Grp. (In re DBSI, Inc.)*, 478 B.R. 192, 197 (Bankr. D. Del. 2012) (considering congestion in addition to other § 1412 factors). Even a minimal benefit to the burden on a court's docket will weigh in favor of transfer to a different venue. *See OCB Rest. Co. v. Vlahakis (In re Buffets Holdings, Inc.)*, 397 B.R. 725, 729 (Bankr. D. Del. 2008). As this Court has noted, this Case—now one of several pending in this District involving mass tort liability claims—will command a great deal of time, and the Court's resources are limited. To the extent that this Case presents a strain on the Court with resulting strain on the parties, such consideration warrants transfer to another venue.

16

43.    Taken together, along with the overwhelming connection to New Jersey and limited and contrived connection to North Carolina, these factors outweigh the Debtor's venue selection, and support transfer of venue to the District of New Jersey.  *See, e.g.*, *Hermitage Inn Real Estate Holding Co.*, Case # 19-10214, 2019 WL 2536075, at \*17 (Bankr. D. Vt. June 19, 2019) (noting that where a debtor's motive for choice of forum is questionable, it "tip[s] the scales" in favor of the creditors' favored choice of venue).

### III.    Venue is Proper in New Jersey

44.    Venue in the District of New Jersey satisfies the requirements of § 1408.  Venue is proper in any district where the Debtor's principal place of business has been located for either the 180 days preceding the filing or the greater portion of that 180-day period.  *See* 28 U.S.C. § 1408(1).  "Principal place of business" is understood to refer to "the place where a corporation's officers direct, control, and coordinate the corporation's activities."  *In re DDMD Trucking, Inc.*, No. 14-12511-ta11, 2015 WL 381299, \*3 (Bankr. D.N.M. Jan. 28, 2015) (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010)).  Here, that place is New Jersey.

### <u>RESERVATION OF RIGHTS</u>

45.    The PSC reserves the right to plead and argue at a later date that the filing of the Case by the Debtor was improper and should be dismissed based on the pre-petition transactions described herein, or for any other reason that justifies dismissal.

*[The remainder of this page is intentionally left blank]*

## **CONCLUSION**

46.    For the foregoing reasons, as well as those set forth in the BA Transfer Motion, the facts and circumstances satisfy the standards under § 1412 for transfer based either on the convenience of the parties or in the interest of justice and, accordingly, the PSC respectfully requests that venue be transferred to the District of New Jersey, where venue is proper, and grant such other and further relief as the Court deems just and proper.

Dated: October 29, 2021          Respectfully submitted,
        Charlotte, NC

                                 */s/Cole Hayes*
                                 Cole Hayes (NC Bar No. 44443)
                                 601 S. Kings Drive
                                 Suite F PMB #411
                                 Charlotte, NC 28204
                                 Telephone: 704-490-4247
                                 Email: cole@colehayeslaw.com

Dated: October 29, 2021          */s/Melanie L. Cyganowski*
        New York, New York       Melanie L. Cyganowski (NY Bar No. 1769678)
                                 Adam C. Silverstein (NY Bar No. 2556538)
                                 OTTERBOURG P.C.
                                 230 Park Avenue
                                 New York, New York 10169
                                 Telephone: (212) 661-9100
                                 Facsimile: (212) 682-6104
                                 Email: mcyganowski@otterbourg.com
                                        asilverstein@otterbourg.com
                                 (Admitted *pro hac vice*)
                                 *Attorneys for the Plaintiffs' Executive Committee*