**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| LTL MANAGEMENT LLC,[1] | : | Case No. 21-30589 (JCW) |
| | : | |
| Debtor. | : | |
| | : | |
| LTL MANAGEMENT LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 21-03032 (JCW) |
| | : | |
| THOSE PARTIES LISTED ON | : | |
| APPENDIX A TO COMPLAINT | : | |
| and JOHN AND JANE DOES 1-1000, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**DEBTOR'S OMNIBUS REPLY IN SUPPORT OF (I) MOTION TO
ENFORCE THE AUTOMATIC STAY AND (II) MOTION FOR AN
ORDER (A) DECLARING THAT THE AUTOMATIC STAY
APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS OR
(B) PRELIMINARILY ENJOINING SUCH ACTIONS AND (C) GRANTING
<u>A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING</u>**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

**Page**

I. THE MESO OBJECTORS' ARGUMENTS AGAINST SUBJECT-MATTER JURISDICTION IGNORE OR CONFUSE APPLICABLE LAW ................................... 7

    A. The Court Has Both "Arising Under" and "Arising in" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and Would Have No Existence Outside of Bankruptcy ............................... 8

    B. The Court Has "Related to" Jurisdiction Over Third-Party Claims, Including Direct Claims, Against the Protected Parties ...................................... 10

II. THE DEBTOR OWES INDEMNIFICATION TO J&J, THE RETAILERS AND THE INDEMNIFIED PARTIES FOR TALC-RELATED CLAIMS .............................. 13

    A. Old JJCI Assumed All Liabilities Associated with J&J's Baby Products Division .................................................................................................................... 13

    B. Old JJCI Assumed Responsibility for Liabilities Related to Shower To Shower ...................................................................................................................... 18

    C. The Debtor Has Indemnification Obligations to the Retailers and Indemnified Parties .............................................................................................. 18

III. PROSECUTION OF DEBTOR TALC CLAIMS IS AUTOMATICALLY STAYED .................................................................................................................... 19

IV. THIS COURT HAS AUTHORITY TO ENJOIN "DIRECT" CLAIMS AGAINST NON-DEBTOR THIRD PARTIES ................................................................. 21

    A. The Debtor Shares an Identity of Interest With the Protected Parties ................ 23

    B. Permitting Debtor Talc Claims to Continue Against the Protected Parties Would Adversely Affect the Debtor's Restructuring Efforts ............................. 28

    C. The Allegations That J&J is Independently Liable For the Debtor Talc Claims Based on Post-1979 Actions Are Irrelevant and Inaccurate ................... 30

V. THE DEBTOR HAS DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF DURING ITS BANKRUPTCY CASE ........................................................ 34

    A. The Positions Taken By Old JJCI and J&J in Imerys Are Consistent With the Preliminary Injunction Sought By the Debtor ............................................... 36

    B. The Debtor Has Satisfied the "Likelihood of Success" Prong ........................... 38

    C. The Debtor and Its Reorganizational Efforts Will Be Irreparably Harmed Without a Preliminary Injunction ......................................................................... 40

    D. The Irreparable Harm That the Debtor Would Suffer Absent An Injunction Substantially Outweighs Any Prejudice to the Defendants ................................. 43

    E. The Public Interest Supports the Preliminary Injunction ..................................... 44

CONCLUSION .................................................................................................................... 46

## <u>TABLE OF AUTHORITIES</u>

**Page**

**CASES**

TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.),
  No. 17-11375, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017).........................22, 23

A.H. Robins Co., Inc. v. Piccinin,
  788 F.2d 994 (4th Cir. 1986) ...........................4, 6, 8, 10, 11, 13, 19, 20, 28, 39, 40, 41, 42, 45

Aldrich Pump LLC v. Those Parties to Actions Listed on Appendix A to
  Complaint (In re Aldrich Pump LLC),
  2021 WL 3729335 (Bankr. W.D.N.C. Aug. 23, 2021)................................................35, 39, 44

Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co., Inc.),
  86 F.3d 364 (4th Cir. 1996) .......................................................................................9

Bippus v. Norton Co.,
  437 F. Supp. 104 (E.D. Pa. 1977) .............................................................................15

Bouton v. Litton Inds., Inc.,
  423 F.2d 643 (3d. Cir. 1970)...............................................................................15, 16

Broussard v. Meineke Disc. Muffler Shops, Inc.,
  155 F.3d 331 (4th Cir. 1998) .....................................................................................33

Caesars Ent. Operating Co. Inc. v. BOKF, N.A.
  (In re Caesars Ent. Operating Co., Inc.),
  808 F.3d 1186 (7th Cir. 2015) ...................................................................................35

Carolin Corp. v. Miller,
  886 F.2d 693 (4th Cir. 1989) .....................................................................................40

Celotex Corp. v. Edwards,
  514 U.S. 300 (1995)..................................................................................................10

Chase Manhattan Bank (N.A.) v. Third Eighty-Ninth Assocs.,
  138 B.R. 144 (S.D.N.Y. 1992)..................................................................................6, 9

Chicora Life Ctr., LC v. UCF 1 Trust 1 (In re Chicora Life Ctr., LC),
  553 B.R. 61 (Bankr. D.S.C. 2016) ........................................................................35, 38

Conway v. 287 Corp. Ctr. Assocs.,
   901 A.2d 341 (N.J. 2006)....................................................................................14

Credit Alliance Corp. v. Williams,
   851 F.2d 119 (4th Cir. 1988) ..........................................................................20

DBMP LLC v. Those Parties Listed on Appendix A to Complaint
   (In re DBMP LLC),
   2021 WL 3552350 (Bankr. W.D.N.C. Aug. 11, 2021)...................................4, 8, 11, 35, 39, 44

Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.),
   619 B.R. 38 (S.D.N.Y. 2020)......................................................................22, 24, 39

Dunnam v. Sportsstuff, Inc.,
   No. 3:07CV322-HEH, 2008 WL 200287 (E.D. Va. Jan. 23, 2008) ........................................20

Edwards v. McElliotts Trucking, LLC,
   No. 3:16-1879, 2017 U.S. Dist. LEXIS 190348 (S.D.W. Va. Nov. 17, 2017) .......................20

FPSDA II, LLC v. Larin (In re FPSDA I, LLC),
   No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794 (Bankr. E.D.N.Y. Dec.
   21, 2012) ................................................................................................8, 9

Grausz v. Englander,
   321 F.3d 467 (4th Cir. 2003) ........................................................................9

Hayes v. Colgate-Palmolive Co.,
   Case No. 16-CI-03503 (Ky. Cir. Ct. Jefferson Jul. 30, 2019) .................................32

In re Am. Film Techs., Inc.,
   175 B.R. 847 (Bankr. D. Del. 1994) ..........................................................22, 23, 27

In re Bestwall LLC,
   605 B.R. 43 (Bankr. W.D.N.C. 2019)................................................................2, 44

In re Bestwall LLC,
   606 B.R. 243 (Bankr. W.D.N.C. 2019)...................................7, 8, 11, 35, 38, 43, 45

In re Booth,
   260 B.R. 281 (B.A.P. 6th Cir. 2001)..................................................................21

In re Brier Creek Corp. Ctr. Assocs. Ltd.,
   486 B.R. 681 (Bankr. E.D.N.C. 2013)................................4, 8, 9, 10, 20, 34, 35, 40

In re Caesars Entm't Operating Co., Inc.,
    561 B.R. 441 (Bankr. N.D. Ill. 2016) ......................................................................40

In re Colonial Realty Co.,
    980 F.2d 125 ...............................................................................................19, 20

In re Combustion Eng'g, Inc.,
    391 F.3d 190 (3d Cir. 2004)...............................................................................12

In re Dunes Hotel Assocs.,
    188 B.R. 162 (Bankr. D.S.C. 1995) .......................................................................2

In re Emoral Inc.,
    740 F.3d 875 (3d Cir. 2014).............................................................................31, 34

In re Gander Partners LLC,
    432 B.R 781 (Bankr. N.D. Ill. 2010) ....................................................................45

In re Garlock Sealing Techs. LLC,
    No. 10-31607, Adv. No. 10-03145 (Bankr. W.D.N.C. June 21, 2010) ...............8, 39

In re Jade Invs., LLC,
    No. 2:18-bk-50025, 2018 WL 2074459 (Bankr. S.D.W. Va. May 1, 2018) ............2

In re Monroe Well Serv., Inc.,
    67 B.R. 746 (Bankr. E.D. Pa. 1986) ....................................................................10

In re Ms. Kipps, Inc.,
    34 B.R. 91 (Bankr. S.D.N.Y. 1983).....................................................................23

In re Philadelphia Newspapers, LLC,
    407 B.R. 606 (E.D. Pa. 2009) ............................................................................28

In re Quigley Co., Inc.,
    No. 04-15739, Adv. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) .............22, 29

In re Specialty Prods. Holding Corp.,
    No. 10-11780, Adv. No. 10-51085 (Bankr. D. Del. Oct. 13, 2010) .........................8

In re SunEdison, Inc.,
    576 B.R. 453 (Bankr. S.D.N.Y. 2017)..................................................................11

In re Tronox,
    855 F.3d 84,104 (2d Cir. 2017)...........................................................................34

In re W.R. Grace & Co.,
    No. 01-01139 (JKF), 2004 WL 954772 (Bankr. D. Del. Apr. 29, 2004) ...................22, 25, 27

Kocher v. Dow Chem. Co.,
    132 F.3d 1225 (8th Cir. 1997) ...............................................................................................11

Kreisler v. Goldberg,
    478 F.3d 209 (4th Cir. 2007) .................................................................................................40

Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of Conn.
    (In re Dow Corning Corp.),
    86 F.3d 482 (6th Cir. 1996) ....................................................................................11, 13, 19

Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank
    (In re Litchfield Co. of S.C. Ltd. P'ship),
    135 B.R. 797 (W.D.N.C. 1992) ..............................................................................................38

Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc.
    (In re Lyondell Chem. Co.),
    402 B.R. 571 (Bankr. S.D.N.Y. 2009)......................................................................................9

Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC),
    No. 20-408, 2021 WL 523625 (D. Del. Feb. 11, 2021).........................................11, 21, 24, 27

McCartney v. Integra Nat'l Bank N.,
    106 F.3d 506 (3d Cir. 1997)...................................................................................................19

McKillen v. Wallace (In re Irish Bank Resol. Corp. Ltd.),
    No. 13-12159, Civ. No. 18-1797, 2019 WL 4740249 (D. Del. Sept. 27, 2019)......................35

Mine Mgmt, Inc. v. Wolfe (In re Mountain Laurel Res. Co.),
    210 F.3d 361 (4th Cir. 2000) ............................................................................................11, 13

Otero Mills, Inc. v. Sec. Bank & Tr. (In re Otero Mills, Inc.),
    25 B.R. 1018 (D.N.M. 1982) ..................................................................................................10

Pacor, Inc. v. Higgins,
    743 F.2d 984 (3d Cir. 1984)..........................................................................10, 11, 12, 13, 19

Pfizer Inc. v. Angelos (In re Quigley Co., Inc.),
    676 F.3d 45 (2d Cir. 2012)...............................................................................................29, 30

Quigley Co, Inc. v. A.C. Coleman (In re Quigley Co., Inc.),
    323 B.R. 70 (S.D.N.Y. 2005) ....................................................................12

Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC),
    321 B.R. 128 (Bankr. D. Del. 2005) .........................................................34

S.E.C. v. World-Wide Coin Invs., Ltd.,
    567 F. Supp. 724 (N.D. Ga. 1983) ...........................................................16

S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In re S.I. Acquisition, Inc.),
    817 F.2d 1142 (5th Cir. 1987) ..................................................................34

Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.),
    2000 WL 33716976 (Bankr. S.D.N.Y. Nov. 3, 2000) ...............................23

Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.),
    502 F.3d 1086 (9th Cir. 2007) ..................................................................38

St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,
    884 F.2d 688 (2d Cir. 1989)......................................................................31

State Farm Mut. Auto. Ins. Co. v. Simmons' Estate,
    417 A.2d 488 (N.J. 1980)..........................................................................14

Steyr-Diamler-Puch of Am. Corp. v. Pappas,
    852 F.2d 132 (4th Cir. 1988) ....................................................................34

Stillwell Partners, L.P. v. Seneca-Cayuga Bancorp, Inc.,
    452 F. Supp. 3d 14 (W.D.N.Y. 2020) .......................................................16

True Homes LLC v. Clayton Homes, Inc.,
    2020 WL 6528861 (W.D.N.C. Nov. 5, 2020)...........................................33

United States v. Bestfoods,
    524 U.S. 51 (1998).....................................................................................33

Vanklive v. Johnson & Johnson,
    Case No. RG20062734 (Cal. Sup. Ct. Alameda)......................................26

Vinal v. Fed. Nat'l. Mortg. Ass'n,
    131 F. Supp.3d 529 (E.D.N.C. 2015)........................................................21

W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.),
    386 B.R. 17 (Bankr. D. Del. 2008) ....................................8, 22, 23, 24, 25, 27, 28

<u>Wilford v. Armstrong World Indus., Inc.</u>,
    715 F.2d 124 (4th Cir. 1983) ................................................................................................41

<u>Winters v. George Mason Bank</u>,
    94 F.3d 130 (4th Cir. 1996) .........................................................................................20, 21

## STATUTES

11 U.S.C. §§ 105(a) and 362(a) .................................................................................................22, 29

11 U.S.C. § 524(g) ...................................................................................................................2, 4, 12, 29

28 U.S.C. § 1334(b) ........................................................................................................................7

Plaintiff LTL Management LLC, the debtor in the above-captioned chapter 11 case

(the "Debtor"), files this Omnibus Reply in further support of (a) the *Debtor' Emergency Motion*

*to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against*

*the Debtor and Its Non-Debtor Affiliates* [Dkt. 44] (the "Motion to Enforce") and (b) the

*Debtor's Motion for an Order (I) Declaring That the Automatic Stay Applies to Certain Actions*

*Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting a*

*Temporary Restraining Order Pending a Final Hearing* [Adv. Pro. Dkt. 2 ] ("PI Motion" and,

together with the Motion to Enforce, the "Motions") [1] and in response to the objections filed by

(a) certain law firms representing mesothelioma claimants (collectively, the "Meso Objectors")

[Adv. Pro. Dkt. 44] (the "Meso Obj."), (b) Alystock, Witkin, Kreis & Overholtz, PLLC

[Dkt. 249; Adv. Pro. Dkt. 45] (the "Alystock Obj.") and (c) the Plaintiffs' MDL Steering

Committee (the "MDL Committee") [Adv. Pro. Dkt. 49] (the "MDL Obj. and, collectively with

the Meso Obj. and the Alystock Obj., the "Objections").[2]

## PRELIMINARY STATEMENT

The Objections present shifting and unpersuasive challenges to the Motions that are

refuted by the record. At the hearing on the temporary restraining order (the "TRO"), the Debtor

presented evidence that the automatic stay should be extended to Johnson & Johnson ("J&J")

and other Protected Parties because (i) the Debtor had assumed all liabilities associated with the

cosmetic talc products at issue, and indemnified J&J (and the Retailers and the Indemnified

Parties) for such liabilities, (ii) the Debtor and J&J shared insurance that covers the claims at

issue, and (iii) the claims against the Debtor and J&J are the same. Thus, for any one of these

---

[1]    Capitalized terms not defined herein have the meanings given to them in the Motions.

