## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF NORTH CAROLINA

## CHARLOTTE DIVISION

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br><div align="center">Debtor.</div> | Chapter 11<br><br>Case No. 21-30589 (JCW) |

## DECLARATION OF LAURA DAVIS JONES

Pursuant to 28 U.S.C. sec. 1746, I, Laura Davis Jones, Esq., declare under penalty of perjury as follows:

1.      I am a partner in the law firm of Pachulski Stang Ziehl & Jones LLP ("PSZ&J" or the "Firm"), located at 919 North Market Street, 17th Floor, Wilmington, Delaware 19801, and have been duly admitted to practice law in the State of Delaware, the United States District Court for the District of Delaware, the United States Court of Appeals for the Third Circuit, and the United States Supreme Court.

2.      Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein. If called as a witness, I would testify as to those facts.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

3.      I submit this Declaration in support of the Response to Order to Show Cause and

Motion of Arnold & Itkin LLP on Behalf of Certain Talc Personal Injury Claimants to Transfer

Venue of this Chapter 11 Case to the District of Delaware or, if not to that Distrtict, the District

of New Jersey Pursuant to 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy

Procedure (the "**Motion**"),[2] to which this Declaration is appended.

4.      A true and correct copy of portions of the Transcript of Hearing dated October 20,

2021 cited in the Motion is attached hereto as **Exhibit A**.

5.      Attached as **Exhibit B** hereto is a printout from Google Maps showing 501

George Street and J&J World Headquarters in New Brunswick, New Jersey, the distance

between the Debtor's address and this Court, and the distance between the Bankruptcy Court in

Trenton New Jersey and the Bankruptcy Court in Wilmington, Delaware.

6.      A true and correct copy of the *Imerys Talc Debtors' Consolidated List Of The Top

Thirty Law Firms With The Most Significant Representations Of Talc Claimants* (the "Imerys

Top 30 Law Firm List") that was filed in as part of the petitions in the Imerys Bankruptcy Case

is attached hereto as **Exhibit C**.

7.      Attached hereto as **Exhibit D** is a chart identifying the extent of the overlap

between the law firms listed on the Imerys Top 30 Law Firm List and those listed on the LTL

Top 30 Law Firm List,[3] indicating which of the law firms listed on the LTL Top 30 Law Firm

List represent members of the Official Committee of Tort  Claimants in the Imerys Bankruptcy

Case, or filed notices of appearance on behalf of clients or took other action in connection with

the Imerys Bankruptcy Case.

8.      A true and correct copy of *Johnson & Johnson's Motion Pursuant to 11 U.S.C. §

362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order

Modifying Automatic Stay to Permit Defense of Certain Talc Claims and Implement Talc*

---

[2] Capitalized terms used and not otherwise defined herein have the meanings ascribed thereto in the Motion.
[3] *Voluntary Petition: Chapter 11 Case: List of 30 Law Firms with the Most Significant Representations of Talc Claimants* [Docket No. 1]) (the "LTL Top 30 Law Firm List")

*Litigation Protocol* (without exhibits) filed in the Imerys Bankruptcy Case at Docket No. 1567 is attached hereto as **Exhibit E**.

9. A true and correct copy of the *Declaration of D. J. (Jan) Baker, Independent Director of the Debtor, in Support of Chapter 11 Petition and First Day Pleadings* filed in the Cyprus Mines Corporation bankruptcy case in the Bankruptcy Court for the District of Delaware, Case No. 21-10398 [Docket No. 7] is attached hereto as **Exhibit F**.

10. A true and correct copy of excerpts from the *Disclosure Statement For Ninth Amended Joint Chapter 11 Plan of Reorganization of Imerys Talc America, Inc. and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* filed in the Imerys Bankruptcy Case at Docket No. 2866 is attached hereto as **Exhibit G**.

11. Attached as **Exhibit H** hereto is a print-out from www.bloomberg.com identifying the location of J&J Services.

12. A true and correct copy of portions of the Transcript of Hearing dated October 21, 2021 cited in the Motion is attached hereto as **Exhibit I**.

Pursuant to 28 U.S.C. sec. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of knowledge and belief. I executed this Declaration on November 3, 2021 at New York, New York.


By:     */s/ Laura Davis Jones*
        Laura Davis Jones

# EXHIBIT A

1

1        UNITED STATES BANKRUPTCY COURT
          WESTERN DISTRICT OF NORTH CAROLINA
2                CHARLOTTE DIVISION

3   IN RE:                    :    Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,       :    Chapter 11

5       Debtor.               :    Charlotte, North Carolina
                                   Wednesday, October 20, 2021
6                             :    9:30 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE J. CRAIG WHITLEY,
9              UNITED STATES BANKRUPTCY JUDGE

10  APPEARANCES:

11  For the Debtor:           Jones Day
                              BY:  GREGORY M. GORDON, ESQ.
12                                 DAN B. PRIETO, ESQ.
                                   AMANDA RUSH, ESQ.
13                                 MARK W. RASMUSSEN, ESQ.
                              2727 North Harwood St., Suite 500
14                            Dallas, TX  75201-1515

15                            Jones Day
                              BY:  ROBERT W. HAMILTON, ESQ.
16                            325 John H. McConnell Blvd., #600
                              Columbus, Ohio  43215
17
                              Jones Day
18                            BY:  JAMES M. JONES, ESQ.
                              250 Vesey Street
19                            New York, NY  10281

20  Audio Operator:           COURT PERSONNEL

21
    Transcript prepared by:   JANICE RUSSELL TRANSCRIPTS
22                            1418 Red Fox Circle
                              Severance, CO  80550
23                            (757) 422-9089
                              trussell31@tdsmail.com
24
    Proceedings recorded by electronic sound recording; transcript
25  produced by transcription service.

1 those policies that are available to LTL to exceed $1.95

2 billion.  Now Old JJCI and J&J have actually tendered talc-

3 related claims to the insurers, but to date, none of those

4 insurers has accepted coverage, defended Old JJCI or J&J, paid

5 the costs of defense, or paid any indemnity claims.  Instead,

6 the insurers at this point in time have asserted various

7 coverage defenses.  As your Honor may know from the pleadings,

8 in May 2019 certain of the insurers filed a lawsuit against,

9 among others, Old JJCI and J&J in the Superior Court of

10 Middlesex County, New Jersey seeking a declaratory judgment

11 regarding the parties' respective obligations under the

12 policies and that litigation, that coverage litigation remains

13 pending as of the date of the filing of this case.

14         Then I want to talk briefly about Imerys.  You heard

15 counsel announce today for Imerys.  So Imerys was a former talc

16 supplier for Old JJCI.  Imerys as well as Cyprus Mines

17 Corporation, which owns certain Imerys mines that supplied Old

18 JJCI, have each filed their own chapter 11 cases.  Imerys filed

19 in February 2019.  Cyprus Mines filed in February of 2021.

20 Both cases are pending in the District Court in Delaware, the

21 Bankruptcy Court in the District of Delaware.  Your Honor

22 probably noticed from the papers that both Imerys and Cyprus

23 contend that they have claims against Old JJCI and J&J for

24 indemnification related to potential liability they have for

25 personal injury claims arising from exposure to talc they sold

39

1    to Old JJCI.  They've each filed an adversary proceeding

2    against Old JJCI and J&J in the Imerys bankruptcy case and they

3    seek declaratory judgments with respect to certain indemnity

4    agreements.  The debtor and J&J contest the claims in those

5    adversary proceedings.

6           I also want to mention, your Honor, with respect to

7    the Imerys and Cyprus filings that JJCI and J&J attempted to

8    negotiate an agreement with the parties in those cases to

9    resolve the talc claims against Old JJCI and J&J as part of a

10   plan in that case, or in those cases and although progress was

11   made, the parties were not able to reach an agreement.  And one

12   challenge, frankly, in reaching an agreement in Imerys was that

13   most of the claims related to Johnson's Baby Powder were

14   asserted against Old JJCI and not Imerys.  In fact, of the

15   38,000 pending talc lawsuits against the debtor as of the

16   petition date only about 18,000 of them were also against

17   Imerys.

18          Imerys also has claims related to talc-containing

19   products of other companies and it's my understanding, your

20   Honor, that about 20 percent of the Imerys mesothelioma claims

21   are unrelated to Old JJCI's talc-containing products.

22          As to the status of the Imerys case, your Honor,

23   there's been no estimation either sought or authorized in that

24   case.  While Imerys proposed a plan of reorganization in that

25   case, based on a recent ruling by the Delaware Bankruptcy Court

1  in its view, bankruptcy is the only option available to fully

2  resolve all claims and bring to an end litigation that's been

3  increasing at an alarming rate and it is anticipated to

4  continue for as many as six decades more.  LTL's goal in this

5  case is to negotiate and confirm a plan as quickly as possible,

6  a plan that will establish a trust to process and pay equitably

7  and efficiently current and future talc claims and provide for

8  the issuance of an injunction that would permanently protect

9  LTL and its affiliates from further talc-related claims.  LTL's

10 prepared to commence negotiations with an official committee of

11 talc claimants and a future claimants' representative as soon

12 as those parties are in place and in a position to begin

13 discussions.

14         And I would say, your Honor, that in this case there's

15 reason to believe that, unlike the asbestos cases that are

16 currently pending before your Honor, meaningful negotiations

17 can occur virtually immediately and that's because negotiations

18 with claimant representatives in the Imerys case were

19 relatively far along and as a result, the parties have a head

20 start on the work that needs to be done to reach an agreement.

21 In that regard, your Honor, LTL intends shortly to file a

22 motion asking that the Court direct the parties to mediation in

23 this chapter 11 case.  The debtor and New JJCI will work with

24 the parties to select a mediator who would be acceptable to all

25 and in addition, your Honor, the debtor is considering filing a

1   similar motion in the Imerys and Cyprus Mines chapter 11 case,

2   cases asking Judge Silverstein to direct the parties in those

3   cases to participate in the mediation, any mediation ordered in

4   this case.  And I would just say, your Honor, that due to the

5   current status of the Imerys and Cyprus cases and the filing of

6   this one we believe we have a unique opportunity to get the

7   parties to the table to see if an overall resolution can be

8   achieved in all three cases.

9          Then, your Honor, I, I wanted to talk briefly about

10  what this case is not about.  Many objections and other

11  pleadings have already been filed in this case, including with

12  respect to routine motions that are usually considered to be

13  noncontroversial and mundane.  Many parrot the common themes,

14  including that Old JJCI engaged in the 2021 corporate

15  restructuring and then filed for bankruptcy to escape talc-

16  related liabilities; that Old JJCI engaged in the 2021

17  corporate restructuring to quarantine or ringfence assets; and

18  that through the corporate restructuring and bankruptcy filing

19  Old JJCI is seeking to leverage claimants to achieve a

20  discount.

21         None of these contentions is true.  As a result of the

22  corporate restructuring and the bankruptcy filing, Old JJCI has

23  escaped no liability.  The debtor is here.  The claims are

24  here.  The same assets that were available to pay claims before

25  the restructuring remain available post the restructuring.  The

1          Is anyone opposed to using this bifurcated process

2     where we essentially are hearing the debtor's TRO evidence

3     today?

4        (No response)

5          THE COURT:  Okay.  And does anyone have a problem with

6     Friday that needs to be a participant in this?

7          We are talking about a TRO, mind you.  I'm not talking

8     about a preliminary injunction.  We'll have another go at this

9     on November the 4th, but for present purposes if we can split

10    up that way, that gets us six hours of time.

11         MS. CYGANOWSKI:  So given, your Honor, if we were to

12    proceed in this way, can we at least at the outset have the

13    debtor tell all of us what the reach of the TRO is?

14         THE COURT:  Well, we'd, of course, need that, wouldn't

15    we --

16         MS. CYGANOWSKI:  It would be helpful.

17         THE COURT:  -- to know what we're enjoining.

18         All right.  Are we ready to proceed then?

19         This is under the caption presently of the debtor's

20    emergency motion to enforce the stay, but it is, effectively,

21    presenting the same evidence that would be presented in support

22    of a TRO, okay?

23              MR. GORDON:  So, your Honor, the -- Mr. Hamilton and I

24    were going to divide this up.  He'll, he'll handle the, the

25    stay issues.  I'll handle the preliminary injunction.  And he's

157

1    going to go first, if it's okay with your Honor.

2              THE COURT:  That's fine with me.

3              Everyone okay?

4         (No response)

5              THE COURT:  Now for purposes of today's planning, we

6    have to be out of here at 6:00.  One of the problems about this

7    new building is our landlord, GSA, has the ability to cut off

8    of our resources, our air and lights, after the appropriate

9    time and we lose our security.

10             So on short notice, going late is not really an

11   option.  So we need to make use of the time.

12             Mr. Hamilton, if you'll lead off.

13             And whoever just got on the phone, we're hearing you.

14   Thank you.

15             MR. HAMILTON:  Thank you, your Honor.  Thank you, your

16   Honor.  Robert Hamilton of Jones Day on behalf of the debtors.

17             Let me start off by saying the TRO that we will be

18   seeking will be two parts.  The first part will be enjoining or

19   restraining all parties from pursuing actions against LTL, its

20   predecessor, JJCI, Old JJCI, its parents, and its, the parties

21   that it has indemnified with respect to claims against, that

22   are now claims against LTL.  It will have two parts.  The first

23   part will be based on the argument that pursuit of those

24   actions against those parties is automatically stayed by the

25   automatic stay.  The second part, which is what we did in

1   cases.  Excuse me -- the meso cases.  That, or, potentially,

2   even in Delaware, given the connection to Imerys and to the

3   Cyprus cases.  The judges there wouldn't be happy to hear me

4   say this, but the bottom line is I have that question and there

5   is a practical question as well, the one I alluded to earlier.

6          As I have cautioned the parties in the prior cases,

7   this is a small, underserved court.  There are only two

8   bankruptcy judges.  One of the two bankruptcy judges is

9   conflicted out of most of the, whatever it is, five or seven

10  cases that we have pending right now.  That means you're stuck

11  with me and there is a limit to what I can do.  And so there is

12  a, a judicial concern here of whether I can get you enough time

13  to manage this case.

14         So for all of those reasons, I was intent to enter an

15  order tomorrow asking the parties to address the question of

16  venue and change of venue.

17         The third part is the debtor has no prior commitment

18  to North Carolina other than its creation and now for the last

19  seven days having a subsidiary that's a North Carolina

20  corporation as well as the debtor and a bank account, of

21  course.

22         But the bottom line is that there are minimal contacts

23  here and there is a, a broader question to be raised as well,

24  which is these divisional mergers and the practice of allowing

25  large corporate concerns to access bankruptcy relief -- and I

1  understand the argument in favor of that from the prior

2  cases -- to access section 524(g) without bringing the entire

3  corporate enterprise in.  I, I understand the reasons why that

4  might not be palatable to a big company.

5          But there is a question there that has never been

6  addressed by the courts prior and I can think of no reason

7  offhand why the Western District of North Carolina needs to be

8  the arbiter of that for all Circuits and courts.

9          So you've got some convincing to do that we're in the

10  right place here.  And I will enter a short order to that

11  effect.  I've got an open mind about it, but I've got lots of

12  questions in my own mind.

13          So that is what I would tee up on the 10th.

14          MS. ABEL:  On the 10th, your Honor?  I, I also have

15  the same concerns, your Honor.  I've put in a request for some

16  documents from the debtor, made that request last Friday -- I

17  have not yet gotten that -- to look at all the documents that

18  were filed in the Texas Secretary of State.

19          If it would help the Court at all, I, it was my

20  intention to file a motion.  If you would rather not have to

21  enter an order, I could, I could act as the, the movant and

22  have everybody feel like they're on a --

23          THE COURT:  Whoever wants to move --

24          MS. ABEL:  -- have an adversary.

25          THE COURT:  -- can move.  I, I wanted to raise the

# EXHIBIT B

**Google** Maps    501 George St



Map data ©2021 Google    200 ft



# 501 George St

New Brunswick, NJ 08933
Building


Directions


Save


Nearby


Send to your phone


Share

## Photos

## At this place

### JNJ - Johnson Hall
4.5          (12)
University



 Maps   501 George St, New Brunswick, NJ 08933 to     Drive 602 miles, 9 hr 13 min
Charles R. Jonas Federal Building



Map data ©2021 Google, INEGI     100 mi

501 George St
New Brunswick, NJ 08933

**Get on NJ-18 S from Johnson Dr**

1 min (0.4 mi)

↑   1.   Head north

259 ft

2.   Turn right toward Johnson Dr

338 ft

3.   Turn left onto Johnson Dr

0.2 mi

4.   Turn left to merge onto NJ-18 S toward Turn Pike

456 ft

## Get on I-95 S in East Brunswick

5 min (3.1 mi)

5.   Merge onto NJ-18 S

2.3 mi

6.   Use the right 2 lanes to take the I-95 S ramp
⚠ Toll road

0.4 mi

7.   Keep left at the fork and merge onto I-95 S

0.3 mi

## Continue on I-95 S. Take NJ Tpke S, I-95 S and I-85 S to W Trade St in Charlotte. Take exit 10B from I-77 S/US-21 S

9 hr 3 min (598 mi)

8.   Merge onto I-95 S
⚠ Toll road

31.5 mi

9.   Continue onto NJ Tpke S
⚠ Toll road

48.8 mi

10.   Keep left at the fork

0.4 mi

11.   Merge onto NJ Tpke S
⚠ Toll road

1.5 mi

12.   Continue onto US-40 W/NJ Tpke S
⚠ Toll road

0.5 mi

13.   Merge onto I-295 S
⚠ Toll road
ⓘ Entering Delaware

6.8 mi

14.   Merge onto I-95 S
⚠ Toll road

8.8 mi

15.   Keep left at the fork to stay on I-95 S
⚠ Toll road
⚠ Parts of this road may be closed at certain times or days
ⓘ Entering Maryland

50.4 mi

16. Keep right at the fork to continue on I-895 S,
    follow signs for Baltimore Harbor Tunnel
    Thruway/Annapolis
    ⚠ Toll road

8.6 mi

17. Keep left at the fork to stay on I-895 S
    ⚠ Toll road

1.8 mi

18. Take exit 4 to merge onto MD-295 S toward Balt
    Pkwy/Bwi Airport

3.5 mi

19. Keep left to stay on MD-295 S

5.9 mi

20. Continue onto Baltimore-Washington Pkwy

12.8 mi

21. Keep right, follow signs for I-95 S/I-495
    S/Richmond VA/Andrews a F B

0.3 mi

22. Continue straight onto I-495 S/I-95 S

18.4 mi

23. Keep left at the fork to stay on I-495 S/I-95 S
    ℹ Passing through District of Columbia
    ℹ Entering Virginia

9.6 mi

24. Use the 2nd from the left lane to keep left at
    the fork, continue on I-95 S and follow signs for
    Richmond

0.1 mi

25. Keep right to stay on I-95 S

37.0 mi

26. Keep left to stay on I-95 S

58.6 mi

27. Keep left at the fork to stay on I-95 S

24.0 mi

28. Take exit 51 for I-85 S/US-460 W toward
    Durham/Atlanta

0.7 mi

29. Continue onto I-85 S/US-460 W
    ℹ Continue to follow I-85 S
    ℹ Entering North Carolina

83.7 mi

30. Keep right at the fork to stay on I-85 S

86.4 mi

31. Keep left to stay on I-85 S, follow signs for I-73
    N/High Point/Charlotte

11.8 mi



| | 32. | Keep left at the fork to stay on I-85 S, follow signs for High Point/Charlotte |
|---|---|---|
| | | 81.4 mi |
| | 33. | Use the 2nd from the right lane to stay on I-85 S |
| | | 0.3 mi |
| | 34. | Take exit 38 for I-77 S/US-21 S toward Columbia |
| | | 0.7 mi |
| | 35. | Keep right at the fork and merge onto I-77 S/US-21 S |
| | | 3.1 mi |
| | 36. | Take exit 10B for Trade Street E |
| | | 0.2 mi |

**Follow W Trade St to S Mint St**

3 min (0.8 mi)

| | 37. | Merge onto W Trade St |
|---|---|---|
| | | 0.8 mi |
| | 38. | Turn right onto S Mint St |
| | | ℹ️ Destination will be on the right |
| | | 187 ft |

Charles R. Jonas Federal Building
401 W Trade St, Charlotte, NC 28202

These directions are for planning purposes
only. You may find that construction
projects, traffic, weather, or other events
may cause conditions to differ from the
map results, and you should plan your route
accordingly. You must obey all signs or
notices regarding your route.

 Maps

402 E State St, Trenton, NJ 08608 to 824 N Market St, Wilmington, DE 19801

Drive 61.9 miles, 1 hr 14 min



Imagery ©2021 TerraMetrics, Map data ©2021 Google   10 mi

402 E State St
Trenton, NJ 08608

**Get on US-1 S from Armory Dr**

2 min (0.6 mi)

↑   1.   Head west on E State St toward E Canal St

289 ft

↰  2.  Turn left onto Armory Dr

————————————————————— 0.2 mi

↰  3.  Turn left onto S Stockton St

————————————————————— 390 ft

↱  4.  Turn left onto the U.S. 1 S ramp

————————————————————— 282 ft

↱  5.  Keep right at the fork, follow signs for US-1
        S/Morrisville/Philadelphia and merge onto US-1
        S

————————————————————— 0.3 mi

### Take I-95 S to N Jackson St in Wilmington. Take exit 7B from I-95 S

————————————————————— 1 hr 3 min (60.5 mi)

↱  6.  Merge onto US-1 S
        ⚠ Toll road
        ℹ Entering Pennsylvania

————————————————————— 6.8 mi

↱  7.  Take the exit onto I-295 W toward I-95
        S/Philadelphia

————————————————————— 6.3 mi

↱  8.  Merge onto I-95 S

————————————————————— 14.6 mi

↰  9.  Keep left to stay on I-95 S

————————————————————— 18.1 mi

↰  10.  Keep left to stay on I-95 S
          ℹ Entering Delaware

————————————————————— 14.5 mi

↱  11.  Take exit 7B toward DE-52 N/Delaware Ave

————————————————————— 0.1 mi

### Take Delaware Ave to N Market St

————————————————————— 4 min (0.8 mi)

↑  12.  Continue onto N Jackson St

————————————————————— 348 ft

↰  13.  Turn left onto Delaware Ave

————————————————————— 0.3 mi

↑  14.  Continue straight to stay on Delaware Ave

————————————————————— 0.2 mi

↑  15.  Continue onto W 10th St

————————————————————— 0.1 mi

↱  16.  Turn right onto N Market St
          ℹ Destination will be on the left

————————————————————— 0.1 mi

824 N Market St
Wilmington, DE 19801

These directions are for planning purposes
only. You may find that construction
projects, traffic, weather, or other events
may cause conditions to differ from the
map results, and you should plan your route
accordingly. You must obey all signs or
notices regarding your route.

