# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

|  |  |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. | |

## DEBTOR'S OBJECTION TO TRANSFER OF VENUE

The above-captioned debtor (the "Debtor") hereby files this objection to the:

(i)   *Motion of Bankruptcy Administrator to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(a)(1) in the Interest of Justice or for the Convenience of Parties* [Dkt. 205] (the "BA Motion") filed by the Bankruptcy Administrator for the Western District of North Carolina (the "Bankruptcy Administrator");

(ii)   *Motion of the MDL Plaintiffs' Steering Committee to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Joinder in Bankruptcy Administrator's Motion to Transfer Venue* [Dkt. 235] (the "PSC Motion" and, together with the BA Motion, the "NJ Motions");[2] and

(iii)   *Response to Order to Show Cause and Motion of Arnold & Itkin LLP on Behalf of Certain Talc Personal Injury Claimants to Transfer Venue of this Chapter 11 Case to the District of Delaware or, if not to that District, the District of New Jersey Pursuant to 28 U.S.C. § 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure* [Dkt. 312] (the "Arnold & Itkin Motion"), filed by the law firm of Arnold & Itkin LLP ("Arnold & Itkin"),[3]

---

[1]   The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2]   Together, the MDL Plaintiffs' Steering Committee and the Bankruptcy Administrator are referred to herein as the "Movants."

[3]   The Arnold & Itkin Motion raises many of the same arguments made in the NJ Motions as to why another venue for this case purportedly would be superior to this Court, arguments with which the Debtor disagrees for the reasons set forth herein as to the NJ Motions.  Given that the Arnold & Itkin Motion was filed approximately 48 hours prior to the Debtor's deadline for filing this objection, the Debtor does not separately respond to the arguments in that motion already made in the NJ Motions.  The Debtor, however, has responded in section III to the argument in the Arnold & Itkin Motion that venue should be transferred to Delaware rather than New Jersey, as advocated in the NJ Motions.

and further submits this pleading in response to the Court's *Order to Appear and Show Cause Why Venue Should Not Be Transferred to Another District* [Dkt. 208] (the "Order to Show Cause").[4]  In support of this objection, the Debtor incorporates the statements contained in the *Second Supplemental Declaration of John K. Kim in Support of Debtor's Objection to Transfer of Venue*, attached hereto as Exhibit A (the "Second Supp. Kim Decl."), and further respectfully represents as follows:

## Introduction

This Court was the obvious place for the Debtor to file its chapter 11 petition. Since at least 2010, the Court has developed extensive expertise on numerous issues that will arise in this case, experience that at this point cannot be matched anywhere in the United States. This experience includes, without limitation, key rulings in the mass tort context on:

— the reach of the automatic stay and requests to lift it;

— the circumstances under which a preliminary injunction should issue as to litigation by claimants against non-debtors;

— the factors relevant to the appointment of a future claimants' representative;

— the estimation of mass tort liabilities, including the need for and proper scope of such estimation;

— the proper circumstances for granting (or not granting) derivative standing in connection with litigation pertaining to prepetition restructuring transactions, including divisional mergers;

— the use of tolling agreements;

— settlements of insurance coverage disputes; and

---

[4]  Other submissions have been and may be made in connection with these issues in advance of or subsequent to the deadline set by the Court in the Order to Show Cause, including, without limitation, *Kellie Brewer's Response in Support of Motion of Bankruptcy Administrator to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(A)(1) in the Interest of Justice or for the Convenience of Parties* [Dkt. 340] (the "Brewer Response"), which was filed at the time the Debtor was completing this objection for filing.  The Debtor reserves all rights to respond to the Brewer Response and any other further submissions in connection with this matter at the hearing on November 10, 2021.

NAI-1522369132

— a myriad of asbestos-related plan confirmation issues, including the propriety and
scope of permanent injunctions and disclosure statement and solicitation issues.

This Court has also ruled on numerous issues in connection with the appropriate scope of

discovery to be conducted in these types of proceedings, including confidentiality and privilege

issues, and has worked through countless case management issues that can streamline, if not

eliminate, the need for collateral litigation on similar issues in this case.  There also is a

developing appellate record in this District with respect to key issues at the heart of mass tort and

divisional merger cases, which will provide further guidance on these matters in this case.

In the same manner that, for instance, the District of Delaware has become known

for its expertise in handling large, complicated chapter 11 business cases, this Court now has

become known for its expertise in handling complicated mass tort cases of national significance,

including cases involving divisional mergers.  It has become routine for national business cases

to file in Delaware based solely on state of incorporation, even where the debtor has substantial

physical assets elsewhere.  For these large cases, there is no nexus of creditors located in one,

defined location.  Instead, the creditors, as well as the debtor's physical assets, are dispersed

throughout the country.  As a result, the experience of the Delaware court is the dominant driver

of the debtor's decision to file in Delaware, as well as uniform acceptance of that decision.

This case is no different.  It is properly venued in this District based on the

Debtor's state of incorporation.  As the Court is aware, where a case is properly domiciled in a

District, the debtor's choice of venue should be afforded "substantial weight and deference."

*See* § I.B., *infra*.  While the Movants argue that the substantial weight and deference typically

afforded a debtor's choice of venue should be less in this case, in fact the opposite is true.  The

experience of the Court is of paramount importance.  Further, this is a large, complex mass tort

NAI-1522369132

case of national significance.  The Debtor's claimants are spread throughout the country in all 50

states.  Moreover, the Debtor's assets are largely intangible and, as this Court in *Kaiser Gypsum*

and Judge Beyer in *Bestwall* recognized in denying motions to transfer venue in those cases, a

debtor's choice of venue, if proper under the venue statute, is less subject to challenge if the

debtor does not have material physical assets and operations.  *See* §§ II.D & II.E, *infra*.

Because of this Court's invaluable experience gained from its handling of

numerous, complicated issues that will be relevant to this case, venue in this Court will **benefit**

**all parties in interest**.  And, there is precedent for centralizing mass tort cases given their

specialized nature.  During the "Bankruptcy Wave" of the early 2000s, Judge Judith Fitzgerald

presided over a dozen or more chapter 11 asbestos bankruptcy cases, both from her home

jurisdiction in Pittsburgh and as a visiting judge in the District of Delaware.

As the case law cited by the Movants demonstrates, chapter 11 cases that are

transferred under the venue statute are almost always "local" cases, and typically real estate cases,

where a debtor owns real property (*e.g.,* a hotel) in one location and, as a result, there are specific

local ties, including creditors located close to the property, that weigh in favor of transfer to that

local venue.  *See* § II.D, *infra*.  National cases, where creditors and assets are geographically

dispersed, are rarely, if ever, transferred, and it would be unprecedented to transfer a case of

national significance in a specialized area that was filed in the jurisdiction that had the most

extensive bankruptcy expertise in that area.  The Movants attempt to fit this case into the rubric

of a local case, arguing, for instance, that venue should be transferred to New Jersey because the

Debtor's books and records or chief legal officer are located there.  But these considerations are

largely, if not completely, irrelevant to the venue issue in a national case of this size and

specialized complexity, where instead the bankruptcy expertise of this Court is of utmost

NAI-1522369132

importance.  These "local" factors—in particular, any contention that costs will be saved because

the Debtor's "witnesses" and documents may reside in New Jersey—are immaterial in context

and, given the Debtor's solvency, irrelevant because they will have no impact on recoveries to

claimants.

The assertion that the federal multi-district litigation in New Jersey (the "<u>MDL</u>")

makes the facts of this case different than the other mass tort cases pending in this jurisdiction,

where either venue was not challenged or where the challenge was denied, is without foundation.

Among other things, (1) the plaintiffs in the MDL are not from New Jersey,[5] (2) the MDL cases

were consolidated largely for coordination of pretrial discovery and ultimately are sent back to

their original or primary jurisdictions, and (3) the cases are now stayed against the Debtor.[6]  *See*

§ II.C, *infra*.  Bankruptcy professionals representing these claimants will not be spending their

time in the MDL, but in this bankruptcy case.  Since many of the bankruptcy professionals likely

to appear in this case also appear in the other mass tort cases in this jurisdiction, the

"convenience of the parties" aspect of venue consideration weighs in favor of venue remaining

here.  And, if geography is otherwise a consideration, Charlotte is more centrally located than

New Jersey between the Eastern and Southern regions of the country, where a significant number

of claimants reside.[7]

All of this leaves one key issue for consideration—the resources of the Court.

The Debtor is not blind to the fact that the Court has significant responsibilities in managing the

other mass tort cases on its docket as well as its other case load.  At the same time, there are

---

[5]    New Jersey plaintiffs cannot sue in the MDL because there would be no diversity of citizenship.

[6]    Whether the MDL proceedings are stayed as to Johnson & Johnson ("<u>J&J</u>") remains subject to the Debtor's
       pending request for a temporary restraining order and related relief.

[7]    *See* § II.C, *infra,* which includes a chart showing concentration of claimants from both the East (for
       instance, New York, Pennsylvania, and Ohio), as well as the South (for instance, Texas, Florida, Georgia,
       Tennessee, and North Carolina).