[2]    This Omnibus Reply is also in response to the joinders filed by Onderlaw, LLC to the MDL Obj. [Adv. Pro. Dkt. 50] and the Barnes Law Group, LLC to the Meso Obj. and the MDL Obj. [Adv. Pro. Dkt. 52].

reasons, permitting talc claims to proceed against J&J and others would be tantamount to

permitting such claims against the Debtor.  At that hearing, the objectors' primary argument was

that the evidence presented was insufficient because the Debtor failed to produce a contract

establishing the Debtor's assumption of J&J's liability and, without that contract, objectors

argued, the Debtor's remaining arguments were flawed.  The Debtor thereafter searched for,

found and produced that contract (and other documents), which affirm the evidence the Debtor

presented, establishing its assumption of liabilities for cosmetic talc products and

indemnification of J&J for claims associated therewith.  With their primary objection refuted, the

objectors now shift their emphasis to a series of equally baseless arguments that are insufficient

to avoid the requested relief.

As an initial matter, while couched as objections to the Motions, each of the Objections is

in reality a disguised motion to dismiss this Chapter 11 Case that falls far short of satisfying the

stringent Fourth Circuit standard for dismissal.[3]  The record establishes that the Debtor's case has

a legitimate purpose:  confirmation of a plan of reorganization that fairly, equitably and

completely resolves tens of thousands of current and future Debtor Talc Claims that have been or

are anticipated to be filed against the Debtor.  In re Bestwall LLC, 605 B.R. 43, 49 (Bankr.

W.D.N.C. 2019) ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid

reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or

mass tort case, need not be due to insolvency.  The Committee agrees.").

---

[3]     In the Fourth Circuit, the party moving to dismiss a chapter 11 case as a bad faith filing "must prove:
(i) that the Chapter 11 case is objectively futile, *and* (ii) that the debtor filed the Chapter 11 case in
subjective bad faith."  In re Dunes Hotel Assocs., 188 B.R. 162, 168 (Bankr. D.S.C. 1995) (citing Carolin
Corp. v. Miller, 886 F.2d 693, 700 (4th Cir. 1989)).  "[T]he Fourth Circuit standard for dismissal of a
Chapter 11 case as a bad faith filing is one of the *most stringent articulated by the federal courts*."  In re
Jade Invs., LLC, No. 2:18-bk-50025, 2018 WL 2074459, at *1 (Bankr. S.D.W. Va. May 1, 2018) (quoting
Dunes Hotel Assocs., 188 B.R. at 168) (emphasis added).

At the time of the bankruptcy filing, the Debtor was besieged by talc claims premised largely on the false allegation that Johnson's Baby Powder, a staple for hundreds of millions of people for over 125 years, contained asbestos and caused cancer. As described in detail in the *Informational Brief* [Dkt. 3], these claims have no valid scientific basis. In fact, the safety of cosmetic-grade talc has been confirmed by independent experts, as well as governmental and regulatory bodies. However, a few blockbuster plaintiff verdicts in plaintiff-friendly jurisdictions have fueled a boom in talc claims, resulting in astronomical costs, with Old JJCI having incurred nearly $1 billion in defense costs on account of cosmetic talc litigation, nearly all of which has been spent in only the last five years, and over $3.5 billion in indemnity payments. *Declaration of John K. Kim in Support of First Day Pleadings* (the "Kim Declaration") [Dkt. 5] ¶40. Although the Debtor has prevailed in most claims brought, including securing unanimous defense verdicts in 6 of the 8 claims tried to verdict this year, the costs of this litigation and the intermittent extreme awards granted demonstrate that the litigation of these cases in the tort system for the next 50 years or more (as claimants seek to do) is untenable, unstainable and inequitable. Only plaintiff law firms benefit from continued litigation. The large majority of claimants, who receive nothing on account of their claims, do not. The lottery-like results of the litigation demonstrate the tort system's ineffectiveness and unfairness.

The Objections fail to dispute the central reason why a preliminary injunction is critical to the Debtor's reorganization: Without it, talc claimants will seek (and, in fact, have sought since the Court's initial ruling) to prosecute the exact same talc-related personal injury claims that are pending against the Debtor against J&J, other Non-Debtor Affiliates, the Retailers and the Indemnified Parties, and the Debtor's insurers. And, that litigation will proceed in literally tens of thousands of individual actions across the country. Such efforts "would undoubtedly

interfere with, and almost surely end, the Debtor's reorganization. With thousands of claims and proceedings spread out across the country, it would be all but impossible to negotiate or confirm a Section 524(g), or any other, plan." DBMP, 2021 WL 3552350, at *43 (Bankr. W.D.N.C. Aug. 11, 2021). That, of course, is why every court asked to enjoin such piecemeal litigation to permit a debtor to pursue a full resolution of its mass tort claims has done so. See PI Mot. at 45-46.

To allow these tens of thousands of pending tort claims to proceed outside of chapter 11 would—given the Debtor's indemnification obligations to J&J, other Non-Debtor Affiliates, and other Protected Parties—effectively lift the section 362 automatic stay of litigation against the Debtor, the real party in interest. At the same time, it would usurp this Court's ability to preside over this case and consider and approve any resolution of the claims proposed herein.[4] This unprecedented result would, contrary to Fourth Circuit precedent, defeat the purpose of this case. See A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986) ("To refuse application of the statutory stay in that case would defeat the very purpose and intent of the statute."); see also Brier Creek, 486 B.R. at 689-92.

The objectors now advance three main arguments. First, the objectors now primarily argue that this Court is powerless to enjoin claims against J&J and certain of the other Protected Parties because each of these other parties allegedly has independent and direct liability to the Defendants. But numerous courts have acknowledged that they have the power to enjoin claims against non-debtor third parties even if those claims are alleged to be direct or relate to non-debtors' independent liability, if there is any impact on the debtor's estate. This is especially the

---

[4]    See In re Brier Creek Corp. Ctr. Assocs. Ltd., 486 B.R. 681, 697 (Bankr. E.D.N.C. 2013) ("Many courts have also stayed non-debtor litigation when such litigation would impair the court's jurisdiction over the bankruptcy case or an adversary proceeding pending before the court.") (citing cases).

case where, as here, the alleged direct claims would involve litigation of the same key facts—the

same products, the same time periods and the same alleged injuries and damages—that are at

issue in the claims against the Debtor.  Every one of these alleged direct claims against J&J and

the other Protected Parties is simply an effort to collect on the very same claims at issue in this

Chapter 11 Case.

Additionally, the objectors' argument that J&J has independent liability is a shift from

how they have litigated talc cases in the tort system—until this last week after the Debtor refuted

their challenge to the Debtor's assumption of liabilities.  Previously, the plaintiffs in the

underlying litigation treated claims against J&J and Old JJCI as one and the same – as a unitary

claim.  Indeed, even out of the roughly 271 cases that have been filed since the Petition Date,

266 of those cases or 98 percent were filed against both J&J and Old JJCI and drew no

distinction in the claims asserted against them.  In the last week, certain plaintiffs have sought to

amend their pleadings to add purported independent claims against J&J, but in the end, those

claims are premised on the same question (whether Old JJCI sold defective cosmetic talc

products) and seek damages for the same harm (purported from the usage of such products).  The

objectors' new claims thus only serve to affirm the extension of the stay to J&J.

Second, the Meso Objectors now argue that this Court lacks jurisdiction to consider the

request for the preliminary injunction.  But they fail to address the law that establishes both

"arising under" and "arising in" jurisdiction over this adversary proceeding, and, in addressing

"related to" jurisdiction, they ignore that the standard requires showing only that third-party

actions conceivably could have any effect on the estate.  Here, the objectors seek to pursue the

Debtor Talc Claims in the tort system—the exact same claims the Debtor is attempting to

address through a reorganization in this case.  Pursuing what are, in reality, claims against the

Debtor outside of this Chapter 11 Case will undoubtedly affect the estate by, among other things, determining the value of the claims asserted against the Debtor.

Third, and finally, the objectors attempt to distance themselves from the contract they said was required to extend the stay to J&J and other Protected Parties. The objectors' initial position at the TRO hearing was that no assumption took place because the Debtor had been unable to locate a copy of any document memorializing the agreement referenced in the Board minutes. After the Debtor produced that contract, from 1979, objectors now resort to a tortured reading of the terms of the agreement to argue that it provides for no assumption of talc-related liabilities. But the agreement is clear that all liabilities, including talc-related liabilities, associated with the Baby Products division were assumed by Old JJCI in 1979.

The prosecution of the Debtor Talc Claims against the Protected Parties, including J&J, is automatically stayed because it would liquidate indemnification claims against the Debtor outside of chapter 11, effectively seek to collect on claims against the Debtor, deplete available insurance coverage and eliminate the protections of the automatic stay. The objectors do not challenge that actions against non-debtors are automatically stayed if the "unusual circumstances" identified in Robins are present; they instead rely on cases that simply found that in those situations the unusual circumstances did not exist. Because the Debtor is the real party in interest with respect to all the types of new claims described by the objectors, the automatic stay is applicable here.

Further, the PI Motion satisfies each of four factors that bankruptcy courts typically consider in reviewing a request to enjoin litigation against non-debtors. See PI Mot. at 6-9, 44-60. The first—likelihood of success—is satisfied because the Debtor unquestionably has the financial capacity to implement a plan of reorganization and is prepared to commence

negotiations to resolve this case.  The second—irreparable harm—is met because the very

purpose of the case would be defeated in the absence of the requested injunction.  The objectors

do not seriously dispute that the preliminary injunction is critical to the fundamental purpose of

the case—to achieve an equitable, final, and full resolution of the Debtor's talc liabilities.  The

third—the balance of harms—weighs decidedly in favor of a preliminary injunction because it

will preserve the Debtor's opportunity to pursue a successful reorganization.  At the same time,

halting the pursuit of the Debtor Talc Claims outside this Court will not materially harm the

Defendants.  Based on the historical pace of resolution of these claims, it would take decades to

resolve them in the tort system.  And, in the majority of cases, the Defendants would receive no

recovery.  In contrast, a bankruptcy trust will provide those claimants "with an efficient means

through which to equitably resolve their claims."  In re Bestwall LLC, 606 B.R. 243, 257 (Bankr.

W.D.N.C. 2019) (citing In re Federal-Mogul Glob., Inc., 684 F.3d 355, 357-62 (3d Cir. 2012)).

The fourth—public interest—also supports granting the PI Motion.  The objectors argue

that the restructuring and the protection of the Debtor afforded by the injunction serve no public

interest, even though a trust would establish a far more equitable and efficient process—both for

current and future talc claimants—than the tort system.  Not only will the requested injunction

help foster a successful chapter 11 reorganization here, which is always in the public interest (PI

Mot., at 59), it will, in stark contrast to the lottery-like results in the tort system, do so by

fostering a rational, equitable resolution of the Debtor Talc Claims.

## **ARGUMENT**

## I.   **THE MESO OBJECTORS' ARGUMENTS AGAINST SUBJECT-MATTER JURISDICTION IGNORE OR CONFUSE APPLICABLE LAW.**

This Court has "jurisdiction of all civil proceedings arising under title 11, or arising in or

related to cases under title 11." 28 U.S.C. § 1334(b).  A bankruptcy court has jurisdiction to

enjoin third-party litigation such as that at issue here under *at least* one of those three bases.

Indeed, *every* other court that has considered the grant of a preliminary injunction relating to a

debtor's mass tort liabilities has granted it.[5]  This includes cases in which the court expressly

found it had jurisdiction over such third-party claims.[6]

> ### A.    The Court Has Both "Arising Under" and "Arising in" Jurisdiction to Grant Relief that Ensures the Effectiveness of the Automatic Stay and Would Have No Existence Outside of Bankruptcy.

The Meso Objectors ignore that the Motions fall under both "arising under" and "arising

in" jurisdiction.

First, a proceeding "aris[es] under" the Bankruptcy Code if it "invokes a substantive right

created by the Bankruptcy Code."[7]  The Debtor's request for declaratory relief aims to confirm

the scope of the automatic stay, "a substantive right created by [section 362 of] the Bankruptcy

Code."  A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999-1000 (4th Cir. 1986). That should

be conclusive for the proceeding.  E.g., Brier Creek, 486 B.R. at 685 ("arising under" jurisdiction

existed over motion in which debtor sought declaratory relief or, in the alternative, a section

---

[5]    See, e.g., Bestwall, 606 B.R. at 254 ("Injunctions of the type requested by the Debtor have previously and uniformly been issued in numerous [] asbestos-related cases") (enjoining asbestos-related actions against non-debtor affiliates, and collecting cases); see also PI Mot., at 46.