# EXHIBIT C

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------- x
                                          :
In re:                                    :  Chapter 11
                                          :
IMERYS TALC AMERICA, INC., et al.,[1]     :  Case No. 19-_____ (_____)
                                          :
        Debtors.                          :  (Joint Administration Requested)
                                          :
--------------------------------------------------------- x
```

### DEBTORS' CONSOLIDATED LIST OF THE TOP THIRTY LAW FIRMS WITH THE MOST SIGNIFICANT REPRESENTATIONS OF TALC CLAIMANTS

The following is a consolidated list (the "Top Plaintiffs' Firms List"), in alphabetical order, of the top thirty law firms with the most significant representations of parties asserting talc claims against Imerys Talc America, Inc. and Imerys Talc Vermont, Inc. (together with Imerys Talc Canada Inc., the "Debtors").[2]  Concurrently with this petition, the Debtors have filed a motion seeking authority to file this Top Plaintiffs' Firms List (on a consolidated basis) and a consolidated list of creditors holding the thirty largest unsecured claims (excluding talc claims).  The Top Plaintiffs' Firms List does not include any person or entity who is an "insider" under section 101(31) of title 11 of the United States Code.  The Top Plaintiffs' Firms List was prepared with information existing as of January 31, 2019.  The Debtors reserve the right to amend the Top Plaintiffs' Firms List based on additional information they may identify.  The information contained in the Top Plaintiffs' Firms List shall not constitute an admission by, nor shall it be binding on, the Debtors.

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

[2]      No talc-related personal injury claims have been filed against Imerys Talc Canada Inc.

| Name of Law Firm | Name, Telephone Number, Mailing Address, and E-mail of Law Firm Contact | Nature of Claim | Indicate if Claim is Contingent, Unliquidated, Disputed or Subject to Set-off |
|---|---|---|---|
| Ashcraft & Gerel, LLP | Attn: James F. Green<br>4900 Seminary Road, Ste. 650<br>Alexandria, VA 22311<br>Phone: 703-997-1774<br>Email: JGreen@ashcraftlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Beasley Allen Crow Methvin Portis & Miles PC | Attn: Leigh O'Dell<br>218 Commerce Street<br>P.O. Box 4160<br>Montgomery, AL 36103-4160<br>Phone: 800-898-2034<br>Fax: 334-954-7555<br>Email: leigh.odell@beasleyallen.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Belluck & Fox, LLP | Attn: Joseph Belluck<br>546 5th Avenue, 4th Floor<br>New York, NY 10036<br>Phone: 212-681-1575<br>Email: jbelluck@belluckfox.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Burns Charest, LLP | Attn: Warren Burns<br>900 Jackson Street, Ste. 500<br>Dallas, TX 75202<br>Phone: 469-904-4550<br>Fax: 469-444-5002<br>Email: wburns@burnscharest.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Cohen Placitella & Roth, PC | Attn: Christopher Placitella<br>127 Maple Ave<br>Red Bank, NJ 07701<br>Phone:888-649-8431<br>Fax: 215-567-6019<br>Email: cplacitella@cprlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Golomb & Honik, P.C. | Attn: Richard Golomb<br>1835 Market Street, Suite 2900<br>Philadelphia, PA 19102<br>Phone: 215-985-9177<br>Fax: 215-985-4169<br>Email: rgolomb@golombhonik.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Gori Julian & Associates P.C. | Attn: Randy Gori<br>156 N Main St.<br>Edwardsville, IL 62025<br>Phone: (888) 362-6890<br>Fax: 614-659-9834<br>Email: randy@gorijulianlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |

| Name of Law Firm | Name, Telephone Number, Mailing Address, and E-mail of Law Firm Contact | Nature of Claim | Indicate if Claim is Contingent, Unliquidated, Disputed or Subject to Set-off |
|---|---|---|---|
| Kazan, McClain, Satterley & Greenwood | Attn: Joseph Satterly<br>55 Harrison St., Suite 400<br>Oakland, CA 94607<br>Phone: 877-995-6372<br>Fax: 510-834-4913<br>Email: jsatterley@kazanlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Kiesel Law LLP | Attn: Melanie Menses Palmer<br>8648 Wilshire Blvd<br>Beverly Hills, CA 90211<br>Phone: 310-854-4444<br>Fax: 310-854-0812<br>Email: palmer@kiesel.law | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Levy Konigsberg LLP | Attn: Robert Ellis<br>800 3rd Ave, 11th Floor<br>New York NY 10022<br>Phone: 212-605-6200 | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Maune, Raichle, Hartley, French & Mudd, LLC | Attn: David Amell<br>70 Washington St., Suite 200<br>Oakland, CA 94607<br>Phone: 800-358-5922<br>Email: damell@mrhfmlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| McDermott & Hickey, LLC | Attn: Kevin McDermott<br>20525 Center Ridge Rd, Ste 200<br>Rocky River, OH 44116<br>Phone: 216-712-7452<br>Fax: 216-916-9238<br>Email: kevin@mcdermotthickeylaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Meirowitz & Wasserberg, LLP | Attn: Samuel Meirowitz<br>233 Broadway Suite 2070<br>New York, NY 10279<br>Phone: 212-897-1988<br>Fax: 646-432-6887<br>Email: sam@mwinjurylaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Morelli Law Firm, PLLC | Attn: Benedict Morelli<br>777 Third Avenue, 31st Floor<br>New York, NY 10017<br>Phone: 212-751-9800<br>Fax: 212-751-0046<br>Email: bmorelli@morellilaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Morris Bart, LLC | Attn: Richard Root<br>601 Poydras Street, 24th Floor<br>New Orleans, LA 70130<br>Phone: 504-217-2793<br>Fax: 504-599-3380<br>Email: rroot@morrisbart.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Motley Rice LLC | Attn: Carman Scott<br>28 Bridgeside Boulevard<br>Mt. Pleasant, SC 29464<br>Phone: 843-216-9000<br>Email: cscott@motleyrice.com | Personal Injury | Disputed/ Contingent/ Unliquidated |

| Name of Law Firm | Name, Telephone Number, Mailing Address, and E-mail of Law Firm Contact | Nature of Claim | Indicate if Claim is Contingent, Unliquidated, Disputed or Subject to Set-off |
|---|---|---|---|
| Napoli Shkolnik PLLC | Attn: Hunter Shkolnik<br>One Greentree Center, Ste. 201<br>10000 Lincoln Drive<br>Marlton, NJ 08053<br>Phone: 212-397-1000<br>Email: hunter@napolilaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Porter & Malouf, PC | Attn: Timothy W. Porter<br>825 Ridgewood Road<br>Ridgeland, MS 39157<br>Phone: 601-957-1173<br>Fax: 601-957-7366<br>Email: tim@portermalouf.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Potts Law Firm | Attn: Adam Funk<br>3737 Buffalo Speedway, Ste. 1900<br>Houston, TX 77098<br>Phone: 713-963-8881<br>Email: afunk@potts-law.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Onder, Shelton, O'Leary & Peterson, LLC | Attn: Stephanie Rados<br>110 E. Lockwood, 2nd Floor<br>St. Louis, MO 63119<br>Phone: 314-963-9000<br>Email: rados@onderlaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Robinson Calcagnie, Inc. | Attn: Mark Robinson<br>19 Corporate Plaza Drive<br>Newport Beach, CA 92660<br>Phone: 949-720-1288<br>Fax: 949-720-1292<br>Email: mrobinson@robinsonfirm.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Sanders Phillips Grossman, LLP | Attn: Randi Kassan<br>2860 Michelle Drive, Ste. 220<br>Irvine, CA 92606<br>Phone: 888-570-4528<br>Fax: 516-741-0128<br>Email: rkassan@thesandersfirm.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Simmons Hanly Conroy, LLC | Attn: Laurence Nassif<br>112 Madison Avenue, 7th Floor<br>New York, NY 10016<br>Phone: 212-784-6400<br>Fax: 212-213-5949<br>Email: lnassif@simmonsfirm.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Simon Greenstone Panatier, PC | Attn: Jeffrey Simon<br>1201 Elm Street, Suite 3400<br>Dallas, TX 75204<br>Phone: 214-276-7680<br>Fax: 214-276-7699<br>Email: jsimon@sgpblaw.com | Personal Injury | Disputed/ Contingent/ Unliquidated |

| Name of Law Firm | Name, Telephone Number, Mailing Address, and E-mail of Law Firm Contact | Nature of Claim | Indicate if Claim is Contingent, Unliquidated, Disputed or Subject to Set-off |
|---|---|---|---|
| The Dugan Law Firm, APLC | Attn: James R. Dugan<br>365 Canal Street, Ste. 1000<br>New Orleans, LA 70130<br>Phone: 504-648-0180<br>Fax: 504-648-0181<br>Email: jdugan@dugan-lawfirm.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| The Lanier Law Firm, PLLC | Attn: Mark Lanier<br>6810 FM 1960 W<br>Houston, TX 77069<br>Phone: 713-569-5200<br>Fax: 713-659-2204<br>Email: wml@lanierlawfirm.com,<br>mark.lanier@lanierlawfirm.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| The Miller Firm, LLC | Attn: Michael Miller<br>108 Railroad Avenue<br>Orange, VA 22960<br>Phone: 540-672-4224<br>Fax: 540-672-3055<br>Email: mmiller@millerfirmllc.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| The Smith Law Firm, PLLC | Attn: Robert Allen Smith, Jr.<br>681 Towne Center Boulevard, Ste B.<br>Ridgeland MS, 39157<br>Phone: 601-952-1422<br>Fax: 601-952-1426<br>Email: allen@smith-law.org | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Waters Krause & Paul | Attn: Kevin Loew<br>222 N Sepulveda Blvd Ste 1900<br>El Segundo, CA 90245<br>Phone: 310-414-8146<br>Fax: 310-414-8156<br>Email: kloew@waterskraus.com | Personal Injury | Disputed/ Contingent/ Unliquidated |
| Weitz & Luxenberg P.C. | Attn: Perry Weitz<br>220 Lake Drive East, Suite 210<br>Cherry Hill, NJ 080002<br>Phone: 856-755-1115<br>Fax: 856-755-1995<br>Email: pweitz@weitzlux.com | Personal Injury | Disputed/ Contingent/ Unliquidated |

5

# EXHIBIT D

| | Firm: | Top 30 Imerys: | Top 30 LTL: | Notice of appearance or filings (Case): |
|---|---|---|---|---|
| 1. | Arnold & Itkin LLP | No | Yes | Yes, filed NOA (both) |
| 2. | Ashcraft & Gerel, LLP | Yes | Yes | No |
| 3. | Beasley Allen Crow Methvin Portis & Miles PC | Yes | Yes | Yes, on TCC in Imerys. |
| 4. | Golomb Spirit Grunfeld, P.C. | Yes | Yes | No |
| 5. | Gori Julian & Associates P.C. | Yes | Yes | Yes, on TCC in Imerys. |
| 6. | Kazan, McClain, Satterly & Greenwood PLC | Yes | Yes | Yes, filed stay relief motion in Imerys. |
| 7. | Lanier Law Firm | Yes | Yes | Yes, on TCC in Imerys. |
| 8. | Levy Konigsberg LLP | Yes | Yes | Yes, filed pro hac in Imerys. On TCC in Imerys. |
| 9. | Maune, Raichle, Hartley, French & Mudd, LLC | Yes | Yes | Yes, filed objections in LTL. |
| 10. | Motley Rice LLC | Yes | Yes | Yes, filed letter in Imerys regarding J&J production to TCC. |
| 11. | Napoli Shkolnik PLLC | Yes | Yes | Yes, filed letter in Imerys regarding J&J production to TCC. |
| 12. | OnderLaw, LLC | Yes | Yes | Yes, on TCC in Imerys |
| 13. | Simmons Hanly Conroy, LLC | Yes | Yes | Yes, filed letter in Imerys regarding J&J production to TCC. |
| 14. | Simon Greenstone Panatier, PC | Yes | Yes | Yes, on TCC in Imerys. |
| 15. | Lanier Law Firm | Yes | Yes | Yes, on TCC in Imerys. |
| 16. | Miller Firm, LLC | Yes | Yes | No |
| 17. | Trammel PC | No | Yes | Voted for talc personal injury claimants in Imerys. |
| 18. | Williams Hart Law Firm | No | Yes | Voted for talc personal injury claimants in Imerys. |
| 19. | Weitz & Luxenberg P.C. | Yes | Yes | No |

# EXHIBIT E

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | Chapter 11 |
| **IMERYS TALC AMERICA, INC.,** *et al.*[1] | Case No. 19–10289 (LSS) |
| **Debtors.** | Jointly Administered |
| | **Objection Deadline: April 22, 2020 at 4:00 p.m. ET**<br>**Hearing Date: May 6, 2020 at 11:00 a.m. ET** |

### JOHNSON & JOHNSON'S MOTION PURSUANT TO 11 U.S.C. § 362(d)(1), FED. R. BANKR. P. 4001, AND LOCAL BANKRUPTCY RULE 4001-1 FOR ENTRY OF ORDER MODIFYING AUTOMATIC STAY TO PERMIT J&J TO SEND NOTICE ASSUMING DEFENSE OF CERTAIN TALC CLAIMS AND TO IMPLEMENT TALC LITIGATION PROTOCOL

Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, "**J&J**") file this motion (the "**Motion**") for entry of an order under section 362(d)(1) of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), and Rule 4001-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") modifying the automatic stay: (i) to permit holders of J&J Talc Claims (as defined below) (the "**J&J Talc Claimants**") to pursue those claims against the Debtors nominally; (ii) for J&J to send notice of J&J's assumption of the defense of all claims against the Debtors alleging harm caused by the Debtors' talc based on the alleged use of J&J product prior to January 1, 2020 that have not reached a final resolution (the "**J&J Talc Claims**"); and (iii) to take certain other actions set forth in the Talc Litigation Protocol (defined below) to assume the defense of and indemnify

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050), and Imerys Talc Canada Inc. (6748). The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.

the Debtors for the J&J Talc Claims. In support of this Motion, J&J, by and through its

undersigned counsel, represents:

<div align="center">

**PRELIMINARY STATEMENT**

</div>

1.      The Debtors' chapter 11 cases have stalled for a year, while J&J has made repeated

proposals to the Debtors to allow J&J to exercise its contractual right and defend lawsuits against

the Debtors alleging personal injuries arising from the use of J&J products containing talc. That

contractual right lives in indemnity provisions that have long been part of the agreements between

the Debtors and J&J.

2.      Instead of including J&J in the plan negotiation process with the talc claimants'

advisors to fashion a resolution that affords the Debtors and their creditors access to a credit-

worthy J&J indemnity and relieves the estates of most of their claims, the Debtors, the Tort

Claimants' Committee (the "**TCC**"), and future claimants' representative (the "**FCR**") have

chosen a different, and perverse path. The construct, as J&J understands it, would have the Debtors

and the talc claimants, present and future, agree on claim amounts as a key part of a chapter 11

plan.

3.      Once agreed, the arrangement would preempt any litigation over what caused the

harm, and arguably obligate J&J to make good on its indemnity without any opportunity to actually

defend the cases. Divested of its contractual right to assume the defense of and control these

thousands of litigations, J&J will suffer tremendous harm as a result of losing the opportunity to

litigate causation or value related to any claim. The Debtors and the claimants seek to achieve an

outcome impossible outside of chapter 11, and also flatly impermissible in these chapter 11 cases

if the agreements with J&J are to be assumed under section 365 or any chapter 11 plan—namely,

a free hand to fix the amount they will then assert J&J is obligated to pay on the purported

<div align="center">2</div>

indemnity, while stripping J&J of its contractual right to litigate causation or value on such purportedly indemnified claims.

4.      J&J, of course, has the financial wherewithal to defend these claims and satisfy any successful talc claim in full, and sets forth below a clear process—in the form of the Talc Litigation Protocol—which honors the talc claimants' full trial rights while removing any obligation for the estates to pay the overwhelming majority of talc claims against them, including talc claims falling outside of J&J's existing indemnity obligations.  As an aside, J&J has been denied discovery regarding the number and amount of these claims, and seeks it in connection with this submission. The stay relief sought herein also includes J&J agreeing to waive strong defenses to its indemnity obligations.

5.      The facts clearly demonstrate that "cause" exists under section 362(d)(1) of the Bankruptcy Code and the traditional *Rexene* factors to lift the stay and permit J&J to implement the Talc Litigation Protocol.  Absent stay relief, the Debtors and the talc claimants, who commenced litigations asserting claims in trial courts across the nation, will waste more time subverting this process.  While chapter 11 is frequently used to channel litigation into one forum and foster settlement between a debtor and its litigants, it is not a vehicle to deprive a credit-worthy indemnitor of its contractual rights; therefore, in balancing the equities, this Motion should be granted.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware,* dated February 29, 2012.  Venue of this proceeding and this Motion in this

district is proper under 28 U.S.C. §§ 1408 and 1409. The authority for the relief requested includes section 362(d)(1) of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-1.

## BACKGROUND

### A.     The Talc Claims

7.     On February 13, 2019 (the "**Petition Date**"), Imerys Talc America, Inc. and two affiliates (collectively, the "**Debtors**") filed voluntary petitions in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), commencing cases for relief under chapter 11 the Bankruptcy Code. The Debtors filed these cases because of litigation and settlement costs associated with tens of thousands of lawsuits (the "**Lawsuits**") alleging personal injury arising from exposure to the Debtors' talc—predominantly through use of products J&J manufactured and sold.[2]

8.     A majority of the Lawsuits name the Debtors and J&J as co-defendants, blaming the Debtors' talc contained in J&J products for causing various illnesses, including mesothelioma and ovarian cancer.[3] The Debtors also face similar litigation arising from products manufactured and sold by other parties that contain the Debtors' talc.

9.     On the Petition Date, the J&J Talc Claims, including over fourteen thousand Lawsuits, were halted against the Debtors in forums across the country by operation of the automatic stay under section 362(a) of the Bankruptcy Code. In all or nearly all cases, the Debtors filed notices of suggestion of bankruptcy to apprise applicable forums and parties of the imposition of the automatic stay. Litigation continued, in most cases, against J&J and other co-defendants.

---

[2] *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors, in Supports of Chapter 11 Petitions and First Day Pleadings*, Case No. 19-10289 (LSS) (Feb. 13, 2019) [D.I. 10] (the "**First Day Declaration**"), ¶¶ 9–10 .

[3] *See, e.g.*, First Day Declaration, ¶ 18.

WEIL:\97367400\36\54966.0222

In certain cases, plaintiffs dismissed the Debtors as defendants to ensure the cases would proceed against other co-defendants notwithstanding the automatic stay afforded the Debtors.

**B.     The Supply Agreements and Indemnity Provisions**

10.     Up until 1989, a subsidiary of J&J produced the cosmetic talcum powder used in J&J products.  In 1989, J&J sold the subsidiary and thereafter sourced talc from the Debtors or their predecessors for use in certain J&J products.  The parties' historical talc supply relationship was memorialized in a serious of agreements between the Debtors and J&J or their respective predecessors.

11.     Certain of these agreements include provisions requiring J&J to indemnify the Debtors for certain losses and provide J&J the right to assume the defense and decision-making with respect to resolution of claims against the Debtors that are potentially indemnified under those agreements.  These agreements are as follows: (a) the 1989 Talc Supply Agreement between Windsor Minerals, Inc. ("**Windsor**") and J&J (the "**1989 SA**"),[4] (b) the 1989 Stock Purchase Agreement between Cyprus Mines Corp. ("**Cyprus**") and J&J (the "**1989 SPA**"),[5] and (c) the 2011 Supply Agreement between Luzenac America, Inc. ("**Luzenac**") and J&J (the "**2011 SA**").[6]

12.     Under the 1989 SPA and the 1989 SA, J&J agreed to defend and indemnify Cyprus and any affiliated companies (*e.g.*, ITA and ITV) from, among other things, (i) claims alleging

---

[4] The 1989 SA is annexed hereto as **Exhibit B**.  Windsor is the operating entity that historically supplied talc to J&J for its cosmetic products, and is now known as Imerys Talc Vermont, Inc. ("**ITV**"), a debtor in these chapter 11 cases. The 1989 SA was executed contemporaneously with the 1989 SPA (as defined herein).  Under Section 8.5 of the 1989 SPA, Cyprus could not purchase the Windsor stock from J&J until the 1989 SA had been executed.  Ex. C, § 8.5.

[5] The 1989 SPA is annexed hereto as **Exhibit C**.  Under the 1989 SPA, J&J sold Windsor's stock to Cyprus, which transferred the stock to a subsidiary, Cyprus Talc Corp., which was later renamed Luzenac and is now known as Imerys Talc America, Inc. ("**ITA**"), a debtor in these chapter 11 cases.  *See* First Day Declaration, ¶¶ 12–14.  In 1992, Cyprus later transferred all talc assets (including ITA and ITV) to RTZ America, Inc. (later known as Rio Tinto America, Inc.), which, through a series of subsequent transactions, transferred the talc assets (including ITA and ITV) to the Imerys Group (as defined in the First Day Declaration) in 1992. *Id.*

[6] The 2011 SA is annexed hereto as **Exhibit D**.

5

injury arising from use of J&J products with **talc supplied to J&J prior to the closing of the sale**[7] and (ii) claims alleging injury arising from use of J&J products with talc **supplied by ITA/ITV pursuant to the 1989 SA**,[8] covering all time periods prior to December 31, 2000 (the "**J&J-Covered Years**").

13.     The 1989 SPA grants J&J, as indemnitor, the right to participate in, assume the defense of, and control decisions to try or settle the claims arising in J&J-Covered Years that J&J indemnifies.[9] Under the 2011 SA, J&J agreed to defend and indemnify ITA for claims brought against ITA arising from talc supplied by ITA to J&J during 2011.[10] The foregoing indemnity obligations are referred to hereinafter as the "**J&J Indemnity Provisions**."

14.     By contrast (and as discussed below), under agreements covering other time periods, the Debtors owe J&J indemnity obligations for liability arising from talc supplied in certain periods (such liquidated and unliquidated obligations, the "**J&J Indemnity Claims**").[11]

---

[7] The 1989 SPA provides that J&J must defend and indemnify Cyprus and/or ITA "from and against, any and all claims, demands, penalties, suits, proceedings, judgments . . . of every kind and nature . . . imposed upon or incurred by Cyprus [and/or ITA] as a result of or in connection with or arising out of . . . any product liability-claim, suit, demand or cause of action  . . . arising out of talc or talc-containing products manufactured by . . . J&J . . . prior to Closing." Ex. C, § 11.2.

[8] Section 11 of the 1989 SA provides that "[J&J] shall indemnify, defend and hold harmless [Windsor/ITV], and its affiliates, . . . from and against all liabilities arising out of any product liability-based claim . . . arising out of the sale of cosmetic talc products to consumer markets, which products were manufactured by [J&J] prior to [January 6, 1989]; or for which [J&J] is directly or indirectly responsible as a result of [J&J's] possession, use or processing of [t]alc delivered to [J&J] pursuant to [the 1989 SA], or as a result of [J&J's] manufacture, shipment and sale of [t]alc-containing product . . .". Ex. B, § 11.

[9] Section 11.4 of the 1989 SPA provides that "In case any [action involving the subject matter of the indemnity provisions] is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, *the indemnifying party shall have the right to participate therein*, and to the extent that *it may elect by written notice* delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, *to assume the defense thereof*, with counsel reasonably satisfactory to such indemnified party . . . *In the event that the indemnifying party shall assume the defense of a lawsuit as provided herein, the indemnifying party, after consultation with the indemnified party, shall have reasonable control over the decision to try, settle, compromise or otherwise terminate such lawsuit*." Ex. C, § 11.4 (emphasis added).

[10] *See* Ex. D, Attachment D, § 6 ("[J&J] shall indemnify, defend and hold harmless [ITA] for any third party claims brought against [ITA] based on the use of [talc] by J&J.").

[11] J&J has filed proofs of claims in these chapter 11 cases for its liquidated claims under the 2001 SA. *See* Claim Nos. 915, 922, and 926.

WEIL:\97367400\36\54966.0222

Namely, under a 2001 Supply Agreement with J&J (the "**2001 SA**"),[12] the Debtors are required to indemnify J&J for losses relating to talc supplied under the 2001 SA between and including the years 2001 and 2006 (the "**Debtor-Covered Years**"), including for the Debtors' predecessors' failure to (a) meet specifications for talc in the 2001 SA, (b) sample and test the talc sufficiently before providing it to J&J; and (c) comply with any law, ordinance, regulation, or rule.[13]

15.     Certain periods are not covered by any supply agreement between J&J and the Debtors (*e.g.*, the years between and including 2007 and 2010, and from 2012 through the commencement of these chapter 11 cases) (collectively, the "**Gap Years**").  The liability for J&J Talc Claims attributable to Gap Years would likely be addressed under state common or statutory law of indemnity and contribution.

16.     As a consequence of the indemnity provisions in J&J's and the Debtors' agreements, the Debtors, J&J, and the J&J Talc Claimants must resolve the following legal and factual issues (the "**Unresolved Indemnity Issues**") before the Debtors can establish, apply, and liquidate indemnification claims against J&J to :

(a)     **Distribution of talc liability across multiple supply periods**.  Nearly all of the J&J Talc Claims allege multiple years of use of the product(s) purportedly causing the J&J Talc Claimants' injury, spanning periods covering J&J-Covered Years and Debtor-Covered Years or Gap Years.  Determining the degree to which each period of use allegedly caused a claimant's injuries likely will be time-consuming and costly.  That determination is necessary, however, because each supply agreement throughout the Debtors' and J&J's relationship is unique, with obligations varying significantly and even running in the opposite direction from obligations in other periods.

(b)     **Gap Year Issues**.  Any attribution of talc liability based on alleged use of products supplied in Gap Years likely requires resolution of complex, fact-intensive issues of state law.

---

[12] The 2001 SA is annexed hereto as **Exhibit E**.

[13] *See* Ex. E, § 7(a)(iv).  Certain Debtors are successors to J&J's counterparties under the 2001 SA, and are bound to the same indemnity obligations as such counterparties.