NAI-1522369132

mitigating factors. For instance, while this case has demanded substantial time in its early days, the Debtor believes that appointment of a statutory claimants' committee and future claimants' representative, along with establishment of omnibus hearings and use of case management procedures, will help streamline future proceedings. In addition, the *Kaiser Gypsum* case is essentially concluded, and the *DBMP* and *Aldrich* cases have completed their near-term trials in connection with the preliminary injunction decisions. And, ultimately, the Court's experience with asbestos cases generally, and divisional merger cases in particular, should lead to substantial efficiencies and judicial economies. Finally, the Debtor respectfully submits that a reallocation of judicial resources, including potentially the inclusion of visiting judges into the jurisdiction, could be considered to help the Court with its non-mass tort docket.

## <u>Argument</u>

I.   **Venue of the Debtor's Chapter 11 Case Is Proper and Entitled to Deference.**

A.   **Venue Is Proper Under 28 U.S.C. § 1408.**

As this Court held in *Kaiser Gypsum*, "[s]ection 1408 is written in the disjunctive, and venue is proper if any of the four alternatives contained in section 1408 is satisfied whether for the 180 days immediately preceding the bankruptcy filing or for the 'longer portion' of the 180 days prior to the bankruptcy filing." *Order Denying Motion of Certain Kaiser Gypsum Claimants to Transfer Chapter 11 Cases to the United States District Court for the Western District of Washington*, *In re Kaiser Gypsum Co., Inc.*, No. 16-31602 [Dkt. 348] (Bankr. W.D.N.C. Jan. 30, 2017) (the "<u>Kaiser Gypsum Order</u>") at 2.[8]

---

[8]   *See also In re Honeycutt*, 2012 Bankr. LEXIS 5857, at *6 (Bankr. E.D.N.C. Dec. 21, 2012) ("Section 1408 is written in the disjunctive; therefore, allowing many possible locations where an entity or individual may file for bankruptcy protection, as long as one of the following four alternative tests for venue is satisfied: the debtor's (1) domicile; (2) residence; (3) location of principal place of business in the United States; or (4) location of principal assets in the United States.") (internal alterations and citation omitted); *In re Mid Atl. Retail Grp., Inc.*, No. 07-81745, 2008 WL 612287, at *2 (Bankr. M.D.N.C. Jan. 4, 2008) ("[V]enue can be proper in several districts as the district where a debtor resides, is domiciled, has its principal place of

NAI-1522369132

As the BA Motion acknowledges, the Debtor was organized in North Carolina and has been domiciled in North Carolina "for the longer portion of" its existence (*see* BA Motion ¶ 14), thereby satisfying the plain language requirements of section 1408.  Because venue of the Debtor's chapter 11 case is proper in this District in the first instance, transfer of venue may be sought pursuant to 28 U.S.C. § 1412 and Bankruptcy Rule 1014(a)(1), which provide that a case properly filed in a district may be transferred only (1) in the interest of justice or (2) for the convenience of the parties.

**B.     The Debtor's Choice of this District Is Entitled to Great Weight and Deference.**

Where, as here, the venue of a chapter 11 case is proper, a presumption arises in favor of that District and the "debtor's [] choice of forum [will] be accorded **substantial weight and deference**."  *In re PWS Holding Corp.*, 1998 Bankr. LEXIS 549, at *4-5 (Bankr. D. Del. Apr. 28, 1998) (emphasis added); *see also In re Enron Corp.*, 274 B.R. 327, 342 (Bankr. S.D.N.Y. 2002) ("A debtor's choice of forum is entitled to great weight if venue is proper."); *In re Ocean Prop. of Delaware, Inc.*, 95 B.R. 304, 305 (Bankr. D. Del. 1988) ("When venue is proper, the debtor's choice of forum is entitled to great weight.") (quotations omitted).[9]

As a result, courts caution against disturbing a debtor's choice of a proper venue.[10] If a debtor's choice of forum satisfies section 1408, "the party challenging a debtor's choice must

---

(continued…)

business, or has principal assets located is not always going to be the same." (citing 28 U.S.C. § 1408 (2000)).

[9]     *Accord Memorandum Opinion and Order Denying the Official Committee of Asbestos Claimants' Motion for Dismissal, or Alternatively, Venue Transfer, In re Bestwall LLC,* No. 17-31795 [Dkt. 891] (Bankr. W.D.N.C. July 29, 2019) (the "Bestwall Order") at 7.

[10]    *See, e.g., Matter of Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1241 (5th Cir. 1979) ("[T]he court should exercise its power to transfer cautiously."), *cert. denied*, 444 U.S. 1045 (1980) (hereinafter referred to as "*CORCO*"); *In re Land Stewards, L.C.*, 293 B.R. 364, 369 (Bankr. E.D. Va. 2002)) ("[W]here the existing venue is entirely appropriate, this Court exercises its power to transfer cases cautiously."); *In re*

NAI-1522369132

show by a preponderance of the evidence that the venue is improper." *In re Honeycutt*, 2012 Bankr. LEXIS 5857 at *6-7 (quoting *In re Mid Atl. Retail Grp.*, 2008 Bankr. LEXIS 790, at *2 (Bankr. M.D.N.C. Jan. 4, 2008)) (citing *In re Farmer*, 288 B.R. 31, 34 (Bankr. N.D.N.Y. 2002) ("'[T]he burden is on the party disputing venue to establish that position by a preponderance of the evidence.'") (quoting *In re Handel*, 253 B.R. 308, 310 (B.A.P. 1st Cir. 2000)); *accord* Bestwall Order at 7.

Further, "[w]here a transfer would merely shift the inconvenience from one party to the other, or where after balancing all the factors, the equities leaned but slightly in favor of the movant, the [debtor's] choice of forum should not be disturbed."). *In re Garden Manor Assoc., L.P.*, 99 B.R. 551, 555 (Bankr. S.D.N.Y. 1988); *see also In re Great Am. Res., Inc.*, 85 B.R. 444, 446 (Bankr. N.D. Ohio 1988) ("[W]here after balancing all of the factors, the equities lean but slightly in favor of the [m]ovant, the [d]ebtors' choice of forum should not be disturbed.")

The Movants have failed to meet their substantial burden of demonstrating by a preponderance of the evidence that either the interest of justice or the convenience of the parties warrants transfer of the Debtor's case. Accordingly, the Debtor's choice of forum should be given deference and venue should be maintained in this District.

## II. The Relevant Facts of this Case Do Not Weigh in Favor of Transfer But Rather Support Venue Remaining in this District.

### A. The Primary Venue Consideration Is the Economic and Efficient Administration of the Estate, and the Court's Experience Alone Dictates that Venue Remain In this District.

Courts consider a variety of factors in determining whether the "interest of justice" or the "convenience of the parties" supports transfer of venue. As to the "interest of

---

(continued…)

*Windtech, Inc.*, 73 B.R. 448, 450 (Bankr. D. Conn. 1987) ("If a debtor originally files in a proper district, the court then exercises its power to transfer . . . cautiously."); *accord* Bestwall Order at 7.

NAI-1522369132

justice," "[u]ltimately, the key consideration is 'whether transferring venue would promote the

efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness.'"

Bestwall Order at 8 (quoting *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391 (2d Cir.

1990)) (citing *Yolo Capital, Inc. v. Normand*, No. 1:17-CV-00180-MR DLH, 2018 WL 576316,

at *2 (W.D.N.C. Jan. 26, 2018)) ("Not all of these [interest of justice] factors are weighed

equally, however, as the most important of these factors is the economic and efficient

administration of the estate.") (citing *Hilton Worldwide, Inc. v. Global Benefits Admin. Comm. v.

Caesars Entm't Corp.*, 532 B.R. 259, 274 (E.D. Va. 2015)).  Similarly, as to "convenience of the

parties," the "most important" factor is whether a transfer would promote the "economic and

efficient administration" of the estate.  *See CORCO*, 596 F.2d at 1247; *see also Enron Corp.*, 274

B.R. at 343 ("In considering the convenience of the parties, the Court weighs a number of

factors . . . The factor given the most weight is the promotion of the economic and efficient

administration of the estate.") (citing *CORCO*, 596 F.2d at 1247); Bestwall Order at 9 ("Courts

evaluate six factors in determining convenience of the parties . . . The consideration given the

most weight is the economic and efficient administration of the estate.") (internal alterations and

citation omitted).

      Given the Court's extensive experience with mass tort cases, and divisional

merger cases in particular, the "economic and efficient administration of the estate" factor, which

predominates both "interest of justice" and "convenience of the parties" prongs of the analysis,

unquestionably weighs in favor of this case remaining in this District.  There is no fact that is

even remotely as important or relevant to the venue consideration here, based on the case law's

focus on the need for "economic and efficient administration of the estate," as the experience that

this jurisdiction and this Court have with issues that will be relevant to this case.  For this reason

alone, any venue transfer should be denied.  The Debtor is unaware of any national case of this

size, magnitude, and complexity that has been transferred from a jurisdiction that had the level of

experience of this Court, including its specialized expertise in mass tort bankruptcy issues.

Indeed, the value of the Court's expertise already has been proven in this case.