[6]    See, e.g., DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP LLC), 2021 WL 3552350, at *18-21 (Bankr. W.D.N.C. Aug. 11, 2021) (rejecting challenges to the court's subject-matter jurisdiction and enjoining asbestos-related claims against non-debtor affiliates); Bestwall, 606 B.R. at 249 (same); In re Specialty Prods. Holding Corp., No. 10-11780, Adv. No. 10-51085, at 2 [Adv. Pro. Dkt. 72] (Bankr. D. Del. Oct. 13, 2010) (the bankruptcy court had jurisdiction to rule on the debtors' motion to clarify the scope of the injunction); W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.), 386 B.R. 17, 28-30 (Bankr. D. Del. 2008) (rejecting challenges to the court's subject-matter jurisdiction and extending the automatic stay to enjoin third party actions); see also In re Garlock Sealing Techs. LLC, No. 10-31607, Adv. No. 10-03145, at 6 [Adv. Pro. Dkt. 14] (Bankr. W.D.N.C. June 21, 2010) (after debtor addressed jurisdiction, finding jurisdiction and granting a preliminary injunction).

[7]    FPSDA II, LLC v. Larin (In re FPSDA I, LLC), No. 10-75439, Adv. No. 12-08032, 2012 WL 6681794, at *4 (Bankr. E.D.N.Y. Dec. 21, 2012), as corrected (Dec. 26, 2012) ("A case 'arising under' the Bankruptcy Code is one that 'invokes a substantive right' created by the Bankruptcy Code.") (citing Atamian v. U.S. Dept. of Educ. (In re Atamian), 368 B.R. 375, 379 (Bankr. D. Del. 2007)), aff'd, No. ADV A-06-50435, 2008 WL 853462 (D. Del. Mar. 31, 2008), aff'd, 300 F. App'x 175 (3d Cir. 2008)).

105(a) injunction, "in that it specifically requested an order confirming that the stay under

§ 362(a)(1) applies to" the third-party action against non-debtor guarantor).

The Court also has "arising under" jurisdiction because the Debtor's request for the

section 105(a) injunction is necessary to guarantee the integrity of the automatic stay (if it does

not apply by its own force).  The Debtor Talc Claims against the Protected Parties "are really

claims against the debtor and therefore impair the automatic stay."  Chase Manhattan Bank

(N.A.) v. Third Eighty-Ninth Assocs., 138 B.R. 144, 147 (S.D.N.Y. 1992).  Given this close link

between the injunction sought and the substantive right in the automatic stay, "common sense

indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the

applicability of the automatic stay," as it plainly does, "then it has jurisdiction over a related

motion for preliminary injunctive relief," in the same proceeding.[8]

Second, and independently, the Court also has "arising in" jurisdiction because the

Debtor's request for injunctive relief under section 105(a) is unique to bankruptcy.  A proceeding

"arises in" a bankruptcy case when it "would have no existence outside of the bankruptcy."[9] And

a claim for such an injunction, tied to and lasting only during a bankruptcy case, "*arises only in*

bankruptcy cases in that such an injunction would have no existence outside of bankruptcy.  The

debtor[] would not be entitled to a § 105 injunction *but for the existence of [its] bankruptcy*

*case[]*."[10]  At least three courts, in three circuits, across several decades, have recognized this

logic.[11]  The Meso Objectors fail to mention these cases or identify any contrary authority.

---

[8]     FPSDA I, LLC, 2012 WL 6681794, at *5 (quoted in Brier Creek, 486 B.R. at 685) (finding "related to" and "arising under" jurisdiction).

[9]     Bergstrom v. Dalkon Shield Claimants Tr. (In re A.H. Robins Co., Inc.), 86 F.3d 364, 372 (4th Cir. 1996); accord Grausz v. Englander, 321 F.3d 467, 471 (4th Cir. 2003).

[10]    Brier Creek, 486 B.R. at 685 (emphases added).

[11]    See id. (finding "arising in" jurisdiction over a request for a section 105(a) injunction of third party action against non-debtor); Lyondell Chem. Co. v. CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.),

### B.    The Court Has "Related to" Jurisdiction Over Third-Party Claims, Including Direct Claims, Against the Protected Parties.

The Court "at a minimum, [has] 'related to' jurisdiction."[12]  The bar for "related to" jurisdiction is intentionally low.  The Court has "related to" jurisdiction over third-party claims against non-debtors when "the outcome of that proceeding could *conceivably* have *any effect* on the estate being administered in bankruptcy."[13]  Under this standard, jurisdiction is straightforward.

Litigation of the Debtor Talc Claims against the Protected Parties outside of this Court would *at least* "conceivably have [an] effect" on the Debtor's estate and reorganization.  As the evidence will show, those claims are the *exact same claims* the Debtor seeks to resolve through reorganization in bankruptcy.  As explained in the PI Motion, in accordance with Texas law, any liability associated with those claims is the responsibility of the Debtor.  Moreover, the Debtor has indemnification obligations to J&J, the Retailers and the Indemnified Parties.  And, the Debtor shares insurance coverage with J&J and the Retailers, who are named as insureds under many of the policies.[14]  Any party pursuing the Debtor Talc Claims against another entity is

---

402 B.R. 571, 586 (Bankr. S.D.N.Y. 2009) (same; also finding "arising under" jurisdiction); In re Monroe Well Serv., Inc., 67 B.R. 746, 753, 753 n.9 (Bankr. E.D. Pa. 1986) (same; favorably cited in Celotex Corp. v. Edwards, 514 U.S. 300, 311 n.8 (1995)).

[12]    Brier Creek, 486 B.R. at 686; accord Celotex, 514 U.S. at 309-311, 311 n.8 (§ 105(a) injunction issued to augment automatic stay was "at least a question 'related to' Celotex's bankruptcy").

[13]    Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984); see Robins, 788 F.2d at 1002, 1002 n.11 (adopting Pacor test); Otero Mills, Inc. v. Sec. Bank & Tr. (In re Otero Mills, Inc.), 25 B.R. 1018, 1020 (D.N.M. 1982) ("[28 U.S.C. § 1334], combined with § 105(a), grants the bankruptcy court power to enjoin parties from proceeding in state court against non-bankrupts where the state proceeding is related to a case arising under Title 11.") (cited in Robins, 788 F.2d at 1002-03).

[14]    All of the pre-1986 occurrence-based insurance policies provide insurance shared by the Debtor and J&J. Kim Decl. ¶¶ 46-54.  In addition, as the evidence will show, the Retailers are identified as insureds in many of the pre-1986 insurance policies.  The relevant provisions generally provide coverage to vendors with respect to bodily injury arising out of the distribution or sale in the regular course of the vendor's business of the named insured's products, subject to certain exclusions.  The only relevant exclusion is where the vendor is alleged to repackage J&J or Old JJCI's products, or where the vendor made a physical or chemical change to the product.

seeking to establish through third-party litigation a claim against the Debtor.  Third-party

litigation involving these claims could at least "conceivably" affect the Debtor's estate (and, in

fact, would materially and adversely impact this case).  See, e.g., Bestwall, 606 B.R. at 249-51

(confirming court's jurisdiction over third party claims that assert the same liabilities as the

debtor sought to reorganize in bankruptcy); DBMP LLC, 2021 WL 3552350, at **18-19; PI

Mot., at 20-21, 25-27.

The Meso Objectors assert that the Court lacks jurisdiction to enjoin direct claims

"against non-debtors for the non-debtor's independent tort liability."  Meso Obj. at 16.  But

"courts have made clear that this standard [for "related to" jurisdiction] applies whether any

claims against a third party are alleged to be 'direct' or 'derivative.'"  Bestwall, 606 B.R. at 249

(citing Pfizer Inc. v. Angelos (In re Quigley Co., Inc.), 676 F.3d 45, 56-57 (2d Cir. 2012)).[15]  A

proceeding "need not necessarily be against the debtor or against the debtor's property" to confer

jurisdiction.  Pacor, 743 F.2d at 994.  Rather, "[a]n action is related to bankruptcy if the outcome

could alter the debtor's rights, liabilities, options, or freedom of action (either positively or

negatively) and which *in any way impacts upon the handling and administration of the bankrupt*

*estate*."[16]

---

[15]    See In re SunEdison, Inc., 576 B.R. 453, 462 (Bankr. S.D.N.Y. 2017) ("Where a third party claim may give
rise to a potential indemnification or contribution claim against the estate, the third party claim will have a
conceivable effect on the estate, and accordingly, the [c]ourt has the jurisdiction to enjoin it.");
Mallinckrodt PLC v. Conn. (In re Mallinckrodt PLC), No. 20-408, 2021 WL 523625, at *2 (D. Del. Feb.
11, 2021) (holding that even if non-debtors had independent liability the court had "related to" jurisdiction
to issue preliminary injunction enjoining claims against them).

[16]    Robins, 788 F.2d at 994; see also Lindsey v. O'Brien, Tanski, Tanzer and Young Health Care Providers of
Conn. (In re Dow Corning Corp.), 86 F.3d 482, 491 (6th Cir. 1996), as amended on denial of reh'g and reh'g
en banc (June 3, 1996) ("Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may
impact on 'the debtor's rights, liabilities, options, or freedom of action' or the 'handling and administration
of the bankrupt estate.'"); Kocher v. Dow Chem. Co., 132 F.3d 1225, 1231 (8th Cir. 1997) (holding that the
district court had "related to" jurisdiction over plaintiff's product liability claims against debtor's non-debtor
co-defendants because the co-defendants had potential indemnification claims against the debtor and
therefore "it is at least arguable that [the plaintiff's] claims against [the co-defendants] conceivably could
affect [the debtor's] bankruptcy estate"); see also Mine Mgmt., Inc. v. Wolfe (In re Mountain Laurel Res.
Co.), 210 F.3d 361 (4th Cir. 2000) ("A.H. Robins makes clear that a bankruptcy court has the authority under

The Meso Objectors' reliance on In re Combustion Eng'g, Inc., 391 F.3d 190 (3d Cir.

2004), is misplaced.  That case addressed whether certain non-debtors were entitled to a

*permanent channeling* injunction under section 524(g), not a *preliminary* injunction under

section 105(a).  See Quigley Co, Inc. v. A.C. Coleman (In re Quigley Co., Inc.), 323 B.R. 70, 78

(S.D.N.Y. 2005) (concluding that Combustion Engineering was not a basis to prevent court from

preliminarily enjoining direct claims against the debtor's non-debtor parent company).

Furthermore, Combustion Engineering is easily distinguishable from the circumstances here.

The injunction in that case sought to enjoin direct claims against third parties that were not

related to the claims against the debtor.  Those claims related to "different products, involv[ing]

different asbestos-containing materials, [that] were sold to different markets."  Combustion

Eng'g, 391 F.3d at 231.  In contrast, the claims against J&J are the exact same claims asserted

against the Debtor; they involve the *same* products, almost always Johnson's Baby Powder, the

*same* time periods and the *same* alleged injuries.  In fact, they are virtually always asserted

against both J&J and the Debtor.  *Supplemental Declaration of John K. Kim in Support of*

*Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions*

(the "Supplemental Kim Declaration") [Adv. Pro. Dkt. 3] ¶ 6.

Finally, the Meso Objectors invoke Pacor, Inc. v. Higgins to argue that only "absolute

entitlement" to indemnification can create "related to" jurisdiction; thus, the Debtor's statutory

and common law indemnification obligations do not create jurisdiction here.  Meso Obj. at 27.

But courts have since rejected that requirement.  Instead, and again, any proceeding that

"possibl[y] … may impact on 'the debtor's rights, liabilities, options, or freedom of action' or the

---

§ 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate.").

'handling and administration of the bankrupt estate'" creates jurisdiction.[17]  The Debtor's

non-contractual indemnification obligations do just that.[18]

## II.    THE DEBTOR OWES INDEMNIFICATION TO J&J, THE RETAILERS AND THE INDEMNIFIED PARTIES FOR TALC-RELATED CLAIMS.

### A.    Old JJCI Assumed All Liabilities Associated with J&J's Baby Products Division.

As discussed in the Kim Declaration and the Supplemental Kim Declaration, in 1979 Old

JJCI assumed all liabilities associated with J&J's Baby Products division.  At the TRO hearing in

this case, the objectors disputed that this occurred because the Debtor at that time had been

unable to locate a copy of the 1979 agreement.  A copy of the Agreement for Transfer of Assets

and Bill of Sale between J&J and J&J Baby Products (which became Old JJCI), effective as of

January 1, 1979 (the "1979 Agreement") has since been found and provided.  It confirms that the

Debtor's statements about the 1979 transaction, which were supported by Board minutes, are

accurate.

Notwithstanding the agreement's plain terms, the MDL Committee and the Meso

Objectors dispute that the 1979 Agreement provides for any assumption of talc-related liabilities.

MDL Obj. ¶34; Meso Obj. ¶ 29.  They argue, without any case law support, that contingent talc-

related liabilities related to J&J's sale of talc-containing products could not have been assumed

---

[17]    See, e.g., In re Dow Corning Corp., 86 F.3d at 491 ("It has become clear following Pacor that 'automatic' liability is not necessarily a prerequisite for a finding of 'related to' jurisdiction.") (citing In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991)).

[18]    And such conclusion is consistent with other courts that have found "related to" jurisdiction based, at least in part, on a third party's non-contractual right to indemnification by the debtor.  See, e.g., In re Dow Corning, 86 F.3d at 494 (unfiled and contingent indemnification claims against the debtor arising from third-party litigation against non-debtors "unquestionably could ripen into fixed claims," which "suffices to establish a conceivable impact on the estate"); Mine Mgmt., Inc. v. Wolfe (In re Mountain Laurel Res. Co.), No. 99-1876, 2000 WL 341913, 210 F.3d 361, *6 (4th Cir. 2000) (Table) ("Robins makes clear that a bankruptcy court has the authority under § 105(a) to enjoin suits against a third-party where the third-party could seek indemnification from the estate or where a judgment against the third-party may raise issues of collateral estoppel with respect to suits against the estate.").

by Old JJCI under the 1979 Agreement because they purportedly were not on the "books or records" of J&J at the time. Id. But the objectors ignore the relevant circumstances, the broad terms of the 1979 Agreement, and the parties' course of performance under the agreement.