WEIL:\97367400\36\54966.0222

(c)     **J&J's defenses against duty to indemnify**. J&J has numerous potential defenses (the "**J&J Indemnity Defenses**") to indemnification of J&J Talc Claims, including that:

    (i)     by rejecting J&J's offers to assume liability for the J&J Talc Claims and ignoring J&J's rights under the J&J Indemnity Provisions to assume the defense of the Debtors and to control settlement decisions involving the J&J Talc Claims, the Debtors breached their obligations under the J&J Indemnity Provisions, relinquishing J&J of any duty to indemnify the Debtors for J&J Talc Claims settled without J&J's participation, and resulting in incurable defaults by the Debtors that render the supply agreements unassumable by the Debtors;

    (ii)     if a settlement, judgment, or recovery from a trust is procured by bad faith, collusion, or fraud, it is not subject to indemnity under the applicable agreement and other principles of indemnity law;

    (iii)     the claimant did not actually use a J&J product;

    (iv)     the products of a company other than J&J to which the Debtors also supplied talc caused the claimant's injury or some other factor or exposure caused the J&J Talc Claimant's injury;

    (v)     settlements of J&J Talc Claims for large dollar amounts are not subject to indemnity by J&J given the lack of reliable scientific evidence of causation of the applicable injury;

    (vi)     While J&J denies that the applicable J&J products contained asbestos, if the Debtors are responsible for providing J&J with contaminated talc in a manner not conforming to J&J's specifications per the supply agreements, J&J would not owe contractual indemnification;[14] and

    (vii)     Allegations of other acts or omissions of the Debtors in production, testing, and delivery of the talc resulted in the injury.

(d)     **J&J's indemnification claims against the Debtors**. The Debtors owe J&J for the J&J Indemnity Claims.[15] The amounts liquidated under these obligations would offset the liquidated amounts of any indemnity obligation owed by J&J to the Debtors under theories of setoff and recoupment. The Debtors' indemnity claims against J&J would likely cause J&J to assert its indemnity claims against the

---

[14] The 1989 SA contains a carve-out for J&J's indemnity obligations if the talc provided by Windsor/ITV did not conform to specifications. *See* Ex. B, § 11 ("[J&J] shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to [J&J] hereunder did not conform to the specifications for such Talc then in effect . . .").

[15] J&J has filed proofs of claim in these chapter 11 cases for the liquidated amounts of these indemnity obligations of the Debtors. *See* Claim Nos. 915, 922, and 926.

WEIL:\97367400\36\54966.0222

Debtors as counterclaims, increasing the morass of litigation issues that would need to be resolved before indemnity could be realized.

(e) **Forum selection, jurisdiction, and other procedural issues**. Several of the supply agreements between J&J and the Debtors require that issues thereunder be arbitrated or decided by courts within a particular state, or are governed by the laws of a particular state.[16] Before any substantive issues of indemnity obligations could be decided, J&J, the Debtors, and/or the J&J Talc Claimants would likely need to determine the appropriate forum (whether bankruptcy or non-bankruptcy, state or federal, arbitration, or other litigation forum) and choice of law to litigate these issues. Most J&J Talc Claims apply across multiple time periods that are covered by agreements containing conflicting forum and choice of law requirements.

17. Complicating these matters further, most of these indemnity issues likely will not apply uniformly across identifiable groups of underlying J&J Talc Claims. Factual distinctions between any two J&J Talc Claims affect the application of the indemnities, including: (a) the time at which a claimant started and finished using the products allegedly causing the injury; (b) which product(s) (including products made by companies other than J&J) a claimant used across the duration; and (c) the alleged injury (*i.e.*, one that allegedly results from talc contaminated with asbestos or from talc itself). In other words, resolution of any particular issue must be conducted across thousands of J&J Talc Claims, absent a settlement among J&J and the Debtors and/or the J&J Talc Claimants. Needless to say, one universally applicable threshold issue that must be proven before J&J Talc Claimants should be entitled to recovery from defendants of the J&J Talc Claims is the issue of whether talc actually causes the illnesses suffered by claimants, which J&J— and the Debtors, at least historically—deny.

C.     **J&J Indemnity Proposals**

18. Long before the Petition Date, J&J sought to resolve disputes with the Debtors related to indemnification rights and obligations under the J&J Indemnity Provisions and the 2001

---

[16] *See, e.g.*, Ex. B, § 15(f) (Vermont choice of law provision); Ex. C, § 13.9 (requiring any issues to be heard in Vermont courts); Ex. D, Attachment D, § 14 (clause requiring arbitration in Colorado); Ex. E, § 15 (clause requiring arbitration in New Jersey).

9

SA. J&J and the Debtors met several times, exchanged correspondence, and participated in two mediations. J&J believed the parties were continuing to work toward resolving the scope and application of the indemnity. Instead, the Debtors filed their chapter 11 petitions. In the one year since the Debtors commenced these cases, and despite several attempts by J&J to engage, the Debtors have not sought an earnest dialogue with J&J with respect to J&J's and the Debtors' indemnity rights and obligations or J&J's proposals.

19.     On November 1, 2019, J&J proposed indemnification principles in yet another effort to resolve the indemnity issues (the "**November Proposal**").[17] To convince the Debtors to engage with J&J on the November Proposal, J&J proposed to fully indemnify and assume the defense of all J&J Talc Claims in which J&J Talc Claimants allege any exposure to talc from the use of J&J products in J&J-Covered Years,[18] even if Claimants also allege exposure in Debtor-Covered Years.

20.     In the November Proposal, J&J also offered to waive its rights to indemnification for any J&J Talc Claim that a court determines arose from alleged use in Debtor-Covered Years or Gap Years. Not only did the November Proposal represent a "bright line rule" that avoided issues of attribution across years, but J&J would assume more liability than required under the agreements. Specifically, J&J proposed to fully indemnify claims alleging use across J&J-Covered Years as well as Debtor-Covered Years and Gap Years, rather than apportioning liability to the Debtors for the Debtor-Covered Years or Gap Years in the claimant's period of use. The proposal would also settle any issue of the Gap Years by dividing all J&J Talc Claims into two

---

[17] The November 1, 2019 letter is annexed hereto as **Exhibit F**.

[18] Although the J&J-Covered Years only extend through December 31, 2000 under the agreements, under the November Proposal, J&J offered indemnity for claims alleging use of J&J products through April 15, 2001, due to an ambiguity in when the J&J-Covered Years end and the Debtor-Covered Years began in the agreements.

categories (based on whether or not the claimant alleged any use prior to a certain date), and each would have clear contractual indemnity obligations. J&J did not receive a formal response to the November Proposal.

21.     On December 3, 2019, J&J again offered to negotiate, reiterating the terms of the November Proposal.[19] Nine days later, the Debtors responded in a phone call with J&J, stating they intended to complete negotiations with Imerys, S.A., the Debtors' parent company, and the TCC and FCR appointed in these chapter 11 cases, before engaging with J&J.

22.     In an effort to jumpstart an otherwise stalled process, and as a further enhancement of the November Proposal and the December 3, 2019 letter, on February 7, 2020, J&J made a formal offer (the "**February Offer**"), in the form of a term sheet, to assume the defense of and indemnify the Debtors for all J&J Talc Claims—any and all claims against the Debtors involving J&J product.[20] Under the February Offer, J&J would indemnify the Debtors for J&J Talc Claims regardless of whether any exposure was alleged in J&J-Covered Years or only in Debtor-Covered Years. This, even though for the Debtor-Covered Years, J&J owes no duty to indemnify, and in fact, may be entitled to indemnity from the Debtors.[21]

23.     The February Offer was conditioned on Bankruptcy Court approval and modification of the automatic stay with respect to the J&J Talc Claims. J&J published the

---

[19] The December 3, 2019 letter is annexed hereto as **Exhibit G**.

[20] The February Offer is annexed hereto as **Exhibit H**.

[21] The February Offer provides that J&J will "agree[] to indemnify [the Debtors] fully for, and assume the defense of, and assume all costs of litigation for [t]alc [c]laims where plaintiffs allege use of J&J/talcum powder products prior to January 1, 2020, . . . and where [the Debtors have] not reached a final resolution (e.g., a settlement has been entered or a non-appealable final judgment has been entered against [the Debtors] in a court of competent jurisdiction) as to such [t]alc [c]laim . . .".

WEIL:\97367400\36\54966.0222

February Offer for all parties to see in its most recent annual report.[22]  On March 4, 2020, the

Debtors sent J&J a letter further deferring consideration and negotiation of the February Offer.[23]

Prior to filing this Motion, J&J reached out the Debtors in an effort to move negotiations forward

and resolve disputes related to indemnification rights and obligations under the J&J Indemnity

Provisions and the 2001 SA.  At which point, the Debtors informed J&J (through counsel) that the

Debtors need, and are unable to get, permission from the TCC and FCR for the Debtors to hold

one-on-one discussions with J&J.[24]  In light of the Debtors' inability to engage in productive

discussions with J&J, J&J is seeking the relief outlined in this Motion, which is necessary for J&J

to alleviate the prejudice that results from the Debtors' inability to negotiate with J&J with regard

to the indemnity issues, including cooperating in certain defenses.

### D.      Talc Litigation Protocol

24.      Having tried unsuccessfully to negotiate a consensual resolution of the treatment of

J&J Talc Claims with the Debtors' counsel, J&J proposes to assume the defense of, and indemnify

the Debtors with respect to, the J&J Talc Claims through the following protocol (the "**Talc**

**Litigation Protocol**"):

(a)      **Notice to Debtors**.  Within three (3) days of the Court entering an order granting
this Motion (the "**Lift Stay Order**"), J&J will give formal notice of J&J's
assumption of the defense of the J&J Talc Claims to the Debtors (the "**Assumption**

---

[22] J&J stated "[t]he Company formally proposed to resolve Imerys' and the Company's obligations arising out of the Talc Claims by agreeing to assume the defense of litigation of all Talc Claims involving the Company's products, lifting the automatic stay to enable the Talc Claims to proceed outside the bankruptcy forum with the Company agreeing to settle or pay any judgment against Imerys, and waiving the Company's indemnification claims against Imerys."  Johnson & Johnson, Annual Report (Form 10-K 2019), at 86 (February 18, 2020).

[23] The March 4, 2020 letter is annexed hereto as **Exhibit I**.

[24] In an email dated March 17, 2020, counsel for the Debtors stated "We have agreed with the FCR and the TC that we would not have separate discussions with you without their participation or consent."  A copy of this email exchange is attached as **Exhibit J**.  A further email from the Debtors' counsel, dated March 18, 2020, stated that they are not allowed to have a phone call with J&J without the FCR and TCC present.  A copy of this email exchange is attached as **Exhibit K**.  J&J was likewise unsuccessful in asking TCC's counsel to provide permission for its counsel to speak to the Debtors' counsel on the telephone without TCC/FCR participation.

Notice"), as contemplated by the 1989 SPA and 1989 SA, and its exclusive right to defend and resolve the J&J Talc Claims on behalf of the Debtors.

(b)    **Notice to Parties in Interest**.  Within fourteen (14) days of entry of the Lift Stay Order, the Debtors, in consultation with J&J, will file and serve upon all parties in interest, the United States Trustee for the District of Delaware, and any other party requesting notice pursuant to Bankruptcy Rule 2002 (i) a copy of the Lift Stay Order; (ii) the Assumption Notice; and (iii) lists of each action or proceeding (including any litigation, arbitration, mediation, negotiation, or other adversarial process) that is a J&J Talc Claim (A) that has been stayed as against the Debtors by application of the automatic stay (each, a "**Stayed Proceeding**"), including proceedings in which the Debtors filed a notice of suggestion of bankruptcy to put parties on notice of the stay of litigation with respect to the Debtors, but in which the Debtors were not removed as defendants; (B) in which a Debtor was dismissed as a defendant, or the proceeding was dismissed as against a Debtor, without prejudice (each, a "**Debtor-Dismissed Proceeding**"); and (C) that commenced after the Petition Date (or that will be commenced in the future) against J&J in which J&J believes the Debtors are appropriate co-defendants, whether or not the automatic stay would preclude the Debtors' being named as co-defendants absent the relief requested herein (each, a "**Postpetition Proceeding**" and together with any Stayed Proceeding or Debtor-Dismissed Proceedings, a "**Proceeding**").

(c)    **Right to Appoint Counsel**.  J&J will be authorized to identify, appoint, and/or designate counsel ("**Appointed Counsel**") to represent the Debtors with respect to the Stayed Proceedings (and each Debtor-Dismissed Proceeding and Postpetition Proceeding, as may become necessary) in conformance with Section 11.4 of the 1989 SPA and will notify the Debtors of such designation.  The Debtors will have seven (7) days after receiving notice of J&J's proposed counsel to notify J&J in writing if the Debtors believe there is any conflict of interest in connection with or otherwise object to J&J's designated counsel, which conflict will be resolved in conformance with Section 11.4 of the 1989 SPA.  Upon the appointment or designation of counsel, the Debtors will cooperate in the defense and resolution of such Proceedings, and will within a reasonable time provide Appointed Counsel with all pleadings, correspondence, discovery, and existing attorney work product related to such proceedings.

(d)    **Notices in Proceedings**.  Appointed Counsel in any Proceeding will serve a copy of the Lift Stay Order upon all parties to the Proceeding, file a notice of appearance in the applicable Proceeding, and file a notice on the applicable docket providing that the automatic stay of the Proceeding against the Debtors has been modified and the proceeding will continue as against the Debtors.  Appointed Counsel, at J&J's direction, will be authorized to (i) conduct the defense of the Debtors in the Proceeding, and/or (ii) settle J&J Talc Claims on behalf of the Debtors without prior Bankruptcy Court approval; *provided*, *however*, that such settlements will be covered by the J&J Indemnity Proposal and paid by J&J.

WEIL:\97367400\36\54966.0222

(e)    **Communication with Claimants' Counsel**.  Appointed Counsel will inform claimants' counsel of the impact of the Lift Stay Order on the J&J Talc Claims, including that (i) plaintiffs' exclusive means of recovery on their J&J Talc Claims are through commencement of a lawsuit or other non-bankruptcy proceeding against the Debtors and defended by J&J or Appointed Counsel on behalf of the Debtors, or through settlement with J&J or Appointed Counsel on behalf of the Debtors, and (ii) J&J is fully indemnifying the Debtors for the J&J Talc Claims, and confer with the claimants' counsel, if necessary, to determine a course of action to advance the Proceeding in light of the Lift Stay Order and the Debtors' participation in the Proceeding.  In any Debtor-Dismissed Proceeding in which the Debtors had been dismissed without prejudice as a co-defendant, or any Postpetition Proceeding in which the Debtors are not named co-defendants, J&J will make reasonable efforts, where feasible and if desired by claimants' counsel, to facilitate the addition or joinder of the applicable Debtor(s) as co-defendants in accordance with local procedural rules; *provided*, *however*, that if the Proceeding is beyond the discovery stage and claimants' counsel determines not to include the Debtors as co-defendants, J&J will not seek to add them.

(f)    **Proofs of J&J Talc Claims**.  J&J will notify any J&J Talc Claimant that files a proof of clam for its J&J Talc Claim in these chapter 11 cases that the defense and any resolution of such Claim will be conducted by J&J in the applicable non-bankruptcy forum and, if the J&J Talc Claimant is not already party to a Proceeding, that the J&J Talc Claimant must commence or join a Proceeding to recover on account of such Claim.  The Debtors will use reasonable best efforts to notify J&J of any proof of claim filed for a J&J Talc Claim.

(g)    **Debtors' Cooperation**.  The Debtors shall cooperate in good faith in the defense of J&J Talc Claims, including maintaining their attorney-client, attorney work product, and joint defense privilege claims vis a vis any talc claimant and making the Debtors' discoverable documents, witnesses, and experts available to J&J in the defense of the J&J Talc Claims or in any insurance coverage litigation relating to the J&J Talc Claims to the extent necessary.  Such witnesses and experts will provide truthful testimony consistent with testimony provided by the Debtors' witnesses and experts in past talc litigation.  In addition, the Debtors shall abide by the obligations of the agreements between J&J and the Debtors, including the obligations of good faith and fair dealing.

25.    As part of the Talc Litigation Protocol, if (and only if) this Motion is granted, J&J will waive the J&J Indemnity Claims and the J&J Indemnity Defenses (such waiver, the "**J&J Indemnity Claims and Defense Waiver**"), while settling numerous challenges to indemnity, as a condition to assuming the defense of and indemnifying the J&J Talc Claims; *provided*, *however*, that J&J reserves its rights to assert any defenses to indemnity based on actions or conduct of the

Debtors occurring after the Petition Date or taken in connection with these chapter 11 cases.[25]  In

addition, as part of the Talc Litigation Protocol, J&J also reserves its rights to seek reimbursement

from the Debtors' insurance carriers to the extent of coverage that would otherwise be available to

pay the Debtors' legal costs and liability for J&J Talc Claims.

## RELIEF REQUESTED

26.     Under section 362(d)(1) of the Bankruptcy Code, J&J seeks entry of the Lift Stay

Order, substantially in the form annexed hereto as **Exhibit A**, modifying the automatic stay to

authorize (a) J&J to implement the Talc Litigation Protocol; (b) J&J Talc Claimants to pursue their

J&J Talc Claims against the Debtors solely outside of the chapter 11 cases; and (c) J&J to enforce

its rights to assume the defense of, and make decisions with respect to, resolution of the J&J Talc

Claims and to have the exclusive right to resolve them; *provided*, *however*, that payment of any

costs or recoveries and enforcement of any settlements or judgments with respect to the J&J Talc

Claims obtained by the J&J Talc Claimants against the Debtors are recoverable only against J&J.[26]

27.     J&J will have "party in interest" standing in bankruptcy court proceedings to the

extent they affect J&J or its litigation and defense of the J&J Talc Claims.

## BASIS FOR RELIEF REQUESTED

28.     The J&J Indemnity Provisions entitle J&J to control decisions as to whether to try

or settle the J&J Talc Claims with respect to the J&J-Covered Years.[27]  If the Lift Stay Order is

entered, J&J would be permitted to exercise its rights to assume the defense of and control

---

[25] J&J is not waiving any argument under the applicable agreements and/or applicable law that relate to any claims to indemnify for punitive damages liability.

[26] J&J believes it could ultimately obtain similar relief as requested in this Motion by filing a motion to compel assumption (or rejection) of the contracts containing the J&J Indemnity Provisions under section 365(a) of the Bankruptcy Code.  J&J reserves the right to file such a motion.

[27] *See* Ex. C, § 11.4.

15

decisions as to whether to resolve any J&J Talc Claims, and in connection therewith, would fully indemnify the Debtors for all J&J Talc Claims liability, offer the J&J Indemnity Claim and Defense Waiver, and implement the Talc Litigation Protocol.  Not only will J&J Talc Claimants receive a full recovery from J&J if they prevail in litigation of the J&J Talc Claims, but J&J's offer to defend and indemnify <u>all</u> J&J Talc Claims, regardless of whether any exposure was alleged in J&J-Covered Years, Debtor-Covered Years, or Gap Years, is a significant expansion of the J&J Indemnity Provisions.  J&J's February Offer thus confers significant benefits on the Debtors, the J&J Talc Claimants, and the Debtors' estates.  There is no conceivable harm that could result to the Debtors or their estates from the relief requested.

29.    J&J, on the other hand, would suffer prejudice if this Motion is denied.  Should the status quo continue, J&J will be prohibited from exercising its contractual rights to assume the defense of the Debtors in the J&J Talc Claims and to control settlement decisions, while presumably the Debtors will seek payment from J&J on the indemnity with respect to the J&J Talc Claims for the J&J-Covered Years.  The automatic stay should not permit the Debtors to realize the benefits of the J&J Indemnity Provisions without acknowledging the corresponding obligation to allow J&J to assume the defense of and authority to decide whether to resolve any of the underlying claims.  The potential harms to J&J far outweigh any potential prejudice to the Debtors, which as discussed above, is non-existent.  As a result, and for the reasons stated herein, cause exists to enter the Lift Stay Order and the enforcement of J&J's rights under the J&J Indemnity Provisions is in the best interests of the Debtors, their creditors, and their estates.

**A.    Cause Exists to Modify the Automatic Stay for Non-Bankruptcy Litigation of the J&J Talc Claims.**

30.    Cause exists to modify the automatic stay for J&J to exercise its rights to assume the defense of the J&J Talc Claims—the very same claims that the Debtors allege precipitated

these chapter 11 cases—and indemnify the Debtors by implementing the Talc Litigation Protocol.

Section 362(d)(1) of the Bankruptcy Code provides, in relevant part, that:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or condition such stay—
>
> (1) for cause . . .

11 U.S.C. § 362(d).

31.     Courts generally consider three factors (the "*Rexene* Factors") to determine whether "cause" exists to permit the continuation of prepetition litigation outside the bankruptcy court:

> (a) whether any great prejudice would be suffered by the debtor or its estate by the continuation of such litigation;
>
> (b) whether the hardship to the movant caused by maintenance of the stay outweighs the hardship to the debtor from its modification; and
>
> (c) the probability of success by the movant on the merits of such litigation if the stay is lifted.

*See*, *e.g.*, *In re Cont'l Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993); *In re Pro Football Weekly*, 60 B.R. 824, 826 (N.D. Ill. 1986); *In re Pursuit Athletic Footwear, Inc.*, 193 B.R. 713, 718 (Bankr. D. Del. 1996); *In re Rexene Products. Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992); *In re Namazi*, 106 B.R. 93, 94 (Bankr. E.D. Va. 1989).  As shown in more detail below, application of the *Rexene* factors to these chapter 11 cases demonstrates convincingly that "cause" exists to grant the relief requested by J&J.

32.     The Bankruptcy Code's policy underlying imposition of the automatic stay supports permitting the Lawsuits to continue in their original forums.  Notably, Congress designed the automatic stay to relieve a debtor of "the financial pressures that drove [it] into bankruptcy" and to protect a debtor and its estate from being whittled away by creditors' lawsuits.  *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1033 (3d Cir. 1991) (quoting H. Rep. No. 95-595, 95th

17

Cong., 1st Sess., 340 (1977)).  Where proceedings will neither interfere with the debtor's pending

bankruptcy case nor result in any great prejudice to the debtor's bankruptcy estate, however, these

policies are not implicated, and "cause" exists to terminate or otherwise modify the stay.

33.     Because the relief requested does not impinge upon the Debtors' equity in property

of the estate, the burden of proof rests squarely on any non-movant to demonstrate that no cause

exists to lift the automatic stay.  *See* 11 U.S.C. 362(g) ("In any hearing under subsection (d) . . .

concerning relief from the [automatic] stay . . . (1) the party requesting such relief has the burden

of proof on the issue of the debtor's equity in property; and (2) the party opposing such relief has

the burden of proof on all other issues."); *see also In re Abeinsa Holding, Inc.*, Case No. 16-10790

(KJC), 2016 WL 5867039, at *3 ("Since the Debtors' equity in property is not at issue here, the

burden to resist lifting of the stay rests entirely with the Debtor . . . [section 362 of the Bankruptcy

Code], by its burden shifting, seems almost [] to ask, 'why shouldn't the stay be lifted?'").

*1.*     *Lifting the Automatic Stay Will Not Prejudice the Debtors or their Estates and Will Not Impact Property of the Estate (Other than Property that Otherwise May Be Used to Pay J&J Talc Claims).*