Recently, the Debtor sought emergency relief both under section 362(a) and section 105(a) to

enjoin the continued litigation of talc claims against the Debtor and its non-debtor affiliates

notwithstanding the filing of these cases.  Based on the Court's recent experience with these

issues in the *DBMP* and *Aldrich* cases, the Court was able to promptly make a preliminary ruling

and then further consider the matter only two weeks later.  Consideration and adjudication of the

same dispute in another venue could have taken substantially longer.

**B.     The Movants Fail to Explain Why This Case Is Any Different than the Mass
        Tort Cases Pending in this Jurisdiction Where Venue Either was not Raised
        or Venue Transfer Was Denied.**

This District has already seen several mass tort cases similar to this case filed in

the last several years.  In some, no venue transfer was sought and in others it was sought and

denied.  The Movants are unable to convincingly explain why this case is any different.  While

the Movants attempt to distinguish this case from these other mass tort cases, no meaningful

distinctions truly exist.  As in this case, in the *Bestwall* and *DBMP* cases the debtors were created

through Texas divisional mergers and organized in North Carolina shortly before filing for

bankruptcy, thereby establishing proper venue in this District.  In each case, the debtor has no

substantial ongoing business operations, no employees, and limited tangible assets in North

Carolina.  Each debtor also relies upon non-debtor affiliates located outside of North Carolina for

its management, seconded employees, various corporate and administrative services, and, most

significantly, funding pursuant to substantially similar funding agreements.  The debtors'

principal place of business, books and records, representatives and "witnesses," and non-debtor

affiliates and funding parties pursuant to the funding agreements are all located outside of North

Carolina.  The primary creditors of each debtor are mass tort claimants located across the country.

Though not formed via Texas divisional merger, Kaiser Gypsum Company, Inc.

("Kaiser Gypsum"), formerly a Washington corporation, converted to a North Carolina

corporation 130 days prior to filing for bankruptcy in this District.  This conversion was

effectuated in order to create the opportunity to file bankruptcy in North Carolina and Kaiser

Gypsum based the venue of its bankruptcy filing on its status as a North Carolina corporation.

The *Kaiser Gypsum* debtors filed for bankruptcy to address asbestos-related and environmental

liabilities, including approximately 14,000 then-pending asbestos-related bodily injury lawsuits

filed in state courts across the country.  Kaiser Gypsum had no substantial ongoing business

operations other than managing its legacy liabilities, no employees, and no material tangible

assets.  Again, the debtor's principal place of business, books and records, representatives and

"witnesses," and non-debtor affiliates and funding parties were all located outside of North

Carolina.

As the BA Motion acknowledges, similar requests to transfer venue were

prosecuted and, ultimately, denied in the *Kaiser Gypsum* and *Bestwall* cases.  *See* BA

Motion ¶ 38.  More recently, in *DBMP*, no party—including the Bankruptcy Administrator—

challenged venue.  The facts of this case, which, contrary to the Movants' assertions, are no

different than the cases above, do not dictate a different result.  Instead, for the very same

reasons that supported the *Kaiser Gypsum* and *Bestwall* decisions, transfer of venue should be

denied in this case as well.  In fact, if anything, the reasons to deny transfer of venue are even

stronger in this case than in *Kaiser Gypsum* and *Bestwall*.  Again, the Debtor would submit that

by far the most compelling factor that will promote the "economic and efficient administration"

NAI-1522369132

of the Debtor's case is the extensive experience that this jurisdiction and this Court have developed with mass tort cases, and divisional merger cases in particular. This experience has only grown exponentially since the *Kaiser Gypsum* and *Bestwall* venue transfer denials were made in early 2017 and early 2019, respectively.

### C. The Existence of the MDL Does Not Warrant a Different Result.

The Movants rely heavily on the MDL as a basis to distinguish this case from the other mass tort cases pending in this District. That reliance is misplaced.

The Movants are correct that, of the approximately 38,000 ovarian cancer cases pending against the Debtor, approximately 35,000 of those cases are pending in the MDL. *See* Second Supp. Kim Decl. ¶ 12. As the BA Motion further admits, however, "plaintiffs in the New Jersey MDL are not necessarily located in New Jersey." BA Motion ¶ 29. This is an understatement. New Jersey plaintiffs cannot sue in the MDL because there would be no diversity of citizenship. *See* Second Supp. Kim Decl. ¶ 13. The MDL plaintiffs are not from New Jersey, but rather are geographically diverse and reside in all other states across the country. *Id.* at ¶ 14. The top three states of residence for plaintiffs with claims in the MDL are California, Texas, and Florida. *Id.* Specifically, 2,810 (or 7.97%) of the MDL plaintiffs are California residents; 2,722 (or 7.72%) are Texas residents; and 2,400 (or 6.80%) are Florida residents. *Id.* Of note, 1,229 (or 3.48%) of the MDL plaintiffs are North Carolina residents. *Id.* This places North Carolina among the top 10 states in which the most MDL plaintiffs reside, as further demonstrated by the chart below. *Id.*

NAI-1522369132

| State of Residence | Number of Plaintiffs | Percentage of Total Plaintiffs |
|---|---|---|
| California | 2,810 | 7.97% |
| Texas | 2,722 | 7.72% |
| Florida | 2,400 | 6.80% |
| New York | 1,976 | 5.60% |
| Pennsylvania | 1,572 | 4.46% |
| Ohio | 1,564 | 4.43% |
| Georgia | 1,327 | 3.76% |
| Illinois | 1,301 | 3.69% |
| Tennessee | 1,241 | 3.52% |
| North Carolina | 1,229 | 3.48% |

In addition, assertions that, collectively, "the MDL plaintiffs have devoted significant resources to litigating in [the District of New Jersey] for five years" (*see* BA Motion ¶ 29) and that those plaintiffs "are accustomed to appearing and litigating before the District of New Jersey," (PSC Motion ¶ 36) misrepresent the realities of the MDL and talc litigation, generally.  The MDL has not focused in any material respect on individual litigants. Second Supp. Kim Decl. ¶ 15.  For instance, discovery in individual cases has been largely limited to electronic production of plaintiff profile forms and medical records.  *Id.*  The exception has been limited work-up of a small number of individual cases, followed by expert discovery in what would have been six potential, future bellwether cases.  *Id.*  Notably, those six plaintiffs hail from Connecticut, New Hampshire, Maryland, Florida, Missouri, and Louisiana. *Id.*  Their counsel are from Louisiana, Missouri, Georgia, and Alabama.  *Id.*  The MDL Lead Counsel are from the District of Columbia and Alabama, and the Plaintiffs' Steering Committee, and Liaison Counsel are likewise located across the country, representing Alabama, Virginia, New Jersey, Texas, Pennsylvania, New York, California, Indiana, Louisiana, South Carolina, and Wyoming.  *Id.*

NAI-1522369132

In any case, the actions pending against the Debtor in the MDL are now stayed.[11]

Accordingly, there is no ongoing litigation of talc claims against the Debtor that would make the

District of New Jersey a more convenient jurisdiction for the parties to that litigation.  Even if the

MDL proceedings had continued against the Debtor (or continue against J&J despite the fact that

the Debtor is the real party in interest), the vast majority of talc claims would not be resolved by

the MDL court, but instead, with only minor exceptions, would be adjudicated in each plaintiff's

home state.  That is because, with the exception of a limited number of bellwether trials, once the

goals of the MDL ultimately are achieved, the MDL judge would remand all of the pending

cases back to the courts from which they were transferred, as required by law.[12]  For plaintiffs

who direct-filed their cases into the MDL, those cases would be remanded to the federal district

court in which the complaint should be deemed to have otherwise been originally filed.[13]  Thus,

after the MDL disbands, tens of thousands of cases would then be prosecuted in their home states

across the country.

Accordingly, the presence of the MDL does not alter the fact that the Debtor's talc

claimants reside and would have cases throughout the country, and, thus, no one jurisdiction is

more convenient than this jurisdiction for venue purposes.  *See In re Bestwall LLC*, No. 17-

31795 (LTB) [Dkt. 767] Hr'g Tr. at 19:25-20:4 (Bankr. W.D.N.C. Jan. 24, 2019) ("With respect

to the Committee's argument that this case should be transferred for the convenience of the

---

[11]   *See* footnote 6, *supra*.

[12]   *See* 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded by the panel at or before the
conclusion of such pretrial proceedings to the district from which it was transferred unless it shall have
been previously terminated…..").

[13]   *See Case Management Order No. 2 (Direct Filing), In re: Johnson & Johnson Talcum Powder Products
Marketing, Sales Practices, and Products Liability Litigation,* MDL No. 16-2738 (FLW) (LHG) [Dkt. 102]
(Feb. 7, 2017).  Direct-filing plaintiffs may designate a remand court in which venue was proper for such
plaintiffs to file their complaints.  Plaintiffs are required to support their choice of remand court with
information regarding plaintiff's current and prior residency, information on location of diagnosis and
injury, and information on location of product purchase and usage.