At the time of the 1979 Agreement, J&J was implementing a program to transfer all assets and liabilities of seven principal operating divisions into separate wholly-owned subsidiaries. [19]  See 12/12/78 Board Minutes, at 6 (discussing "the incorporation of seven principal operating divisions of [J&J] effective January 1, 1979 as wholly-owned subsidiaries" including J&J Baby Products, which "will be accomplished by a transfer of assets from the divisions to the corporations respectively which will also assume the liabilities of the divisions respectively"). Supp. Kim Decl., Annex A. This program was implemented "in light of substantial potential state-tax savings, as well as additional legal considerations" and was "[i]n-keeping with [J&J's] long-standing policy of decentralization of corporate business." Id. Thus, the clear intent of the program was to allocate all assets and liabilities of each applicable operating division among separate, wholly-owned subsidiaries to realize the expected benefits. And the intent and purpose of the 1979 Agreement was to effectuate a portion of that program by assigning to J&J Baby Products the specific assets and liabilities relating to the Baby Products

---

[19]     New Jersey law governs the 1979 Agreement since it does not have a governing law provision. See also State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 417 A.2d 488, 492-93 (N.J. 1980) (holding that the law of the place of the contract ordinarily governs unless another place has a more significant relationship). Under New Jersey's liberal interpretation of the parol evidence rule, "'evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement.'" Conway v. 287 Corp. Ctr. Assocs., 901 A.2d 341, 347 (N.J. 2006) (quoting Atl. N. Airlines v. Schwimmer, 96 A.2d 652 (N.J. 1953)). "This is so even when the contract on its face is free from ambiguity." Id. New Jersey courts thus "allow a thorough examination of extrinsic evidence in the interpretation of contracts." Id. "Such evidence may 'include consideration of the particular contractual provision, an overview of all the terms, the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct.'" Id. (quoting Kearny PBA Local # 21 v. Town of Kearny, 81 N.J. 208, 221, 405 A.2d 393 (1979)).

division, as opposed to those assets and liabilities of other operating divisions that were transferred to other subsidiaries, all on a division-by-division basis.

The 1979 Agreement assigns to J&J Baby Products "all the businesses, franchises, properties and assets of every nature and description, tangible and intangible, wherever located, which are now allocated on the books or records of J&J to its BABY Division." 1979 Agreement, 3. Likewise, J&J Baby Products agreed to assume and pay, perform or discharge "all the indebtedness, liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to its BABY Division" and to indemnify J&J and its officers, directors and stockholders against all such indebtedness, liabilities and obligations. Id. at 5. The broad range of assumed liabilities thus complemented and mirrored the transferred assets to effect an orderly separation of the relevant divisions.

Courts that have considered similar broad language have found it to be inclusive of contingent product liability claims without any specific reference to the assumption of such claims. In Bippus v. Norton Co., 437 F. Supp. 104 (E.D. Pa. 1977), for example, the court held that a purchaser's agreement to "assume and agree to pay, perform and discharge all liabilities and obligations reflected on the Balance Sheet" as of a specified date included products liability claims relating to the purchased pneumatic tool business even in the absence of any specific reference to them on the balance sheet because the drafters "used broad categories, not narrow specifies, so the absence of a reference to products liability is . . . insignificant." Id. at 107. Similarly, in Bouton v. Litton Inds., Inc., 423 F.2d 643 (3d. Cir. 1970), the Third Circuit held that an asset purchaser's assumption of all liabilities as of a specified date "whether accrued, absolute, contingent, or otherwise, to the extent, and only to the extent, that the same are reflected or reserved against in the financial statements as supplemented" included certain future

-15-

product liability claims not enumerated.  Id. at 652.  The absence of any specific reference to the claims was "not significant" because the agreement "referred to broad categories of liabilities, not to narrow specifics."  Id.

In addition, the term "books and records" is broadly construed to extend far beyond balance sheets or financial statements.  In the context of interpreting shareholder access provisions (i.e., provisions pursuant to which a shareholder seeks to inspect a corporations' books and records), for example, courts have confirmed the expansive reach of the phrase "books and records" and similar phrases.  See, e.g., S.E.C. v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 749 (N.D. Ga. 1983) (holding that "virtually any tangible embodiment of information made or kept by an issuer" is within scope of "books and records" provision of Foreign Corrupt Practices Act).  Similarly, pursuant to the Model Business Corporation Act, the narrower term "records and books of account" is "the subject of a broad and liberal construction so as to extend to all records, contracts, papers and correspondence . . . ."  Stillwell Partners, L.P. v. Seneca-Cayuga Bancorp, Inc., 452 F. Supp. 3d 14, 20-21 (W.D.N.Y. 2020) (quoting Meyer v. Ford Indus., Inc., 272 Or. 531, 538 (1975)).  The phrase extends to "'all material corporate documents,' and is not limited to accounting or financial records." Id. (quoting 5A Fletcher Cyclopedia of Private Corporations § 2214 (Apr. 2020)).

Finally, the parties course of performance under the 1979 Agreement further evidences that Old JJCI assumed J&J's talc liabilities under the agreement.  In fact, all talc-related costs not otherwise covered by insurance have been charged to Old JJCI since the 1979 Agreement. *Declaration of Adam Lisman* (the "Lisman Declaration") [Adv. Pro. Dkt. 51-A] ¶¶ 8-9.

1. **Old JJCI and J&J's Subsequent Actions Are Consistent With the 1979 Agreement.**

The Meso Objectors argue that J&J and Old JJCI have "repeatedly" taken positions in litigation that are contrary to the assumption of the talc-related liabilities by Old JJCI in 1979. Meso Obj. at 10-11. That is not true, and the evidence offered in support of the argument is misleading.

For example, at the TRO hearing in this matter, counsel for the Meso Objectors cited extensively to arguments asserted by counsel for J&J and Old JJCI in the Etheridge matter as supposed evidence of an inconsistent or changing position on these issues, but failed to give crucial context for the portions of the arguments that were highlighted. In the Etheridge case, the plaintiff named only J&J as a defendant, presumably because the plaintiff alleged exposures to Johnson's Baby Powder only for the limited period of 1960-1963, when J&J manufactured the product and Old JJCI did not yet exist. See 3/1/2017 Complaint. The plaintiff never amended the complaint to name Old JJCI but nevertheless sought to add Old JJCI to the verdict form at the conclusion of trial. Because the unamended complaint named only J&J and the only evidence offered of alleged use all predated the formation of Old JJCI, Old JJCI objected to being added to the verdict form. See 8/27/2019 Memorandum of Law in Opposition to Plaintiffs' Brief That Defendant Johnson & Johnson Consumer Inc. Is Proper Party. Nevertheless, Old JJCI offered to substitute in for J&J as the sole defendant on the verdict form, but the plaintiff refused the offer.

In addition, the fact that some past verdict forms assigned liability separately to J&J and Old JJCI is irrelevant. As the evidence will show, J&J and Old JJCI sometimes have been named separately and sometimes together on verdict forms, and plaintiffs have rarely, if ever, submitted any evidence to support any particular allocation between J&J and Old JJCI. In all cases, however, all talc-related costs have been charged to Old JJCI. Lisman Decl. ¶ 8. Finally,

the fact that J&J has stated that it and Old JJCI are "financially independent of each other" simply acknowledges that the entities are treated as separate legal entities with their own assets and liabilities.  It is entirely consistent with the recognition that Old JJCI owed indemnity to J&J.

**B.    Old JJCI Assumed Responsibility for Liabilities Related to Shower To Shower.**

The MDL Committee and the Meso Objectors both argue that liabilities associated with Shower to Shower were not assumed by Old JJCI because that product was not part of the Baby Product division in 1979.  MDL Obj. ¶12; Meso Obj. ¶ 52.  But, as the evidence will show, Personal Products Company assumed those liabilities from J&J in 1978 when it became responsible for Shower to Shower.  As explained in the Kim Declaration, Personal Products Company ultimately became Old JJCI.  Kim Decl ¶¶ 11, 14.  Old JJCI's assumption of those liabilities was part of J&J's efforts to decentralize its operations in the 1970s, and is confirmed by the fact that all talc-related costs have always been charged to Old JJCI irrespective of the talc product that was the subject of the litigation.  Lisman Dec. ¶¶ 8-9.

**C.    The Debtor Has Indemnification Obligations to the Retailers and Indemnified Parties.**

The Debtor has contractual, common law and statutory indemnification obligations to the Retailers and the Indemnified Parties.  PI Mot. at 51.  The MDL Committee insists that the Debtor must "demonstrate[] that each affiliated entity has an indemnity agreement with the Debtor (or Old JJCI)".  MDL Obj. ¶ 41.  But this ignores that the Debtor has produced many such agreements and also has common-law indemnification obligations to the Retailers.  For their part, the Meso Objectors argue that it is "fatal" to the Debtor's requested relief that some of the indemnification agreements with the Retailers have conditions that purportedly do not provide for "absolute entitlement to indemnity" by the Debtor.  But, as discussed above, there is no requirement that there be "automatic" liability in respect of indemnification obligations.  See,

e.g., In re Dow Corning Corp., 86 F.3d at 491 ("It has become clear following Pacor that

'automatic' liability is not necessarily a prerequisite for a finding of 'related to' jurisdiction.")

(citation omitted).

## III.    PROSECUTION OF DEBTOR TALC CLAIMS IS AUTOMATICALLY STAYED.

The Court should overrule the Objections because the automatic stay bars actions to assert

Debtor Talc Claims against the Protected Parties.

First, as detailed in the Motions, pursuit of any Debtor Talc Claim against J&J, the

Retailers or an Indemnified Party is stayed by section 362(a)(1) because, as a result of the

Debtor's indemnity obligation and shared insurance coverage, such pursuit constitutes an action

against the Debtor, which is "the real party defendant" in the action.  A.H. Robins Co. v.

Piccinin, 788 F.2d 994, 999-1000 (4th Cir. 1986); McCartney v. Integra Nat'l Bank N., 106 F.3d

506, 510-11 (3d Cir. 1997) (action against non-debtor stayed under section 362(a)(1) where

debtor "was, in essence, the real party in interest").  The indemnity obligation ensures that any

judgment on or settlement of the Debtor Talc Claims would liquidate the indemnification claim

against the Debtor *for the same liability*.  In addition, because the Debtor's insurance coverage

also covers talc claims against J&J and the Retailers, a judgment on or settlement of the Debtor

Talc Claims would deplete available insurance coverage.  "To refuse application of the statutory

stay in that case would defeat the very purpose and intent of the statute."  Robins, 788 F.2d at

999; see Mot. to Enforce at 15; PI Mot. at 24-25.  In addition, because all of J&J's liabilities

associated with Johnson's Baby Powder and other talc-containing products were transferred to

Old JJCI long ago, and are now liabilities of the Debtor, pursuit of the Debtor Talc Claims

against J&J is an effort to "recover claims against the debtor" that is stayed under

section 362(a)(1).  In re Colonial Realty Co., 980 F.2d 125, 131-32 (2d Cir. 1992 (actions "to

recover a claim against the debtor" as provided in section 362(a)(1) "must encompass cases in

which the debtor is not a defendant; it would otherwise be totally duplicative of the former

category and pure surplusage").

The Meso Objectors argue that <u>Colonial Realty</u> is inapplicable here because "the claims

against J&J are independent of any claims against the estate." Meso Obj. at 28. The MDL

Committee asserts a similar argument. MDL Obj. at 13-14. But when a debtor indemnifies

another defendant for liability, section 362(a)(1) applies precisely because the action is deemed

to be one against that debtor. See <u>Dunnam v. Sportsstuff, Inc.</u>, No. 3:07CV322-HEH, 2008 WL

200287, *3 (E.D. Va. Jan. 23, 2008) (stay applied to action against non-debtor where, because

debtor indemnified non-debtor, proceeding against non-debtor "would unavoidably become a de

facto proceeding against [the debtor] and would frustrate the purposes'' of section 362(a)(1));

<u>Edwards v. McElliotts Trucking, LLC</u>, No. 3:16-1879, 2017 U.S. Dist. LEXIS 190348, at *7-*9

(S.D.W. Va. Nov. 17, 2017) (stay applied to action against non-debtor indemnified by debtor).

Second, the cases cited by the objectors do not question the validity of extending the stay

to non-debtors due to the "unusual circumstances" identified in <u>Robins</u>; instead, the courts found

that the <u>Robins</u> circumstances were not present.[20] An extension of the stay under

section 362(a)(1) is warranted here because prosecution of the Debtor Talc Claims would

liquidate indemnification claims against the Debtor outside of chapter 11, deplete available

insurance coverage and eviscerate the protections of the automatic stay.

Third, the MDL Committee concedes that actions against the Debtor's insurers could be

stayed under section 362(a)(3) but argues that because the insurers dispute coverage the stay

does not apply. MDL Obj. at 20-21. The Debtor's rights to insurance coverage, however, are

---

[20]     <u>Cf</u>. <u>Brier Creek</u>, 486 B.R. at 689-93 (distinguishing both <u>Credit Alliance Corp. v. Williams</u>, 851 F.2d 119
(4th Cir. 1988), and <u>Winters v. George Mason Bank</u>, 94 F.3d 130 (4th Cir. 1996) to find that guarantor
arbitration would significantly impact the debtors and their bankruptcy estates, and have the potential to
derail the reorganization efforts of the debtors).

indisputably property of the estate that are protected by the automatic stay.  See In re Booth, 260 B.R. 281, 285-86 (B.A.P. 6th Cir. 2001) ("Courts have, across a wide variety of circumstances, almost uniformly adhered to the view that contingent interests are property of the estate"); Vinal v. Fed. Nat'l. Mortg. Ass'n, 131 F. Supp.3d 529, 537 (E.D.N.C. 2015) ("Contingent and unliquidated claims are considered property of the estate…").[21]  There is simply no basis in law, and the objectors cite none, for the MDL Committee's position that insurance rights potentially worth almost $2 billion are not entitled to the protection of the automatic stay or a preliminary injunction because the insurers (as has been the case in many other mass tort cases) are contesting coverage.