34.     Neither the Debtors nor their estates will be prejudiced if the automatic stay is

modified, as requested by J&J.  To the contrary, the relief requested provides a substantial benefit

to the Debtors' estates by (i) removing the J&J Talc Claims from the claims that must be resolved

in these chapter 11 cases and guaranteeing their payment in full to the extent they prove

meritorious, (ii) offering to defend and indemnify J&J Talc Claims for Debtor-Covered Years and

the Gap Years that would not be covered by the J&J Indemnity Provisions, and (iii) J&J waiving

its indemnity claims against the Debtors in the Debtor-Covered Years.

35.     The first benefit to the Debtors is the elimination from the Debtors' estates of over

ten thousand claims, leaving more assets to cover any remaining claims against the Debtors.  The

only claims that would be left encumbering the Debtors' estates are claims that will receive a better

recovery from the value of the business. The Debtors contend that they "lack the financial wherewithal to litigate against the mounting Talc Claims . . . asserted against them in the tort system." First Day Declaration, ¶ 9. A vast majority of these claims are J&J Talc Claims that are covered by J&J's offer to defend and indemnify the Debtors. The relief requested in this Motion, therefore, provides a substantial benefit to the Debtors by relieving them of the financial burdens of J&J Talc Claim liabilities and defense costs that allegedly led to their bankruptcy filings. It cannot be credibly argued that this financial boon to the Debtors (and as a result, their creditors) in any way prejudices the Debtors or their estates.

36.     Far from "interfer[ing] with the orderly liquidation or rehabilitation of the debtor," *In re Tribune Co.*, 418 B.R. at 127 (quoting *Rexene*, 141 B.R. at 576), modifying the stay to allow J&J to assume the defense of and indemnify the J&J Talc Claims would promote the orderly reconciliation of the much fewer remaining claims against the Debtors and the Debtors' reorganization while simultaneously reducing the burden on this Court's docket. *See In re Glunk*, 342 B.R. 717, 741-42 (Bankr. E.D. Pa. 2006) ("In enacting § 362(d)(1), Congress recognized that 'it will often be more appropriate to permit proceedings to continue in their place of origin . . . to relieve the bankruptcy court from many duties that may be handled elsewhere.'" (internal citations omitted)). The Debtors' estates will have more resources to pay other creditors because J&J's indemnity of the J&J Talc Claims will reduce the Debtors' liabilities to a mere fraction of their current level and eliminate most of the transaction costs the Debtors would otherwise incur in administering the J&J Talc Claims.

37.     The second benefit to the Debtors' estates is the elimination of litigation and uncertainty regarding the Unresolved Indemnity Issues, which would be replaced by J&J's guarantee of indemnifying all J&J Talc Claims if liability is established. Without the relief

requested in this Motion, the Unresolved Indemnity Issues likely will be hotly disputed and litigated among the parties, and parties would litigate numerous complex issues before the J&J Indemnity Provisions would be applied to individual J&J Talc Claims.[28]  Specifically, absent entry of the Lift Stay Order, and assuming the Debtors can assume (and potentially, assign to a trust) the J&J Indemnity Provisions under section 365(a) of the Bankruptcy Code (which is highly doubtful),[29] if the Debtors, the trustee of a section 524(g) trust or other trust, or the J&J Talc Claimants pursue indemnification claims against J&J, litigation costs will not end with the establishment of a trust.  Quite to the contrary, to the extent any chapter 11 plan seeks to pursue indemnification claims against J&J post-confirmation, J&J intends to raise and pursue— vigorously—each and every one of the J&J Indemnity Defenses.

38.  Under the Talc Litigation Protocol, on the other hand, J&J will provide the J&J Indemnity Claim and Defense Waiver, obviating the need for such litigation.  Thus, although J&J reserves its rights to defend against any indemnity should this Motion be denied (and believes it has meritorious defenses), as a part of the Talc Litigation Protocol, J&J proposes to indemnify the Debtors beyond J&J's contractual obligations for all J&J Talc Claims and waive its indemnity claims against the Debtors.  That is, J&J's voluntary assumption of the defense and offer of

---

[28] The 1989 SA contains a carve-out for J&J's indemnity obligations if the talc provided by Windsor/ITV did not conform to specifications.  *See* Ex. B, § 11 ("[J&J] shall have no obligation of indemnification pursuant to this Section 11 in the event that the Talc delivered to [J&J] hereunder did not conform to the specifications for such Talc then in effect . . .").

[29] The Debtors believe the agreements that contain the J&J Indemnity Provisions, like the 1989 SA and 1989 SPA, are "executory contracts" within the meaning of section 365(a) of the Bankruptcy Code.  To the extent the Debtors can still cure their defaults under these agreements (which J&J suspects is not the case), the Debtors would need to do so to enforce their indemnity rights against J&J.  The agreements would be assumed *cum onere*—that is, if the Debtors seek to take advantage of their rights to indemnity in the J&J Indemnity Provisions, they must also permit J&J to exercise its own rights under the agreements—the right to assume the defense.  Regardless, if the Debtors seek to assume the J&J Indemnity Provisions after negotiating and settling with the J&J Talc Claimants without sufficient incentives to resist the J&J Talc Claimants' overreaching, the Debtors' breach will likely be incurable to the extent J&J was excluded from negotiations to its detriment, and the J&J Indemnity Provisions would not be able to be assumed and enforceable against J&J.

indemnity with respect to the J&J Talc Claims will eliminate the Debtors' transactional and litigation costs with respect to such claims and improve recoveries on any meritorious claims.

39.     The third benefit to the Debtors' estates is the elimination of J&J's indemnity claims against the Debtors.  As explained above, depending on the timeframe of the plaintiffs' claimed product use, if the Motion is denied, the Debtors will also owe J&J indemnity for a portion of the J&J Talc Claims.  If (and only if) this Motion is granted, J&J agrees to waive its right to seek compensation on its otherwise valid and enforceable contractual indemnity rights against the Debtors and to withdraw J&J's proofs of claims with prejudice.  These waivers provide substantial benefits to the Debtors and their estates and creditors, making it even more compelling that "cause" exists to lift the stay.

40.     Courts have acknowledged in other contexts that the stay should be lifted to allow plaintiffs to pursue tort claims where a third party will bear in full the costs of defense and pay any judgments, because in those circumstances the impact on the debtor and its estate is minimal—the debtor does not incur defense costs with respect to the claims, and any judgment against the debtor would be paid by the third party.  *See, e.g.*, *In re Armstrong World Indus.*, 106 F. App'x 785, 787 (3d Cir. 2004) (affirming the district court's order lifting the automatic stay to allow plaintiffs to pursue their claims against the debtor outside the bankruptcy forum but only for the purpose of collecting from the debtor's insurance policies).[30]

---

[30] *See also IBM v. Fernstrom Storage & Van Co. (In re Fernstrom Storage & Van Co.)*, 938 F.2d 731 (7th Cir. 1991) (lifting the automatic stay to allow civil litigation against the debtor to proceed so that a liability determination could be made in order for a claimant to collect form the debtor's insurer); *In re Downey Fin. Corp.*, 428 B.R. 595, 611 (Bankr. D. Del. 2010) (finding "cause" existed to lift the automatic stay because claims were being made only against the debtor's insurance policies); *In re Desa Holdings Corp.*, 353 B.R. 419, 422 (Bankr. D. Del. 2006) (noting that the automatic stay was lifted to allow a plaintiff to pursue a personal injury claim against a debtor but limiting the plaintiffs' recovery to applicable insurance coverage); *In re Desoto*, 2006 Bankr. LEXIS 4115, at *16–17 (Bankr. D.N.J. Apr. 20, 2006) (lifting the automatic stay to permit a legal malpractice action against a debtor to proceed in state court but only permitting recovery from the debtor's insurance and not the debtor's personal assets); *In re Winterland*, 101 B.R. 547, 549 (Bankr. C.D. Ill. 1988) (finding "cause" existed to lift the automatic stay because the movant only sought to lift the stay to the extent insurance coverage was available, resulting in a lack of prejudice to

WEIL:\97367400\36\54966.0222

41.     Such is the case here.  If the Motion is granted, J&J will indemnify the Debtors for losses related to the J&J Talc Claims—uncapped and irrespective of the ultimate allowed amount of J&J Talc Claims (as determined in the tort system).  Moreover, J&J has agreed to defend the Debtors against the J&J Talc Claims.  Therefore, there is no concern of depletion of estate assets or unfair treatment to other creditors.     Accordingly, the Debtors would experience no great prejudice if the J&J Talc Claims proceed in the tort system as provided for in this Motion.

2.     *The Balance of the Hardships Weighs in Favor of J&J Because J&J Will Suffer Significant Hardship if the Stay Is Not Lifted.*

42.     Absent relief from the stay to implement the Talc Litigation Protocol, J&J will suffer significant hardship, as compared to the lack of any hardship to the Debtors (and indeed a benefit to the Debtors) if the stay is modified.

43.     If the stay is not modified, J&J will be deprived of a fundamental benefit of its bargain to indemnify the Debtors—the right to control the defense of the Debtors and decision as to whether to settle any of the J&J Talc Claims (that J&J may have a duty to indemnify).  J&J is the party that is most willing, able, and motivated to defend the J&J Talc Claims because of the J&J Indemnity Provisions.  In contrast, the Debtors may not be incentivized to defend and reconcile the J&J Talc Claims diligently in light of the numerous statements made by the Debtors that they seek to settle with the TCC and FCR to the exclusion of J&J and seek indemnity from J&J for the J&J Talc Claims.[31]  It is the classic case of moral hazard.  The mismatch of motivations

---

the debtor); *cf. Royal Ins. Co. of Am. v. McCrory Corp.*, 1996 U.S. Dist. LEXIS 5552, at *2 (S.D.N.Y. Apr. 23, 1996) (reversing a bankruptcy court order denying relief from the automatic stay when a creditor only sought relief from the stay to proceed nominally against the debtor in order to obtain proceeds of the debtor's insurance policy).

[31] To date, the Debtors have excluded J&J from settlement discussions with the TCC and the FCR, even in connection with the J&J Talc Claims.  In fact, in an email dated March 17, 2020, annexed hereto as **Exhibit J**, the Debtors' counsel informed J&J's counsel that the Debtors agreed with the TCC and FCR to not have any discussions with J&J without the participation or consent of the TCC and FCR.  The Debtors are apparently agreeing to such extreme measures to reach a deal with the TCC, the FCR, and the Debtors' parent but at the potential sacrifice of vigorously

of the indemnified party versus the party who ultimately may be on the hook for actually paying the claims, as exemplified here, is the reason why potential indemnitors negotiate for the right to assume the defense and control the litigation, like J&J did through the indemnity provisions in the 1989 SPA and the 1989 SA.[32] The hardship J&J will suffer if the stay is not modified far outweighs any potential hardship to the Debtor if the Court modifies the stay (which, as explained above, is none at all).

44.     The relief requested herein will allow J&J to argue defenses to the J&J Talc Claims, resolve J&J Talc Claims, and satisfy any judgments on the Debtors' behalf (to the extent such claims prevail in the applicable forum) outside of the chapter 11 cases without affecting the assets of the estates.   It will also settle the Unresolved Indemnity Issues without complex post-confirmation litigation in this Court or, more likely, other non-bankruptcy forums.

45.     Moreover, the potential benefits to all creditors weigh in favor of granting this Motion. The J&J Talc Claimants will benefit from the requested modification of the automatic stay because, if such claimants prevail on the merits of their claims, they will obtain a full recovery from J&J, a highly solvent co-defendant, for the Debtors' portions of the liability (in addition to whatever recovery they would get from J&J on behalf of its apportionment of fault).  Because this treatment of the J&J Talc Claims essentially would take them out of the chapter 11 cases and render them unimpaired under section 1124(1) of the Bankruptcy Code, the J&J Talc Claimants would fare far better than they would under any plan the Debtors could propose, which would likely impair such Claims and limit their recovery to a discrete pool of funds.[33]  For both current

---

pursuing the Debtors' available defenses to the J&J Talc Claims.  The Debtors' refusal of the J&J Indemnity Proposals raises doubts as to whether the Debtors are engaging in good faith negotiations.

[32] *See, e.g.*, 1989 SPA § 11.4.

[33] *See, e.g.*, Debtors' *Motion for an Order Further Extending the Exclusive Periods within which to File a Chapter 11 Plan and Solicit Acceptances Thereof*, Case No. 19-10289 (LSS) (Dec. 6, 2019) [D.I. 1292], ¶ 12 ("the Debtors' goal in the Chapter 11 Cases is to efficiently negotiate a plan of reorganization resolving their talc-related personal injury

and future J&J Talc Claimants, J&J offers the potential of full recovery (with respect to legitimate claims), which is a remarkable and highly favorable outcome for such Claimants.

46.    In addition, many of the existing J&J Talc Claimants are already actively suing J&J (or would almost certainly do so in addition to seeking any recovery from the Debtors), so there is no significant administrative burden upon those J&J Talc Claimants to include the Debtors as defendants in the litigation against J&J and other co-defendants.  In fact, the J&J Talc Claimants avoid the cost of having to simultaneously negotiate their claims in the Debtors' chapter 11 cases and split their resources between multiple forums, because as previously discussed, a trust that is assigned the rights under the J&J Indemnity Provisions (to the extent possible) would need to litigate the J&J Indemnity Defenses before a recovery can be obtained from J&J.

47.    Lifting the automatic stay also benefits all other creditors that are not J&J Talc Claimants.  By removing the lion's share of the claims against the Debtors, J&J's proposed relief frees up assets of the Debtors to provide greater distributions to such other unsecured creditors.

48.    In light of the foregoing, no creditor of the Debtors will be prejudiced by the relief sought herein and it is implausible that any party could legitimately oppose this Motion with the best interests of creditors in mind.  The proposed relief treats the J&J Talc Claims exactly as they would be treated outside of bankruptcy, as if the Debtors never filed for chapter 11, other than replacing a potentially insolvent defendant with a highly solvent one.[34]  The J&J Talc Claimants would have their day in court in their chosen forums and be afforded the opportunity to be paid in

---

claims by establishing a funded trust and channeling injunction pursuant to sections 524(g) and 105(a) of the Bankruptcy Code").  For numerous reasons, including the potential need to reserve funds to satisfy future claims, distribution procedures for trusts under section 524(g) typically involve paying only a percentage of allowed claim amounts determined pursuant to those procedures—unlike the indemnity offered by J&J, which will result in final determinations of claim amounts in the tort system (potentially including through settlements) and, if necessary, full payment thereof.

[34] As of the date hereof, J&J has a market capitalization in excess of $326.6 billion.  *See* Bloomberg, JNJ company information and market quotes, available at https://www.bloomberg.com/quote/JNJ:US.

full to the extent the J&J Talc Claims are adjudicated to have merit or are otherwise settled. The only conceivable reason claimants might oppose the requested relief is that they believe their claims will be treated better in these chapter 11 cases than being fully unimpaired and adjudicated outside of bankruptcy on their merits. For example, claimants might seek to negotiate inflated claim estimates or a less-than-rigorous claim scrutiny process, which a debtor (and potentially its non-debtor parent and affiliates seeking to benefit from a channeling injunction) may be pressured to accept absent sufficient financial incentives to challenge them. However, obtaining a recovery in bankruptcy more favorable to a claimant's entitlement outside of bankruptcy is inconsistent with the objectives and purposes of the Bankruptcy Code and is a result the United States Supreme Court has cautioned against. *See Butner v. United States*, 440 U.S. 48, 55 (1979) ("It is an axiomatic principle of chapter 11 practice that creditors cannot be elevated to a better position than their pre-petition legal entitlements.").

49.     J&J attempted to accomplish the relief requested herein consensually with the Debtors through the November Offer and the February Offer. Relief from the automatic stay through this Motion is a result of the Debtors' refusal of those offers. And the Debtors and the J&J Talc Claimants alike benefit from the relief requested in this Motion because the Debtors' failure to accept the J&J Indemnity Proposals may provide J&J with a defense to any claim under the J&J Indemnity Provisions. The J&J Indemnity Claim and Defense Waiver allows prevailing J&J Talc Claimants access to indemnity notwithstanding the Debtors' refusal as a means of offering a comprehensive resolution of the J&J Talc Claims and to assume the defense thereof.

50.     The relief requested by this Motion will also allow the most knowledgeable forums to determine the tort issues in these cases. That is, determinations of various tort issues will require consideration of various state laws, which the multi-district litigation and other state courts may

be better suited—and, in fact, are designed—to do. *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 401 F.3d 143, 146 (3d Cir. 2005) (discussing that the purpose of a multi-district litigation is to facilitate coordination among numerous state and federal suits which purport to concern the underlying conduct); *see also Matter of Royston Dev. Corp.*, 25 B.R. 715, 717 (Bankr. M.D. Fla. 1982) (holding that the most appropriate forum for the resolution of a dispute was the state court because issues presented must be decided solely on the basis of state law). Moreover, modification of the automatic stay will promote judicial economy by resolving claims against the Debtor in the forum that is most familiar with the law associated with a resolution of such claims. *In re Peterson*, 116 B.R. 247, 250 (D. Colo. 1990) ("[O]ne of the primary purposes in granting relief from the stay to permit claim liquidation is to economize judicial resources.").

51.      The likely benefits to the Debtors, their estates, and the J&J Talc Claimants if the relief requested herein is granted, versus the substantial prejudice likely to be suffered by J&J absent the relief requested herein, make the balancing test a lopsided affair in favor of modifying the stay.

   *3.      The Success on the Merits Factor Should Not Be Weighed Heavily in Consideration of the Stay Relief Requested, But Still Weighs in Favor of Granting Such Relief.*

52.      Because J&J is agreeing to assume the Debtors' liability for the J&J Talc Claims, the ultimate outcome of the litigation is not relevant to the administration of the Debtors' estates. Therefore, J&J submits that this factor should not be considered by the Court. Even assuming success on the merits is a relevant factor, however, J&J believes that it (and the Debtors as named parties) is likely to succeed on the merits of its defenses to the J&J Talc Claims. The relief requested in this Motion allows J&J to pursue various meritorious defenses to the underlying claims to both J&J's and the Debtors' benefit. Absent the relief requested in this Motion, while

26

J&J would preserve its J&J Indemnity Claims and J&J Indemnity Defenses, it may effectively be deprived of any means to argue its underlying defenses to J&J Talc Claims after they reach resolution as between the Debtors and the J&J Talc Claimants. Therefore, this factor weighs in favor of lifting the stay and allowing the J&J Talc Claims to proceed in the tort system.

**B.      Maintaining the Automatic Stay Will Not Further the Policies of and Purposes for the Automatic Stay.**

53.      As this Court has observed, in addition to considering the *prima facie* case for cause to lift the automatic stay, the Court should also consider the general policies underlying the automatic stay and whether they are furthered by denying the relief requested in a motion. *See In re Scarborough-St. James Corp.*, 535 B.R. 60 (Bankr. D. Del. 2015). The policies underlying the automatic stay do not favor enforcing the stay to prevent J&J's assumption of the defense and the indemnity of J&J Talc Claims.

54.      The Third Circuit has explained that the underlying purpose of the automatic stay is to "prevent certain creditors from gaining preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *In re W.R. Grace & Co.*, 2007 Bankr. LEXIS 1214, at *6-7 (Bankr. D. Del. Apr. 13, 2007) (citing *Borman v. Raymark Industries, Inc.,* 946 F.2d 1031, 1036 (3rd Cir. 1991)); *In re Tribune Co.*, 418 B.R. at 127. None of those purposes are furthered by continuing the application of the stay to the J&J Talc Claims in light of J&J's indemnity offer.

55.      *First*, no creditors would gain an unfair preference for their claims against the Debtors by lifting the stay. In fact, lifting the automatic stay would eliminate creditors of the Debtors' bankruptcy estates by removing the J&J Talc Claims, which would proceed in the tort system where the claimants could recover in full from J&J. The claims of other creditors in these

chapter 11 cases would remain stayed and be resolved through the bankruptcy process. Neither group of creditors would be skipping ahead of the other in preference. Therefore, no unfair advantage would occur by lifting the stay.

56.     *Second*, the Debtors' assets would not be depleted by allowing the J&J Talc Claims to proceed in the tort system. J&J is agreeing to indemnify and assume the defense and resolution of the J&J Talc Claims, relieving the Debtors of any go-forward defense costs for the J&J Talc Claims, and to indemnify the Debtors with respect to judgments against the Debtors. In addition, J&J would agree to waive any claims for indemnity, contribution, or reimbursement from the Debtors with respect to the J&J Talc Claims. The J&J Talc Claims are the vast majority of the Debtors' potential liabilities. Thus, there is no possibility that granting the relief requested will result in the Debtors' assets being depleted.

57.     *Third*, there would be no interference with the reorganization of the Debtors. Granting the Motion allows the Debtors to unload their largest liabilities—the liabilities that they assert drove them into bankruptcy. It will pave the wave for the Debtors to propose a much simpler plan of reorganization that allows them to emerge successfully from chapter 11 and provide the best possible result for the Debtors and their creditors.

58.     In addition, enforcing the stay in these circumstances would actually delay the administration of these chapter 11 cases because the J&J Talc Claims will presumably need to be liquidated or estimated by the Bankruptcy Court (whether for purposes of allowance, plan feasibility, or contributions to a trust). Allowing J&J to indemnify the Debtors for the J&J Talc Claims and assume the defense of such claims allows the chapter 11 cases to proceed without requiring any resolution or estimation of any of the J&J Talc Claims, which the Debtors claim precipitated the chapter 11 cases.

59.     Although not an enumerated policy underlying the automatic stay, the interests of judicial economy are also best served by the requested stay modification. Lifting the stay would advance the orderly progress of the cases, rather than staying them as against the Debtors only, which creates discontinuities and inefficiencies between multiple forums, and skews participating parties' incentives. Modifying the stay therefore minimizes the prejudice suffered by the non-debtor defendants like J&J, as well as the plaintiffs who may be litigating in two forums. It is far more efficient for common issues raised in the talc litigation and claims against both the Debtors and J&J to be resolved once, in combined non-bankruptcy forum litigation (with J&J assuming the Debtors' defense and indemnifying the Debtors for losses).

60.     The stay, thus, should be lifted to allow J&J to indemnify and assume the defense of the J&J Talc Claims because J&J's indemnification offer will eliminate the very harms the automatic stay was intended to alleviate.

## <u>CONSENT TO JURISDICTION</u>

61.     Pursuant to Local Rule 9013-1(f), J&J consents to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties; *provided*, *however*, that J&J submits to the Court's jurisdiction for the limited purposes of the Court's determination as to the lifting of the automatic stay under section 362(a) of the Bankruptcy Code for J&J to assume the defense of the J&J Talc Claims from the Debtors and to indemnify the Debtors with respect thereto, and not in connection with any findings related to the scope of the J&J Indemnity Provisions, the merits of claims and defenses waived by the J&J Indemnity Claim and Defense Waiver, or any other issue.