- 14 -

parties, Bestwall's creditors are spread throughout the country; therefore, the Western District is just as convenient as any jurisdiction."). The Movants also seem to suggest that the MDL is the only or central place where talc-related, ovarian cancer litigation has proceeded for the last several years. To the contrary, plaintiffs involved in this litigation have been actively pursuing their claims in multiple venues across the country. For example, there are nearly 700 plaintiffs with claims filed in California state courts and nearly 800 plaintiffs with claims filed in Missouri state courts in addition to the claims filed in the state courts of Florida, Illinois, Delaware, Georgia, Louisiana, Pennsylvania, Arizona, Virginia, and Rhode Island, among others. Second Supp. Kim Decl. ¶ 16. These cases have not been sitting idly, but instead have been individually active. *Id.* There have been multiple ovarian cancer trials conducted in these courts over the past several years, including one trial in South Dakota; eight cases tried to verdict in St. Louis, Missouri; one trial in Los Angeles, California; one trial in St. Clair County, Illinois; one trial in Philadelphia County, Pennsylvania; and one case tried to verdict in Richmond County, Georgia. *Id.*

And this is in addition to nearly 450 active mesothelioma and lung cancer cases which existed at the time of the Debtor's filing. *Id.* at ¶ 17. Those cases are pending in 44 federal and state courts in 24 separate states.[14] *Id.* Mesothelioma trials have proceeded to jury deliberations in California, Florida, Kentucky, New Jersey, New York, Oklahoma, and South Carolina, with additional cases opening trial in Indiana, Oregon, and Washington. *Id.*

Furthermore, the notion that a bankruptcy case in this jurisdiction would require tens of thousands of personal injury claimants to come to Charlotte (*see* BA Motion ¶ 29; PSC

---

[14]    Cases are presently pending in each of Arkansas, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, and Washington. *Id.*

NAI-1522369132

Motion ¶ 36) or, if in New Jersey, "would enable meaningful participation" by such claimants (*see* PSC Motion ¶ 36), is contrary to practice in bankruptcy.  Once a statutory claimants' committee is formed and a future claimants' representative is appointed, those fiduciaries and their respective professionals will be charged with representing the interests of current and future talc claimants in this case.  It should be noted that none of the law firms proposed by the Bankruptcy Administrator to serve on the talc claimants' committee, and which will be appointed to that committee based on the Court's recent ruling, list their address as being in New Jersey. *See Motion of the Bankruptcy Administrator to Appoint an Official Committee of Talc Claimants* [Dkt. 227] (Oct. 28, 2021) at Ex. A.

With respect to the significance of the Judicial Panel on Multidistrict Litigation ("JPML") Transfer Order, as the BA Motion notes, a key factor cited by the JPML warranting creation of the MDL in the District of New Jersey was the fact that Judge Wolfson had the federal talc case that was most advanced, as well as her experience with MDLs making Chief Judge Wolfson "well situated to structure [the] litigation so as to minimize delay and avoid unnecessary duplication of discovery and motion practice." *See* BA Motion ¶ 28.  Indeed, those factors also were key to J&J and Old JJCI (as defined in the *Declaration of John K. Kim in Support of First Day Pleadings* [Dkt. 5] (the "First Day Decl.")) in their support of the District of New Jersey as a forum for the MDL.[15]  The Transfer Order thus only reinforces the main reason

---

[15]    *See Response of Defendants Johnson & Johnson and Johnson & Johnson Consumer Companies to Motion for Transfer and Coordination of Pretrial Proceedings Pursuant to 28 U.S.C. § 1407,* MDL No. 16-2738 [Dkt. 38] (Aug. 5, 2016) at 3 ("Judge Wolfson currently presides over the case at the most advanced stage [*Chakalos*] . . . Because this action is the most advanced of any of the federal court actions with regard to the amount of discovery that has been conducted, Judge Wolfson is the most familiar with the issues and well-equipped to coordinate discovery among all of the actions."); *id.* at 5 ("Judge Wolfson has previously presided over three MDL proceedings . . . Accordingly, Judge Wolfson clearly has the necessary experience to preside over this MDL proceeding.").

NAI-1522369132

why venue of this case should remain in this District.  It is *this* Court's experience with complex

mass tort bankruptcies that makes this the ideal forum for this case to reside.[16]

    **D.**    **Because This is a National, Not a Local, Case With Mostly Intangible Assets, the Alleged Connections to New Jersey Raised By the Movants Have Little, if Any, Relevance to Venue.**

        Ultimately, the various purported "connections" to New Jersey upon which the

Movants rely have no practical impact on whether that forum is more appropriate for this highly

complex, nationally significant mass tort case.  As such, those factors are insufficient to disrupt

the presumed propriety of the Debtor's chosen venue.  The case law cited by the Movants

illustrates this point.

        The cases cited by the Movants in which venue of a chapter 11 case actually was

transferred overwhelmingly are local, real estate cases.  In these cases, a debtor typically has

property (such as a hotel) in one location, and local creditors tied to that property that weigh in

favor of transfer to the local venue.  *See, e.g.*:

> *In re Hermitage Inn Real Estate Holding Co.*, *LLC*, 2019 WL 2536075 (Bankr. D. Vt. June 19, 2019) (venue ordered in Vermont where initial involuntary petition was filed, followed by voluntary petitions elsewhere, since debtors' principal assets, real estate holdings including a golf and ski club, along with substantial creditors (including trade creditors), were located in Vermont);

> *In re Grand Dakota Partners, LLC*, 573 B.R. 197 (Bankr. W.D.N.C. 2017) (venue transferred to North Dakota where debtor's principal asset, a hotel, and the "vast majority of the Debtors' creditors" were located);

> *In re Rehoboth Hospitality, LP,* 2011 WL 5024267 (Bankr. D. Del. Oct. 19, 2011) (venue transferred to Texas where debtor's primary asset was a hotel and related real estate in Texas, the "overwhelming majority" of non-insider creditors were in Texas, and bankruptcy case would likely involve valuation and potential disposition of the real estate);

---

[16]    The assertion that transfer of this case is warranted because Judge Wolfson "may choose" to withdraw the reference for some or all proceedings is purely speculative.  *See* BA Motion ¶¶ 30-31. Such theoretical possibilities should not be considered, particularly when this Court is optimally suited to efficiently administer the Debtor's case.

NAI-1522369132

*In re Lakota Canyon Ranch Dev., LLC*, 2011 WL 5909630 (Bankr. E.D.N.C. June 21, 2011) (venue transferred to Colorado where debtor's principle assets, a golf course and certain other real property, as well as the debtor's primary secured creditor, were located, and most unsecured creditors were located closer to Colorado than to North Carolina);

*In re Spartan Holding Co., Inc.*, 2011 WL 5909502 (Bankr. E.D.N.C. May 24, 2011) (venue transferred to Western District of North Carolina where debtor's principal assets, a car wash and certain other real estate, along with its creditors, were located);

*In re Dunmore Homes, Inc.*, 380 B.R. 663 (Bankr. S.D.N.Y. 2008) (venue transferred to California where "[t]he majority of the Debtor's significant assets consist[ed] of real property in residential developments" in California, substantial trade creditors were located in California, and "the Debtor's real estate assets and the local or regional business climate in which the Debtor and its Subsidiaries operated [were] the driving considerations in [the] case");

*In re Pinehaven Assocs.*, 132 B.R. 982 (Bankr. E.D.N.Y. 1991) (venue transferred to Mississippi where debtor's sole asset and only business was operation of a Mississippi motel, all creditors were located in or near Mississippi (or closer to Mississippi than New York), and bankruptcy case would involve title to, interests in, and appraisal of the motel);

*In re A & D Care, Inc.,* 86 B.R. 43 (Bankr. M.D. Pa. 1988) (venue transferred to District where debtor's principal asset was contract right to operate a minimum security prison and provide drug and alcohol treatment services at that location); and

*In re 19101 Corp.*, 74 B.R. 34 (Bankr. D.R.I 1987) (venue transferred to Florida where debtor's sole asset, a piece of real property, was located and dispute regarding debtor's ownership interest in that property would involve application of Florida law).

Such cases have little, if any, bearing in a complex, national case like this, where the Debtor has no material operational assets. Rather, the purpose of this case is to globally resolve present and future talc claims held by claimants across the country—a resolution with national impact. The location of the Debtor's principal place of business, the location of its books and records, the location of potential witnesses, and similar factors relevant in local real estate cases are largely irrelevant here, especially when compared to the extensive expertise of

NAI-1522369132

this Court.  That the Debtor's chief legal officer has his office in New Jersey, or that the Debtor's largely electronic records technically are located there, have no actual impact on how this case will proceed.  As the Court has found, venue considerations differ in the context of a debtor without substantial physical assets or operations.  *See* Kaiser Gypsum Order at 3 ("[B]ecause the Debtors do not have significant, ongoing operations and active employee constituencies, the Court finds that no other potential venue is an inherently more favorable venue.").  This is particularly true for "national cases" where assets and creditors are dispersed throughout the country.