## IV.     THIS COURT HAS AUTHORITY TO ENJOIN "DIRECT" CLAIMS AGAINST NON-DEBTOR THIRD PARTIES.

The objectors each argue that this Court is unable to enjoin claims against the Protected Parties that are "direct" claims or based on alleged "independent liability."  See, e.g., MDL Obj. at 13-17; Meso Obj. at 27-30.  It is well-settled, however, that section 105(a) of the Bankruptcy Code may be used to enjoin claims against non-debtor third parties, even if they are based on the non-debtor parties' own conduct, if pursuit of such claims would adversely impact the debtor's estate or impair the debtor's reorganization.  See, e.g., Mallinckrodt, 2021 WL 523625, at *2-5 (D. Del. Feb. 11, 2021) (denying motion for leave to appeal preliminary injunction enjoining actions asserting liability based on non-debtors' own conduct because non-debtors were entitled

---

[21]     The four exhibits referenced by the Meso Objectors do not establish that "any potential coverage is speculative and demonstrably uncertain."  Meso Obj. ¶ 61.  The first exhibit, which is cited for the proposition that J&J has taken the position that it is "self-insured," is a statement in a single interrogatory response from the first mesothelioma case against J&J that went to trial.  The response specifically states that J&J is self-insured solely for that individual claim, which was the case before the Middlesex policies were exhausted.  The three remaining exhibits are cited for the proposition that J&J has asserted that "tort claims are unlikely to implicate its insurance policies."  Id.  These interrogatory responses, which are each responses in the context of individual claims, simply state that disclosure of insurance information is only implicated where such documents would bear on J&J's ability to satisfy a judgment.  They do not support a conclusion that talc claims are not covered by insurance.

to contractual indemnity from debtor); <u>Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.)</u>, 619 B.R. 38 (S.D.N.Y. 2020) (affirming bankruptcy court's issuance of preliminary injunction to halt pending state and private actions against debtors and certain non-debtors, including former or current owners, directors, officers and other associated entities and including claims that were allegedly independent or not derivative of the debtors); *Order Pursuant to 11 U.S.C. § 105 Granting in Part and Denying in Part Debtor's Mot. for a Prelim. Inj.*, <u>TK Holdings Inc. v. State of Hawai'i (In re TK Holdings Inc.)</u>, No. 17-11375, Adv. Pro. No. 17-50880 (Bankr. D. Del. Aug. 22, 2017) [Dkt. 63] (enjoining state and private actions against non-debtors for 90-days, subject to further extensions, notwithstanding arguments that claims against non-debtors were direct claims); <u>W.R. Grace & Co. v. Chakarian (In re W.R. Grace & Co.)</u> ("<u>Chakarian</u>"), 386 B.R. 17, 34 (Bankr D. Del. 2008) (staying actions against non-debtor railroad asserting liability based on railroad's transportation of asbestos-containing material from debtors' mining operations because, among other things, the possibility of collateral estoppel and "record taint" in such actions would compel the debtors' participation and impair the reorganization effort).[22]

The Protected Parties, including J&J, the Retailers and the Indemnified Parties, share such an identity of interest with the Debtor that continued prosecution of the Debtor Talc Claims against the Protected Parties, even if such claims are allegedly for the Protected Parties'

---

[22] <u>See also</u> *Inj. Pursuant to §§ 105(a) and 362(a) and Fed. Rule of Bankruptcy Procedure 7065*, <u>In re Quigley Co., Inc.</u>, No. 04-15739, Adv. No. 04-04262 (Bankr. S.D.N.Y. Dec. 17, 2004) [Dkt. 122] (the "<u>Quigley PI Order</u>") (enjoining the continuation of any and all asbestos lawsuits against the parent corporation of the debtor); <u>In re W.R. Grace & Co.</u>, No. 01-01139 (JKF), 2004 WL 954772, at *4 (Bankr. D. Del. Apr. 29, 2004) (applying automatic stay to litigation between two non-debtor parties where one of the parties was the current owner of property previously owned by the debtor but was entitled to contractual indemnity from the debtor on account of claims with respect to that property); <u>In re Am. Film Techs., Inc.</u>, 175 B.R. 847, 853 (Bankr. D. Del. 1994) (rejecting the argument that third-party suits should be permitted to proceed where the non-debtor's alleged liability "rests upon his own breach of duty" because the existence of a contract imputing the liability of the non-debtor parties to the debtors created an important distinction, rendering inapplicable cases that declined to enjoin suits against the non-debtor).

independent conduct (which they are not), would involve litigation of the same key facts—the

same products, the same time periods and the same alleged injuries—related to the talc liabilities

of Old JJCI, and would effectively seek to resolve the very same claims at issue in this

Chapter 11 Case.

**A.      The Debtor Shares an Identity of Interest With the Protected Parties.**

There is an identity of interest between a non-debtor and a debtor when the debtor's

conduct or product is "at the core of the issues raised" in actions against the non-debtor.  <u>See</u>

<u>Chakarian</u>, 386 B.R. at 30-31.[23]  The Debtor Talc Claims seek to recover on alleged liabilities for

which the Debtor is responsible as a result of the 2021 Corporate Restructuring.  They are all

based on the same talc-containing products, including primarily Johnson's Baby Powder.  This

case is thus comparable to <u>Chakarian</u>, where the debtor's alleged conduct predominated the

claims against the non-debtors and the court found it appropriate to enjoin such claims based on

an identity of interest.

In <u>Chakarian</u>, the debtors sought to expand the preliminary injunction to include actions

against Burlington Northern and Santa Fe Railroad ("<u>BNSF</u>") relating to its rail transportation of

vermiculite derived from the debtors' former ore mining operations in Libby, Montana.

---

[23]      <u>See</u> <u>also</u> Hr'g Tr. at 13:16-24, 14:7-15:4, <u>TK Holdings Inc.</u>, Adv. Pro. No. 17-50880 (Bankr. D. Del. July 13, 2017) [Dkt. 64] (the "<u>Takata PI Ruling</u>") (finding an identity of interest between the debtors and the non-debtors, even though plaintiffs alleged they asserted direct claims against the non-debtors, because the basis for all the claims was the "delivery and installation of a defective part manufactured by the debtors" and the debtors owed indemnification obligations to the non-debtors); <u>Singer Co. B.V. v. Groz Beckert KG (In re Singer Co. N.V.)</u>, 2000 WL 33716976, at *3 (Bankr. S.D.N.Y. Nov. 3, 2000) (finding that action against non-debtor defendant was inextricably intertwined with the debtors given that non-debtor was merely a distributor of the debtors and the core of the action was for patent infringement based on the debtors' product); <u>Am. Film Techs.</u>, 175 B.R. at 849-50 (finding identity of interest in part because counts against non-debtors and debtors necessarily involved the same subject matter and would involve facts identical to each other); <u>In re Ms. Kipps, Inc.</u>, 34 B.R. 91, 93 (Bankr. S.D.N.Y. 1983) (finding that automatic stay extended to non-debtor principal of the debtor given that action against non-debtor was inextricably intertwined with claim against and liability of the debtor and was premised on "one wrong, one injury and one recovery").

Chakarian, 386 B.R. at 20-21, 24.  The court enjoined the claims against non-debtor BNSF

because the debtors' actions were alleged to be the proximate cause of the plaintiffs' injuries

(i.e., the debtors' operations and conduct at the mines were at the "core of the issues" raised in

the actions against BNSF), and the debtors were obligated to indemnify the non-debtor.  Id. at

31, 36.  The bankruptcy court expressly rejected the argument that the test for identity of interest

could not be satisfied where the non-debtor was allegedly independently liable.  See id. at 30.

Rather, the actions against the non-debtor would have directly impacted the bankruptcy estate

because the non-debtor's liability allegedly arose from its dealings with the debtors and

implicated the debtors' insurance; therefore, the debtors would be required to defend those

actions, which would adversely impact the debtors' reorganization.  Id. at 31-32.

Other courts have likewise found that even allegedly direct claims against non-debtors do

not cut off an identity of interest between the debtor and the non-debtors.  See Mallinckrodt,

2021 WL 523625 at **3, 6 (noting that the bankruptcy court found that there was an identity of

interest between the non-debtors and the debtors based on the existence of contractual indemnity

claims and the risk of collateral estoppel and record taint that would make it necessary for the

debtors to participate in the actions to protect their interests, and stating that a holding that the

non-debtors could have independent liability would not preclude or estop the bankruptcy court's

conclusions that the claims are "inextricably intertwined"); Purdue Pharm., 619 B.R. at 45, 53

(recognizing identity of factual interest in allegations against non-debtor and debtors and the fact

that objectors would rely on the same facts to prove the claims against the non-debtor as against

the debtors); Hr'g Tr. at 262:3-8, Purdue Pharm. L.P. v. Mass. (In re Purdue Pharm. L.P.),

[Dkt. 87] (Bankr. S.D.N.Y. Oct. 11, 2019) (stating that even if "a claim against a third party is

independent or not derivative of the debtors, it still may be enjoined under proper

circumstances."); Takata PI Ruling at 15:5-16 (rejecting contention that non-debtors "inability to

be indemnified for their own negligent or wrongful acts" vitiated the identity of interest created

by contractual indemnity obligations of the debtors and finding that all the claims against the

non-debtors revolved around the acts and omissions of the debtors); see also W.R. Grace & Co.,

2004 WL 954772 at **2-3 (finding that there was an identity of interest between the debtor and

the non-debtor owner of property that was previously owned by the debtor in litigation between

two non-debtors given entitlement to contractual indemnity).

The identity of interest between the Debtor and the Protected Parties here is based on the

same grounds that courts have previously found sufficient to support a preliminary injunction,

regardless of any alleged direct claims.  Primarily here, (a) the core of the issues raised in the

Debtor Talc Claims arise out of Johnson's Baby Powder and other talc-containing products for

which the Debtor is responsible as a result of the 2021 Corporate Restructuring, (b) the Debtor

owes contractual, as well as common law, indemnification to the Protected Parties, (c) litigating,

settling or attempting to establish the value the Debtor Talc Claims against the Protected Parties

would liquidate the same claims against the Debtor and (d) continued prosecution of the Debtor

Talc Claims would potentially bind the Debtor through res judicata and collateral estoppel, and

create an evidentiary record that could prejudice the Debtor.

First, all the claims against the Debtor and the Protected Parties arise out of alleged harm

caused by Johnson's Baby Powder and other talc-containing products. See Chakrain, 386 B.R.

at 36 (stating that non-debtor alleged that the debtors' actions were the cause of plaintiffs'

injuries); Takata PI Ruling at 14:7-15:4 (finding that basis for claims was the delivery and

installation of defective part manufactured by debtors).  This is true regardless of whether Old

JJCI or the Debtor is also named as a defendant or whether the Protected Parties have

independent liability with respect to the claim. The Debtor Talc Claims do not distinguish between the actions of the Debtor or the Protected Parties but instead seek recoveries for the same alleged conduct under the same or similar theories. This is demonstrated by the fact the plaintiffs virtually always conflate the Debtor, Old JJCI and J&J (i.e., they treat them as a single party with a unitary claim) by offering the very same evidence against each and seeking the same damages and relief on their claims regardless of whether the claims are brought against the Debtor or any of the Protected Parties.

Perhaps the most stark exemplar of this phenomena is the ongoing Vanklive trial,[24] referenced repeatedly throughout the TRO hearing in this matter. Immediately following that hearing, counsel for both plaintiffs and J&J appeared before the court to discuss proceeding as to J&J. When counsel to J&J suggested that certain evidence would need to be limited or perhaps struck in light of the case moving forward only as to J&J (not Old JJCI), counsel for the plaintiffs strenuously objected, arguing that evidence from "inception, you know, of Ms. Vanklive's use through the present time" should continue to come in. See Vanklive, 10/22/2021 Transcript of Proceedings, 2795:5-2796:13.

And this conflation of the two companies has served plaintiffs' purpose in many instances. In fact, during one trial, the jury was so confused they sent out the following question during deliberations: "Please explain the difference between Johnson & Johnson and Johnson & Johnson Consumer Incorporated. As well as why the differences in percentage may occur when awarding punitive damages if any." See 2/6/2020 Barden (Phase II) Trial Tr. 117:15-24. In short, the Debtor Talc Claims against the Protected Parties are inextricably intertwined with the claims pending against the Debtor.

---

[24]     Vanklive v. Johnson & Johnson, Case No. RG20062734 (Cal. Sup. Ct. Alameda).

Second, the Debtor is contractually obligated to indemnify the Non-Debtor Affiliates, including J&J and New JJCI, and has or is alleged to have contractual indemnification obligations with, or other obligations to, the Retailers and Indemnified Parties.  See PI Mot. at 51-53; see also Chakarian, 386 B.R. at 31 (finding identity of interest because debtors owed the non-debtor contractual indemnification obligations); Takata PI Ruling at 15:5-16 (finding identity of interest created by contractual indemnification obligations and rejecting contention that inability to be indemnified for negligent or wrongful acts vitiated this identity); Mallinckrodt, 2021 WL 523625 at *3 (noting how the bankruptcy court found that there was an identity of interest between the non-debtors and the debtors based, in part, on the existence of contractual indemnity claims); W.R. Grace & Co., 2004 WL 954772 at **2-3 (finding that there was an identity of interest between the debtor and the non-debtor given entitlement to contractual indemnity).

Third, as explained in the PI Motion, litigating, settling or attempting to establish the value of the Debtor Talc Claims against the Protected Parties would liquidate claims against the Debtor, which are the very same claims the Debtor seeks to address through this Chapter 11 Case.  See PI Mot. at 25.  And fourth, continuance of such litigation also creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.  Id.; see also Chakarian, 386 B.R. at 35 (taking into account "the risks of collateral estoppel and record taint" in issuing injunction to stay claims against non-debtor); Mallinckrodt, 2021 WL 523625 at *3 (noting bankruptcy court's finding that risk of collateral estoppel and record taint would make it necessary for the debtors to participate in the actions to protect their interests).  This risk is present regardless of any alleged independent liability on the part of the Protected Parties.  See Am. Film Techs., 175 B.R. at 853-55 (rejecting argument that,

even if collateral estoppel applied, suits against non-debtors should not be enjoined because the

non-debtors were allegedly independently liable).  In their totality, therefore, these circumstances

satisfy the identity of interests factor.