## NOTICE

62.     Notice of this Motion will be given to: (a) counsel for the Debtors; (b) the Office of the United States Trustee for the District of Delaware; (c) counsel for the TCC; (d) counsel for the FCR; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1.  J&J submits that, under the circumstances, no other further notice is required.

63.     A copy of this Motion is available on (a) the Court's website: www.deb.uscourts.gov, and (b) the website maintained by the Debtors' Claims and Noticing Agent, Prime Clerk LLC, at https://cases.primeclerk.com/imerystalc.

## CONCLUSION

64.     For the reasons stated herein, J&J asks this Court to enter an order substantially in the form attached hereto as **Exhibit A**, granting relief from the stay under Bankruptcy Code section 362(a) to allow J&J to assume the defense of the J&J Talc Claims and indemnify the Debtors with respect to any costs and judgments in respect thereof, and such other and further relief as the Court deems just and proper.

WEIL:\97367400\36\54966.0222

Dated: March 20, 2020
      Wilmington, Delaware

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Del. Bar No. 4976)
222 Delaware Ave., Ste. 1410
Wilmington, Delaware 19801
Telephone: (302) 467-4210
Facsimile: (302) 651-7701
Patrick.Jackson@faegredrinker.com

-and-

**WEIL, GOTSHAL & MANGES LLP**
Diane P. Sullivan (admitted *pro hac vice*)
Gary T. Holtzer
Ronit J. Berkovich (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Johnson & Johnson and Johnson &
Johnson Consumer Inc.*

# EXHIBIT F

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | Chapter 11 |
| CYPRUS MINES CORPORATION,[1] | Case No. 21-10398 |
| Debtor. | |

## DECLARATION OF D. J. (JAN) BAKER, INDEPENDENT DIRECTOR OF THE DEBTOR, IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, D. J. (Jan) Baker, hereby declare as follows:

1.      I am the sole Independent Director of Cyprus Mines Corporation (the "Debtor"), having been elected on February 1, 2020.  I am authorized to submit this declaration (this "Declaration") on behalf of the Debtor.

2.      I am a lawyer and a member of the bar of New York.  I began my legal career in 1973, as an associate at Fulbright & Jaworski in Houston, Texas.  I became a partner at that firm in 1980 and continued to practice as a partner there and at four other firms over the next 36 years.  I joined Weil, Gotshal & Manges LLP in 1985; Gibson Dunn & Crutcher LLP in 1999; Skadden, Arps, Slate, Meagher & Flom LLP in 2001; and Latham & Watkins, LLP in 2008.  I was a global co-chair of the restructuring practice groups at Gibson, Dunn & Crutcher and at Latham & Watkins.  I retired from Latham & Watkins in 2016.  At each of these firms, I specialized in restructuring and reorganization matters and thus am familiar with the Bankruptcy Code and the Bankruptcy Rules (each as defined herein).  During my law practice, I represented approximately 150 companies in either in-court or out-of-court restructuring matters.  Since my retirement from

---

[1]  The last four digits of the Debtor's taxpayer identification number are 0890.  The Debtor's address is 333 N. Central Ave., Phoenix, AZ 85004.

amkerlin-152340008

Latham & Watkins, I have served as an independent, outside director for approximately 25 companies going through bankruptcy or restructuring processes, including the Debtor.

3.      Since joining the Debtor's Board of Directors, through a review of external and internal documents and my discussions with knowledgeable persons, I have become familiar with the Debtor's history, assets, financial condition, policies and procedures, books and records, and litigation. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from persons directly involved in serving the Debtor or retained advisers who report to me in the ordinary course of my responsibilities. References to the Bankruptcy Code, the chapter 11 process, and related legal matters are based on my understanding of such matters from my own experience. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

5.      I submit this Declaration on behalf of the Debtor in support of the Debtor's chapter 11 petition for relief and various "first-day" and "second-day" motions (collectively, the "Motions").[2] The Debtor has relatively small business operations, including the ownership of various parcels of real property, certain royalty interests that have generated *de minimis* revenue (*e.g.*, less than $1,500 in each of the past two calendar years), and the ownership of a subsidiary that is not a debtor herein. Accordingly, the Debtor is not seeking extensive first-day relief. The

---

[2]  Unless otherwise defined herein, all capitalized terms shall have the meanings ascribed to them in the applicable Motions.

Debtor, however, is seeking approval of debtor-in-possession financing and a number of administrative motions relevant to the conduct of this chapter 11 case.

6.      I have reviewed the Debtor's petition and the Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to enable the Debtor to administer its estate and affairs efficiently.

7.      At the outset, it is important to emphasize that a critical goal of the Debtor's chapter 11 filing (this "Chapter 11 Case") is to enable the Debtor to manage in a fair and comprehensive manner existing and future tort claims against it alleging personal injury resulting from exposure to talc products that were manufactured and distributed by others using talc mined and sold by the Debtor or its former subsidiaries.  Much of the balance of this Declaration is devoted to explaining how in my view the Chapter 11 Case can and should achieve that purpose.

8.      In particular, as I describe in detail in the first section of this Declaration below, the Debtor is a predecessor in interest of Imerys Talc America, Inc. ("ITA"), a debtor in a chapter 11 case in this Bankruptcy Court at Case No. 19-10289 (LSS).  Recently, after an extensive investigation and analysis by my advisors and me, the Debtor has agreed, together with certain of its non-debtor affiliates, to a fair and comprehensive settlement with ITA and certain other parties to the ITA chapter 11 case regarding the treatment of Talc Personal Injury Claims (as defined later in this Declaration).  The further implementation of that settlement, which I discuss later in this Declaration, is the focal point of this Chapter 11 Case.

9.      Accordingly, Part I of this Declaration provides an overview of the Debtor's corporate history and its relationship with ITA.  Part II of this Declaration summarizes the Debtor's current status and its assets and liabilities, including talc-related claims against the Debtor.  Part III addresses the circumstances leading to commencement of, and the objectives for, this Chapter 11

Case, including the development, structure and contemplated implementation of the settlement. Part IV discusses the relevant facts in support of the Motions.

## I. THE DEBTOR'S CORPORATE HISTORY

### A. The Debtor's Corporate History

10. Cyprus Mines Corporation ("CMCNY") was formed as a New York corporation in 1916. In 1964, CMCNY expanded into the talc business with the acquisition of 100% of the stock of Sierra Talc Company.

11. Talc is a hydrated magnesium silicate that is used in manufacturing dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals. Talc is mined from talc deposits, which are geologically formed through the transformation of rocks under the effect of hydrothermal fluids carrying components needed to form the mineral.

12. In 1965, CMCNY acquired Southwestern Talc Company and formed two wholly-owned subsidiaries. It used the first—CMC-Sierra Corporation—to hold title to a facility in Ghent, Belgium that processed crude talc shipped from the United States and Australia. The second was United Clay Mines Corporation, and CMCNY merged the assets of Sierra Talc Company with United Clay Mines Corporation to form United Sierra Corporation ("United Sierra"). For the entirety of its existence, United Sierra mined clays and talcs from various properties across the United States that were owned by its parent, CMCNY. It principally sold its products to the pulp and paper, paint, ceramic, plastic, rubber, cosmetic, and agricultural industries via sales that were handled by CMCNY's sales force and a network of qualified distributors.

13. In 1974, CMCNY changed the name of United Sierra to Cyprus Industrial Minerals *Company*, and changed the name of CMC-Sierra Corporation to Cyprus Industrial Minerals

- 4 -

*Corporation.*  In that same year, CMCNY also created another wholly-owned subsidiary, Cyprus Georesearch Company.

14.     In 1978, CMCNY dissolved Cyprus Industrial Minerals Company and operated its businesses as a division.  Cyprus Industrial Minerals Corporation and Cyprus Georesearch Company remained wholly-owned subsidiaries of CMCNY at that time.

15.     In 1979, CMCNY, through Cyprus Georesearch Company, acquired the assets, but not the liabilities, of Charles Mathieu, Inc., an importer and distributor of cosmetic talc.[3]

16.     In April 1979, Standard Oil Company (Indiana) created Amoco CYM Corporation, a Delaware corporation and wholly-owned subsidiary, for the sole and express purpose of acquiring CMCNY.  In September of that year, CMCNY merged with and into Amoco CYM Corporation.  Amoco CYM Corporation, as the surviving entity, then changed its name to Cyprus Mines Corporation, which is the Debtor in this Chapter 11 Case.

17.     The Debtor received through the 1979 merger all rights to the historical insurance policies of CMCNY, which policies continue to provide coverage for, and relate to, various current and former businesses of the Debtor and its affiliates, including, but not limited to, the talc operations of the Debtor and certain of its former subsidiaries.  As I discuss below, ITA disputes the Debtor's claim and asserts its own competing claim to the coverage rights under these historical insurance policies.

---

[3]  The California Superior Court has held at least four times that, because Cyprus Georesearch Company/ CMCNY did not acquire Charles Mathieu, Inc.'s liabilities and Charles Mathieu, Inc. remained in business after Cyprus Georesearch Company bought its assets, Cyprus Georesearch Company and/or CMCNY are not Charles Mathieu, Inc.'s successor and did not assume liabilities arising out of its operations.  *See* Statement of Decision at 7, *Alfaro v. Colgate-Palmolive Co.*, No. BC583520 (Cal. Super. Ct. May 27, 2016); Order at 2, *Colpitts v. Am. Int'l, Inc.*, No. BC600850 (Cal. Super. Ct. Sept. 8, 2016); Tr. at 110-13, *Herford v. AT&T Corp.*, No. BC646315 (Cal. Super. Ct. Sept. 28, 2017); Statement of Decision at 8, *Von Salzen v. Am. Int'l Indus.*, No. BC680576 (Cal. Super. Ct. Aug. 1, 2018).

18.     In 1980, Standard Oil Company (Indiana) contributed the stock of the Debtor to Amoco Minerals Company, a wholly-owned subsidiary of Standard Oil Company (Indiana) incorporated under Delaware law. Amoco Minerals Company then merged Cyprus Georesearch Company into the Debtor.

19.     In 1985, Standard Oil Company (Indiana) changed its name to Amoco Corporation, and Amoco Minerals Company changed its name to Cyprus Minerals Company. Amoco Corporation thereafter spun off Cyprus Minerals Company as an independent company, with the Debtor remaining as its subsidiary.

20.     On January 6, 1989, the Debtor and Johnson & Johnson entered into a stock purchase agreement (the "1989 SPA"), pursuant to which the Debtor acquired all of the stock of Windsor Minerals, Inc. Windsor Minerals, Inc. operated talc mines in Vermont and historically supplied talc to Johnson & Johnson for use in baby powder. In connection with the acquisition, Windsor Minerals, Inc. entered into a supply agreement (the "1989 SA"), pursuant to which it continued to supply talc to Johnson & Johnson. The Debtor renamed Windsor Minerals, Inc. as Cyprus Windsor Minerals Corp. ("Windsor"). Windsor supplied Johnson & Johnson with talc between 1989 and 1992. The Debtor itself never supplied talc to Johnson & Johnson except for a limited period between December 1979 and March 1980. As discussed below, the 1989 SPA and 1989 SA contained indemnification obligations in favor of the Debtor and its affiliates by Johnson & Johnson for historical talc products as well as those sold by Windsor under the 1989 SA.

### B.     The Debtor-Imerys Connection

21.     In June 1992, the Debtor sold its talc-related assets to RTZ America Inc. (later known as Rio Tinto America, Inc.) ("RTZ") through a two-step process. *First*, the Debtor transferred its talc-related assets and liabilities (subject to minor exceptions that are not relevant), including its stock in Windsor, to Cyprus Talc Corporation, a newly formed subsidiary of the

Debtor, pursuant to an Agreement of Transfer and Assumption, dated June 5, 1992 (as amended, the "1992 ATA").  *Second*, the Debtor sold the stock of Cyprus Talc Corporation to RTZ pursuant to a Stock Purchase Agreement, also dated June 5, 1992 (as amended, the "1992 SPA").[4]  The purchase price was approximately $79.5 million.

22.     In 1993, after the sale to RTZ, Cyprus Minerals Company (the Debtor's parent) merged with AMAX Inc. to form Cyprus Amax Minerals Co. ("CAMC" and, together with the Debtor, "Cyprus").  The Debtor remains a subsidiary of CAMC.  I understand that Amoco Minerals Company, Cyprus Minerals Company, and CAMC never mined, sold, or distributed talc.

23.     Soon after the 1992 transactions, RTZ merged Cyprus Talc Corporation with RTZ's existing subsidiary, Luzenac America, Inc.  As the surviving corporation, Cyprus Talc Corporation then changed its name to Luzenac America, Inc.  In 2011, RTZ sold the stock of Luzenac America, Inc. to Imerys Minerals UK, Ltd., which then changed the name of Luzenac America, Inc. to ITA. As part of these transactions, Windsor became Imerys Talc Vermont, Inc. ("ITV").

24.     By virtue of the 1992 ATA, the entity now named ITA (formerly Cyprus Talc Corporation) expressly and broadly assumed the talc liabilities of the Debtor and its former subsidiaries that were in the talc business.  Specifically (but without limitation), paragraph 4 of the 1992 ATA provides that Cyprus Talc Corporation (*i.e.*, ITA):

> shall assume and shall perform, pay, and discharge all of the liabilities or obligations, whether known or unknown, contingent or otherwise primarily relating to the Transferred Assets, including, without limitation, liabilities and obligations, whether known or unknown, contingent or otherwise arising out of the transactions or events occurring on or prior to the Closing and relating primarily to the Transferred Assets.

---

[4]  The Debtor also sold its French and German talc businesses to RTZ's French subsidiary.

Therefore, as of and since the closing of the transactions under the 1992 SPA, talc liabilities relating to the pre-transfer talc business of the Debtor, and its former subsidiaries, now rest with ITA and its subsidiaries (including ITV, now a subsidiary of ITA).   Under the 1992 ATA, moreover, the Debtor has claims against ITA to the extent the Debtor incurs or has incurred liabilities or obligations relating to the talc business it transferred to ITA in 1992.  Following the 1992 transactions, the Debtor engaged in no talc-related business activity.

25.     On February 13, 2019, ITA, ITV, and Imerys Talc Canada Inc. ("ITC" and, collectively with ITV and ITA, the "Imerys Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Imerys Debtors' chapter 11 cases are being jointly administered as *In re Imerys Talc America, Inc.*, No. 19-10289 (LSS) (Bankr. D. Del.).

## II.     THE DEBTOR'S OPERATIONAL STATUS, ASSETS, AND LIABILITIES

### A.     Operational Status

26.     The Debtor is a Delaware corporation and a wholly-owned subsidiary of CAMC, which is an indirect subsidiary of Freeport-McMoRan Inc. ("Freeport").  As described above, the Debtor had significant operations.  At the time of the 1992 transaction, as reflected by the $79.5 million purchase price paid by RTZ for the Debtor's talc business, the Debtor and its subsidiaries had substantial talc operations and revenues.  At that time, the Debtor or subsidiaries had over 500 employees and operated approximately eight talc mines in the United States.

27.     The Debtor currently has relatively limited business operations, which include the ownership of various parcels of real property, certain royalty interests that generate *de minimis* revenue (*e.g.*, less than $1,500 in each of the past two calendar years), and the ownership of an operating subsidiary that conducts marketing activities, as described below.  The Debtor has officers and directors, but it no longer has employees itself.  Certain administrative support

services, including in-house legal, tax, and accounting, have been, and will continue to be, provided to the Debtor by affiliated companies, including its ultimate parent, Freeport.  In recent years, the costs of these services have been recorded as capital contributions from CAMC to the Debtor.  Similarly, the Debtor's accounts payable, including outside legal expenses and environmental remediation obligations, have been funded in recent years by Freeport or CAMC via capital contributions from CAMC to the Debtor.

### B.  Description of the Debtor's Assets

28.     The Debtor's assets fall into four primary categories:  real property, insurance rights, indemnification rights, and other personal property.  Each of these asset categories is described below.

29.     <u>Real Property</u>.  The Debtor's real property consists of:  (i) a 5-acre vacant residential lot near Hartsel, Colorado; (ii) approximately 83-acres in Sault Ste. Marie, Michigan, which is a former leather tannery site that has been on the Environmental Protection Agency's National Priorities List since 1990; (iii) an approximately 50-acre former talc mining site located in the Town of Windham, Vermont, along with an adjoining 13.1 acres in which the Debtor holds only a mineral rights interest; and (iv) a 25% mineral rights interest in 1,200 acres in Sheridan County, Wyoming.

30.     <u>Insurance Rights</u>.  The Debtor and its affiliates assert rights to numerous insurance policies that provide coverage for product liabilities (the "<u>Cyprus Historical Policies</u>").  The Cyprus Historical Policies consist of numerous primary, excess, and umbrella comprehensive general liability insurance policies issued, or otherwise providing coverage, to the Debtor and/or its current or former affiliates between 1961 and 1986.  The policies provide coverage for bodily injury that occurs during the respective policy periods.  The Debtor is informed and believes that all of the primary liability policies that could provide coverage for asbestos-related liabilities

arising out of the talc business of the Debtor and/or its current or former affiliates have been exhausted, except for primary liability policies issued by The American Insurance Company from May 1961 to October 1964. The remaining coverage consists of umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total aggregate limits in excess of $100 million (plus certain additional policies issued to Standard Oil Company (Indiana) or affiliates between 1980 and 1985). The Debtor's ownership of insurance rights has been challenged by the Imerys Debtors, as discussed in more detail below.

31. <u>Indemnification Rights</u>. The Debtor and its affiliates, including CAMC, believe that they have indemnity rights against Johnson & Johnson or one of its affiliates for talc-related claims. Under the 1989 SPA, pursuant to which the Debtor purchased Windsor (the entity known today as ITV), Johnson & Johnson agreed to indemnify the Debtor and affiliates for any product liability-based claim arising out the sale of talc to J&J prior to the January 6, 1989, closing date. In addition, under the 1989 SA, Johnson & Johnson agreed to indemnify Windsor (and its affiliates, including the Debtor) from and against all liabilities arising out of any product liability-based claim for which Johnson & Johnson is directly or indirectly responsible as a result of Johnson & Johnson's manufacture, shipment, and sale of a talc-containing product derived from talc delivered under the 1989 SA. While the Debtor has additional protection from the talc-related claims through these indemnification agreements with Johnson & Johnson, the Debtor's ability to recover under the indemnification agreements in a timely fashion is uncertain. As of the date hereof, Johnson & Johnson has refused to acknowledge or honor its indemnification obligations. As discussed below, Cyprus has brought an adversary proceeding against Johnson & Johnson to establish and enforce Cyprus's indemnity rights.

32.   <u>Other Personal Property</u>.  The Debtor has certain other personal property, including: (i) equity in a subsidiary called Climax Molybdenum Asia Corporation ("<u>Climax</u>"), a Delaware corporation with principal operations in Tokyo, Japan; (ii) a 0.000625% overriding royalty interest in oil and gas production on real property located in Rio Arriba County, New Mexico; and (iii) certain potential claims and causes of action against its immediate parent, CAMC, which are being resolved pursuant to the Cyprus Settlement, discussed more fully below.  Climax, the subsidiary of the Debtor, conducts sales and marketing of molybdenum and copper on behalf of other Freeport entities.  It has several employees based in Japan.

**C.   Description of Talc Personal Injury Claims**

33.   The Debtor's most significant alleged liabilities are the numerous Talc Personal Injury Claims asserted against it.

34.   From 1992 until 2010, talc-related lawsuits against the Debtor were rare.  In the last decade, however, the number of lawsuits against the Imerys Debtors, the Debtor, and CAMC have greatly increased.  In these cases, two types of allegations have predominated:  asbestos contamination in talc-based personal care products, and exposure to talc products that are not alleged to be contaminated with asbestos.  The primary targets of these suits have been the producers of talc-containing products, but defendants in many of these cases also include talc miners and distributors.  The Debtor and its immediate parent, CAMC, have been among those targeted.  Many of the claims against CAMC have been dismissed on the ground that it did not mine or distribute talc; others against the Debtor and CAMC have settled.

35.   Today, the Debtor is among the defendants in hundreds of actions brought before several U.S. federal and state courts by plaintiffs asserting personal injuries resulting from exposure to talc products which were manufactured and distributed by others using talc mined and sold by the Debtor or its former subsidiaries (the "<u>Talc Personal Injury Claims</u>").

36.     Plaintiffs generally have asserted two primary types of Talc Personal Injury Claims: (1) claims alleging ovarian cancer or other gynecological diseases arising as a result of talc exposure ("OC Claims"); and (2) claims alleging mesothelioma, respiratory cancers, or other asbestos-related diseases resulting from exposure to talc allegedly contaminated with asbestos ("Mesothelioma Claims").  As of January 29, 2021, there were approximately 427 suits pending alleging Talc Personal Injury Claims against the Debtor.

37.     Plaintiffs asserting OC Claims generally allege that they have developed ovarian cancer or other related gynecological cancers as a result of their use of certain cosmetic products, primarily Johnson & Johnson body powders (which were historically comprised almost entirely of talc) for feminine hygiene purposes.  Historically, plaintiffs have asserted that talc itself causes ovarian cancer and have not asserted that talc contained in the body powder was contaminated with trace amounts of asbestos.  Beginning in 2017, however, some plaintiffs asserting OC Claims began to assert that their personal injuries also were caused by alleged trace asbestos contamination of the talc.  The Debtor disputes that it has any liability in connection with OC claims.

38.     Plaintiffs asserting Mesothelioma Claims generally allege they have developed non-ovarian cancer personal injuries based on some form of asbestos exposure.  Some of these plaintiffs assert that they were only exposed to talc that was contaminated with trace amounts of asbestos, while others allege additional non-talc exposure to asbestos.  Many plaintiffs allege exposure to talc in cosmetic products; others allege exposure in an industrial context, such as at a manufacturing facility.  In many cases, plaintiffs have made insufficient allegations for the Debtor to determine whether the Mesothelioma Claims are based on cosmetic talc exposure, industrial talc exposure, or both.  However, of the Mesothelioma Claims, the Debtor estimates that the vast majority of the claims against the Debtor or CAMC are based solely on exposure to cosmetic

products; the majority of the remainder of the claims allege exposure to cosmetic products as well as industrial exposure and a very small number of claims allege only industrial exposure.

39.     The Debtor estimates that over 95% of those Talc Personal Injury Claims asserted against the Debtor or CAMC are Mesothelioma Claims rather than OC Claims. The Debtor disputes that it has any liability in connection with Mesothelioma Claims.

40.     In its defense against the Talc Personal Injury Claims, the Debtor has at all times maintained that the talc it supplied (or its subsidiaries supplied) was safe, that the Talc Personal Injury Claims are entirely without merit, and that exposure to the Debtor's talc products has not caused any personal injuries. The safety of talc has been confirmed by dozens of peer-reviewed studies and multiple regulatory and scientific bodies, including the Food and Drug Administration.

41.     CAMC also disputes that it has any liability for Talc Personal Injury Claims, both on the same grounds the Debtor has put forward and because it is a separate parent company that did not itself mine, produce, or distribute talc. As discussed below, the Debtor, while disputing that it has any liability to plaintiffs, believes that it has potential causes of action against CAMC for any liability that the Debtor may have.