The Movants' arguments that the location of the Debtor's mostly intangible assets weigh in favor of venue transfer are, for the same reasons, from a practical standpoint, irrelevant. Where, as here, the debtor has limited tangible assets, traditional local real estate case venue factors are simply not determinative.  *See, e.g., In re Kaiser Gypsum Company, Inc., et al.*, No. 16-31602 (JCW) [Dkt. 261] Hr'g Tr. at 98:19-99:2 (Bankr. W.D.N.C. Nov. 22, 2016) ("[W]hen you get over to the other side of this on *forum non conveniens*, given the nature of what we're doing here with intangible assets, companies that don't have active employee constituencies, and the like, venue, in my mind, becomes a lot more optional in the sense that one place is not inherently more favorable than the others."); *In re Bestwall LLC*, No. 17-31795 (LTB) [Dkt. 767] Hr'g Tr. at 18:9-12 (Bankr. W.D.N.C. Jan. 24, 2019) ("The fact that the debtor is a holding company weighs against transferring the case in the interest of justice because it's not an operating company with employees, vendors, customers, and other tangible assets in a separate location.").

NAI-1522369132

In any case, the Movants cannot refute that the Debtor has a bank account in

North Carolina and valuable membership interests in its North Carolina subsidiary.[17]  The BA

Motion asserts (and is echoed by the PSC Motion) that "[t]he Debtor's most valuable asset [its

rights under the Funding Agreement] is located in New Jersey and, likewise, the location of a

majority of its assets, as such, it must be concluded that the Debtor's principal asset is located in

New Jersey."  BA Motion ¶ 36.  As the BA Motion seems to advocate with respect to the

Debtor's membership interests, however, the Debtor's contractual rights under the Funding

Agreement are an intangible asset with no physical location.  Where the intangible asset is

located for venue purposes is not clearly defined.  And, as with other factors raised by the

Movants, the "location" of this intangible asset has nothing to do with whether it is more

"convenient" or appropriate for this case to be venued somewhere other than this District.  This

said, the Funding Agreement (which is substantially similar to funding agreements in other

divisional merger cases) is governed by North Carolina law (Funding Agreement § 9) and is

enforceable against J&J and JJCI in North Carolina pursuant to North Carolina's "long arm"

statute.  *See, e.g., Embark, LLC v. 1105 Media, Inc.*, 231 N.C. App. 538, 544 (2014); *Williamson

Produce, Inc. v. Satcher*, 122 N.C. App. 589, 594 (1996); *Tom Togs, Inc. v. Ben Elias Indus.

Corp.*, 318 N.C. 361, 367 (1986).

Regardless of the "location" of the Funding Agreement, J&J and New JJCI (as

defined in the First Day Decl.) have committed to funding a North Carolina trust with $2 billion

for the payment of any current and future talc-related liabilities of the Debtor.  *See* First Day

---

[17]    The BA Motion argues that those ownership interests should be disregarded because "Royalty A&M is a
newly created limited liability company, formed on the eve of the Debtor's own organization" and its
"operations and assets lack any relationship to North Carolina."  *See* BA Motion ¶ 36.  The BA provides no
authority for that proposition, nor mentions that essentially the same set of facts existed as to the
subsidiaries of the debtors in the *Bestwall* and *DBMP* cases.

NAI-1522369132

Decl. ¶ 28.  These funds will represent substantial tangible assets, $2 billion worth, held in a

North Carolina trust.

   E.   ***Patriot Coal* Already Has Been Rejected as a Basis to Transfer Mass Tort
        Cases Like This Out of this District.**

        The only truly "national case" that the Movants cite where venue was transferred

is the *Patriot Coal* case, which is readily distinguishable and fails to support a transfer of venue

here.  Indeed, this Court in *Kaiser Gypsum* and Judge Beyer in *Bestwall* rejected *Patriot Coal* as

a basis to transfer venue.

        In *Patriot Coal*, the debtors created, on the eve of bankruptcy, two New York

domiciled shell entities with essentially no assets to take advantage of the "affiliate filing rule" to

permit the entire corporate family to file in New York.  The New York entities were not the

relevant entities for the chapter 11 restructuring (*i.e.*, they were not the entities with the

operations and debt in need of restructuring); they were just a tool to allow affiliates with

businesses outside of New York to file in the preferred court.

        Here, unlike in *Patriot Coal*, the Debtor did not take advantage of the status of

any of its affiliates to manufacture venue (LTL Management LLC is the only debtor in this case).

Further, the Debtor is not a shell company, as were the entities created in *Patriot Coal*.  The

Debtor has substantial assets.  As a result, there were important legal consequences to the

selection of a state to govern the Debtor's formation.  Among other things, the decision to

organize the Debtor in North Carolina (1) subjected it to the laws of North Carolina,

(2) impacted its fiduciary obligations and the standards that govern indemnification and

exculpation of its officers and directors, (3) required the payment of franchise taxes to North

Carolina, and (4) created oversight of the Debtor by North Carolina governmental authorities.

As a result, the Debtor accepted not just the potential benefits of organizing in North Carolina,

- 21 -

but any legal burdens as well.[18]  This was not the case in *Patriot Coal*, where the newly created entities had no true assets.

In addition to being factually distinguishable, *Patriot Coal* was raised in support of venue transfer in both *Kaiser Gypsum* and *Bestwall* cases and proved unpersuasive.[19]  Indeed, in denying the official committee of asbestos claimants' request to transfer venue in *Bestwall*, Judge Beyer expressly distinguished and dismissed *Patriot Coal* as supportive of venue transfer in that case.  *See* Bestwall Order at 8-9.  Citing the Kaiser Gypsum Order issued by this Court, Judge Beyer further ruled that, where the debtor "is not itself an operating company like the primary debtors in *Patriot Coal* . . . where [the debtor's] Chapter 11 case should be venued 'in the interest of justice' is a less relevant question than when a debtor files in a jurisdiction that is separate from where it actually conducts its operations." *Id.* at 9.  As in *Bestwall* and *Kaiser Gypsum*, "there is no compelling basis to transfer venue in the interests of justice because [the Debtor] is not operating a business with numerous employees, vendors, customers, and tangible assets in a separate location, which was the concern leading to a venue transfer in *Patriot Coal*." *Id.*[20]

---

[18]     *See PWS Holding Corp.*, 1998 Bankr. LEXIS 549, at *14 ("[M]any businesses incorporate in states in which they conduct little, if any, business.  With the choice of citizenship comes various rights and responsibilities.  Significantly, a business must subject itself to personal jurisdiction in the courts of its state of incorporation.").

[19]     *See Motion of the Official Committee of Asbestos Claimants to (I) Dismiss the Debtor's Chapter 11 Case For Cause as a Bad Faith Filing Pursuant to 11 U.S.C. § 1112(b), or Alternatively, (II) Transfer Venue In the Interest of Justice and for the Convenience of the Parties Pursuant to 28 U.S.C. § 1412, In re Bestwall LLC*, No. 17-31795 (LTB) [Dkt. 495] (Bankr. W.D.N.C. Aug. 15, 2018) at 25-27; *Motion of Certain Kaiser Gypsum Claimants to Transfer Chapter 11 Cases to the United States District Court for the Western District of Washington Pursuant to 28 U.S.C. §§1408 and 1412 and Rule 1014 of the Federal Rules of Bankruptcy Procedure, In re Kaiser Gypsum Co., Inc.*, No. 16-31602 [Dkt. 62] (Bankr. W.D.N.C. Oct. 7, 2016) at 17-20.

[20]     The BA Motion also makes limited reference to *Winn-Dixie*, but the facts of that case are the same as *Patriot Coal*—shell subsidiaries created on the eve of filing solely to take advantage of the affiliate filing rule, and the debtors in that case actually consented to the venue transfer.

- 22 -

Unlike *Patriot Coal*, national cases such as *Enron*, where venue was <u>not</u> transferred, are more instructive.  In these national cases, a debtor's choice of venue is accorded deference because of the complex, geographically diverse nature of the case, even where significant ties exist to other forums.  *Enron* was "a large, multifaceted national and international corporation" with "creditors and stockholders across the United States and around the world." 274 B.R. at 334.  The debtors filed in New York even though they had significant ties to Texas. The basis for the filing in New York was that one subsidiary, which held less than .5% of the debtors' assets, had its principal place of business there.  *Id.* at 338, 341.  Notwithstanding significant ties to Texas that arguably would have made Texas a more appropriate venue under a "local" case venue analysis,[21] the court denied transfer to Texas in favor of the debtors' chosen venue.  *Id.* at 351.

The court noted that venue determinations for complex cases with broad impact should not be blindly based on "traditional" factors, but instead must accommodate the realities of the case.  The court reasoned:

> In the context of the Debtors' cases, the factors considered cannot be viewed in an insular manner.  Rather, the standards must be applied with a broader perspective, taking into account the national and international scope of the Debtors' businesses as well as the geographical dispersal of the creditors involved.  Moreover, the standards must be applied considering the realities of the administration of a complex chapter 11 debtor seeking to reorganize.  In summary, in addressing the convenience of the parties and the interest of justice, this Court will examine the *CORCO* factors as well as the learning curve issue, while taking into consideration the efficient administration of the bankruptcy estate and matters of judicial economy, timeliness and fairness based upon the unique facts and circumstances of the Debtors' complex corporate structure—with the outcome of its bankruptcy reorganization having worldwide implications.