> **B.    Permitting Debtor Talc Claims to Continue Against the Protected Parties
> Would Adversely Affect the Debtor's Restructuring Efforts.**

In addition to the identity of interests between the Debtor and the Protected Parties,

actions against a non-debtor should be stayed where permitting them to proceed would adversely

impact the debtor's reorganization, regardless of whether such claims are direct.  See Robins,

788 F. 2d at 1003, 1008 (stating courts may enjoin actions against non-debtors in "unusual

circumstances," i.e., where the continuation of cases would adversely impact debtor's

reorganization efforts, and sustaining injunction and transfer of claims against non-debtors in

part because such claims, if successful, would reduce insurance funds available to debtor's

estate); Quigley PI Order at 3-4 (finding that continued prosecution of any and all asbestos

claims against non-debtor parent would deplete shared insurance policies and funds in an

insurance trust to the detriment of the debtor's estate); Chakarian, 386 B.R. at 31-32 (finding that

actions against non-debtor directly impacted the estate due to the overlap of issues, contractual

indemnity and the implication of the debtors' insurance, which would all necessitate the debtors'

involvement and divert resources to attend to the claims rather than the reorganization); Takata

PI Ruling at 19:5-23:5 (finding that continued prosecution of the state and individual actions

against non-debtors would adversely impact the debtors' efforts to reorganize given need of all

stakeholders to focus on reorganization process); In re Philadelphia Newspapers, LLC, 407 B.R.

606, 616 (E.D. Pa. 2009) (finding that the diversion of resources caused by action against non-

debtors arising from a series of allegedly false and misleading newspaper and internet articles

and certain non-debtors "bad acts" would impact the debtors' ability to engage in a timely and effective reorganization).

By allowing the actions to proceed against the Protected Parties, claimants would be permitted to litigate, in other forums, the exact same talc claims based on the exact same facts that are being asserted against the Debtor in the Chapter 11 Case, adversely impacting the Debtor's ability to equitably and completely resolve such claims and the Debtor's rights to insurance coverage by potentially depleting its insurance policies.

In Quigley, for example, the bankruptcy court entered a preliminary injunction pursuant to sections 105(a) and 362(a) "restraining and enjoining the commencement or continuation of *any and all* actions or other proceedings against Pfizer" (the non-debtor parent of the debtor) "which allege personal injury or wrongful death based upon purported exposure to asbestos, silica mixed dust, talc, or vermiculite." Quigley PI Order at 1-2 (emphasis added).   The bankruptcy court enjoined both allegedly direct and derivative claims against the Pfizer, the non-debtor, based on its finding that the shared insurance policies and funds contained in an insurance trust, of which the debtor and Pfizer were joint beneficiaries, would be depleted if plaintiffs were allowed to continue bringing asbestos suits against Pfizer.  Quigley PI Order at 3-4.[25]

---

[25]     Subsequently, the preliminary injunction order in Quigley was amended by the parties to limit the injunction to claims that would be barred by section 524(g).  See *Am. Inj. Pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Fed. Rule of Bankruptcy Procedure 7065*, Dkt. 238, Quigley, No. 04-15739, Adv. No. 04-04262 (Bankr. S.D.N.Y. Dec. 6, 2007).  After entry of that order, the parties litigated whether "apparent manufacturer" claims could be included within the scope of the amended preliminary injunction order. Quigley Co., Inc. v. Angelos (In re Quigley Co., Inc.), 676 F.3d 45 (2d Cir. 2012).  The Second Circuit, after analyzing section 524(g), determined that Pfizer did not fit under any of the circumstances referenced in section 524(g)(4)(A)(ii) (regarding entities to whom a permanent channeling injunction may be extended).  As a result, the prosecution of such claims was not enjoined under the terms of the order.  Id. at 62.  Despite the fact that the Second Circuit ultimately found that the claims were not subject to the amended order due to the section 524(g) limitation added by agreement, it did conclude that the bankruptcy court otherwise would have had jurisdiction to issue the preliminary injunction given the allegations regarding the potential impact of the claims on the debtor's estate.  Id. at 57-58.  Quigley thus further

Here, allowing the Debtor Talc Claims to proceed against the Protected Parties would permit claimants to conduct an end-round the Chapter 11 Case and effectively foreclose the Debtor's opportunity to equitably and completely resolve the Debtor Talc Claims in a reorganization proceeding. The resulting indemnification claims, the risk of collateral estoppel and evidentiary prejudice and potential diminution of insurance coverage would all harm the Debtor and its prospects for reorganization. Further, a continuation of this litigation would require the Debtor to actively involve itself in and defend the litigation of the Debtor Talc Claims against the Protected Parties in order to preserve estate assets, at a time when the Debtor should be protected from such litigation burdens. See PI Mot. at 51-56. This Court, like the Quigley court, in order to avoid irreparable harm to the Debtor's prospects for reorganization, should enjoin the continued prosecution of Debtor Talc Claims against the Protected Parties.

C.    **The Allegations That J&J is Independently Liable For the Debtor Talc Claims Based on Post-1979 Actions Are Irrelevant and Inaccurate.**

The Meso Objectors and MDL Committee argue that J&J is directly liability for talc-related claims against the Debtor based on alleged conduct after 1979. Meso Obj. ¶¶ 12-21; MDL Obj. ¶¶ 14-17. These allegations, however, do not change the reality that the claimants seek to recover from the Protected Parties the same underlying damages allegedly caused by exposure to Old JJCI or J&J's talc-containing products. These "direct" claims are the exact same talc claims based on the exact same facts that are being asserted against the Debtor in this Chapter 11 Case. They should therefore be enjoined.

In addition, these new allegations advanced by the objectors against J&J apply to all of the Debtor's claimants. In particular, the objectors allege that J&J has independent liability

---

supports the proposition that a preliminary injunction may issue as to direct claims against a non-debtor affiliate when the prosecution of such claims would directly and adversely impact the debtor's estate.

because (a) it did not require any warnings on Johnson's Baby Powder, (b) it allowed the use of

J&J's logo on the product, and (c) it made statements to the public about the safety of talc.  Meso

Obj. ¶¶12-18.  These types of general claims that are available to all of a debtor's creditors are

property of the debtor's estate.  In re Emoral Inc., 740 F.3d 875, 879 (3d Cir. 2014) (stating that

"[i]n order for a cause of action to be considered 'property of the estate,' the claim must be a

'general one, with no particularized injury arising from it' and that such a general cause of action

is "properly pursued by the bankruptcy trustee because it inures to the benefit of all creditors.");

St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 701 (2d Cir. 1989) (where a

claim is "a general one, with no particularized injury arising from it, and if that claim could be

brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the

creditors are bound by the outcome of the trustee's action.").  As such, the pursuit of a creditor's

claim based on these types of allegations against J&J now belongs to the Debtor's estate and

cannot be pursued by individual creditors.

### 1.    The Meso Objectors Omit Key Testimony From Dr. Hopkins.

The Meso Objectors use incomplete record citations in a failed effort to support their

argument that J&J has direct liability post-1979.  In the Meso Objection, the Meso Objectors

argue that "J&J made all health and safety decisions regarding talc and asbestos."  Meso Obj. at

7.  They made these same arguments at the TRO hearing.  TRO Hr'g Tr. at 51:5-53:8; 79:2-10;

80:1-90:25 (Oct. 22, 2021) (cross-examination of Mr. Kim on prior testimony of Dr. Hopkins).

As support for this allegation, the Meso Objectors claim that the "corporate representative of

both J&J and Old JJCI, Dr. John Hopkins repeatedly confirmed this point in sworn testimony"

and selectively cite to testimony in the talc litigation.  Meso Obj. at 7.  The Meso Objectors

further assert that "[t]here is no dispute that Dr. Hopkins repeatedly gave this sworn testimony on

behalf of both J&J and JJCI as corporate representative of both companies . . . ."  Id. at 7.

But the Meso Objectors omit that Dr. Hopkins later clarified this testimony.  In 2019

Dr. Hopkins was presented with the same testimony highlighted at the TRO hearing and in the

Meso Objection and explained, consistent with Mr. Kim's testimony, that although J&J was

responsible for establishing health and safety *policy*, its operating subsidiaries, including Old

JJCI, were charged with making health and safety *decisions* related to their operations.  See Hr'g

Tr. 51:20-52:5, Hayes v. Colgate-Palmolive Co., Case No. 16-CI-03503 (Ky. Cir. Ct. Jefferson

Jul. 30, 2019) (attached hereto as Exhibit A) ("Q:  Johnson & Johnson corporate . . . what I call

the mothership in New Brunswick, made all the health and safety policy decisions with regard to

asbestos and talc products, correct?  A:  I'm not—I'm not sure where—where the separation. . . .

The responsibility for making the decision was with the individual company that was separated

out, either Consumer Products, Baby Products."); id. at 53:15-53:24 ("Q:  Okay.  The parent

company in New Jersey is the one that made all the corporate decisions regarding asbestos, talc,

health and safety decisions for all the global companies, correct?  A:  We're getting into

semantics of what you mean by parent company.  The decisions on the safety of talc were made

by the individual operating companies, which would be, in this case, Consumer Products, which

is a separate company within, as you call it, the mothership, the parent company.").

## 2. The Objectors' Recent Allegations Regarding Windsor Minerals Inc. Are Incorrect and Should be Disregarded.

The MDL Committee asserts that "at all times relevant . . . J&J maintained complete

control of all aspects of the domestic and foreign subsidiaries implicated in its talc. . . .,"

including its former subsidiary Windsor Minerals Inc. ("Windsor").  MDL Obj. ¶ 17.  Based on

that assertion, the MDL Committee now states, some five years after the commencement of the

MDL, that they intend to amend the complaint in the MDL to allege that J&J has direct liability

for talc-related claims on account of its "complete control" of Windsor.[26]

　　　As an initial matter, the timing of these "new" claims—decades after the alleged actions occurred and less than two weeks after the Debtor filed the PI Motion—is, at best, suspect.  There are significant questions regarding the objectors' ability to now raise such claims, including with respect to the applicable statutes of limitation.

　　　In addition, the precise nature of the "direct" claims the objectors may assert is not clear (the MDL Committee has not provided a copy of the proposed amended complaint).  As a general proposition, the corporate form must be respected, and J&J cannot be held liable for the acts of its subsidiaries.  United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries."); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 350 (4th Cir. 1998) (finding that to hold involvement of parent company justified disregard of corporate form would place North Carolina outside the mainstream of corporate law and citing to Bestfoods); True Homes LLC v. Clayton Homes, Inc., 2020 WL 6528861, at *12 (W.D.N.C. Nov. 5, 2020) (finding argument that parent company treated subsidiaries as a single business enterprise insufficient to pierce the corporate veil and citing to Bestfoods to support need to recognize separate corporate existence).

　　　If the objectors are claiming that J&J so dominated Windsor that corporate separateness should be ignored and J&J should be held responsible for some or all of the talc-related claims against Windsor, such claims are in the nature of alter ego claims.  However, Windsor is now known as Imerys Talc Vermont, Inc. and is a debtor in the currently pending Imerys bankruptcy

---

[26]    Similarly, the Meso Committee claims that "the talc liabilities arising from [Windsor] were never part of J&J Baby Products Division and thus could not have been passed to the Old JJCI's predecessor as part of the 1979 Transaction."  Meso Obj. at 21.

case.  It is widely recognized that alter ego and similar claims are property of a debtor's estate.

See, e.g., Steyr-Diamler-Puch of Am. Corp. v. Pappas, 852 F.2d 132, 135 (4th Cir. 1988); In re

Tronox, 855 F.3d 84,104 (2d Cir. 2017); S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (In

re S.I. Acquisition, Inc.), 817 F.2d 1142, 1152-53 (5th Cir. 1987); In re Emoral Inc., 740 F.3d

875 (3d Cir. 2014); Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC), 321 B.R. 128, 136-37

(Bankr. D. Del. 2005).  Accordingly, these claims would be property of the Imerys Talc

Vermont, Inc. bankruptcy case and cannot be brought by the MDL Committee.

And critically, as with any Debtor Talc Claim asserted against J&J on whatever basis, the

assertion of "direct" claims against J&J on account of acts related to Windsor would involve the

exact same products, the exact same allegations and the exact same damages as contained in the

talc claims asserted against Old JJCI and now the Debtor.

Finally, any alleged liability J&J may have with respect to its interactions with Windsor

prior to 1979 were assumed by Old JJCI in the 1979 transaction and are now the Debtor's

responsibility.  Thereafter, Old JJCI was responsible for the Baby Products business and was the

entity that had dealings with Windsor.  Thus, these claims are in reality claims against the

Debtor.  These newly created claims provide no basis for this Court to except from the automatic

stay or the requested preliminary injunction the litigation of talc claims against J&J.

## V.    THE DEBTOR HAS DEMONSTRATED THE NEED FOR INJUNCTIVE RELIEF DURING ITS BANKRUPTCY CASE.

Courts consider various factors in evaluating a request for a preliminary injunction under

section 105 to stay litigation against a non-debtor, including the traditional four-pronged test

applicable to preliminary injunctions generally.  But "the Fourth Circuit has made very clear that

the *critical*, *if not decisive*, issue over whether injunctive relief should be granted is whether and

to what extent the non-debtor litigation interferes with the debtors' reorganization efforts."  Brier

Creek, 486 B.R. at 694 (emphasis added); Chicora Life Ctr., LC v. UCF 1 Trust 1 (In re Chicora

Life Ctr., LC), 553 B.R. 61, 64-65 (Bankr. D.S.C. 2016) ("[T]he bankruptcy court 'may enjoin a

variety of proceedings … which will have an adverse impact on the Debtor's ability to formulate

a Chapter 11 plan.'") (quoting Willis v. Celotex Corp., 978 F.2d 146, 149 (4th Cir. 1992)).