### D.     Description of Non-Talc Related Liabilities

42.     The Debtor has no secured debt. Other than its talc-related liabilities (including the fees and expenses of the Debtor's professionals that have been defending the Debtor against Talc Personal Injury Claims in the tort system), the Debtor's only other material business-related unsecured obligations are certain ongoing environmental remediation obligations related to three sites that are currently, or were formerly, owned by the Debtor. The environmental remediation work is being handled by contractors under executory contracts. The Debtor also has an unsecured intercompany note obligation to CAMC in the aggregate principal amount of $1,650,000.00, which is described further below.

III.     **EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASE**

A.       **Imerys Debtors' Chapter 11 Cases**

43.     Prior to the Petition Date, ITA, the entity that had assumed talc liabilities of the Debtor and its former subsidiaries, was defending and indemnifying Cyprus in the pending talc lawsuits—and had committed to defend Cyprus in future lawsuits—relating to alleged liabilities arising from or relating to the former talc operations of the Debtor and its subsidiaries (such lawsuits, whether currently pending or to-be filed in the future and whether filed before or after the Petition Date, collectively, the "Talc Lawsuits").

44.     ITA's acceptance of tender and the defense and indemnity of Cyprus in the Talc Lawsuits is embodied in certain letter agreements and tender procedures agreed to between Cyprus and ITA (the "Letter Agreements") and was further illustrated by the course of dealing of the parties since the execution of the Letter Agreements in 2016.

45.     As of January 29, 2021, the Debtor was a defendant in approximately 427 Talc Lawsuits, the vast majority of which are pending in state courts, instituted by plaintiffs asserting alleged liabilities relating to the Debtor or its former subsidiaries (including Windsor/ITV) that were transferred to ITA in 1992, for which ITA is now liable due to its express assumption of such liabilities in the 1992 ATA and the 1992 SPA.

46.     Upon commencement of the Imerys Debtors' chapter 11 cases, ITA breached the Letter Agreements and its obligations under the 1992 ATA and the 1992 SPA when it expressly rescinded its acceptance of tender of all of the Talc Lawsuits, leaving Cyprus to defend the suits in the tort system despite ITA's express assumption in the 1992 transactions of the liabilities asserted against Cyprus in the Talc Lawsuits.

**B.      Adversary Proceeding Regarding Cyprus Historical Policies**

47.      At the time of the 1992 transactions and since that date, the Debtor was and is an insured under the Cyprus Historical Policies.  The Cyprus Historical Policies broadly cover the liabilities of a wide spectrum of Cyprus-affiliated historical businesses, including, but not limited to, the former talc operations of the Debtor and certain of its former subsidiaries acquired by ITA.  The Cyprus Historical Policies, at all times, have remained property of the Debtor and its affiliates.

48.      Shortly after commencement of the Imerys Debtors' chapter 11 cases, the Imerys Debtors claimed that they held the exclusive rights to proceeds of the Cyprus Historical Policies for Talc Lawsuits that involved assumed liabilities, and advised Cyprus that Cyprus should take all actions necessary to assume and pay for its own defense in those actions.  Cyprus strongly disputes the Imerys Debtors' position regarding the Cyprus Historical Policies.

49.      On March 7, 2019, the Imerys Debtors commenced an adversary proceeding, No. 19-50115 (LSS) (Bankr. D. Del.) (the "Insurance Adversary Proceeding"), to determine the parties' rights in the proceeds of the Cyprus Historical Policies.  Specifically, the Imerys Debtors seek declarations that (i) ITA owns all rights to the proceeds of the Cyprus Historical Policies resulting from accrued claims or causes of action against the insurers related to pre-transfer talc liabilities and (ii) section 362(a)(3) of the Bankruptcy Code applies to prohibit any effort by Cyprus to access such proceeds, whether for defense costs or for any judgments or other liabilities related to pre-transfer talc liabilities.

50.      In March 2019, the parties agreed that, during the pendency of the Insurance Adversary Proceeding, Cyprus could access the Cyprus Historical Policies for Talc Lawsuits, but the Imerys Debtors reserved their rights to pursue Cyprus for reductions in policy limits during the Adversary Proceeding, if the Imerys Debtors prevail.  The Insurance Adversary Proceeding currently is stayed.

51.     During the stay of the Insurance Adversary Proceeding, Cyprus, the Imerys Debtors, the Imerys Debtors' tort claimants committee (the "Imerys Tort Claimants' Committee"), and James L. Patton, Jr., as the future claims representative (the "Imerys FCR") in the Imerys Debtors' chapter 11 cases, participated in a mediation of their disputes before mediator Lawrence W. Pollack.  As described below, the mediation resulted in an agreement on the terms and conditions of a global compromise and settlement of the parties' disputes, including the disputes raised in the Insurance Adversary Proceeding.

### C.     Adversary Proceeding Regarding Indemnification Rights

52.     The Debtor and its affiliates, including CAMC, believe that they have broad indemnity rights against Johnson & Johnson covering any liabilities and obligations arising out of the Debtor's or Windsor's supply of talc to Johnson & Johnson prior to the 1992 transactions.

53.     On June 15, 2020, after Johnson & Johnson had repeatedly denied that it has obligations to Cyprus—and asserted that the Debtor had transferred its indemnity rights to ITA in 1992—Cyprus commenced an adversary proceeding in the Bankruptcy Court, No. 20-50626 (LSS) (Bankr. D. Del.) (the "Indemnification Adversary Proceeding"), against the Imerys Debtors and Johnson & Johnson in the Imerys Debtors' chapter 11 cases.  A core issue to be decided in the Indemnification Adversary Proceeding is whether Cyprus has indemnity rights against Johnson & Johnson under the 1989 SPA and the 1989 SA.

54.     On July 29, 2020, the Imerys Debtors filed an answer to the complaint in the Indemnification Adversary Proceeding asserting various affirmative defenses and counterclaims (i) seeking a declaration that the Debtor lacks the right and standing to pursue causes of action asserted in the complaint, and (ii) asserting that the Debtor breached its representations and warranties under certain agreements.  On July 29, 2020, Johnson & Johnson filed a motion to dismiss the complaint for lack of subject matter jurisdiction, or, in the alternative, to abstain or to

sever and transfer the claims against Johnson & Johnson to the United States District Court for the District of Vermont (the "J&J Motion to Dismiss"). On September 1, 2020, Cyprus responded to the Imerys Debtors' counterclaims and the J&J Motion to Dismiss, and on September 3, 2020, Cyprus filed a request for oral argument in connection with the J&J Motion to Dismiss. On September 16, 2020, Johnson & Johnson filed a reply in support of the J&J Motion to Dismiss. On October 6, 2020, Cyprus sought leave to file a sur-reply in opposition to the J&J Motion to Dismiss, and on October 16, 2020, Johnson & Johnson filed an opposition to the sur-reply. As of the Petition Date, the J&J Motion to Dismiss is pending before the Bankruptcy Court.

**D.      My Appointment As Independent Director And Decision to Explore a Chapter 11 Filing**

55.      In August 2019, the Debtor retained me as a consultant for the purpose of evaluating strategic alternatives for managing and resolving Talc Personal Injury Claims against the Debtor. Effective as of February 1, 2020, I was elected as a director of the Debtor. At that time and continuing through the present, I was and am the Debtor's sole independent director. Effective as of January 8, 2021, the Debtor's Board of Directors appointed me as the sole member of a special committee of the Board of Directors (the "Special Committee") to represent the interests of the Debtor in connection with any transaction, agreement, action, or proceeding concerning (i) the commencement, administration, and resolution of any case of the Debtor under chapter 11 of the Bankruptcy Code, (ii) obtaining financing from any affiliate of the Debtor, (iii) the prosecution or settlement of any claims and causes of action of the Debtor against any affiliate of the Debtor, and (iv) any other matter in which there is any conflict or divergence between the interests of the Debtor and the interests of any affiliate of the Debtor.

56.      First, in my role as consultant, and later as independent director and the sole member of the Special Committee, various factors led me to the conclusion that it was necessary

and appropriate to consider a chapter 11 filing for the Debtor.  After commencement of the Imerys Chapter 11 Case, the Debtor faced an increasing number of Talc Personal Injury Claims in the tort system.  At the same time, the Debtor faced increasing uncertainty regarding the assets available to manage and address the Talc Personal Injury Claims.  Specifically, the uncertainty regarding access to the Cyprus Historical Policies, Johnson & Johnson's denial of indemnification owing to the Debtor, and the Debtor's limited sources of revenue and funds, put the Debtor in a position where it was unlikely to be able to defend and resolve its existing Talc Personal Injury Claims and those that may be filed in the future.  In that context, I determined that it was necessary to consider a possible filing under chapter 11 of the Bankruptcy Code to manage and seek to resolve the Talc Personal Injury Claims.  To aid me in that consideration, in January 2020, the Debtor engaged Reed Smith LLP, a firm experienced in asbestos-related chapter 11 cases.

57.     Over several months, I, together with counsel, worked to identify and assess alternative means to resolve the Talc Personal Injury Claims and considered possible claims against the Debtor's corporate parents and their predecessors under various state law theories, including veil-piercing and successor liability.  At the same time, the Debtor explored the viability of using a chapter 11 bankruptcy filing to address the Talc Personal Injury Claims by channeling them to a trust created under sections 105 and 524(g) of the Bankruptcy Code that would be structured to ensure the fair and equitable treatment of present and future claimants.  As part of this process, the Debtor worked constructively with CAMC to gain access to large volumes of relevant documents in response to numerous information requests.

58.     After extensive discussions with my advisors, I, as the sole independent Director, ultimately determined that, due to the increasing number of Talc Personal Injury Claims asserted and to be asserted and the prospect of diminishing, readily accessible insurance/third party

indemnitor coverage, continued litigation of Talc Personal Injury Claims in the tort system was not a viable option and that the Debtor should explore further the commencement of this Chapter 11 Case.  I also concluded that a chapter 11 case filed in conjunction with a global settlement among the Debtor, CAMC, and the Imerys Debtors would, if achievable, be in the best interests of the Debtor, its estate, and its stakeholders.

59.     At the same time that the Debtor was exploring the possibility of a chapter 11 filing, the discussions among CAMC, the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR to resolve the Insurance Adversary Proceeding and related issues were ongoing in the context of the mediation process described above.  I was consulted as those discussions occurred and, along with my advisors, I communicated regularly with CAMC and its advisors to seek to ensure that any negotiated resolution would be acceptable to the Debtor and achieve the Debtor's goals.  As discussed more fully below, the mediation culminated in a global settlement agreement, which I support, and this Chapter 11 Case was filed to help implement that global settlement.

60.     To further aid in the implementation of the global settlement, on behalf of the Debtor, I engaged the services of James L. Patton, Jr., Esq., as the Debtor's future claimants' representative.  Mr. Patton also is serving as the Imerys FCR, and I believe that Mr. Patton is well qualified to serve as the Debtor's future claims representative.  In addition, given the overlap between the Debtor's creditors and the creditors of the Imerys Debtors, and given Mr. Patton's knowledge derived from the Imerys Debtors' chapter 11 cases, I believe it would be beneficial and efficient for the Debtor and its creditors for Mr. Patton to serve as future claimants' representative in the Debtor's Chapter 11 Case.

61.     At my request, my advisors have had discussions and negotiations with a pre-petition ad hoc tort claimants committee made up of eight (8) firms that each represent holders of one or more Talc Personal Injury Claims against the Debtor, who also are members of the Imerys Tort Claimants' Committee.  Specifically, the prepetition ad hoc committee consists of holders of Talc Personal Injury Claims against the Debtor represented by the following law firms:  (i) Lanier Law Firm; (ii) Levy Konigsberg LLP; (iii) The Gori Law Firm; (iv) OnderLaw, LLC; (v) Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.; (vi) Simon Greenstone Panatier, P.C.; (vii) Cohen, Placitella & Roth, P.C.; and (viii) Barnes Law Group.  The prepetition ad hoc committee engaged Robinson & Cole LLP, as counsel, Willkie Farr & Gallagher LLP, as special litigation and corporate counsel, and co-retained Gilbert LLP with the prepetition future claimants' representative as special insurance counsel.  The extensive discussions with the Imerys Tort Claimants' Committee and the Imerys FCR, as well as the discussions with the pre-petition committee and future claimants' representative for the Debtor, provide me with confidence that the global settlement on which the Debtor's chapter 11 filing is based can be achieved.

**E.     Cyprus Settlement**

62.     The Debtor has for more than 40 years been a wholly-owned subsidiary of CAMC or predecessor companies.  Accordingly, in order to help develop and evaluate any resolution of Talc Personal Injury Claims, the Debtor conducted due diligence to determine the extent to which CAMC or its predecessors or affiliated companies may have liability for Talc Personal Injury Claims relating to the production, supply, or distribution of talc by the Debtor or its former subsidiaries.

63.     Prior to the Petition Date, the Debtor requested, and CAMC provided, approximately 87,000 documents relating to the Debtor's or its affiliates' historical operations and the Debtor's parent companies' relationships with the Debtor.  All of such documents were

exhaustively reviewed and analyzed by Reed Smith. Through this due diligence process, and in reliance upon *Emoral, In*c. v. *Diacetyl (In re Emoral)*, 740 F.3d 875 (3d Cir. 2014), *cert. denied sub nom. Diacetyl Plaintiffs* v. *Aaroma Holdings, LLC*, 574 U.S. 974 (2014), the Debtor asserted that CAMC or its predecessors historically controlled the Debtor in such a manner as to subject themselves to potential liability to the Debtor's bankruptcy estate for Talc Personal Injury Claims based on principles of corporate veil-piercing and successor liability.

64. While CAMC denied these allegations, the Debtor's assertions led to good faith, arm's-length negotiations between the Debtor and CAMC, through each entity's outside legal counsel, regarding a settlement of the claims asserted by the Debtor. As the sole independent director, I oversaw and directed the negotiations on behalf of the Debtor.

65. At first, the Debtor's and CAMC's discussions proceeded side by side with the mediation being conducted with the Imerys Debtors, the Imerys Tort Claimants' Committee, and the Imerys FCR. In or around September 2020, however, the separate work-streams merged into a global settlement discussion regarding a framework for a full and comprehensive resolution and release of (i) any and all current and future potential liabilities, at law or equity, arising out of or related to talc-related litigation claims against the Debtor, CAMC, Freeport, and any of their current or former affiliated persons or entities, including all parent companies and subsidiaries (hereinafter collectively the "Cyprus Protected Parties" and singly a "Cyprus Protected Party") that will be channeled, released, or enjoined under the Bankruptcy Code, and (ii) any and all estate claims (including claims based on theories of veil-piercing, successor liability, or conspiracy) that any of the Debtor or the Imerys Debtors could assert against the Debtor (in the case of the Imerys Debtors), CAMC, or the other Cyprus Protected Parties.

66.     In December 2020, these negotiations resulted in a global settlement (the "Cyprus Settlement") — the main terms of which were reflected in a Term Sheet dated December 12, 2020 — that will be incorporated into and implemented by two separate chapter 11 plans, which will be coordinated to the maximum extent possible, specifically, the Imerys Debtors' chapter 11 plan (the "Imerys Chapter 11 Plan") and a chapter 11 plan for the Debtor (the "Cyprus Plan"). The terms of the Cyprus Settlement include, among others[5]:

a.      On behalf of each of the Cyprus Protected Parties (including the Debtor), and pursuant to a promissory note, CAMC will pay a total of $130 million to a talc trust (the "Talc Personal Injury Trust") to be established under the Imerys Chapter 11 Plan in seven annual installments;

b.      Freeport will provide a guarantee of all of CAMC's obligations to the Talc Personal Injury Trust;

c.      The Cyprus Protected Parties will assign to the Talc Personal Injury Trust any and all rights to and in connection with Cyprus Historical Policies through 1992 as to which there has not been a complete release of coverage for Talc Personal Injury Claims, and the Talc Personal Injury Trust will assume obligations, and accept certain restrictions, associated with recovering proceeds under the Cyprus Historical Policies;

d.      The appropriate Cyprus Protected Parties will each execute and deliver to the Talc Personal Injury Trust an assignment to the Talc Personal Injury Trust of all of their rights to or claims for indemnification, contribution, or subrogation against any person relating to the payment or defense of any Talc Personal Injury Claims;

e.      In consideration for the contributions described above, the Imerys Chapter 11 Plan and the Cyprus Plan will include the broadest releases and channeling injunctions permitted by law so as to prevent the assertion of any further talc-related claims of any kind against any Cyprus Protected Party, with the intent to provide the Cyprus Protected Parties with "global peace" from any further talc-related litigation of any kind;

f.      The channeling injunctions contained in the Imerys Chapter 11 Plan and the Cyprus Plan will channel all Talc Personal Injury Claims against any Cyprus Protected Party to the Talc Personal Injury Trust;

_____

[5] This is a summary only. The terms of the definitive settlement agreement, the Imerys Chapter 11 Plan, and the Cyprus Plan will supersede this summary in all instances.

g.    The effectiveness of the parties' agreement is conditioned upon confirmation and the occurrence of the effective date of the Imerys Chapter 11 Plan and the Cyprus Plan, as well as entry of orders by the District Court affirming the Imerys Chapter 11 Plan and Cyprus Plan, including approval of the terms of the parties' global settlement; and

h.    CAMC will provide the Debtor with unsecured, superpriority debtor-in-possession financing to fund the reasonable administrative expenses of this Chapter 11 Case, subject to certain conditions, as described more fully below.

67.    In addition to providing a framework for full and comprehensive resolution of all Talc Personal Injury Claims against the Debtor and the Cyprus Protected Parties, the Cyprus Settlement resolves the Debtor's claims against CAMC concerning principles of corporate veil-piercing and successor liability and the parties' disputes in the Insurance Adversary Proceeding and alleviates the need for CAMC and the Debtor to pursue the Indemnification Adversary Proceeding against the Imerys Debtors.

**F.    Funding Pre-Petition Negotiations And This Chapter 11 Case**

68.    The Debtor has relatively small ongoing business operations and limited cash-on-hand.  In the recent past, the Debtor has been dependent upon capital contributions made by its immediate parent, CAMC, to fund its general, administrative, and legal expenses.  Before the Petition Date, CAMC communicated to the Debtor that it was no longer willing to fund the Debtor in that manner.  Under these circumstances, the Debtor and its advisors determined that the Debtor would require significant pre- and post-petition financing to support the pre-filing activities and the post-petition administration of this Chapter 11 Case.  The Debtor's access to sufficient sources of liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to executing its restructuring plan, including so that the Debtor can pay the fees and expenses of well-qualified advisors to represent an official committee of tort claimants and a future claimants' representative to be appointed in this Chapter 11 Case.  Given the Debtor's need for financing, the Debtor and its advisors (as well as the Imerys Tort Claimants' Committee

and the Imerys FCR) negotiated with CAMC to obtain credit for the Debtor on the most favorable terms possible.

69.     To fund certain prepetition retainers required by the prepetition future claimants' representative, the prepetition ad hoc committee of tort claimants, and the Debtor's professionals, as well as other pre-filing expenses, CAMC loaned the Debtor the principal sum of $1,650,000.00 on an unsecured basis.  The terms of the prepetition intercompany loan were memorialized in a promissory note dated January 11, 2021.

70.     In addition, consistent with the Cyprus Settlement, CAMC, as lender, and the Debtor, as borrower, entered into the Superpriority Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"), dated as of February 11, 2021, pursuant to which CAMC agreed, subject to Bankruptcy Court approval, to loan the Debtor up to the maximum aggregate principal amount of $14,450,000, for the purpose of paying the reasonable administrative expenses incurred by the Debtor during the Chapter 11 Case.  Loans under the DIP Credit Agreement are unsecured, but entitled to super-priority administrative expense status pursuant to section 364(c) of the Bankruptcy Code.

71.     Importantly, CAMC has agreed that all unpaid principal amounts of each loan and all other unpaid obligations under the DIP Credit Agreement, including accrued and unpaid interest, will be deemed to be fully, finally, and forever released, relinquished, and discharged on the effective date of a chapter 11 plan acceptable to CAMC that implements the parties' global settlement.

72.     Under my direction as the sole independent director and member of the Special Committee, the Debtor negotiated the DIP Credit Agreement with CAMC in good faith, at arm's length, with the assistance of its advisors, and in the context of the Cyprus Settlement.  I believe

that the terms of the DIP Credit Agreement are fair and allow the Debtor to maximize the value of its estate for the benefit of holders of Talc Personal Injury Claims.

## III.    GOALS OF THIS CHAPTER 11 CASE

73.    The Imerys Debtors have filed the Imerys Chapter 11 Plan in the Imerys Debtors' chapter 11 cases.  Consistent with the terms of the Cyprus Settlement, the Imerys Chapter 11 Plan will establish the Talc Personal Injury Trust and channel all existing and future Talc Personal Injury Claims against the Imerys Debtors to the Talc Personal Injury Trust pursuant to sections 105(a) and 524(g) of the Bankruptcy Code.  In consideration of CAMC's contributions to the Talc Personal Injury Trust on behalf of itself, the Debtor, and the other Cyprus Protected Parties, the Imerys Chapter 11 Plan contemplates that the Debtor and the Cyprus Protected Parties also will be considered protected parties and receive the benefit of the channeling injunction under the Imerys Chapter 11 Plan.

74.    The Debtor filed this Chapter 11 Case consistent with the terms of the Cyprus Settlement to provide the Debtor and the Cyprus Protected Parties maximum protection under sections 524(g), 105(a), and 1141(d)(1) of the Bankruptcy Code.  The Debtor intends to seek confirmation of a chapter 11 plan that will channel all existing and future Talc Personal Injury Claims against it and certain other protected parties, including the Cyprus Protected Parties, to the Talc Personal Injury Trust pursuant to section 524(g) of the Bankruptcy Code.  The proposed channeling injunction will enjoin any entity that holds or asserts, or that may in the future hold or assert, a Talc Personal Injury Claim from taking any action for the purpose of directly or indirectly recovering on such Talc Personal Injury Claim from the Debtor and other protected parties.  Accordingly, the sole recourse of any current or future holder of a Talc Personal Injury Claim

against any protected party on account of such Talc Personal Injury Claim will be against the Talc Personal Injury Trust.

75.     The Plan is intended to channel to the Talc Personal Injury Trust any and all pending or future claims against the Debtor and any Cyprus Protected Party in any way relating to the Debtor's or any current or former subsidiary of the Debtor's manufacture, distribution, or other conduct relating in any way to talc or talc-containing products.  Under the Debtor's chapter 11 plan, the Talc Personal Injury Trust will assume liability for all Talc Personal Injury Claims against the Debtor and the Cyprus Protected Parties and use its assets, including the contributions made by CAMC, to review and resolve the Talc Personal Injury Claims and, if eligible, compensate the holders of the Talc Personal Injury Claims.  By establishing procedures to govern trust distributions, the Talc Personal Injury Trust will be able to resolve Talc Personal Injury Claims in a fair and efficient manner, as required by section 524(g) of the Bankruptcy Code.