---

[21] For example, "[m]ost of the Debtors' real property [was] located in Houston" (*id.* at 338); "[o]f the twenty-eight affiliated debtors . . . twenty-six [had] their principal place of business located in Houston[,] [f]or most of the affiliated debtors . . . the location of the principal assets and the location of the corporate books and records [was] also in Houston[,] [n]early all of the executives and officers reside[d] in Houston" (*id.* at 339); and the "six principal employees of the Debtors who [were] expected to be responsible for the financial restructuring and development of a plan of reorganization [were] based in Houston" (*id.* at 340).

- 23 -

NAI-1522369132

*Id.* at 345.  Applying this approach, the court found that traditional venue inquiries, such as the

"location" of a debtor, its assets, and its "books and records," largely are inapplicable in

reorganization cases with geographically diverse assets, including significant intangible assets.

In such cases, the court observed:

> The location of the assets is not as important where the ultimate goal is
> rehabilitation rather than liquidation . . . Furthermore, while a debtor's location
> and the location of its assets are often important considerations in single asset real
> estate cases, these factors take on less importance in a case where a debtor has
> assets in various locations.  While the majority of the Debtor entities have their
> headquarters in Texas, Enron's assets are geographically located throughout the
> world.  Aside from the office building and other tangible assets which are located
> in Texas, much of the Debtors' assets consist of contracts and trading operations
> which have no tangible location.  Furthermore, the presence of the books and
> records in Houston is not a major concern because with modern technology that
> information, which is ordinarily computerized, can be readily transported via
> electronic mail.

*Id.* at 347-48.  As in *Enron*—as opposed to the local, real estate cases cited by the Movants—

such factors have little, if any, application here.

Finally, when considering judicial economy, the *Enron* court maintained venue

partly as a result of the court's experience in addressing cross-border insolvency matters, which

would be relevant given the global nature of the debtors' cases.[22]  The Debtor submits that this

Court likewise should weigh its significant experience in mass tort and divisional merger cases in

favor of maintaining venue, as such experience is not only relevant to, but likely outcome

determinative of, the economic and efficient administration of this case.

---

[22] *Id.* at 350 ("These Debtors' cases have a global presence.  Indeed, affiliated entities have already filed
insolvency proceedings in various countries.  Further promoting judicial economy is the fact that this Court
has familiarity with Cross Border Insolvency cases, having presided over (i) cases regarding parallel
proceedings in Canada and the United States, and (ii) 11 U.S.C. § 304 proceedings involving insurance
insolvencies in Australia.  This Court has experience in developing a protocol to facilitate the coordination
of proceedings in this Court and the proceedings conducted in a foreign jurisdiction.  Moreover, this Court
conducted video hearings regarding the foreign proceedings referred to above.  Thus the interest of justice
also supports retention of venue in this district.").

- 24 -

In *In re Caesars Entm't Operating Co.*, another national case, the court similarly deferred to the debtor's chosen venue in Illinois in a case involving dueling involuntary and voluntary petitions. Like the *Enron* court, the *Caesars* court reasoned that venue considerations differ in national, geographically diverse cases compared to local real estate cases. The court noted:

> In this case, the professionals are located throughout the United States. The Debtor's books and records are electronically accessible from anywhere in the United States. While the parties spent a significant amount of time debating flight times and frequencies, as well as the availability of travel by train, the Court is not convinced that in this modern age of travel and communication, this District is significantly more or less accessible or convenient for the various parties in interest and their professionals than the Illinois Court.

2015 Bankr. LEXIS 314 at *19 (Bankr. D. Del. Feb. 2, 2015).

The court further observed that, notwithstanding "a substantial majority of the Debtor's creditors have voiced their preference with respect to venue in favor of this Court, a factor some courts take into consideration in the CORCO analysis . . . venue is not determined by popular vote under Rule 1014(b)." *Id.* at *20-21. Instead, the court deferred to the debtor's judgement regarding its choice of venue based upon all of the relevant factors in a complex national case. *See id.* at *24. In fact, among other considerations, the *Caesars* court recognized as sufficient justification for the debtor's choice of forum different law among Circuits and "that those differences could benefit the Debtor's reorganization efforts."[23] The Debtor respectfully submits that the Court should afford its venue choice the same deference as the *Enron* and *Caesars* courts provided the debtors in those national cases where this Court is best positioned to promote the economic and efficient administration of this case.

---

[23] *Id.* at *27 ("The Debtor also demonstrated that its decision to file in the Illinois Court rather than this Court was premised on their analysis of different applications of the law in the judicial circuits in which this Court and the Illinois Court operate and that those differences could benefit the Debtor's reorganization efforts. Whether the Debtor is correct in its analysis remains to be seen, but the Debtor did provide sufficient justification for its choice of forum.").

- 25 -

III.     **The Pending Cases of *Imerys* and *Cyprus* Do Not Weigh in Favor of Transfer to Delaware.**

      The Arnold & Itkin Motion raises many of the same arguments as the NJ Motions, but instead favors transfer of this case to Delaware.  Given its criticism of the Debtor's choice of venue based on the Debtor's place of incorporation, it is interesting that the Arnold & Itkin Motion advocates transfer to Delaware, where venue based solely on place of incorporation without any other contacts is routine, and where the Debtor could not have filed in the first instance.  While the Arnold & Itkin Motion primarily argues for transfer to Delaware, ultimately, ignoring the Court's experience and expertise, it takes an "anywhere but here" approach by also advocating for New Jersey above the case remaining with this Court.  In any event, the arguments raised in the Arnold & Itkin Motion are insufficient to warrant venue transfer.

      The fact that a creditor or co-defendant's chapter 11 case is pending in another jurisdiction is not sufficient to support transferring venue of a debtor's case from its chosen jurisdiction to its creditor's or co-defendant's chosen jurisdiction.  Arnold & Itkin does not cite to a single case supporting the transfer of venue of a chapter 11 case to a jurisdiction where a debtor's creditor's or co-defendant's chapter 11 case is pending.  In fact, the Debtor (and its affiliates) are the primary target of the talc plaintiffs' claims, with the *Imerys* debtors' liability constituting just a small portion of the parties' total liability in cases where juries have apportioned liability between J&J/Old JJCI and the *Imerys* debtors.  *See* Second Supp. Kim Decl. ¶ 18.  The "tail should not wag the dog" in having the small, co-defendant's choice of venue control for the larger and primary co-defendant, just because the small co-defendant filed first.

      There is also precedent for courts in different jurisdictions hearing chapter 11 cases even when there are overlapping issues and litigation involving the parties.  For example,

NAI-1522369132

in the chapter 11 cases of *In re Sherwin Alumina Company, LLC*[24] and *In re Noranda Aluminum, Inc.*,[25] which were filed in different districts in different Circuits, multiple disputes arose with respect to a prepetition supply agreement entered into by the debtors in the two cases, which both debtors claimed was essential to their reorganization. The bankruptcy courts in those cases had no problem coordinating and resolving overlapping issues, including jointly ordering mediation.[26] The Debtor is confident that, like the bankruptcy courts in St. Louis and Corpus Christi, the separate bankruptcy courts in Wilmington and Charlotte will be able to manage successfully, for instance, the disputed cross indemnities asserted between the parties.

In addition, the Delaware bankruptcy court has **<u>not</u>** considered most key issues that are likely to arise in the Debtor's chapter 11 case. Arnold & Itkin paints a misleading picture suggesting that talc-related issues have been litigated extensively in front of the Delaware bankruptcy court in *Imerys* and *Cyprus*. Arnold & Itkin Motion ¶ 14 ("[T]he Delaware Bankruptcy Court has been addressing the kinds of issues that will be involved in the resolution of this case"). They have not. Tellingly, Arnold & Itkin does not provide any example of the talc-related issues that the *Imerys* bankruptcy court has supposedly addressed.

No party has filed an estimation motion in the *Imerys* or *Cyprus* cases, nor does it appear likely that such a motion ever will be filed. Instead, the *Imerys* debtors have intentionally avoided any process in the bankruptcy court that would put the details of talc claims in front of the court. Their approach has been to give control of their chapter 11 cases to the plaintiffs'

---

[24]    No. 16-20012-399 (Bankr. S.D. Tex.).

[25]    No. 16-10083-399 (Bankr. E.D. Mo.).

[26]    *See In re Sherwin Alumina Co., LLC*, No. 16-20012 [Dkt. 728] (Bankr. S.D. Tex. Aug. 3, 2016).