"[W]here the facts are sufficient to demonstrate that the non-debtor litigation adversely

impacts the debtors' reorganization efforts, injunctive relief is warranted."[27]  The Debtor has

shown, under the traditional preliminary injunction factors as adapted in bankruptcy, why a

preliminary injunction is warranted.  See PI Mot. at 47-60.  Notwithstanding the objectors'

general assertion that injunctions are a "drastic and extraordinary remedy," MDL Obj. at 22; see

also Meso Obj. at 30; Aylstock Obj. at 8., injunctions of the type requested in the PI Motion have

"previously and uniformly been issued in numerous other asbestos-related cases, including in

this jurisdiction."  Bestwall, 606 B.R. at 254 (citing cases); see also Aldrich Pump LLC v. Those

Parties to Actions Listed on Appendix A to Complaint (In re Aldrich Pump LLC), 2021 WL

3729335, at *34 (Bankr. W.D.N.C. Aug. 23, 2021) (issuing injunction and stating that

"bankruptcy courts routinely grant preliminary injunctions before plans of reorganization have

been filed"); DBMP LLC v. Those Parties Listed on Appendix A to Complaint (In re DBMP

LLC), 2021 WL 3552350, at **21, 40 (Bankr. W.D.N.C. Aug. 11, 2021) (issuing injunction and

citing to various cases for the propositions that several courts have "determine[d] the merits of a

preliminary injunction against third-party claims in an asbestos bankruptcy" and bankruptcy

---

[27]     Brier Creek, 486 B.R. at 695; accord Caesars Ent. Operating Co. Inc. v. BOKF, N.A. (In re Caesars Ent.
Operating Co., Inc.), 808 F.3d 1186, 1188-89 (7th Cir. 2015) (if denying a third-party preliminary
injunction will "endanger the success of the bankruptcy proceedings, the grant of the injunction would …
be 'appropriate to carry out the provisions' of the Bankruptcy Code") (quoting § 105(a)); see McKillen v.
Wallace (In re Irish Bank Resol. Corp. Ltd.), No. 13-12159, Civ. No. 18-1797, 2019 WL 4740249, at *5
(D. Del. Sept. 27, 2019) (in considering extension of the automatic stay to third parties, explaining that
"[t]he standard for the grant of a stay is generally whether the litigation could interfere with the
reorganization of the debtor") (quoting Gerard v. W.R. Grace & Co. (In re W.R. Grace & Co.), 115 F.
App'x. 565, 570 (3d Cir. 2004)).

courts routinely grant preliminary injunctions before plans or reorganization have been filed).

### A.    The Positions Taken By Old JJCI and J&J in <u>Imerys</u> Are Consistent With the Preliminary Injunction Sought By the Debtor.

As an initial matter, the Meso Objectors assert that Old JJCI and J&J took positions more than a year ago in the <u>Imerys</u> chapter 11 cases that are allegedly inconsistent with the Debtor's arguments to enjoin claims against J&J and others in this case.  Meso Obj. ¶¶ 1-3.  To support their argument, the Meso Objectors takes phrases out of context from filings in <u>Imerys</u>.  A closer review of the <u>Imerys</u> situation demonstrates the baselessness of this allegation and establishes the consistency between Old JJCI and J&J's positions there and the relief the Debtor seeks here.

In March 2020 Old JJCI and J&J filed a motion to lift the stay in the <u>Imerys</u> cases seeking to exercise their contractual rights under their indemnity agreements with Imerys to assume the defense of talc claims for which Imerys stated it would seek indemnity against Old JJCI and J&J and to allow those claims to proceed in the tort system with Old JJCI and J&J agreeing to pay the resulting settlement or judgment.  But that motion does not in any way cut against the relief the Debtor is seeking in this case.

First, Old JJCI and J&J argued that lifting the stay in <u>Imerys</u> would not harm those debtors, because Old JJCI  and J&J would be assuming the defense of such claims and paying any resulting liability.  Those claims would no longer exist against the Imerys estates, making reorganization easier.  The situation here presents the exact opposite scenario.  In this case, the failure to apply or extend the stay to J&J and other Protected Parties would harm the Debtor, because, among other things, allowing the litigation to continue against those parties would establish liability against the Debtor, negatively impacting the Debtor's estate and ability to reorganize.

Second, the context in which Old JJCI and J&J filed the lift stay motion in <u>Imerys</u> is important.  At the time the lift stay motion was filed, the Imerys debtors were on the verge of a deal where in exchange for a release benefiting Imerys's French parent, Imerys would allow the talc claimants' committee and future claimants' representative in that case to establish inflated claim values to be used against Old JJCI and J&J as indemnitors.  Even though J&J/Old JJCI believed they had good defenses to the indemnity under those circumstances, they decided it was better to try the Imerys talc claims with their own talc claims rather than face the prospect of massive manufactured liability being asserted against them on the indemnity.  In contrast to Imerys' eschewing of arms' length negotiations and improper use of chapter 11 to foist liabilities on a third party (Old JJCI and J&J), the Debtor seeks to use this Chapter 11 Case to reach a consensual resolution with the talc claimants and pay those claims.  Indeed, New JJCI and J&J have already agreed to set aside $2 billion for that very purpose.[28]

Finally, the <u>Imerys</u> bankruptcy court denied Old JJCI and J&J's motion for procedural reasons.  The efforts of Old JJCI and J&J to protect their interests on the indemnity in <u>Imerys</u>— at a time when (i) the Debtor had not filed a bankruptcy case and (ii) Imerys was attempting to use its bankruptcy case to inflate claim values for the purpose of determining Old JJCI's liability—have no bearing on the Debtor's critical need for a stay to give its reorganization an opportunity to succeed.

---

[28]  In <u>Imerys</u>, Old JJCI and J&J noted that lifting the stay would protect the debtors from liability; in this case, extending the stay would protect the Debtor from liability.  Old JJCI and J&J's argument regarding the impropriety of Imerys' parent from securing a release pursuant to a plan that would permit the plaintiffs to establish their own settlement values and to foist liability on Old JJCI and J&J is irrelevant to this case where the Debtor seeks to settle its own liability with the claimants and not foist it on someone else.  Moreover, Old JJCI and J&J's objection to the Imerys parent receiving a release under the proposed plan was based on the particular facts at issue, not that third-party releases for non-debtors was inappropriate in all cases.

**B.      The Debtor Has Satisfied the "Likelihood of Success" Prong.**

**1.      The Debtor's and the Objectors' Differing Views of the Talc Liability Do Not Demonstrate That a Successful Reorganization is Unlikely.**

The objectors do not dispute that in bankruptcy proceedings, "success on the merits is to be evaluated in terms of the likelihood of a successful reorganization." Bestwall, 606 B.R. at 254 (quoting Sudbury, Inc. v. Escott, 140 B.R. 461, 466 (Bankr. N.D. Ohio 1992)); see MDL Obj. at 23; Meso Obj. at 31; Aylstock Obj. at 9.  However, the objectors fail to recognize that "[e]stablishing that a reorganization is likely to be successful is not intended to be a particularly high standard." Bestwall, 606 B.R. at 254; Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.), 502 F.3d 1086, 1097 (9th Cir. 2007) ("it is not a high burden to show a reasonable likelihood of success in reorganization").  Courts have focused primarily on the debtor's financial ability to reorganize.[29]  Here, the Debtor easily satisfies its burden; there is no legitimate dispute that the Debtor has the financial wherewithal to carry out a reorganization.[30]

The objectors instead suggest the Debtor has not met its burden because the Debtor is seeking relief that is not palatable to them.  In particular, the MDL Committee argues that the Debtor's goal to "enjoin claimants from commencing or continuing litigation" against certain

---

[29]    See Chicora Life Ctr., 553 B.R. at 66 (looking primarily to debtor's financial ability to reorganize, as well as debtor's efforts to negotiate with a tenant, in assessing likelihood of success prong); Litchfield Co. of S.C. Ltd. P'ship v. Anchor Bank (In re Litchfield Co. of S.C. Ltd. P'ship), 135 B.R. 797, 807 (W.D.N.C. 1992) (finding likelihood of success on the merits based on showing of "probability of successfully effectuating a plan of reorganization").

[30]    Indeed, the Meso Objectors note that J&J, one of the co-obligors under the Funding Agreement, is "one of the most solvent, creditworthy, and well-capitalized entities in the United States." Meso Obj. at 1; see also Aylstock Obj. at 9 ("J&J is among the most solvent, liquid, and profitable corporations in the world.").  The Meso Objectors take issue with the Debtor's agreed funding of a qualified settlement fund (the "QSF Trust') in the amount of $2 billion, suggesting that the Debtor, by agreeing to settle its talc liability for $4 billion previously, has "adopted positions incongruous with an expeditious reorganization." Meso Obj. at 32.  As explained in the Kim Declaration, the agreed funding of the QSF Trust simply provides, at a time when neither New JJCI nor J&J is required to provide such funding, pre-funding for Permitted Funding Uses (as such term is defined in the Funding Agreement). See Kim Decl. ¶¶ 81-83.  Such funding does not diminish the Debtor's likelihood of a successful reorganization; rather it should eliminate any doubt regarding the Debtor's financial ability to pay legitimate claims and assist in funding any talc trust set forth in a plan of reorganization in this Chapter 11 Case.

protected parties including J&J, is "not acceptable."  See MDL Obj. at 24.  The Meso Objectors

similarly argue that the Debtor's litigation position with respect to talc claims, particularly as set

forth in the Informational Brief, is likewise unacceptable.  See Meso Obj. at 31-32.  Given their

disagreement with the requested relief and views of the 2021 Corporate Restructuring, the MDL

Committee, while recognizing that such arguments are premature, asserts that no consensual plan

of reorganization will be confirmable here.  See MDL Obj. at 23 & n.9, 24 (noting that "[t]his is

not the time to dispute the merits of an as-yet unproposed plan" but arguing that plan

confirmation is highly doubtful).

    However, a party's disagreement with the requested relief alone cannot serve as a basis

for finding that that Debtor's reorganization is unlikely.  See Aldrich, 2021 WL 3729335, at *35

(finding that court was unable to conclude that reorganization was not possible simply because

counsel for the official committee of asbestos claimants asserted that claimants would never

agree to a plan and that "[t]o find otherwise would be to prejudge the outcome of the Chapter 11

Case at its outset"); DBMP, 2021 WL 3552350, at *40 (same).

    As the MDL Committee further recognizes, "there is much at issue and the Case is in its

infancy."  MDL Obj. at 24.  It is far too early to reach a conclusion that no reorganization will be

possible here; estate representatives have not yet been appointed and negotiations have not even

begun.  Even the most contested mass tort bankruptcies, such as Garlock and Specialty Products,

have resulted in confirmed plans.  A section 105 injunction is designed to provide "an

opportunity to formulate a plan of reorganization."  Robins, 788 F.2d at 998 (emphasis added).

A number of courts have rejected the same kind of futility argument the objectors advance here.

See, e.g., In re Purdue Pharm. L.P., 619 B.R. 38, 58 (S.D.N.Y. 2020) (affirming section 105

injunction enjoining mass tort claims against non-debtors, noting "Appellants cannot say that a

reorganization is unlikely simply because they intend to object to the plan as presently

constituted"); In re Caesars Entm't Operating Co., Inc., 561 B.R. 441, 452 (Bankr. N.D. Ill.

2016) (granting preliminary injunction notwithstanding creditors' argument that proposed

restructuring support agreement "cannot serve as the basis for a successful reorganization,"

noting "[w]hatever merit the guaranty creditors' criticisms of the [restructuring support

agreement] may have, they do not suggest a successful reorganization is less than

likely. . . Objections to the specifics of the [restructuring support agreement]. . .prove that the

parties have disagreements about the [restructuring support agreement], not that a resolution of

those disagreements is out of the question"); cf. Carolin, 886 F.2d at 701 (stringent bad-faith

dismissal standard supported by policy of not "prejudging" the likelihood of a successful

rehabilitation).

> **C.     The Debtor and Its Reorganizational Efforts Will Be Irreparably Harmed
> Without a Preliminary Injunction.**
>
> > **1.     The Requested Injunction is Necessary to Achieve the
> > Reorganizational Goals of This Case.**

As stated above, "the critical, if not decisive, issue" in determining whether to enjoin

litigation against non-debtors is whether the litigation would, absent an injunction, "interfere[]

with the debtors' reorganization efforts." Brier Creek, 486 B.R. at 694; Kreisler v. Goldberg,

478 F.3d 209, 215 (4th Cir. 2007) (section 105(a) injunction is appropriate if third-party action

would "put detrimental pressure on [the debtors'] reorganization effort"); Robins, 788 F.2d at

1003 (injunction is appropriate when third-party litigation "would adversely or detrimentally

influence and pressure the debtor through the third party") (internal citation omitted).

The entire purpose of this case—an equitable, final, and complete resolution of tens to

hundreds of thousands of current and future Debtor Talc Claims—would be thwarted without a

preliminary injunction.  There is no dispute that the objectors oppose the injunction so that talc

claimants can pursue in the tort system the exact same claims pending against the Debtor—

involving the same plaintiffs, the same products, the same time periods, and the same liability

and damage allegations—against the Non-Debtor Affiliates.  That is precisely what has

continued to occur after the filing of this case and the entry of the TRO.  Both Old JJCI and J&J

have been named together as defendants more than 265 times since the chapter 11 filing.

Irreparable harm here is not merely "a possibility," it is "likely."  See MDL Obj. at 24.

An injunction protects a debtor from "uncontrollable" and "uncoordinated proceedings in

different courts," allowing that debtor an "opportunity to formulate a plan of reorganization."