## IV.     MOTIONS

76.     To ensure the efficient administration of the estate, the Debtor seeks approval of the following Motions (which are customary in mass tort bankruptcy cases) and related orders (the "Proposed Orders"), and respectfully requests that the Bankruptcy Court enter the Proposed Orders granting such Motions:

     a.     First day motions for which relief is sought on an emergency basis:

          i.     Debtor's Motion for Interim and Final Orders (I) Authorizing the Listing of Addresses of Counsel for Talc Claimants in the Creditor Matrix in Lieu of Talc Claimants' Addresses; (II) Approving Certain Notice Procedures for Talc Claimants; and (III) Authorizing the Filing of a List of the Law Firms Representing the Largest Numbers of Talc Claimants (the "Talc Claimants Notice Procedures Motion");

          ii.     Debtor's Motion for an Order (I) Approving the Master Service List and (II) Approving the Form and Manner of the Notice of Commencement of the Debtor's Chapter 11 Case (the "Case Procedures Motion"); and

iii. Debtor's Application Pursuant to 28 U.S.C. § 156(C) for Entry of an Order Authorizing the Employment and Retention of Prime Clerk LLC as the Claims and Noticing Agent, *Nunc Pro Tunc* as of the Petition Date (the "Claims and Noticing Agent Motion"); and

b. Second day motions for which relief is sought on regular notice:

i. Debtor's Motion for Entry of an Order Under 11 U.S.C. §§ 105, 361, 362, 364, and 507 (I) Authorizing the Debtor to Obtain Postpetition Financing, (II) Providing Super-Priority Administrative Expense Status, and (III) Granting Related Relief (the "DIP Financing Motion");

ii. Debtor's Motion for an Order Appointing James L. Patton, Jr., as Legal Representative for Future Talc Claimants, *Nunc Pro Tunc* to the Petition Date (the "FCR Motion");

iii. Debtor's Motion for Entry of an Order (I) Establishing Bar Dates for Submitting Proof of Claim for Non-Talc Claims and Indirect Talc Personal Injury Claims, (II) Approving Procedures for Submitting Proofs of Claim, and (III) Approving Notice Thereof (the "Bar Date Motion"); and

iv. applications to retain the following professionals: (i) Reed Smith LLP, as general bankruptcy counsel; (ii) Kasowitz Benson Torres LLP, as special conflicts counsel; and (iii) Prime Clerk LLC, as administrative advisor (collectively with the Claims and Noticing Agent Motion, the "Retention Applications").

77. I have reviewed each of the Motions, Proposed Orders, and exhibits thereto (or have otherwise had their contents explained to me), and the facts set forth therein are true and correct to the best of my knowledge, information, and belief. Moreover, I believe that the relief sought in each of the Motions is vital to enabling the Debtor to make the transition to, and efficiently and effectively administer, its Chapter 11 Case.

**A.     The Talc Claimants Notice Procedures Motion**

78. Through the Talc Claimants Notice Procedures Motion, the Debtor seeks (i) authorization to list the addresses of counsel for Talc Claimants in the creditor matrix in lieu of the Talc Claimants' addresses, (ii) approval of certain notice procedures for Talc Claimants, and

(iii) authorization to file a list of the top ten law firms representing the largest number of Talc Claimants.

79.     The Debtor's defense counsel maintains a database that identifies the names, but not the addresses, of the Talc Claimants.  Instead, the Debtor's defense counsel typically tracks the address information of counsel of record for the Talc Claimants and conducts all communications regarding the related litigation through such counsel of record.

80.     The Debtor has the home addresses of some plaintiffs but not others.  Talc Claimants rarely include their addresses in the complaint.  As cases progress, the Debtor sometimes obtains the home or mailing address of plaintiffs, including through discovery or court filings.  But, in other cases, the Debtor does not have addresses for personal service.  Therefore, at this time, various of the Talc Claimants' addresses are unknown and not readily available to the Debtor.

81.     Throughout the course of this Chapter 11 Case, I understand that various notices, mailings, and other communications must be sent to parties-in-interest, including the Talc Claimants.  To provide the best and most efficient notice to Talc Claimants, the Debtor seeks to implement certain notice procedures (the "Notice Procedures") by which the Debtor will (a) list the addresses of known counsel of record for the Talc Claimants, in lieu of the addresses of the Talc Claimants themselves, on the Debtor's creditor matrix and (b) send required notices, mailings, and other communications related to the Chapter 11 Case to such known counsel of record for the Talc Claimants in lieu of sending such communications to the Talc Claimants themselves in the manner required pursuant to otherwise applicable noticing procedures in effect in the Chapter 11 Case, *provided* that the Debtor will (or direct the Claims Agent to) send required notices, mailing

and other communications directly to any Talc Claimants who so request such direct notice from the Debtor in writing.[6]

82.    I believe that implementing the Notice Procedures will provide superior, actual notice to Talc Claimants than if the Debtor were to attempt to deliver notices and other communications directly to such claimants.  In addition, I understand that the address for counsel to the Talc Claimants is more likely to remain unchanged over time, and hence providing notice to the counsel of record will allow for more accurate notice to Talc Claimants.  Moreover, I believe that the Notice Procedures will significantly ease the Debtor's administrative burden of sending notices to hundreds of Talc Claimants, resulting in a more cost-effective notice procedure that benefits the Debtor's estate and creditors.  I understand this notice procedure has been used in most asbestos-related chapter 11 cases.

83.    By the Talc Claimants Notice Procedures Motion, the Debtor also seeks authorization to file a consolidated list of the top ten law firms representing the largest number of Talc Claimants.  As described above, the Debtor is currently named as a defendant in pending Talc Lawsuits.  Taken in the aggregate, the vast majority of the Debtor's known creditors are Talc Claimants (though, as noted above, the Debtor vigorously disputes all liability as to the Talc Personal Injury Claims).  The Debtor's primary goal in filing this Chapter 11 Case is to confirm a plan of reorganization pursuant to sections 105(a), 524(g), and 1129 of the Bankruptcy Code that channels all of the present and future Talc Personal Injury Claims to a trust vested with substantial assets and provides for a channeling injunction prohibiting claimants from asserting against the

---

[6]  Additionally, by the Talc Claimants Notice Procedures Motion, the Debtor seeks authorization to serve only one copy of each document on law firms (at each relevant address) representing multiple Talc Claimants, which shall be notice to all such counsel's clients, provided that any notice or other document relating specifically to one or more particular Talc Claimants (rather than all Talc Claimants represented by such law firm) shall clearly identify such parties.

Debtor or other protected party any claims arising from talc mined, produced, sold, or distributed by the Debtor. While the Debtor disputes all liability as to the Talc Personal Injury Claims, I believe this approach will provide fair and equitable treatment of all stakeholders. As a result, the Debtor believes it likely that the Office of the United States Trustee (the "U.S. Trustee") will appoint an official committee of tort claimants consisting of individuals represented by the predominant plaintiffs' firms representing the Talc Claimants in the tort system.

84. I do not believe that listing the individual Talc Claimants with the largest unsecured claims against the Debtor would facilitate the U.S. Trustee's appointment of a tort claimants' committee. Tort claimants' committees typically consist of individuals, or their estates, that are represented by the predominant plaintiffs' firms representing the relevant claimants in the tort system, and those firms are able to identify individual clients that are willing to serve on the committee. In addition, I believe that attempting to designate certain individual Talc Claimants as holding the "largest" unsecured claims would be arbitrary, where the pending Talc Personal Injury Claims are disputed, contingent, and/or unliquidated. I believe that providing the U.S. Trustee with a list of the top ten law firms with the most significant Talc Claimant representations as determined by the volume of pending Talc Personal Injury Claims would better assist the U.S. Trustee in forming such a committee.

## B. The Case Procedures Motion

85. Through the Case Procedures Motion, the Debtor seeks (i) authorization to establish a master service list and (ii) approval of the form and manner of service of a notice regarding commencement of this Chapter 11 Case.

86. Currently, there are over 500 creditors (including the Talc Claimants) and parties-in-interest that may be entitled to receive notice in this Chapter 11 Case. In the event that the Court authorizes the Debtor to serve law firms in lieu of Talc Claimants, there still will be over

200 creditors and parties-in-interest that may be entitled to receive notice. To require the Debtor to provide notice of all pleadings and other papers filed in this Chapter 11 Case to these parties-in-interest would be overly burdensome and costly to its estate. To alleviate this burden, the Debtor is requesting that the Bankruptcy Court allow it to establish a master service list and a Bankruptcy Rule 2002 list, all as further described in the Case Procedures Motion.

87.     I believe this motion will reduce costs and increase the effective administration of the estate.

### C.     The DIP Financing Motion

88.     Prior to the Petition Date, the Debtor, as borrower, and its parent, CAMC, as lender, negotiated a debtor-in-possession credit agreement ("DIP Credit Agreement"), subject to Bankruptcy Court approval, that I believe will provide the Debtor with sufficient cash to complete this Chapter 11 Case and maintain the Debtor's administrative solvency. The DIP Credit Agreement permits the Debtor to borrow from CAMC an amount up to $14,450,000 for the purposes of funding the reasonable administrative expenses of this Chapter 11 Case, including the payment of estate professionals. As an entity with limited business functions and no employees, the Debtor expects that there will be minimal administrative expenses in this Chapter 11 Case beyond the professionals' fees and expenses incurred by the Debtor, the official committee of tort claimants, and the future claimants' representative. As a result of the anticipated limited uses of the loans, the parties agreed that a budget was unnecessary within the context of this Chapter 11 Case.

89.     Amounts extended under the DIP Credit Agreement are entitled to super-priority administrative claim priority under sections 363(c), 503(b), and 507(a)(2) of the Bankruptcy Code. Amounts borrowed under the DIP Credit Agreement are to be forgiven upon the effective date of

a confirmed plan of reorganization that is acceptable to CAMC and that includes CAMC as a released party and a protected party as contemplated by the Cyprus Settlement.

90.     The DIP Credit Agreement was negotiated in good faith and at arms' length between outside counsel for the Debtor and CAMC. As the Debtor's sole independent director, I oversaw and directed the negotiations on behalf of the Debtor, and I believe the DIP Credit Agreement reflects the best terms that the Debtor could have obtained under the circumstances.

91.     Indeed, I do not believe that the Debtor would be able to obtain any financing on better terms than those offered by CAMC. The Debtor does not have business operations that generate significant revenue and would not be able to pay the expenses of this Chapter 11 Case absent the financing that has been negotiated. Based on my 43 years of bankruptcy practice, I do not believe that any other lender would provide post-petition financing to the Debtor on an unsecured basis and then forgive that loan upon successful confirmation of a plan of reorganization that includes the lender as a released party.

### D.     The FCR Motion

92.     Through the FCR Motion, the Debtor seeks the entry of an order authorizing the appointment of Mr. Patton as the future claimants' representative, *nunc pro tunc* to the Petition Date.

93.     I understand that the appointment of a future claimants' representative to represent the interests of future claimants is necessary for the Debtor to successfully pursue and achieve confirmation of a plan under sections 105 and 524(g) of the Bankruptcy Code.

94.     Based upon my review of Mr. Patton's curriculum vitae and my awareness of decisions by various bankruptcy courts discussing Mr. Patton's qualifications, I believe that Mr. Patton is highly qualified to serve as the future claimants' representative and that his extensive experience, particularly relating to his service as future claimants' representative in the Imerys

Chapter 11 Case, will promote efficiency in this Chapter 11 Case. I believe that appointing an experienced future claimants' representative, such as Mr. Patton, minimizes the potential for missteps that could prolong the reorganization process, delay payments to claimants, and result in substantially increased professional fees and other bankruptcy-related expenses.

### E. The Bar Date Motion

95. Through the Bar Date Motion, the Debtor seeks the entry of an order: (i) establishing bar dates by which entities asserting claims against the Debtor must file proofs of claim; (ii) approving procedures for submitting proofs of claim; and (iii) approving the form and manner of service of the bar date notice. I believe that the procedures described in the Bar Date Motion will provide creditors with notice and opportunity and a clear process for filing proofs of claim and achieve administrative and judicial efficiency.

96. The procedures described in the Bar Date Motion also provide notice of who should **not** file a proof of claim in response to the Bar Dates, including holders of Direct Talc Personal Injury Claims (as defined in the Bar Date Motion). Review and liquidation of the Direct Talc Personal Injury Claims will be accomplished by the Talc Personal Injury Trust following the effective date of the Debtor's chapter 11 plan. Consequently, as the Court will never have occasion to adjudicate the Direct Talc Personal Injury Claims, there is no practical reason for holders of Direct Talc Personal Injury Claims to file proof of their Direct Talc Personal Injury Claims as part of the claims process in this Chapter 11 Case.

97. For the avoidance of doubt, the Debtor is requesting through the Bar Date Motion that the Court establish a bar date for entities to file **<u>Indirect</u>** Talc Personal Injury Claims. I believe that a bar date for entities to file Indirect Talc Personal Injury Claims is necessary for, among other things, the Debtor to solicit the appropriate parties for purposes of voting on any plan of reorganization in this Chapter 11 Case.

### F.      Retention Applications

98.      I believe that the retention of chapter 11 professionals is essential to this Chapter 11 Case.  Accordingly, during this Chapter 11 Case, the Debtor anticipates that it will request permission to retain, among others, the following professionals:  (i) Reed Smith LLP, as general bankruptcy counsel; (ii) Kasowitz Benson Torres LLP, as special conflicts counsel; and (iii) Prime Clerk LLC, as claims and noticing agent and administrative advisor.  I believe the above professionals are well-qualified to perform the services contemplated by the various retention applications, the services are necessary for the success of this Chapter 11 Case, and the professionals will coordinate their services to avoid duplication of efforts.  I understand that the Debtor may find it necessary to seek retention of additional professionals as this Chapter 11 Case progresses.

## <u>CONCLUSION</u>

99.      I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the Motions be granted, together with such other and further relief as is just.


*[The remainder of this page was intentionally left blank.]*

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of February 2021.

/s/ D. J. (Jan) Baker
D. J. (Jan) Baker
Independent Director
Cyprus Mines Corporation

# EXHIBIT G

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ------------------------------------------------------- x | | |
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC AMERICA, INC., *et al.*,[1] | : | Case No. 19-10289 (LSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------- | : | |
| In re: | : | Chapter 11 |
| | : | |
| IMERYS TALC ITALY S.P.A., | : | Case No. [Not yet filed] |
| | : | |
| Potential Debtor. | : | [Joint Administration To Be Requested] |
| | : | |
| ------------------------------------------------------- x | | |

**DISCLOSURE STATEMENT FOR NINTH AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF IMERYS TALC AMERICA, INC. AND ITS DEBTOR
AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Imerys Talc America, Inc. (6358), Imerys Talc Vermont, Inc. (9050) and Imerys Talc Canada Inc. (6748).  The Debtors' address is 100 Mansell Court East, Suite 300, Roswell, Georgia 30076.  This solicitation is also being conducted by Imerys Talc Italy S.p.A. pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018.  If the Plan is accepted by the requisite number of claimants in Class 4, Imerys Talc Italy S.p.A. will commence a bankruptcy case that will be, pending entry of an order by the Bankruptcy Court, jointly administered under Case No. 19-10289 (LSS).

Documents listed in subsections (d), (g), (h), (i), (j), (k), and (l) shall each be in form and substance acceptable to each of the Plan Proponents; *provided further* that the Plan Documents listed in subsections (a), (b), and (c) will be revised as needed, subject to Article V of the Plan, to take into account any additional Executory Contracts and Unexpired Leases to be assumed or rejected in advance of the Confirmation Hearing.  The Plan Supplement will be served only on those parties that have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 and any party in interest who requests in writing a copy from counsel for the Debtors; *provided* that the Plan Documents listed in subsection (m) above will be filed and served on all parties receiving Ballots.  In addition, copies of all Executory Contract and Unexpired Lease exhibits will be served on the applicable counterparties to such Executory Contracts and Unexpired Leases.  Once the Plan Supplement is filed, a copy will also be available for review on the Claims Agent's website free of charge at https://cases.primeclerk.com/ImerysTalc/ by clicking the link for "Plan & Disclosure Statement."

As provided in the Plan, certain documents included in the Plan Supplement may be revised prior to Confirmation.  For example, the list of Executory Contracts and Unexpired Leases to be assumed by the North American Debtors will be revised as needed to take into account additional Executory Contracts and Unexpired Leases to be assumed in advance of the Confirmation Hearing.  On or before February 5, 2021, the Debtors shall serve copies of the lists of Executory Contracts and Unexpired Leases provided for in the Plan Supplement on the applicable counterparties.  Additionally, the Debtors will serve any revised Executory Contract and Unexpired Lease list on affected counterparties within two (2) days of filing such lists, *provided that* each counterparty to an Executory Contract or Unexpired Lease that (i) is later added to the list and/or (ii) has its Cure Amount modified by the Debtors shall have until the date that is fourteen (14) days after the Debtors serve such counterparty with notice thereof to object to the assumption of its Executory Contract or Unexpired Lease pursuant to the Plan, including any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code, and, if the proposed Cure Amount has been modified, exclusively to the proposed Cure Amount.

## ARTICLE III.

## GENERAL INFORMATION

This Article III provides a general overview of the North American Debtors' and ITI's corporate history, business operations, organizational structures, and assets.  It also discusses the events leading to the filing of the Chapter 11 Cases.

3.1    <u>History and Business, Organizational Structure, and Assets of the North American Debtors</u>

(a)    *Corporate History*

The Debtors were acquired in 2011 (the "**2011 Purchase**") by an Imerys Group[25] holding company, Mircal S.A. ("**Mircal**").  Mircal entered into an agreement with Rio Tinto to purchase

---

[25]    The Imerys Group is a French multinational corporation comprised of over 360 affiliated entities directly and indirectly owned by Imerys S.A.

the stock of the Rio Tinto Corporate Parties' talc operations,[26] including the stock of Luzenac America, Inc. ("**Luzenac America**") and Windsor Minerals, Inc. ("**Windsor**").[27]  The stock purchase agreement entitled Mircal to substitute other members of the Imerys Group to acquire individual talc-related entities from the Rio Tinto Corporate Parties, and Mircal exercised that right to cause Imerys Minerals Holding Limited (UK), an indirect, non-debtor subsidiary of Imerys S.A., to acquire the outstanding shares of Luzenac America.  At the same time, Mircal also acquired the stock of Luzenac, Inc. ("**Luzenac**"), which is now known as ITC, from another member of the Rio Tinto Corporate Parties, QIT Fer & Titane, Inc.  Mircal remains the direct parent entity of ITC. Luzenac America, Windsor, and Luzenac subsequently changed their names to ITA, ITV, and ITC, respectively.[28]

At the time of the 2011 Purchase there were only approximately eight Talc Personal Injury Claims pending against one or more of the Debtors, each of which was in the early stages of litigation.  Since then, the number of suits has increased significantly, with over 16,000 on or prior to Petition Date.

(b)    *North American Debtors' Operations*

The Debtors are in the business of mining, processing, selling, and/or distributing talc.  Talc is mined from talc deposits, which were geologically formed through the transformation of existing rocks under the effect of hydrothermal fluids carrying one or several of the components needed to form the mineral.  There are many types of talc and each ore body has its own features and geology. Accordingly, the mining and processing of talc requires highly-technical and specialized knowledge.  Talc is used in the manufacturing of dozens of products in a variety of sectors, including coatings, rubber, paper, polymers, cosmetics, food, and pharmaceuticals.

The operations of the North American Debtors include talc mines, plants, and distribution facilities located in: Montana (Yellowstone, Sappington, and Three Forks); Vermont (Argonaut and Ludlow); Texas (Houston); and Ontario, Canada (Timmins, Penhorwood, and Foleyet).  Talc sold by the North American Debtors is utilized in numerous products, including, but not limited to: polymers; paper; paints and coatings; specialties; rubber; personal care/cosmetics; building materials; and others.  ITA and ITV sell talc directly to their customers as well as to third party

---

[26]    As used herein, "**Rio Tinto Corporate Parties**" means Rio Tinto plc, Rio Tinto Limited, and the Persons listed on Schedule IV attached to the Plan, each of which is directly or indirectly controlled by Rio Tinto plc and/or Rio Tinto Limited, and the future successors or assigns of Rio Tinto plc, Rio Tinto Limited, and/or the Persons listed on Schedule IV attached to the Plan, solely in their capacity as such.

[27]    The Debtors have been owned by various entities over their 100-year history.  In 1989, Johnson & Johnson sold the stock of Windsor, which is now known as ITV, to Cyprus Mines.  In 1992, Cyprus Mines and its affiliates transferred such stock and all of their other assets in the talc business to a newly formed subsidiary, Cyprus Talc Corporation ("**CTC**").  As a result of this transaction, Windsor became a wholly-owned subsidiary of CTC.  Contemporaneously with the 1992 transfer, RTZ America, Inc. purchased the outstanding shares of CTC.  Also in 1992, CTC was renamed Luzenac America, which is now known as ITA.  Windsor continued to remain a wholly-owned subsidiary of Luzenac America.

[28]    A timeline of the ownership history of each of the North American Debtors is included in the *Declaration of Alexandra Picard, Chief Financial Officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 10] (the "**First Day Declaration**").

and affiliate distributors.  ITC exports the vast majority of its talc into the United States almost entirely on a direct basis to its customers.

As of the Petition Date, approximately 5% of the North American Debtors' revenues were from talc sales in the United States for personal care/cosmetic applications.  In addition, as of the Petition Date, the North American Debtors' top customers in the personal care/cosmetic sector were manufacturers of baby powder (50% of personal care sales), makeup (30% of personal care sales), and soap (20% of personal care sales).  Although there are other talc suppliers in the market, the North American Debtors were historically the sole supplier of cosmetic talc to J&J.[29]  The Debtors report that although personal care/cosmetic sales make up only a minor percentage of the North American Debtors' revenue, nearly all of the pending Talc Personal Injury Claims allege injuries based on use of cosmetic products containing talc, though some claims also allege injuries based on exposure to talc in an industrial setting.