NAI-1522369132

representatives.[27]  Under the *Imerys* now-failed chapter 11 plan, in exchange for a release for

their non-debtor French parent, the *Imerys* debtors agreed to give the Imerys TCC and Imerys

FCR the right to write their own claim values and eligibility criteria in the trust distribution

procedures, giving the plaintiffs' representatives the ability to attempt to foist inflated claims on

J&J through the alleged indemnity.  The *Imerys* debtors simply filed the plaintiffs' claim values

as is, later admitting they did not negotiate either the claim values or the eligibility criteria.[28]  As

a result of the *Imerys* debtors' positions, the Delaware bankruptcy court has not confronted the

issues of the validity and values of the talc claims.  Even the recent mediation motions filed in

that case (*see* Arnold & Itkin Motion ¶ 31 n.19) do not seek global resolution, but seek to address

specific narrow issues.[29]

---

[27]     For example, they entered into an undisclosed agreement with the official committee of tort claimants
(the "Imerys TCC") within days of the Imerys TCC's appointment agreeing they would not seek estimation
of talc claims or object to any talc claims.  *See* Letter to Court, *In re Imerys Talc Am., Inc.*, No. 19-10289
(LSS) [Dkt. 3267] (Bankr. D. Del. Mar. 29, 2021).  Then they entered into a second undisclosed agreement
a year later to not engage in any discussions with J&J without the Imerys TCC's or the future claimants'
representative's (the "Imerys FCR") consent.  *See Johnson & Johnson's Motion Pursuant to 11 U.S.C. §
362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying
Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement
Talc Litigation Protocol, In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) [Dkt. 1567] (Bankr. D. Del. Mar.
20, 2020) at Ex. J.  And they thereafter refused to challenge questionable vote changes on a plan that the
court ultimately disallowed.  *See In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS), 2021 Bankr. LEXIS
2852 (Bankr. D. Del. Oct. 13, 2021).

[28]     *See* Letter to Court, *In re Imerys Talc Am., Inc.*, No. 19-10289 (LSS) [Dkt. 4024] (Bankr. D. Del. Sept. 9,
2021) at Ex. J (Dep. Tr. of *Imerys* debtors' 30(b)(6) witness) 413:10-414:21.

[29]     *See generally Moving Insurers' Motion for Entry of an Order (I) Appointing a Mediator, (II) Referring
Certain Matters to Mandatory Mediation, and (III) Granting Related Relief, In re Imerys Talc Am., Inc.*,
No. 19-10289 [Dkt. 4290] (Bankr. D. Del. Oct. 25, 2021); *Debtors' Motion for Entry of an Order
(I) Appointing Mediator, (II) Referring Certain Matters to Mediation, and (III) Granting Related Relief, In
re Imerys Talc Am., Inc.*, No. 19-10289 [Dkt. 4291] (Bankr. D. Del. Oct. 26, 2021); *Century Insurers'
Motion for Entry of an Order Mandating Mediation, In re Imerys Talc Am., Inc.*, No. 19-10289 [Dkt. 4292]
(Bankr. D. Del. Oct. 26, 2021); *Joint Motion of the Cyprus Debtor and the Cyprus Future Claimants'
Representative for Entry of an Order (I) Appointing Mediator, (II) Referring Certain Matters to Mediation,
and (III) Granting Related Relief, In re Imerys Talc Am., Inc.*, No. 19-10289 [Dkt. 4295] (Bankr. D. Del.
Oct. 27, 2021).  These mediation motions all relate to disputes with the *Imerys/Cyprus* insurance carriers
and/or the so-called "Cyprus Settlement" (the amount the *Cyprus* debtor and its non-debtor parent would
pay into the *Imerys* trust), not to the issues that will be fundamental to the Debtor's case.

NAI-1522369132

The Debtor has no desire to tie its own case to the *Imerys* case. After almost three years, *Imerys* is back to square one. The debtors' proposed chapter 11 plan failed to get the requisite support of creditors after the court threw out questionable votes the debtors tried to defend. This Debtor will not benefit from being dragged in to that morass. Instead, the Debtor respectfully submits that it deserves the opportunity to prosecute its own chapter 11 case.

In the other bankruptcy Arnold & Itkin cites as related and pending in Delaware, the *Cyprus* case, almost nothing has happened. The debtor filed a plan early on that it had negotiated with the Imerys TCC and Imerys FCR prepetition. However, the official committee of tort claimants and future claimants' representative appointed in *Cyprus* do not appear to support that plan. In any case, no disclosure statement hearing was ever scheduled, and very little has been brought before the bankruptcy court in the case.

J&J/Old JJCI did engage in negotiations with certain plaintiffs' firms on the Imerys TCC and the Imerys FCR regarding a dollar amount and structure through which J&J/Old JJCI could resolve its talc liability through the *Imerys* case. *See* Second Supp. Kim Decl. ¶ 19. While it may have been reported to the Delaware bankruptcy court at a very high level that there were negotiations, that court did not hear, let alone decide, any legal or factual issues relating to those negotiations. *Id.* At this point, the Debtor believes the negotiations over the Debtor's liability are best handled **_directly_** in the Debtor's case in this jurisdiction and implemented under the Debtor's chapter 11 plan.

Of note, however, the Delaware District Court in the *Imerys* case did agree that the talc claims against J&J/Old JJCI are not "related to" the *Imerys* chapter 11 cases.[30] The arguments that these two cases are so related that the Debtor's chapter 11 cases should be in the

---

[30] *See In re Imerys Talc Am., Inc.*, No. 19-00103 (MN), 2019 U.S. Dist. LEXIS 120572 (D. Del. July 19, 2019).

NAI-1522369132

same jurisdiction as the *Imerys* debtors' cases is a turn-around from arguments numerous claimants made in that litigation.  There, the plaintiffs argued that their asserted claims against J&J were **not** "related to" the *Imerys* chapter 11 cases,[31] and the Delaware District Court agreed.

Finally, the suggestion that this case be transferred to Judge Silverstein, whose busy docket already includes mass tort cases *Imerys, Cyprus, Boy Scouts of America*, and *Paddock*, along with her other chapter 11 and non-chapter 11 docket, asks the Court to simply assign the case to another busy Judge.  In denying transfer of the *Kaiser Gypsum* cases, the Court observed that sending those cases to Delaware was not a viable option precisely because of the high caseloads already carried by Delaware courts.  *See In re Kaiser Gypsum Company, Inc., et al.*, No. 16-31602 (JCW) [Dkt. 261] Hr'g Tr. at 99:16-22 (Bankr. W.D.N.C. Nov. 22, 2016) ("If you're wanting to go to Delaware, I'd have some pause just 'cause I know our friends up there are carrying significantly high caseloads.  I happen to be on the NCBJ's Legislative Committee where we've been trying to speak to members of Congress for getting increases in filings and getting a lot of those temporary seats converted over.").[32]

## IV.    Judicial Resource Considerations

This leaves the question of the Court's resources to address this case in addition to the Court's pending docket.  The Debtor believes that, while this proceeding will undoubtedly be

---

[31]    *See, e.g., The Official Committee of Tort Claimants' Memorandum of Law in Opposition to J&J's Motion to Fix Venue, In re Imerys Talc Am., Inc.*, No. 19-00103 (MN) [Dkt. 46] (D. Del. May 13, 2019) at 2 ("Any theoretical impact J&J's liability potentially may have on Debtors' chapter 11 cases is far too attenuated to support 'related-to' jurisdiction or justify the State Court Talc Claims' wholesale transfer to this District."); at 14 ("'[R]elated-to' jurisdiction simply does not exist.").

[32]    The Bankruptcy Administrator separately notes the bankruptcy cases of *Imerys* and *Cyprus* and argues that the proximity of the Delaware proceedings to New Jersey "will allow for easier access of all debtors' professionals to each of the cases."  *See* BA Motion ¶ 32.  However, most of these professionals are not coming from Delaware or New Jersey, and the Debtor's section 327(a) professionals are not appearing in either of the Delaware cases.  By contrast, the Debtor's professionals, as well as many other professionals that may be involved in this case, are involved in other mass tort cases pending in this jurisdiction.  This Court's and Judge Beyer's scheduling have minimized travel for these professionals by grouping together hearings in the various mass tort cases pending here.  These efficiencies will not be realized in this case if it is not pending in this District.

complex absent an early consensual resolution, the Court's experience with asbestos cases generally, and divisional merger cases in particular, should lead to substantial efficiencies and judicial economies.

While the Debtor recognizes that this proceeding has demanded a substantial amount of the Court's time in the first month of this case, the Debtor believes this is primarily due to the myriad early case matters that must be attended to, and the large number of constituencies wishing to be heard prior to the appointment of a statutory committee and future claimants' representative. The Debtor believes such time demands are transitory and that the demands on the Court and all parties will balance as the case progresses. The appointment of a well-represented statutory committee and future claimants' representative will help streamline these proceedings by limiting the number of parties in interest who regularly participate in hearings going forward. Establishment of omnibus hearings, as has been done in other cases, and parties' adherence to case management procedures will result in matters being heard on a less compressed time schedule, with motions practice undertaken in due time with due deliberation.

Additionally, the *DBMP* and *Aldrich* cases have completed their near-term trials in connection with the preliminary injunction decisions and the confirmation of the plan of reorganization approved in *Kaiser Gypsum* is now on appeal to the United States Court of Appeals for the Fourth Circuit, with little or no anticipated need for hearings before this Court for the foreseeable future.

Finally, the Debtor respectfully submits that a reallocation of judicial resources, including potentially the inclusion of visiting judges into the jurisdiction, could be considered to help the Court with its non-mass tort docket. When the District of Delaware faced significant resource issues in the early 2000s, it frequently turned to the visiting judge solution, and the

NAI-1522369132

Debtor believes other jurisdictions have used the same mechanism to address workload issues

from their dockets as well.