Robins, 788 F.2d at 998.  Putting "pressure" on the Debtor and seeking an effective dismissal of

this case through what is tantamount to lifting the stay against the Debtor to permit

uncoordinated, piecemeal tort litigation in hundreds of different courts across the country in

literally tens of thousands of cases is exactly what the objectors hope to achieve in objecting to

the PI Motion.[31]

Denying the injunction also would prevent this case from achieving equal treatment

across similarly situated claimants.  Absent the injunction, the Defendants could seek to liquidate

the exact same talc claims that exist against the Debtor in the Chapter 11 Case against Protected

Parties outside of the Chapter 11 Case.  This non-bankruptcy litigation, if not stayed, would

undermine (or eliminate) the parties' and the Court's ability to achieve confirmation of a plan

---

[31]    The MDL Committee relies upon Wilford v. Armstrong World Indus., Inc., 715 F.2d 124 (4th Cir. 1983)
for the proposition that piecemeal litigation against the Protected Parties should be permitted to proceed.
MDL Obj. at 26.  However, the facts of Armstrong are inapposite.  That case involved an attempt by 24
non-debtor codefendants (none related to the debtors) to stay asbestos litigation (with respect to wholly
separate claims) pending the completion of bankruptcy cases commenced by certain of their codefendants.
The case involved a single claimant, did not weigh the benefits of resolving thousands of claims in a single
forum and did not address a circumstance in which the debtors had agreed to indemnify the parties seeking
the stay.  In short, Armstrong presented an entirely different set of circumstances than those present here
and is wholly inapplicable.

that treats all talc claimants fairly and equitably.[32]

The MDL Committee argues that the Debtor's indemnification obligations are circular—that is, that the Debtor would simply assert a claim under the Funding Agreement for any claim of indemnity asserted against it by J&J. However, this misreads the Funding Agreement. As was set forth in the PI Motion, "[a]lthough the Funding Agreement with New JJCI and J&J serves as a backstop to ensure that the Debtor's ability to pay the Debtor Talc Claims has not been diminished as compared to that of Old JJCI, the New JJCI and J&J indemnity claims nonetheless would affect the estate because the Debtor's assets must be used first to fund a trust to pay these claims under a plan of reorganization." PI Mot. at 52 n.23.

The MDL Committee also seeks to minimize the harm caused by any indemnification claims by arguing that any indemnification claim would be "a general unsecured pre-petition claim subject to the automatic stay and subject to the same review an allowance procedures as any other general unsecured pre-petition claim before the Court." MDL Obj. at 27. However, this misses the point. The claims being liquidated against the Protected Parties would be the *exact same claims* as the (now contingent, unliquidated) claims being asserted against the Debtor (all of which also are general unsecured claims). Whether or not any indemnification claims could be, as the MDL Committee argues, "subject to expungement," is irrelevant—the Debtor's liability would have been liquidated outside this Chapter 11 Case, defeating its purpose and the Debtor's opportunity to reorganize. To accept the MDL Committee's argument would be to ignore Robins, which holds that injunctive relief is appropriate when a "judgment against the third-party defendant will in effect be a judgment or finding against the debtor." 788 F.2d

---

[32]    The Meso Objectors summarily argue that litigation against the Protected Parties cannot harm the Debtor because the "litigation has no bearing on its estate." Meso Obj. at 32-33. For the reasons set forth above, this assertion is belied by the record and the law.

at 999.

**D.      The Irreparable Harm That the Debtor Would Suffer Absent An Injunction Substantially Outweighs Any Prejudice to the Defendants.**

The sole harm the objectors argue they will face if the injunction issues is delay.  See MDL Obj. at 27, Aylstock Obj. at 10.  However, this theoretical consequence to claimants has been raised in many other mass tort bankruptcy cases, yet, the relief has "uniformly been issued." Bestwall, 606 B.R. at 254 (citing cases).

The balance of harms weighs decidedly in favor of a preliminary injunction and giving the Debtor's reorganization effort an opportunity to succeed.  Halting the pursuit of the Debtor Talc Claims imposes no material harm.  See also PI Mot. at 57 & n.28.  As the record will demonstrate, based on the historical pace of resolution of these claims, it would take decades to resolve them in the tort system.  Such resolutions are costly—Old JJCI incurred nearly $1 billion in the past five years alone defending personal-injury talc claims—and result in widely varying recoveries for claimants with comparable damages.  See Kim Decl. ¶¶ 38-40, 58.  In contrast, a bankruptcy trust will provide claimants (and the Debtor) "with an efficient means through which to equitably resolve [the] claims."  Id. (citing In re Federal-Mogul Glob., Inc., 684 F.3d 355, 357-62 (3d Cir. 2012)).

Even if this Court assumes that an injunction might cause delay for some Defendants, "it is well established that mere delay is insufficient to prevent the issuance of an injunction."  Id. at 58.  And, of course, the issuance of an injunction will not permanently deprive the Defendants of an opportunity to pursue the Debtor Talc Claims.  It will merely halt those claims, giving the Debtor time to reach consensus on a plan of reorganization.

The objectors have offered nothing to refute these and the other arguments raised in the PI Motion, aside from (i) summary statements that litigation of the talc claims should be

permitted to continue against Non-Debtor Affiliates, notwithstanding any impact on the

bankruptcy case (see MDL Obj. at 27-28) and (ii) unsupported summary allegations that the

liabilities of the Protected Parties "cannot affect the Debtor." Meso Obj. at 33. For the reasons

set forth in the PI Motion and herein, permitting litigation of the Debtor Talc Claims against the

Protected Parties (to many of whom the Debtor owes indemnity) to continue will irreparably

harm the Debtor's estate and thwart the entire purpose of this Chapter 11 Case. Accordingly, the

balance of harms clearly weighs in favor of issuing an injunction.

### E.       The Public Interest Supports the Preliminary Injunction

The objectors' arguments on the public-interest prong focus on reiterating arguments that

"direct" claims against J&J should not be enjoined and attacking the 2021 Corporate

Restructuring. See MDL Obj. at 28; Meso Obj. at 33-35; Aylstock Obj. at 10-11. Those attacks

are misguided. First, as set forth above, enjoining "direct" claims against J&J and the retailers is

entirely appropriate.[33] Moreover, contrary to the assertions of the MDL Committee, extension of

the injunction to each of the Protected Parties is both "reasonable and necessary" for the reasons

set forth above. MDL Obj. at 28. Permitting Debtor Talc Claims to continue against the

Protected Parties would jeopardize the very purpose of this Chapter 11 Case. Without the

requested relief, the Debtor would not benefit from a reprieve of litigation to focus on its

reorganization. Indeed, the Debtor, contrary to the assertion of the MDL Committee, is not

"advancing the interests of corporate third-parties." MDL Obj. at 28. Rather, it is seeking to

preserve its ability to pursue a reorganization. The Debtor and the Protected Parties fully

understand that all liability arising out of the Debtor Talc Claims will be "resolved and

---

[33]       The Meso Objectors' attempts to distinguish this case from asbestos cases fall short. Meso Obj. at 33-35.
Here, as in Aldrich Pump, DBMP and Bestwall, prosecution of Debtor Talc Claims against the Protected
Parties would amount to prosecution of those claims against the Debtor. As in those cases, the injunction
requested here is appropriate.

channeled only if [the Debtor] succeeds in confirming a plan of reorganization that contains a channeling injunction that extends to the Protected Parties." <u>Bestwall</u>, 606 B.R. at 258.  The Court and parties in interest, however, will be unable to comprehensively and equitably resolve all Debtor Talc Claims in this Chapter 11 Case without the requested injunctive relief.

The objectors' attacks on the 2021 Corporate Restructuring are likewise unfounded.  <u>See</u> Meso Obj. at 35; MDL Obj. at 28; Aylstock Obj. at 10.  There is no "tactic" here to be avoided, nor is the Bankruptcy Code being "subverted."  MDL Obj. at 28.  Courts have consistently affirmed the public's interest in a successful reorganization, which may be at its greatest in mass-tort bankruptcies.[34]  As detailed above, the preliminary injunction is a critical ingredient to the Debtors' successful reorganization.[35]

The MDL Committee suggest that the public interest requires denial of the preliminary injunction because, the 2021 Corporate Restructuring "shield[ed] a business's operations from both litigation and the negative impacts of a bankruptcy petition."  Meso Obj. at 35.  This argument is flawed for several reasons.  <u>First</u>, the preliminary injunction will not allow any party to escape any talc-related liabilities, and a permanent channeling injunction will only be granted in connection with a confirmed plan of reorganization.  <u>Second</u>, both New JJCI and J&J are party to the Funding Agreement.  Neither the Debtor nor New JJCI or J&J dispute that this Court has the power, if necessary, to enforce the Funding Agreement against New JJCI or J&J.  The "benefits of bankruptcy without its burdens" argument is designed to require that any effort to

---

[34]    <u>See</u>, <u>e.g.</u>, <u>Robins</u>, 788 F.2d at 1008 (noting "the unquestioned public interest in promoting a viable reorganization:); <u>In re Gander Partners LLC</u>, 432 B.R 781, 789 (Bankr. N.D. Ill. 2010) ("[P]romoting a successful reorganization is one of the most important public interests.") (quoting <u>In re Integrated Health Servs., Inc.</u>, 281 B.R. 231, 239 (Bankr. D. Del. 2002)).

[35]    The MDL Objectors speculate that this Chapter 11 Case may "spawn copycat cases" that will "flood this Court's docket."  MDL Obj. at 28.  This is no more than speculation, and it is not well founded.

-45-

resolve the Debtor Talc Claims be accompanied by reputational damage and adverse business disruptions, not legitimate concerns about available sources of recovery for talc claimants.

Accordingly, the objectors have failed to rebut the Debtor's showing that a preliminary injunction is in the public interest.

## <u>CONCLUSION</u>

The Objections should be overruled, and the PI Motion should be granted.

Dated:  November 3, 2021
      Charlotte, North Carolina

Respectfully submitted,

*/s/ John R. Miller, Jr.*
C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
Matthew L. Tomsic (NC 52431)
RAYBURN COOPER & DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:  rrayburn@rcdlaw.net
       jmiller@rcdlaw.net
       mtomsic@rcdlaw.net

Gregory M. Gordon (TX Bar No. 08435300)
Dan B. Prieto (TX Bar No. 24048744)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
      dbprieto@jonesday.com
      asrush@jonesday.com
(Admitted *pro hac vice*)

Brad B. Erens (IL Bar No. 06206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
(Admitted *pro hac vice*)

PROPOSED ATTORNEYS FOR DEBTOR

NAI-1522558978

-47-

## **EXHIBIT A**

Hayes Hearing Transcript

NO. 16-CI-03503                          JEFFERSON CIRCUIT COURT
                                            DIVISION TEN (10)


DONNA ANN HAYES                                      PLAINTIFF




VS.             TRANSCRIPT OF PROCEEDINGS

                    JULY 30, 2019




COLGATE-PALMOLIVE COMPANY,
ET AL.                                              DEFENDANTS




                        *    *    *


        Heard before the Hon. Angela McCormick Bisig,
Judge, Jefferson Circuit Court, Division 10, Jefferson
County Judicial Center, 700 West Jefferson Street,
Louisville, Kentucky.




                        *    *    *




                LAURA J. KOGUT, RMR, CRR, CRC
            McLendon-Kogut Reporting Service, LLC
                    Anchorage Office Plaza
            2525 Nelson Miller Parkway, Suite 204
                 Louisville, Kentucky  40223
                        (502) 585-5634
                  lkogut@mclendon-kogut.com
                    https://protect-us.mimecast.com/s/
          igS7C689QgTEBkPWipP4Bd?domain=mclendon-kogut.com

1          Q.      So Johnson & Johnson was the

2    manufacturer and the seller of the Shower to Shower

3    product all the way through the '70s, '80s, '90s, all

4    the way till it sold to Valiant in 2012, correct?

5          A.      The main -- the main -- what you call

6    mothership, the main Johnson & Johnson, was -- was the

7    main owner of the Consumer Products company, but like

8    I said a little while ago, my understanding is that

9    the Shower to Shower section was put into a separate

10   division, or separate company, under Johnson & Johnson

11   in the early '70s.

12         Q.      We'll come back to that.  We'll come

13   back to that because in your deposition -- you

14   remember testifying?

15         A.      I do, and again, maybe I -- maybe I

16   didn't speak clearly or maybe I didn't understand the

17   question, but it's -- it was still part of Johnson &

18   Johnson, which you call the mothership, until it was

19   sold to Valiant, I think it was 2012.

20         Q.      Johnson & Johnson corporate, the main

21   mother -- what I call the mothership in New Brunswick,

22   made all the health and safety policy decisions with

23   regard to asbestos and talc products, correct?

24         A.      I'm not -- I'm not sure where -- where

25   the separation.  The --

Page 52

1          Q.      You're not sure?

2          A.      The responsibility for making the

3    decisions was with the individual company that was

4    separated out, either Consumer Products, Baby

5    Products.

6          Q.      You recall testifying last Monday in

7    New Jersey?

8          A.      Yes.

9          Q.      And last Monday in New Jersey, on

10   July 22nd, you were sworn to tell the truth, were you

11   not?

12         A.      Yes.

13         Q.      And last Monday, you were being

14   examined by an attorney named Mr. Panatier, correct?

15         A.      Yes.

16         Q.      And Mr. Panatier, last Monday, asked

17   you this question:  Johnson & Johnson Corporate in New

18   Brunswick --

19              MR. DUBIN:  Objection.

20              THE COURT:  You want to approach?

21              (BENCH CONFERENCE)

22         Q.      Isn't it true, Dr. Hopkins, that

23   Johnson & Johnson, in New Brunswick, made all the

24   health and safety policy decisions with regard to

25   asbestos and talc products, correct?

Page 53

1          A.          That is my understanding.

2          Q.          And they made those health and safety

3      decisions about asbestos and talc for all the global

4      companies, correct?

5          A.          The --

6          Q.          Is that correct?

7          A.          You need to define what you mean by

8      Johnson & Johnson New Brunswick.

9          Q.          The parent company.

10         A.          The parent company is a legal entity.

11         Q.          That's right.

12         A.          They -- the subsidiary companies are

13     those that are called Consumer Products.  They were

14     the ones who made the decision.

15         Q.          Okay.  The parent company in New

16     Jersey is the one that made all the corporate

17     decisions regarding asbestos, talc, health and safety

18     decisions for all the global companies, correct?

19         A.          We're getting into semantics of what

20     you mean by parent company.  The decisions on the

21     safety of talc were made by the individual operating

22     companies, which would be, in this case, Consumer

23     Products, which is a separate company within, as you

24     call it, the mothership, the parent company.

25         Q.          Well, turn to Page 20, lines 6 through