Together, the North American Debtors are the market leader with respect to talc production in North America, representing nearly 50% of the market.  Their main competitors are the following companies: Mineral Technologies Inc., American Talc Company, Inc., IMI Fabi, and Cimbar.

(c)    *Existing Organizational Structure and Ongoing Businesses*

The North American Debtors continue to mine, process, and distribute talc, utilizing a core group of executives and staff personnel who are assisted by specialized outside professionals and consultants.

As of October 31, 2020, the North American Debtors employed approximately 277 employees – 177 by ITA, 28 by ITV, and 72 by ITC.  These employees are located at the North American Debtors' offices in Roswell, Georgia, and talc mines, plants, and distribution facilities in Montana, Vermont, Texas, and Ontario, Canada.[30]  Approximately 98 of the employees are salaried employees and approximately 179 of the employees are hourly employees.  In addition, the North American Debtors' workforce also includes approximately 4 part-time employees and approximately 29 independent contractors.[31]  The North American Debtors also rely on services provided by Imerys S.A. and certain Non-Debtor Affiliates under various shared services arrangements, as further described in the First Day Declaration and the Cash Management Motion (as defined below).

The officers (with position) of each of the North American Debtors as appointed by their respective boards of directors are: Giorgio La Motta (President), Anthony Wilson (Treasurer), and

---

[29]    "**J&J**" means Johnson & Johnson, Johnson & Johnson Baby Products Company, Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Consumer Inc., Johnson & Johnson Consumer Products, Inc., and each of their past and present parents, subsidiaries and Affiliates, direct and indirect equity holders, and the successors and assigns of each, excluding the Debtors and the Imerys Non-Debtors.

[30]    Certain of the North American Debtors' officers conduct operations from a rented office located in San Jose, California.

[31]    Included as hourly employees are approximately 111 employees who are covered by various collective bargaining agreements.

business day, funds remaining in certain of ITA's bank accounts were automatically swept to Imerys USA. The amount swept to Imerys USA less any payments made by Imerys USA on account of expenses incurred by ITA or ITV was recorded in ITA's and Imerys USA's books as an interest-bearing intercompany loan in favor of ITA pursuant to (i) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITA and Imerys USA (the "**ITA Loan Agreement**") and (ii) that certain Intercompany Loan and Investment Agreement, dated as of June 2018, by and between ITV and Imerys USA (the "**ITV Loan Agreement**" and, together with the ITA Loan Agreement, the "**Intercompany Loan Agreement**").[33] Prior to the Petition Date, ITA and ITV modified certain aspects of their cash management system and eliminated the practice of automatically sweeping funds to Imerys USA. As of the date hereof, (i) ITA no longer has an outstanding loan receivable from Imerys USA and (ii) ITV has an outstanding loan receivable from Imerys USA in the amount of approximately $2,500,000.

ITC operates under a separate cash management system from the other North American Debtors. Historically, excess cash generated by ITC's operations was periodically swept to Imerys S.A. at the discretion of ITC. All transfers of cash that were made to Imerys S.A. (net of any cash transfers made from Imerys S.A. to ITC) were recorded as an intercompany interest-bearing loan on the books of Imerys S.A. and ITC pursuant to (i) that certain Intra-Group Treasury Agreement, by and between Imerys S.A. and certain of its subsidiaries, including the North American Debtors, and (ii) that certain Intercompany Loan and Investment Agreement by and between Imerys S.A. and ITC. As of the date hereof, ITC no longer holds an outstanding loan due and payable from Imerys S.A.

<div align="center">(3)    Insurance Policies, Indemnity Rights, and Settlement Agreements</div>

The North American Debtors are insureds, or otherwise have rights to coverage, under numerous Talc Insurance Policies covering, among other things, liability for Talc Personal Injury Claims. Although the Debtors estimate that the amount of the aggregate insurance available is material, the realizable value of such coverage is subject to any number of factors, including, without limitation, the solvency of the insurers and the outcome of existing and any future coverage disputes. As further described in Article V of this Disclosure Statement, prepetition, the North American Debtors were actively pursuing claims against certain insurers for substantial insurance coverage and collections against these insurers, and were engaged in disputes with certain of their predecessors in interest regarding who has the right to access certain Talc Insurance Policies.

In addition, the Debtors believe that (i) Talc Personal Injury Claims related to the North American Debtors' sale of talc to J&J are subject to uncapped indemnity rights against J&J under certain stock purchase and supply agreements and (ii) one or more of the North American Debtors (*e.g.*, ITV f/k/a Windsor Minerals, Inc.) have the rights to the proceeds of insurance policies issued

---

*507(a), Fed. R. Bankr. P. 6003 and 6004, and Del. Bankr. L.R. 2015-2 (I) Authorizing Continued Use of Existing Cash Management System, Including Maintenance of Existing Bank Accounts, Checks, and Business Forms, (II) Authorizing Continuation of Existing Deposit Practices, (III) Approving the Continuation of Intercompany Transactions, and (IV) Granting Superpriority Administrative Expense Status to Certain Postpetition Intercompany Claims* [Docket No. 11] (the "**Cash Management Motion**").

[33]    The Intercompany Loan Agreements were amended by that certain Letter Agreement, dated as of February 11, 2019.

<div align="center">27</div>

to J&J. J&J has historically disputed the existence and extent of any indemnity obligations owed to the Debtors or the Imerys Non-Debtors, and has disputed that the North American Debtors have any rights to the proceeds of insurance policies issued to J&J. In particular, J&J has stated that it does not believe it owes the Debtors any indemnity obligations after December 31, 2000. J&J has also stated that it believes that it has strong defenses against any indemnification obligations asserted by the Debtors or their successors and that the Debtors have materially breached their contractual indemnity agreements and common law duties.[34] The Plan Proponents disagree with J&J's assertions.

As of the date hereof, the North American Debtors have identified various insurance and indemnity assets, including:

- remaining aggregate limits under the Talc Insurance Policies with solvent insurers (not otherwise subject to a Bankruptcy Court-approved settlement agreement) having an estimated realizable value of approximately $830 million available to pay claims covered under such agreements, which estimate excludes any estimate for anticipated recoveries on account of the coverage provided by insurers who are subject to settlement agreements;

- the right to access certain shared insurance policies issued to J&J and its subsidiaries with estimated total aggregate limits of approximately $2 billion; *provided, however*, that J&J disputes that the Debtors are entitled to such proceeds;

- the right to seek the proceeds of policies issued to Standard Oil (Indiana) and its subsidiaries with total aggregate limits of approximately $1.2 billion; and

- indemnity rights against J&J.

As described in Articles IV, VI, and VII of this Disclosure Statement, the Debtors' ability to access certain of these insurance and indemnity assets is affected by the Rio Tinto/Zurich Settlement and the Cyprus Settlement.

(4)    Other Assets

As of October 31, 2020, the North American Debtors also had the following core assets:

- Inventory with an approximate value of $27.3 million. The inventory includes raw materials, finished goods, and other inventory or supplies. Raw materials represent the largest component of total inventory for ITA and ITV, totaling approximately $13.3 million and $1.9 million, respectively, and include, among other things, purchased crude ore and mined ore. Finished goods represent the largest component of total inventory for ITC, totaling approximately $2.2 million, and

---

[34]    These and other arguments made by J&J against the applicability of the indemnity obligations and the availability of the insurance proceeds are discussed in Article XII of this Disclosure Statement.

May 1961 to October 1964.  The remaining coverage consists of umbrella and excess policies issued by various insurers from April 1962 to July 1986 with total remaining aggregate limits of approximately $160 million.  In addition, the Debtors are informed and believe that ITA also has rights to seek the proceeds from insurance policies issued to Standard Oil (Indiana) from 1980 to 1985 with total aggregate limits of approximately $1.2 billion.

The North American Debtors are presently litigating their rights to these policies (and others issued to Cyprus) in the Cyprus Insurance Adversary Proceeding (as defined and further discussed below).  The Cyprus Settlement, if approved and implemented, would settle this litigation.  Pursuant to the Cyprus Settlement, if the Cyprus Trigger Date occurs, all rights to the Cyprus Talc Insurance Policies will be assigned to the Talc Personal Injury Trust.  However, in the event the Cyprus Trigger Date does not occur, the rights to these policies will be resolved pursuant to the Cyprus Insurance Adversary Proceeding or otherwise.

(b)     *J&J*

(1)     J&J Insurance and Indemnity Obligations

*J&J Insurance.*  The Debtors have asserted that one or more of the Debtors have the right to insurance coverage from various Talc Insurance Policies issued to J&J (including, for the purpose of this section, policies issued to J&J's corporate predecessors or subsidiaries) with total aggregate limits of approximately $2 billion.  For example, ITV (f/k/a Windsor Minerals, Inc.) was a wholly-owned J&J subsidiary during the applicable policy periods of the J&J Talc Insurance Policies and therefore entitled to coverage.  The Debtors presently are unaware of the total remaining and available limits of the Talc Insurance Policies issued to J&J.  J&J disputes that the Debtors or any third parties are entitled to the proceeds of any insurance coverage from various insurance policies issued to J&J.[47]

*J&J Indemnification Obligations*.  The Debtors also have asserted that one or more of the Debtors, the Protected Parties, and the Imerys Non-Debtors also have certain, uncapped indemnity rights against J&J for J&J Talc Claims arising under the following agreements: (i) that certain Agreement, between Cyprus Mines Corporation and Johnson & Johnson, dated as of January 6, 1989 (the "**1989 SPA**"); (ii) that certain Talc Supply Agreement, between Windsor Minerals Inc. and Johnson & Johnson Baby Products Company, a division of Johnson & Johnson Consumer Products, Inc., dated as of January 6, 1989 (the "**1989 Supply Agreement**"); (iii) that certain Supply Agreement between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of April 15, 2001 (the "**2001 Supply Agreement**"); (iv) that certain Material Purchase Agreement, between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2010; and (v) that certain Material Purchase Agreement,

---

[47]     Certain Talc Insurance Policies issued or allegedly issued to J&J are the subject of an active coverage litigation in New Jersey state court, styled as *Atlanta Int'l Ins. Co. v. Johnson & Johnson, et al.*, Case No. MID-L-3563-19.  The Debtors, the Tort Claimants' Committee, and the FCR are not parties to this litigation and have not intervened.  The Plan Proponents believe the action is subject to the automatic stay, and the Debtors have demanded that the insurers stay this action.  Although plaintiffs in the action do not believe that the automatic stay applies, pending resolution of that issue, they have agreed to conduct themselves as if the automatic stay applies.

between Johnson & Johnson Consumer Companies, Inc. and Luzenac America, Inc., dated as of January 1, 2011 (the "**2011 Material Purchase Agreement**" and, together with (i), (ii), (iii), and (iv), the "**J&J Agreements**").[48]

J&J has previously disputed that the indemnification obligations arising out of these agreements in favor of the Debtors are uncapped or that they relate to future claimants. J&J has also previously disputed that it has any indemnification obligations under the 1989 Supply Agreement to the extent any Talc Personal Injury Claims allege exposure to talc used by J&J that did not conform to J&J's specifications, and has contended that certain periods of time are not covered by any supply agreement between the Debtors and J&J. Moreover, J&J claims that the Debtors have certain obligations to indemnify J&J under the 2001 Supply Agreement.[49]

More recently, J&J has acknowledged that indemnification obligations exist, but it has contested the scope of its obligations to the Debtors and has asserted that it has claims against the Debtors for indemnity.[50] While neither J&J nor the Debtors have initiated litigation relating to these indemnity obligations, on June 6, 2019, a lawsuit was brought by National Union Fire Insurance Company of Pittsburgh, Pa. ("**National Union**") against Johnson & Johnson Consumer Companies, Inc., Johnson & Johnson Baby Products Company, and Johnson & Johnson (collectively, the "**J&J Defendants**") in the Superior Court of the State of Vermont, Chittenden Unit, styled as *National Union Fire Insurance Company of Pittsburgh, PA. as Subrogee of Cyprus Mines Corporation v. Johnson & Johnson Consumer Companies, Inc. et al.*, Case No. 495-6-19-CNEV (the "**Subrogation Proceeding**"). In the Subrogation Proceeding, National Union sought, among other things, to recover from the J&J Defendants, as the putative subrogee of ITA and Cyprus Mines, the amounts National Union allegedly incurred defending ITA and Cyprus Mines in various asbestos-related bodily injury product liability lawsuits. In response, on October 8, 2019, the Debtors filed a motion to enforce the automatic stay in the Bankruptcy Court in order to enjoin National Union from continuing the Subrogation Proceeding (the "**Motion to Enforce**") [Docket No. 1117]. Prior to the filing of the Motion to Enforce, the J&J Defendants also filed an answer to National Union's complaint in the Subrogation Proceeding. On October 18, 2019, shortly after the North American Debtors filed the Motion to Enforce, National Union agreed to dismiss the Subrogation Proceeding without prejudice, and the Debtors withdrew the Motion to Enforce.

---

[48]     For the avoidance of doubt, these indemnification obligations include any and all indemnity rights of the Debtors, the Protected Parties, and the Imerys Non-Debtors against J&J for Talc Personal Injury Claims pursuant to any other applicable agreement, order, or law.

[49]     Each of these agreements are described in Article XII of this Disclosure Statement.

[50]     *See generally Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion [For] An Order Pursuant to Bankruptcy Rule 2004* [Docket No. 750]; *Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 2]; *Reply Memorandum of Law in Further Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 81].

In addition, Cyprus has also asserted uncapped indemnity rights against J&J pursuant to the 1989 Supply Agreement and the 1989 SPA, including in the Cyprus Indemnity Adversary Proceeding (as defined below). As further discussed below, the North American Debtors are presently litigating their rights to certain of these indemnification obligations in the Cyprus Indemnity Adversary Proceeding. The Cyprus Settlement, if approved and implemented, would settle the litigation as between Cyprus and the Debtors. Pursuant to the Cyprus Settlement, if the Cyprus Trigger Date occurs, Cyprus' rights to indemnification by J&J (only to the extent related to any Talc Personal Injury Claim that is channeled to the Talc Personal Injury Trust) will be assigned to the Talc Personal Injury Trust. However, in the event the Cyprus Trigger Date does not occur, the ownership of these indemnity rights will be resolved pursuant to the Cyprus Indemnity Adversary Proceeding or otherwise.

> (2)   J&J Removal Attempt

In addition to the foregoing, on April 18, 2019, Johnson & Johnson and Johnson & Johnson Consumer Inc. (collectively, the "**J&J Removal Parties**") commenced a civil action in the U.S. District Court for the District of Delaware (the "**District Court**") and moved to fix venue in the District Court for all pending talc-related personal injury and wrongful death claims (the "**Venue Motion**").[51] The Venue Motion sought to transfer the 2,400 lawsuits under 28 U.S.C. §§ 157(b)(5) and 1334(b), which authorize the federal district court in which a bankruptcy case is pending to hear claims "related to" a debtor's bankruptcy case. Contemporaneously with that filing, the J&J Removal Parties began filing notices of removal in state court actions in order to remove such actions to federal court where they would be subject to transfer under the Venue Motion. On May 3, 2019, the J&J Removal Parties filed a motion in the Bankruptcy Court to extend the deadline to file such notices of removal in state court actions [Docket No. 486]. On June 27, 2019, the Bankruptcy Court granted the J&J Removal Parties' request to extend the removal deadline [Docket No. 755].

Numerous parties, including the Tort Claimants' Committee, the FCR, and a myriad of plaintiffs' personal injury counsel around the country, filed oppositions in response to the J&J Removal Parties' Venue Motion in the District Court.[52] On July 19, 2019, the District Court denied the J&J Removal Parties' Venue Motion.[53] Upon entry of the order, the District Court closed the civil case.[54]

> (3)   J&J Motion to Modify the Automatic Stay

On March 27, 2020, J&J filed the *Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to*

---

[51]   *Johnson & Johnson and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b)*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 1].

[52]   *See* Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket Nos. 37, 45, 46, 48, 49, 50, 53, 55, 56, 57, and 58].

[53]   *See Memorandum Opinion*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 96].

[54]   *See Order*, Civ. Action No. 19-mc-00103 (MN) (D. Del. 2019) [Docket No. 97].

US-DOCS\120811663.4

# EXHIBIT H



Teenagers Are the Most Convinced There's a
Climate Emergency

Learn More

**Menu**    Search                    **BLOOMBERG**                    Sign In    **Subscribe**

**Quick Links**    Stocks    Currencies    Commodities    Rates & Bonds    Sectors    Watchlist

RECENTLY VIEWED COMPANIES

| **TESLA INC** | **APPLE INC** | **NETLIST INC** | **CYTODYN INC** | **AMAZON.COM INC** | **META PLATFORMS I** |
|---|---|---|---|---|---|
| 1,208.59 | 148.96 | 7.09 | 1.14 | 3,318.11 | 329.98 |
| ▲ +94.59 | ▼ -0.84 | ▲ +0.44 | ▲ +0.04 | ▼ -54.32 | ▲ +6.41 |

# Johnson & Johnson Services Inc

Johnson & Johnson Services Inc. offers consumer healthcare products. The Company provides healthcare products in the areas of feminine hygiene, baby care, facial skincare, beauty, wound care, cough and cold, oral care, and over-the-counter products. Johnson & Johnson Services serves clients worldwide.

| SECTOR | INDUSTRY | SUB-INDUSTRY | INCORPORATED |
|---|---|---|---|
| Health Care | Health Care | Health Care Facilities & Svcs | 1979 |

| ADDRESS | PHONE | WEBSITE |
|---|---|---|
| 1 Johnson & Johnson Plaza New Brunswick, NJ 08933 United States | 1-732-524-0400 | www.jnj.com |

NO. OF EMPLOYEES

--

# Most Popular

TSLA:US
**TESLA INC**
1,208.59 USD ▲ +94.59 +8.49%

AAPL:US
**APPLE INC**
148.96 USD ▼ -0.84 -0.56%

XAB:GR
**NETLIST INC**

Your monthly limit of free content is about to expire. **Stay on top of historic market volatility. Try 3 months for ~~$8.75~~ $0.50 per week. Cancel anytime.**

Claim This Offer    **Sign In**

Bloomberg Anywhere clients get _free access_

https://www.bloomberg.com/profile/company/0290794D:US#:~:text=Johnson %26 Johnson Services Inc.,Johnson Services serves clients worldwide    1/4

**AMAZON.COM INC**
3,318.11 USD ▼ -54.32 -1.61%

## Invest $1,000 Here?

**The Motley Fool** | Sponsored

## If You're Over 40 And Own A Computer, This Farm Game Is A Must-Have!

Farm and Explore the Wilderness of Alaska. Set up a flourishing farm, build prosperous factories, and organize a roaring food trade. Once you're ready, embark on a long and exciting Journey to find what everyone else …

**Klondike** | Sponsored

## Man Who Called 2020 Crash Issues New Warning

Wall Street legend who predicted last year's stock plunge warns Americans to brace for an "aftershock" that could take millions by surprise.

**Stansberry Research** | Sponsored

## Queens: Startup Is Changing the Way People Retire

This Princeton grad's startup raised $110 million to help you plan a comfortable retirement. See how its free tool can get you on track.

**SmartAsset** | Sponsored

Sponsored

## California High Court Won't Hear Brad Pitt Divorce Appeal

Bloomberg

## Tesla's Hidden Billionaire: How a Retail Trader Made $7 Billion

Bloomberg

## These Cars Are So Loaded It's Hard to Believe They're So Cheap

Your monthly limit of free content is about to expire. **Stay on top of historic market volatility. Try 3 months for $8.75 $0.50 per week. Cancel anytime.**

Claim This Offer

**Sign In**

Bloomberg Anywhere clients get free access

Johnson & Johnson Services Inc. - Company Profile and News - Bloomberg Markets

**Vietnam Seafood Firms in South of Country Hit by Virus Outbreak**

Bloomberg

## Trump's Social Network Won't Give Him What He Wants Most



ee [Play for

er-realistic champions to

re Promo

## People Also Search For

CL1:COM
**WTI Crude**
83.88 USD/bbl. ▼ -0.17  -0.20%

DM1:IND
**Generic 1st 'DM' Future**
35,775.00 USD ▼ -25.00  -0.07%

EURUSD:CUR
**EUR-USD**
1.1601 USD ▼ -0.0005  -0.0431%

INDU:IND
**DJIA**

Your monthly limit of free content is about to expire. **Stay on top of historic market volatility. Try 3 months for ~~$8.75~~ $0.50 per week. Cancel anytime.**

Claim This Offer

**Sign In**

Bloomberg Anywhere clients get free access

# More From The Financial Web

**Earn cash with a new Citigold® relationship and required activities.**
EARN UP TO $1,500

---

**Join the VCs that invested in Lemonade — before the IPO**
OurCrowd

---

**The Worst Way to Withdraw From Retirement Accounts**
smartasset

---

**Biggest Electric Vehicle Trend for 2022?**
Empire Financial Research

---

**Enjoy 0% Intro APR for 21 months on balance transfers**
Life In Balance

---

**These Investing Platforms Offer Perks Like $0 Account Minimums**
NerdWallet

---

**Which Travel Card Has The Most Valuable Miles? Compare Now**
NerdWallet

---

**Wall St. legend's biggest prediction in 50 years**
Stansberry Research

---

**Trade Options on a Shoestring budget. You can start with just $240**
TradeWins

---

sponsored by Dianomi

Terms of Service  Do Not Sell My Info (California)    Trademarks  Privacy Policy
©2021 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices    Help

Your monthly limit of free content is about to expire. **Stay on top of historic market volatility. Try 3 months for ~~$8.75~~ $0.50 per week. Cancel anytime.**

Claim This Offer

**Sign In**

Bloomberg Anywhere clients get **free access**

# EXHIBIT I

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                   WESTERN DISTRICT OF NORTH CAROLINA
 2                          CHARLOTTE DIVISION

 3   IN RE:                        :      Case No. 21-30589-JCW

 4   LTL MANAGEMENT LLC,           :      Chapter 11

 5        Debtor,                  :      Charlotte, North Carolina
                                          Friday, October 22, 2021
 6                                 :      1:29 p.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8   LTL MANAGEMENT LLC,           :      AP 21-03032-JCW

 9        Plaintiff,               :

10            v.                   :

11   THOSE PARTIES LISTED ON       :
     APPENDIX A TO COMPLAINT and
12   JOHN AND JANE DOES 1-1000,    :

13        Defendants.              :

14   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                        TRANSCRIPT OF PROCEEDINGS
16            BEFORE THE HONORABLE J. CRAIG WHITLEY,
                   UNITED STATES BANKRUPTCY JUDGE
17

18   Audio Operator:               COURT PERSONNEL

19
     Transcript prepared by:       JANICE RUSSELL TRANSCRIPTS
20                                 1418 Red Fox Circle
                                   Severance, CO  80550
21                                 (757) 422-9089
                                   trussell31@tdsmail.com
22

23   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
24

25
</pre>

1  history was.

2  Q   You have no evidence that Mr. Wuesthoff ever worked in

3  North Carolina, correct?

4  A   I don't -- I, I believe he never worked in North Carolina.

5  Q   Okay.

6      And this Mr. Dickinson, another officer from LTL Management

7  LLC, where does he work?

8  A   He works in New Jersey.

9  Q   Okay.  And can you identify any officer, employee, anyone

10  associated with LTL Management LLC that actually works in North

11  Carolina?

12  A   No.

13  Q   Sir, you in 2001 were Senior Counsel in the Litigation

14  Group at Johnson & Johnson, correct?

15  A   Correct.

16  Q   And you were involved in product liability litigation and

17  supervising that at Johnson & Johnson from 2001 all the way up

18  until about ten days ago, correct?

19  A   Yes.  Well, I, I had a change -- yeah.  So I also became

20  head of Product Liability during that span.

21  Q   Right.  So just to be clear for the Court, you became the

22  head lawyer for Product Liability at Johnson & Johnson in what

23  year?

24  A   I'm going to have to look back at my declaration.

25  Q   Could you give us your best estimate?