Dated: November 5, 2021                    Respectfully submitted,
        Charlotte, North Carolina

                                                      */s/ John R. Miller, Jr.*

C. Richard Rayburn, Jr. (NC 6357)
John R. Miller, Jr. (NC 28689)
Matthew L. Tomsic (NC 52431)
RAYBURN COOPER & DURHAM, P.A.
227 West Trade Street, Suite 1200
Charlotte, North Carolina 28202
Telephone:  (704) 334-0891
Facsimile:  (704) 377-1897
E-mail:  rrayburn@rcdlaw.net
              jmiller@rcdlaw.net
              mtomsic@rcdlaw.net

Gregory M. Gordon (TX Bar No. 08435300)
Dan B. Prieto (TX Bar No. 24048744)
Amanda Rush (TX Bar No. 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
E-mail: gmgordon@jonesday.com
       dbprieto@jonesday.com
       asrush@jonesday.com
(Admitted *pro hac vice*)

Brad B. Erens (IL Bar No. 06206864)
JONES DAY
77 West Wacker
Chicago, Illinois 60601
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
E-mail: bberens@jonesday.com
(Admitted *pro hac vice*)

PROPOSED ATTORNEYS FOR DEBTOR

NAI-1522369132

## **EXHIBIT A**

Second Supplemental Kim Declaration

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |
|---|---|
| In re | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No. 21-30589 (JCW) |
| Debtor. |  |

**SECOND SUPPLEMENTAL DECLARATION OF JOHN K. KIM**
**IN SUPPORT OF DEBTOR'S OBJECTION TO TRANSFER OF VENUE**

John K. Kim, being first duly sworn, deposes and states as follows:

1.      I am the Chief Legal Officer of LTL Management LLC, a North Carolina
limited liability company (the "Debtor") and the debtor in the above captioned chapter 11 case.  I
have held this position with the Debtor since its formation on October 12, 2021.

2.      I am employed by Johnson & Johnson Services, Inc. ("J&J Services"), a
non-debtor affiliate of the Debtor and a subsidiary of the Debtor's ultimate non-debtor parent
company, Johnson & Johnson ("J&J").  Just prior to my role as the Chief Legal Officer of the
Debtor, I was J&J's Assistant General Counsel, Practice Group Lead for the Product Liability
Litigation Group.  In that role, I was responsible for product liability litigation globally.  I began
my employment with J&J and its affiliates in 2001 as a Senior Counsel in the Litigation Group,
handling a variety of cases ranging from commercial disputes and international arbitrations to
product liability litigation.

3.      Prior to my employment with J&J and its affiliates, I was associated with
the law firm of Simpson Thacher & Bartlett in its Litigation Group from 1989 to 2001, where I

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

handled a number of complex litigation engagements, including bankruptcy proceedings, anti-trust disputes, insurance coverage arbitrations and securities actions.

4.      I earned a Juris Doctor degree from Fordham University School of Law in 1989 and a Bachelor of Arts degree from Tufts University in 1985.

5.      On October 14, 2021 (the "Petition Date"), the Debtor commenced a reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      On October 25, 2021, the Bankruptcy Administrator for the Western District of North Carolina filed the *Motion of Bankruptcy Administrator to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(a)(1) in the Interest of Justice or for the Convenience of Parties* [Dkt. 205] (the "BA Motion").

7.      On October 26, 2021 the Court entered the *Order to Appear and Show Cause Why Venue Should Not Be Transferred to Another District* [Dkt. 208] (the "Order to Show Cause").

8.      On October 29, 2021, the Plaintiffs' Steering Committee filed the *Motion of the MDL Plaintiffs' Steering Committee to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Joinder in Bankruptcy Administrator's Motion to Transfer Venue* [Dkt. 235] (the "PSC Motion" and, together with the BA Motion, the "NJ Motions").

9.      On November 3, 2021, the law firm of Arnold & Itkin LLP filed the *Response to Order to Show Cause and Motion of Arnold & Itkin LLP on Behalf of Certain Talc Personal Injury Claimants to Transfer Venue of this Chapter 11 Case to the District of Delaware or, if not to that District, the District of New Jersey Pursuant to 28 U.S.C. § 1412 and Rule 1014*

*of the Federal Rules of Bankruptcy Procedure* [Dkt. 312] (the "Arnold & Itkin Motion" and,

together with the NJ Motions, the "Motions").

10.    I submit this declaration in support of the *Debtor's Objection to Transfer
of Venue* filed contemporaneously herewith (the "Debtor's Objection"),[2] which is being filed in

response to the Order to Show Cause and the Motions, and to provide certain information

regarding (a) talc claims pending against the Debtor, including claims pending in the federal

multi-district litigation in New Jersey (the "MDL"), and (b) the Debtor's case and the pending

bankruptcy cases of Imerys Talc America, Inc. and its affiliated debtors.

11.    The facts and statements set forth in this Declaration are based on:  (a) my

personal knowledge; (b) information supplied to me by other members of management,

professionals, or employees; (c) my review of relevant documents; and/or (d) my opinion based

upon my experience and knowledge.  If called upon to testify, I could and would testify to

the facts and opinions set forth in this declaration.

## Pending Talc Claims

12.    Of the approximately 38,000 ovarian cancer cases pending against the

Debtor as of the Petition Date, approximately 35,000 of those cases are pending in the MDL.

13.    I understand that New Jersey plaintiffs cannot sue in the MDL because

there would be no diversity of citizenship.

14.    The MDL plaintiffs are not from New Jersey, but rather are geographically

diverse and reside in all other states across the country.  The top three states of residence for

plaintiffs with claims in the MDL are California, Texas, and Florida.  Specifically, 2,810 (or

---

[2]    To the extent not otherwise defined herein, capitalized terms have the meanings given in the Debtor's
Objection.

7.97%) of the MDL plaintiffs are California residents; 2,722 (or 7.72%) are Texas residents; and

2,400 (or 6.80%) are Florida residents.  1,229 (or 3.48%) of the MDL plaintiffs are North

Carolina residents.  This places North Carolina among the top 10 states in which the most MDL

plaintiffs reside, as further demonstrated by the chart below.

| State of Residence | Number of Plaintiffs | Percentage of Total Plaintiffs |
|---|---|---|
| California | 2,810 | 7.97% |
| Texas | 2,722 | 7.72% |
| Florida | 2,400 | 6.80% |
| New York | 1,976 | 5.60% |
| Pennsylvania | 1,572 | 4.46% |
| Ohio | 1,564 | 4.43% |
| Georgia | 1,327 | 3.76% |
| Illinois | 1,301 | 3.69% |
| Tennessee | 1,241 | 3.52% |
| North Carolina | 1,229 | 3.48% |

15.    The MDL has not focused in any material respect on individual litigants.

For instance, discovery in individual cases has been largely limited to electronic production of

plaintiff profile forms and medical records.  The exception has been limited work-up of a small

number of individual cases, followed by expert discovery in what would have been six potential,

future bellwether cases.  Those six plaintiffs hail from Connecticut, New Hampshire, Maryland,

Florida, Missouri, and Louisiana.  Their counsel are from Louisiana, Missouri, Georgia, and

Alabama.  The MDL Lead Counsel are from the District of Columbia and Alabama, and the

Plaintiffs' Steering Committee, and Liaison Counsel are likewise located across the country,

representing Alabama, Virginia, New Jersey, Texas, Pennsylvania, New York, California,

Indiana, Louisiana, South Carolina, and Wyoming.

16.    In addition to the MDL, there are nearly 700 plaintiffs with claims filed in

California state courts and nearly 800 plaintiffs with claims filed in Missouri state courts in

addition to the claims filed in the state courts of Florida, Illinois, Delaware, Georgia, Louisiana, Pennsylvania, Arizona, Virginia, and Rhode Island, among others. These cases have not been sitting idly, but instead have been individually active. There have been multiple ovarian cancer trials conducted in these courts over the past several years, including one trial in South Dakota; eight cases tried to verdict in St. Louis, Missouri; one trial in Los Angeles, California; one trial in St. Clair County, Illinois; one trial in Philadelphia County, Pennsylvania; and one case tried to verdict in Richmond County, Georgia.

17.    This is in addition to nearly 450 active mesothelioma and lung cancer cases which existed at the time of the Debtor's filing. Those cases are pending in 44 federal and state courts in 24 separate states. Cases are presently pending in each of Arkansas, Arizona, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, and Washington. Mesothelioma trials have proceeded to jury deliberations in California, Florida, Kentucky, New Jersey, New York, Oklahoma, and South Carolina, with additional cases opening trial in Indiana, Oregon, and Washington.

## Imerys

18.    In cases where juries have apportioned liability between J&J/Old JJCI and the *Imerys* debtors, the *Imerys* debtors' liability has constituted just a small portion of the parties' total liability.

19.    Prior to the Petition Date, J&J/Old JJCI engaged in negotiations with certain plaintiffs' firms on the Imerys TCC and the Imerys FCR regarding a dollar amount and structure through which J&J/Old JJCI could resolve its talc liability through the *Imerys* case. While it may have been reported to the Delaware bankruptcy court at a very high level that there

were negotiations, that court did not hear, let alone decide, any legal or factual issues relating to those negotiations.

Dated:  November 5, 2021

_____
John K. Kim