# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

In re:                                                    )
                                                          )        Chapter 11
**LTL MANAGEMENT LLC,**[1]                                )
                                                          )        Case No. 21-30589 (JCW)
      **Debtor.**                                 )
——————————————————————                                    )

## RESPONSE OF THE MESOTHELIOMA GROUP ON BEHALF OF CREDITORS IN SUPPORT OF MOTIONS OF BANKRUPTCY ADMINISTRATOR AND MDL PLAINTIFFS' STEERING COMMITTEE TO TRANSFER VENUE OF BANKRUPTCY CASE PURSUANT TO 28 U.S.C. § 1412 AND FED R. BANKR. P. 1014(a)(1) IN THE INTEREST OF JUSTICE OR FOR THE CONVENIENCE OF PARTIES

———————————————————————————

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

ARGUMENT ............................................................................................................... 2

    I.    For mesothelioma claimants, transfer to New Jersey is amply warranted under the CORCO factors and the "interest of justice" standard ............................................... 3

    II.   The Debtor's manufactured ties to North Carolina are marginal at best, and allowing its bankruptcy to remain in this district would compromise the interest of justice. ........................ 9

    III.   This Case Should Not Be Transferred to Delaware. ...................................................... 10

RESERVATION OF RIGHTS ............................................................................................ 12

CONCLUSION ............................................................................................................ 13

# <u>TABLE OF AUTHORITIES</u>

**Cases**

Becker v. Baron Bros., Coliseum Auto Parts, Inc., 649 A.2d 613 (N.J. 1994) .............................. 8

Beshada v. Johns-Manville Products Corp., 447 A.2d 539 (N.J. 1982) ......................................... 8

Coffman v. Keene Corp., 628 A.2d 710 (N.J. 1993) ....................................................................... 8

Etheridge, et al. v. Johnson & Johnson et al., Case No. 19-01189(KCF) (D.N.J.)......................... 5

Fischer v. Johns-Manville Corp., 512 A.2d 466 (N.J. 1986) .......................................................... 8

Hannah v. Johnson & Johnson Inc., Case No. 18-10319, 2020 WL 3497010 (D.N.J. June 29, 2020) ............................................................................................................................................ 5

Hirschfeld v. Beckerle et al., 3:18-cv-14796-FLW-DEA (D.N.J.) .................................................. 5

In re Accutane Litig., 191 A.3d 560 (N.J. 2018) ............................................................................. 9

In re Commonwealth Oil Ref. Co., 596 F.2d 1239 (5th Cir. 1979).................................................. 2

In re Enron Corp., 274 B.R. 327 (Bankr. S.D.N.Y. 2002)............................................................... 2

In re Grand Dakota Partners, LLC, 573 B.R. 197 (Bankr. W.D.N.C. 2017)........................... 2, 10

In re Imerys Talc Am., Inc., No. 19-MC-103 (MN), 2019 WL 3253366 (D. Del. July 19, 2019) ................................................................................................................................................ 11, 12

In re Patriot Coal Corp., 482 B.R. 718 (Bankr. S.D.N.Y. 2012) .................................................... 3

Kaenzig v. Charles B. Chrystal, Inc., et al., No. MID-L-4873-12-AS (N.J. Super.)...................... 4

Landrigan v. Celotex Corp., 605 A.2d 1079 (N.J. 1992)................................................................. 8

Rowe v. Bell & Gossett Company, 218 A.3d 784 (N.J. 2019)......................................................... 8

Theer v. Philip Carey Co., 628 A.2d 724 (N.J. 1993) ..................................................................... 8

Whelan v. Armstrong International Inc., 231 A.3d 640 (N.J. 2020) ................................................ 8


**Statutes**

28 U.S.C. § 1412............................................................................................................................... 2


**Other Authorities**

FDA, Baby powder manufacturer voluntarily recalls products for asbestos, https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos (Oct. 18, 2019) ................................................................. 4

Jeb Barnes, Dust-Up: Asbestos Litigation and the Failure of Commonsense Policy Reform (2011)............................................................................................................................................. 8

Johnson & Johnson, Annual Report (Form 10-K) (Feb. 22, 2021) ............................................... 12

KCIC, Asbestos Litigation: 2020 Year in Review (2020) ............................................................. 9

New Jersey Courts, Updated Judiciary Mass Tort (Non-Asbestos) Resource Book Developed for
Wider Audience (Feb. 15, 2007) .................................................................................................. 8

Supreme Court of New Jersey, Notice to the Bar (April 11, 2008) ................................................. 9

Tina Bellon, J&J, Imerys unit must pay $117 million in N.J. asbestos cancer case, Reuters, Apr.
11, 2018, https://reut.rs/3jWUpKu .............................................................................................. 4

## INTRODUCTION

1.        This response is submitted by the law firms of Maune Raichle Hartley French & Mudd, LLC; Levy Konigsberg LLP; Kazan, McLain, Satterly & Greenwood; and Weitz & Luxenberg P.C.[2] (the "Mesothelioma Group"), in support of the *Motion of Bankruptcy Administrator to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and Fed. R. Bankr. P. 1014(a)(1) in the Interest of Justice or for the Convenience of Parties* ("the Transfer Motion") [ECF No. 205] and the *Motion of the MDL Plaintiff's Steering Committee to Transfer Venue Pursuant to 28 U.S.C. § 1412 and Joinder in Bankruptcy Administrator's Motion to Transfer Venue* (the "PSC Motion") [ECF No. 235].

2.        The motions to transfer should be granted and this bankruptcy case transferred to the District of New Jersey.

3.        The firms in the Mesothelioma Group represent the vast majority of mesothelioma victims with pending talc-related actions.  The Debtor's stay motion represents that there are approximately 430 such cases "pending in New Jersey, California, Illinois, Missouri, New York, and Ohio"—but not, notably, in North Carolina.[3]

4.        This Court correctly noted serious venue concerns with North Carolina and the important factors weighing in favor of a New Jersey forum in both its comments at the first-day

---

[2] The law firms submit this memorandum for practical and procedural purposes only, and this submission does not constitute any acceptance of service or waiver of rights regarding notice and service.

[3] *Debtor's Motion for an Order (I) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors or (II) Preliminarily Enjoining Such Actions and (III) Granting A Temporary Restraining Order Pending a Final Hearing*, Case No. 21-30589 (JCW), Adv. Pro. No. 21-03032 (JCW), ECF No. 2, at 14.  In the Informational Brief filed on October 14, 2021 as Doc. 3 in Case No. 21-30589 (the "Informational Brief"), the Debtor further stated: "At the time of filing, one or more mesothelioma cases are pending in the state courts of each of the following: Arizona, Arkansas, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio, Pennsylvania, Oklahoma, Rhode Island, South Carolina, Texas, and Washington." Informational Brief, at 126 n.470.

hearing on October 20 and its show-cause order entered on October 26, 2021 as Doc. 208 in Case No. 21-30589 ("Show Cause Order").

5.      The Bankruptcy Administrator's Transfer Motion makes an overwhelming showing that the Court should transfer this bankruptcy case to the District of New Jersey in the interest of justice or for the convenience of the parties.   The PSC Motion provides further persuasive arguments in favor of transfer.   LTL's bankruptcy petition has effectively brought the New Jersey Talc MDL within the jurisdiction of this Court.   It would be more appropriate to return the MDL to New Jersey.

6.      The Mesothelioma Group fully agrees with, and joins in, those motions.   It endeavors not to duplicate their arguments.   Rather, it files this separate response to amplify the point that New Jersey is the appropriate bankruptcy venue for mesothelioma claimants as well.

## ARGUMENT

7.      This Court applies the six "CORCO" factors established in In re Commonwealth Oil Ref. Co., 596 F.2d 1239, 1247 (5th Cir. 1979), in assessing whether transfer serves the convenience of the parties. See, e.g., In re Grand Dakota Partners, LLC, 573 B.R. 197, 201–02 (Bankr. W.D.N.C. 2017) (applying the six CORCO factors). The CORCO factors include (1) the proximity of creditors of every kind to the court; (2) the proximity of the Debtor to the court; (3) the proximity of the witnesses necessary to the administration of the estate; (4) the location of the assets; (5) the economic administration of the estate; and (6) the necessity for ancillary administration if a liquidation should occur.  CORCO, 596 F.2d at 1247.

8.      The "interest of justice" prong of 28 U.S.C. § 1412, meanwhile, "is a broad and flexible standard that is applied based on the facts and circumstances of each case." In re Enron Corp., 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002).  Unreasonable forum shopping is an important

factor in this analysis.  In re Patriot Coal Corp., 482 B.R. 718, 726–28, 738 (Bankr. S.D.N.Y. 2012).

9.    The Bankruptcy Administrator's Transfer Motion meticulously addresses each standard and shows that each supports transfer to New Jersey.  The PSC Motion confirms that conclusion. Both the Transfer Motion and the PSC Motion are correct.

I.    **For mesothelioma claimants, transfer to New Jersey is amply warranted under the CORCO factors and the "interest of justice" standard.**

10.    The convenience of the parties and the well-developed features of New Jersey law and judicial procedure for addressing mesothelioma claims all strongly support transfer to New Jersey, under either the "convenience of the parties" or "interest of justice" standard.

11.    New Jersey is far and away the most convenient venue for the Debtor's creditors. New Jersey is already the site of tens of thousands of talc-based suits against the Debtor's predecessor, Johnson & Johnson Consumer Inc. ("Old JJCI"); its parent, Johnson & Johnson ("J&J"); and its affiliates.  The District of New Jersey currently oversees an MDL regarding claims that use of J&J's talc products caused ovarian cancer.  As this Court has observed, "few, if any, of the talc-related claims against the Debtor are pending in the Western District of North Carolina. Approximately 35,000 cases (of approximately 38,000), the overwhelming number of cases against the Debtor, are pending in federal multi-district litigation in New Jersey."  Show Cause Order, at 2.  J&J and Old JJCI themselves have noted that the District of New Jersey was specifically selected by the United States Judicial Panel on Multidistrict Litigation for the purposes of pretrial coordination: "The purposes of this transfer and 'centralization' process is to avoid duplication of discovery, to prevent inconsistent pretrial rulings, and to conserve the resources of

the parties, their counsel, and the judiciary."[4]  Given the District of New Jersey's experience with talc-based claims, the Bankruptcy Administrator is correct that no forum is more qualified to conduct an estimation trial of the Debtor's liabilities, should that prove necessary.

12.    New Jersey is an especially appropriate forum with respect to talc-related mesothelioma claimants in particular.  The first cosmetic talc mesothelioma case tried to verdict in the United States was tried in New Jersey.[5] Of the 53 verdicts in favor of mesothelioma talc plaintiffs nationwide, 16 were secured in New Jersey.  California, on the opposite side of the country from J&J's headquarters, is the only state with more.  And since a 2019 public announcement by the Food and Drug Administration ("FDA") finding asbestos in Johnson's Baby Powder,[6] more than half of all mesothelioma talc verdicts in the country have occurred in New Jersey:

| Case | Jurisdiction | Year |
|---|---|---|
| Barden v. J&J, et al. | NJ | 2020 |
| Etheridge v. J&J, et al. | NJ | 2020 |
| McNeill v. J&J, et al. | NJ | 2020 |
| Ronning v. J&J, et al. | NJ | 2020 |
| Mure-Cabrera v. J&J, et al. | FL | 2020 |
| Prudencio v. J&J, et al. | CA | 2021 |
| Johnson v. J&J, et al. | CA | 2021 |

13.    Moreover, in 2019, the New Jersey Bankruptcy Court and the District of New Jersey oversaw J&J and Old JJCI's removal of and pursuit of a channeling injunction covering

---

[4] *Omnibus Reply in Support of J&J's Motion for Entry of Order Modifying Automatic Stay to Implement Talc Litigation Protocol* ("Omnibus Reply"), Imerys Talc America, Inc., et al., Case No. 19-10289 (LSS) (D. Del.), ECF No. 1769, at 8 n.10.

[5] See generally Kaenzig v. Charles B. Chrystal, Inc., et al., No. MID-L-4873-12-AS (N.J. Super.); see also Tina Bellon, J&J, Imerys unit must pay $117 million in N.J. asbestos cancer case, Reuters, Apr. 11, 2018, https://reut.rs/3jWUpKu (describing another New Jersey case, Lanzo, as the "second trial nationally to focus on claims that J&J's talc products contained asbestos").

[6] FDA, Baby powder manufacturer voluntarily recalls products for asbestos, https://www.fda.gov/news-events/press-announcements/baby-powder-manufacturer-voluntarily-recalls-products-asbestos (Oct. 18, 2019).

hundreds of mesothelioma and non-MDL ovarian cancer cases. The courts remanded those matters

back to New Jersey state courts.[7]

14.      New Jersey has additional connections to this matter.  New Jersey is home to an

ongoing state-court action brought by insurers disputing their obligations to reimburse J&J and

Old JJCI for costs incurred in relation to talc cases.  Docket No. MID-L-003563-19, in the Superior

Court of Middlesex County, New Jersey.  The New Jersey coverage action has a clear nexus to

this proceeding, because the Debtor claims that the insurance policies at issue are an asset of the

estate.

15.      And the District of New Jersey presided over a shareholder derivative action

brought by J&J investors who alleged that members of the company's board of directors violated

their fiduciary duties by failing to prevent the continued sale of talc-based body powders.

Hirschfeld v. Beckerle et al., 3:18-cv-14796-FLW-DEA (D.N.J.).

16.      The proximity of the Debtor to New Jersey, meanwhile, is obvious.  As this Court

has observed, "nearly all the assets and employees of the Debtor, New JJCI, and the Debtor's

ultimate parent, J&J, are located in New Jersey. The Debtor has a mailing address of 501 George

St., New Brunswick, NJ 08933."  Show Cause Order, at 2.  Google Streetview shows the following

signage at the Debtor's mailing address:

---

[7] See, Hannah v. Johnson & Johnson Inc., Case No. 18-10319, 2020 WL 3497010, at *25 (D.N.J. June 29, 2020); Etheridge, et al. v. Johnson & Johnson et al., ECF No. 34, Case No. 19-01189(KCF) (D.N.J.) (June 19, 2019).



17.    As the Court further recognized, "[t]he only employees of the Debtor are employees of Johnson & Johnson Services, Inc., a New Jersey corporation, that have been "seconded" to the Debtor. These employees continue to work in New Jersey."  Show Cause Order, at 2.

18.    The documents effectuating the restructuring bear out this Court's observation. Chenango Zero, Chenango One, Chenango Two, Currahee Holding Company, and the Debtor all list New Jersey as their principal place of business; Chenango One and Chenango Two both list "initial managers" with New Jersey addresses; the sole person executing the Articles of Organization for the Debtor is lists a New Jersey address; and Robert Wuesthoff—a Johnson & Johnson executive based in New Jersey—is designated as the president of Chenango One. [Ex. A to Abel Decl., ECF No. 206, at 6; id. Ex. B, at 13, 15, 18, 23, 25, 27; Chenango Two Certificate of Merger, Ex. 2, at 1]. To be clear: Almost every document effecting the divisive merger and giving birth to Debtor lists significant ties to New Jersey. North Carolina, of course, does not appear until the final step: conversion, followed immediately by bankruptcy.

19.    John Kim's testimony further supports transfer to New Jersey.  Although Mr. Kim is the Debtor's Chief Legal Officer by title, the Debtor does not actually employ Mr. Kim. Rather, he is a Johnson & Johnson Services, Inc. employee who lives in New Jersey and is "seconded" to the Debtor for purposes of this litigation. Oct. 22 Hearing Transcript, Ex. 1, at 44:1–18. As Mr. Kim conceded, Dr. John Hopkins, a long-time corporate representative for J&J in talc litigation,

previously testified that the parent company—which is again, based in New Jersey—made "all health and safety policy decisions with regard to asbestos and talc products." <u>Id.</u> at 88:4–9; <u>Hopkins Transcript</u>, Ex. 7, at 20:11–17. LTL board members Bob Wuesthoff and Richard Dickinson are also based in New Jersey. <u>Kim Transcript</u>, Ex. 4, at 30:18–31:13; <u>see also</u> <u>Lisman Transcript</u>, Ex. 8, at 192:17–193:9 (testimony of J&J Vice President and Assistant Corporate Controller Adam Lisman that he was not aware of any relationships between North Carolina and LTL board members Russell Deyon, Robert Wuesthoff, and Richard Dickinson).

20.     In fact, Mr. Kim and Mr. Wuesthoff—LTL's chief legal officer and president, respectively—both continue to use Johnson & Johnson email addresses. [Funding Agreement, Annex 2 to First Day Decl., ECF No. 5, at 13 (listing Mr. Wuesthoff's email address as "rwheustho@its.jnj.com" and Mr. Kim's as "JKim8@its.jnj.com")].

21.     The location of witnesses, experts, documents, and counsel also favors New Jersey: Of the eleven J&J and Old JJCI witnesses deposed in previous mesothelioma cases, eight lived in New Jersey. None lived in North Carolina.  New Jersey, not North Carolina, is the center of J&J's operations.  Dr. Ed Kuffner, chief medical officer for both Old and New JJCI, could not name any significant medical safety decision regarding talc made in North Carolina. <u>Kuffner Transcript</u>, Ex. 3, at 26:20–23.

22.     J&J Senior Legal Records Coordinator Susan Schirger-Ward testified that the company's records room and records vault are both located in New Brunswick, New Jersey. <u>Schirger-Ward Transcript</u>, Ex. 6, at 11:3–6, 44:8–16.

23.     The majority of expert witnesses in previous talc mesothelioma cases are clustered in California or on the East Coast. As compared to North Carolina, then, New Jersey is a far more convenient venue.

24.     Finally, six out of the nine law firms that have gone to trial against J&J and affiliates in previous talc mesothelioma cases have offices in New Jersey or attorneys licensed there.

25.     New Jersey law and judicial procedure also support transfer to New Jersey. As the Court is aware, mesothelioma is a signature malignant tumor linked to asbestos exposure. Due to its industrial history, New Jersey is among the most active states for mesothelioma and asbestos claims.  As a result, New Jersey has well-developed judicial procedures and a well-developed legal jurisprudence for addressing asbestos claims and mesothelioma claims in particular.  Asbestos exposure in New Jersey frequently occurred at the state's manufacturing plants, power generation facilities, oil refineries, and shipyards.  New Jersey was considered a hub for asbestos litigation even before the first asbestos bankruptcy was filed by a New Jersey company, Johns-Manville, in 1982. New Jersey attorney Karl Asch, for example, in 1978 discovered the "Sumner Simpson Papers" during litigation against Raybestos-Manhattan. Those papers "contained a treasure trove of correspondence . . . which showed that [leading asbestos manufacturing companies] not only knew about the risks of asbestos for decades but also had commissioned studies on its dangers and concealed the results."[8]

26.     This history and experience put the New Jersey courts at the forefront of mass tort and asbestos litigation.  New Jersey is among the most active states for mesothelioma suits, and it has for decades been a "national leader" for evaluating and adjudicating mass torts, including those involving asbestos.[9]

---

[8] Jeb Barnes, Dust-Up: Asbestos Litigation and the Failure of Commonsense Policy Reform 25–26 (2011).

[9] See New Jersey Courts, Updated Judiciary Mass Tort (Non-Asbestos) Resource Book Developed for Wider Audience (Feb. 15, 2007). Important New Jersey asbestos cases include Whelan v. Armstrong International Inc., 231 A.3d 640 (N.J. 2020); Rowe v. Bell & Gossett Company, 218 A.3d 784 (N.J. 2019); Becker v. Baron Bros., Coliseum Auto Parts, Inc., 649 A.2d 613 (N.J. 1994); Theer v. Philip Carey Co., 628 A.2d 724 (N.J. 1993); Coffman v. Keene Corp., 628 A.2d 710 (N.J. 1993); Landrigan v. Celotex Corp., 605 A.2d 1079 (N.J. 1992); Fischer v. Johns-Manville Corp., 512 A.2d 466 (N.J. 1986); Beshada v. Johns-Manville Products Corp., 447 A.2d 539 (N.J. 1982).

27.    Additionally, several New Jersey companies facing asbestos litigation have filed for bankruptcy in the District of New Jersey, including Case Nos. 18-27963 (Duro Dyne National Corp.), 13-37149 (Consolidated Aluminum Corporation), 11-15110-MBK (State Insulation Corp), 03-51524 (Congoleum Corp.), 03-26723-MS (The Muralo Co.), 01-30135 (G-I Holdings), 01-38790 (same), and 00-41610 (Burns & Roe).   Many of the resulting asbestos trusts use the Princeton, New Jersey-based Versus to process claims.

28.    In 2008, the New Jersey Supreme Court designated all state-court asbestos litigation as a mass tort.   Supreme Court of New Jersey, Notice to the Bar (April 11, 2008). Mesothelioma and other cases filed in the state are now tried at the courthouse located in New Brunswick—down the road from J&J's headquarters and the Debtor's mailing address—and, pre-COVID-19 pandemic, could often get to trial within a year. In 2020, Middlesex, New Jersey was one of the top ten jurisdictions for mesothelioma filings.[10]

29.    New Jersey local rules permit the consolidation of multicounty litigation, which is relatively unusual in state courts. Similar in many ways to MDL procedures, those rules facilitate the transfer of cases not just from multiple counties, but also from states throughout the country. See, e.g., In re Accutane Litig., 191 A.3d 560 (N.J. 2018) (mass tort multicounty litigation involving over two thousand plaintiffs). The advantages of the New Jersey forum are clear.

**II.    The Debtor's manufactured ties to North Carolina are marginal at best, and allowing its bankruptcy to remain in this district would compromise the interest of justice.**

30.    The Bankruptcy Administrator's statement that "the Debtor's connections to North Carolina are limited, manufactured, and recent," could not be truer. Transfer Motion, at 9. The Debtor has not explained (and cannot explain) why its "Texas Two Step" required it to be

---

[10] KCIC, Asbestos Litigation: 2020 Year in Review, 9 (2020).

domesticated in North Carolina.  It could just have easily manufactured venue in any other State

or territory of the United States. "[T]he weight afforded to a debtor's choice is diminished when

the 'choice of forum is not directly related to the operative, underlying facts of the case.'" In re

Grand Dakota Partners, LLC, 573 B.R. at 203.

31.     The timeline of the Debtor's (i) formation, (ii) conversion from a Texas LLC to a

North Carolina entity, and (iii) almost immediate filing of a voluntary petition is itself sufficient

to show that any ties between the Debtor and North Carolina are tenuous at best. But that only

scratches the surface. The Debtor manufactured all of its purported connections to North Carolina.

As Mr. Kim testified, the Debtor does not even maintain an office in the state. Oct. 22 Hearing

Transcript, Ex. 1, 45:2–8. It has minimal and intangible assets in North Carolina, no business

operations in the state, and no officers, employees, or other persons associated with the entity who

work there.  Id. at 46:9–12.  In short, there is not a single tie between the Debtor and North

Carolina—excepting, of course, those manufactured to support the Debtor's incorporation there

and the bankruptcy petition that followed two days later.

32.     Venue was invented by the Debtor on the eve of filing. This backdrop demands that

the Debtor's preference be given no weight. It would run counter to the interest of justice to permit

the Debtor to reap any benefits from manipulating the venue provisions of the Bankruptcy Code.

**III.     This Case Should Not Be Transferred to Delaware.**

33.     Delaware is not an appropriate forum for this case.  The creditors, the Debtor, the

Debtor's assets, and J&J itself all have their most significant contacts with New Jersey, rather than

Delaware.

34.     Arnold & Itkin LLP argues that the District of Delaware is "the appropriate

transferee Court for this case" [ECF No. 312, at 4]. But its primary rationale is that the Delaware

bankruptcy court is overseeing the Imerys and Cyprus Chapter 11 proceedings. Those cases are separate proceedings and are not appropriate forums for resolving the issues presented here.

35. This is a "solvent bankruptcy" case arising out of an abusive Texas Two-Step merger. Imerys and Cyprus, meanwhile, are standard bankruptcies. They would only be derailed even further if this matter were combined with them. This case involves special issues not present in the existing Delaware bankruptcies. For example, this case will likely entail application by the creditors' committee to the bankruptcy court for derivative standing to pursue a fraudulent transfer claim. Litigating that claim will require significant discovery and court time. If that litigation occurred in the Imerys and Cyprus bankruptcies, it would only serve to delay them even further— an undesirable result given the problems already facing the Imerys and Cyprus proceedings. As the Debtor noted at the first-day hearing, Imerys's reorganization plan recently failed to achieve the necessary votes. First-Day Hearing Transcript, Ex. 9, at 39:22–40:16. There is thus no reason that the Delaware court supervising the Imerys bankruptcy is better suited to resolve this case than a New Jersey court and, indeed, every reason to believe it would be worse.

36. When J&J previously sought to fix venue for approximately 2,400 talc actions in the District of Delaware, Judge Maryellen Noreika denied that request and explained that doing otherwise would "grind the wheels of justice to a halt" by adding almost five times the court's annual volume of cases to "an already-busy docket." In re Imerys Talc Am., Inc., No. 19-MC-103 (MN), 2019 WL 3253366, at *8 (D. Del. July 19, 2019). This bankruptcy involves even more claimants.

37. After Judge Noreika's ruling, J&J switched positions and argued against the Imerys bankruptcy case in Delaware as a forum for the resolution of talc claims. J&J maintained that the automatic stay should be lifted so that it could "defend the safety of its products (and the core

causation issues) in open court." Omnibus Reply, at 2.  J&J warned that "bankruptcy cannot be used for improper purposes," id. at 10, and criticized the attempt by the holding company of Imerys, non-debtor Imerys S.A. Group, to seek the benefits of the channeling injunction and third-party releases through the Imerys Case.  J&J cited the need to provide claimants with the opportunity "to litigate outside of bankruptcy," "in lawsuits they already have ongoing against or will commence against J&J," where each would enjoy the "right to her or his day in court and potential for full recovery[.]  Id. at 32. It went so far as to state that talc suits should proceed outside of the Delaware bankruptcy because "determinations of various tort issues will require consideration of various state laws" and "modification of the automatic stay [would] promote judicial economy by resolving claims against the Debtor in the forum that is most familiar with the law associated with a resolution of such claims."[11][12]

38.     After J&J argued so vehemently against the Delaware bankruptcy forum, neither J&J nor the Debtor should be heard to argue for transfer to Delaware.

## **RESERVATION OF RIGHTS**

39.     The Mesothelioma Group reserves the right to plead and argue at a later date that Debtor's filing of both its bankruptcy petition and the associated adversary proceeding were improper and should be dismissed based on the pre-petition transactions described herein, or for any other reason that justifies dismissal.

---

[11] *Johnson & Johnson's Motion Pursuant to 11 U.S.C. § 362(d)(1), Fed. R. Bankr. P. 4001, and Local Bankruptcy Rule 4001-1 for Entry of Order Modifying Automatic Stay to Permit J&J to Send Notice Assuming Defense of Certain Talc Claims and to Implement Talc Litigation Protocol*, Imerys Case, ECF No. 1567, at 25–26.

[12] J&J has also implicitly admitted that New Jersey is a more appropriate forum than Delaware for resolution of talc claims. In a recent corporate filing, it stated that talc suits against the company "have been primarily filed in state courts in Missouri, New Jersey[,] and California"—not Delaware, and not North Carolina. Johnson & Johnson, Annual Report (Form 10-K), at 86 (Feb. 22, 2021).

## CONCLUSION

40.    For the reasons stated, the Mesothelioma Group respectfully requests that the Court

grant the motions of the Bankruptcy Administrator and the MDL plaintiffs' steering committee

and transfer this matter to New Jersey.

Respectfully submitted this the 5th day of November 2021.

**WALDREP WALL BABCOCK
& BAILEY PLLC**

*/s/ Thomas W. Waldrep, Jr.*
Thomas W. Waldrep Jr. (NC State Bar No. 11135)
Kevin L. Sink (NC State Bar No. 21041)
James C. Lanik (NC State Bar No. 30454)
Jennifer B. Lyday (NC State Bar No. 39871)
John R. Van Swearingen (NC State Bar No. 53646)
Natalia L. Talbot (NC State Bar No. 55328)
370 Knollwood Street, Suite 600
Winston-Salem, NC 27103
Telephone: 336-717-1280
Facsimile: 336-717-1340
Email: notice@waldrepwall.com

**MASSEY & GAIL L LP**

*/s/ Jonathan S. Massey*
Jonathan S. Massey (DC Bar No. 457593)
The Wharf
1000 Maine Ave. SW, Suite 450
Washington, D.C. 20024
Telephone: 202-650-5452
Facsimile: 312-379-0467
Email: jmassey@masseygail.com

*Attorneys for the Mesothelioma Group*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| **LTL MANAGEMENT LLC,**[1] | ) | |
| | ) | Case No. 21-30589 (JCW) |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF THOMAS W. WALDREP, JR.**
**IN SUPPORT OF RESPONSE OF THE MESOTHELIOMA GROUP ON BEHALF**
**OF CREDITORS IN SUPPORT OF MOTIONS OF BANKRUPTCY**
**ADMINISTRATOR AND MDL PLAINTIFFS' STEERING COMMITTEE TO**
**TRANSFER VENUE OF BANKRUPTCY CASE PURSUANT TO 28 U.S.C. § 1412**
**AND FED R. BANKR. P. 1014(a)(1) IN THE INTEREST OF JUSTICE**
**OR FOR THE CONVENIENCE OF PARTIES**

_____

I, Thomas W. Waldrep, Jr., pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a member in good standing of the bar of the State of North Carolina and am

admitted to practice in North Carolina and the United States District Court of the Western District

of North Carolina.

2.      My office is located at 370 Knollwood Street, Suite 600, Winston-Salem, NC

27103.

3.      I submit this Declaration in support of the *Response of the Mesothelioma Group*

*on Behalf of Creditors in Support of Motions of Bankruptcy Administrator and MDL Plaintiffs'*

*Steering Committee to Transfer Venue of Bankruptcy Case Pursuant to 28 U.S.C. § 1412 and*

*Fed R. Bankr. P. 1014(a)(1) in the Interest of Justice or for the Convenience of Parties* (the

"Response") filed contemporaneously herewith.

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501
George Street, New Brunswick, New Jersey 08933.

4.      Annexed hereto as **Exhibit 1** are selected excerpts from the transcript of the October 22, 2021 hearing held by this Court in the above-captioned case.

5.      Annexed hereto as **Exhibit 2** is the Certificate of Merger of Chenango Two LLC with and into Currahee Holding Company Inc. filed with the Office of the Secretary of State of Texas on October 12, 2021.

6.      Annexed hereto as **Exhibit 3** are selected excerpts from the transcript of the deposition of Edwin K. Kuffner, M.D., that took place in the above-captioned case on October 30, 2021.

7.      Annexed hereto as **Exhibit 4** are selected excerpts from the transcript of the deposition of John Kim that took place in the above-captioned case on October 31, 2021.

8.      Annexed hereto as **Exhibit 5** are selected excerpts from the transcript of the October 20, 2021 hearing held by this Court in the above-captioned case.

9.      Annexed hereto as **Exhibit 6** are selected excerpts from the transcript of the deposition of Susan Schirger-Ward that took place in the above-captioned case on October 31, 2021.

10.      Annexed hereto as **Exhibit 7** are selected excerpts from the transcript of trial testimony given on July 22, 2019, in Barden v. Brenntag North America, et al., Case No. L-6040-17 (N.J. Super. Ct.).

11.      Annexed hereto as **Exhibit 8** are selected excerpts from the rough-draft transcript of the deposition of Adam Lisman that took place in the above-captioned case on October 30, 2021.

Dated:      Charlotte, North Carolina
            November 5, 2021

                                        */s/ Thomas W. Waldrep, Jr.*
                                        Thomas W. Waldrep, Jr.

# Exhibit 1

1

1        UNITED STATES BANKRUPTCY COURT
        WESTERN DISTRICT OF NORTH CAROLINA
2              CHARLOTTE DIVISION

3   IN RE:                      :      Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,         :      Chapter 11

5        Debtor,                :      Charlotte, North Carolina
                                       Friday, October 22, 2021
6                               :      1:29 p.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8   LTL MANAGEMENT LLC,         :      AP 21-03032-JCW

9        Plaintiff,             :

10            v.                :

11  THOSE PARTIES LISTED ON     :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000,  :

13       Defendants.            :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                    TRANSCRIPT OF PROCEEDINGS
16          BEFORE THE HONORABLE J. CRAIG WHITLEY,
                UNITED STATES BANKRUPTCY JUDGE
17

18  Audio Operator:            COURT PERSONNEL

19
    Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
20                             1418 Red Fox Circle
                               Severance, CO  80550
21                             (757) 422-9089
                               trussell31@tdsmail.com
22

23  Proceedings recorded by electronic sound recording; transcript
    produced by transcription service.
24

25

1   Q    So you worked for Johnson & Johnson as a lawyer in New

2   Brunswick, New Jersey from April of 2000 all the way up until

3   approximately October 10th of 2021, correct?

4   A    Correct.

5   Q    And on October 10th of 2021 you then went to work for an

6   entity named LTL Management LLC, correct?

7   A    Technically, I worked for Johnson & Johnson Services, Inc.

8   seconded to LTL Management.

9   Q    Are you currently an employee or officer of LTL Management?

10  Yes or no.

11  A    I am an officer as seconded by Johnson & Johnson Services.

12  Q    Where do you live, sir?

13  A    I live in Princeton, New Jersey.

14  Q    And how long have you lived in New Jersey?

15  A    I think around 2002, I want to say.  I don't -- I'm sorry I

16  can't be more precise, yeah.

17  Q    Have you ever lived in North Carolina?

18  A    No, I have not.

19  Q    Have you ever visited North Carolina before you came down

20  here for the bankruptcy proceedings?

21  A    Several times, yes.

22  Q    Several times?

23  A    Yes.

24  Q    For business or pleasure?

25  A    Mostly for business.

1    Q    Okay.

2         And, sir, where is LTL Management LLC's office in North

3    Carolina?

4    A    Oh, LLC.  The -- LTL does not have an office in North

5    Carolina.

6    Q    Where do formal notices for LTL Management LLC get sent?

7    A    I believe it's 501 George Street in New Brunswick, New

8    Jersey.

9    Q    And other than you, sir, who are the other officers of LTL

10   Management?

11   A    There's a President, Bob Wuesthoff, and there's a CFO,

12   Richard Dickinson.

13   Q    And Mr. Wuesthoff, where does he work?

14   A    Since COVID, he's been working out of Florida.

15   Q    Okay.  Is, is he someone who has worked in New Jersey for

16   many years?

17   A    I actually, I don't know Mr. Wuesthoff's background on

18   where he, he worked.  He was a former J&J  -- he is -- he was a

19   Johnson & Johnson, one of the Johnson & Johnson entity

20   employees and I -- I -- I actually don't know where his office

21   was.

22   Q    Okay.  To be clear, did Mr. Wuesthoff work at Johnson &

23   Johnson in New Jersey at some point?

24   A    I think that might be true.  He, he may have worked in

25   Pennsylvania, also.  I'm just not clear on where, what his past

1   history was.

2   Q   You have no evidence that Mr. Wuesthoff ever worked in

3   North Carolina, correct?

4   A   I don't -- I, I believe he never worked in North Carolina.

5   Q   Okay.

6       And this Mr. Dickinson, another officer from LTL Management

7   LLC, where does he work?

8   A   He works in New Jersey.

9   Q   Okay.  And can you identify any officer, employee, anyone

10  associated with LTL Management LLC that actually works in North

11  Carolina?

12  A   No.

13  Q   Sir, you in 2001 were Senior Counsel in the Litigation

14  Group at Johnson & Johnson, correct?

15  A   Correct.

16  Q   And you were involved in product liability litigation and

17  supervising that at Johnson & Johnson from 2001 all the way up

18  until about ten days ago, correct?

19  A   Yes.  Well, I, I had a change -- yeah.  So I also became

20  head of Product Liability during that span.

21  Q   Right.  So just to be clear for the Court, you became the

22  head lawyer for Product Liability at Johnson & Johnson in what

23  year?

24  A   I'm going to have to look back at my declaration.

25  Q   Could you give us your best estimate?

1   A    Yeah.  I would just quibble with "all" -- "all" -- "all."

2   'Cause I, I have to assume there are some decisions that are

3   made elsewhere.  But I --

4   Q    So, Mr. Kim, you assume that some decisions must be, must

5   have been made elsewhere, but your corporate representative

6   says all health and safety policy decisions with regard to

7   asbestos and talc products were made by the parent company,

8   Johnson & Johnson?  Yes or no.

9   A    That's what he said, yes.

10  Q    I mean, certainly Johnson & Johnson -- well, you know their

11  name was always on the container, right?

12  A    I, I don't think so.  It's -- I know Johnson's is.  I, I

13  don't know that Johnson & Johnson has always been there.

14  Q    Okay.  We'll take a look at that issue.  But, but --

15  A    Yeah.

16  Q    -- Johnson & Johnson is the parent company.  As, as the

17  head company certainly it had the authority the entire time

18  Johnson's Baby Powder was sold to require warnings on those

19  products, correct?

20  A    I'm not sure technically, you know.  It definitely had a --

21  had -- could weigh in on that, yes, absolutely.

22          MR. BLOCK:  Let's go to the next slide.

23  BY MR. BLOCK:

24  Q    I mean, the next slide is testimony again from Dr. Hopkins.

25  This is from another trial, May 3, 2019, at Page 7752, Line 11.

# Exhibit 2

F I L E D
In the Office of the
Secretary of State of Texas

OCT 1 2 2021

Corporations Section

**CERTIFICATE OF MERGER**

**OF**

**CHENANGO TWO LLC**

**WITH AND INTO**

**CURRAHEE HOLDING COMPANY INC.**

**(Texas)**

**October 12, 2021**

This CERTIFICATE OF MERGER is being duly executed and filed by the undersigned to effect the merger of CURRAHEE HOLDING COMPANY INC., a New Jersey corporation ("Currahee Holdco"), and CHENANGO TWO LLC, a Texas limited liability company ("Chenango Two"), pursuant to Chapters 4 and 10 of the Texas Business Organizations Code (the "TBOC"). The undersigned hereby certify the following information in connection with the merger of Chenango Two with and into Currahee Holdco (the "Merger"):

**Merging Entity Information**

1.     Currahee Holdco is a corporation. It is incorporated under the laws of the State of New Jersey. Its principal place of business is 199 Grandview Road, Skillman, New Jersey 08558. Currahee Holdco will survive the Merger and, pursuant to the Plan of Merger, the name of the surviving entity will be "Johnson & Johnson Consumer Inc."

2.     Chenango Two is a limited liability company. It is organized under the laws of the State of Texas. Its principal place of business is 199 Grandview Road, Skillman, New Jersey 08558. Chenango Two will not survive the Merger.

**Plan of Merger**

3.     In lieu of providing the plan of merger providing for the Merger (the "Plan of Merger"), Currahee Holdco certifies that:

(a)     A signed Plan of Merger is on file at the principal place of business of Currahee Holdco, and the address of such principal place of business is provided in this Certificate of Merger.

(b)     On written request, a copy of the Plan of Merger will be furnished without cost by Currahee Holdco to any owner or member of any domestic entity that is a party to the Plan of Merger.

1521702957

### Approval of Plan of Merger

4.     The Plan of Merger has been approved as required by the laws of the jurisdiction of formation of each entity that is party to the Merger and by the governing documents of those entities.

### Effectiveness of Filing

5.     This Certificate of Merger and the Merger will be effective as of 11:00 a.m. Central Time, on October 12, 2021.

### Tax Certificate

6.     In lieu of the Company providing a tax certificate from the Texas Comptroller of Public Accounts, Currahee Holdco will be liable for the payment of any franchise taxes of Chenango Two required in the State of Texas.

*[Signature Page Follows]*

IN WITNESS WHEREOF, each of the undersigned has executed this Certificate of Merger as of the date first written above.

CURRAHEE HOLDING COMPANY INC., a
New Jersey corporation

By: *Michelle W Goodridge*
Name: Michelle Goodridge
Title: President

CHENANGO TWO LLC, a Texas limited liability
company

By: *Michelle W Goodridge*
Name: Michelle Goodridge
Title: President

# Exhibit 3

1          UNITED STATES BANKRUPTCY COURT

         WESTERN DISTRICT OF NORTH CAROLINA

2               CHARLOTTE DIVISION

3

    ***************************

4   In Re                        Chapter 11

5   LTL MANAGEMENT LLC,          Case No.

         Debtor.                 21-30589(JCW)

6

    ****************************

7   LTL MANAGEMENT LLC,

8            Plaintiff,

         v.                      Adv. Pro. No.

9                                21-03032(JCW)

    THOSE PARTIES LISTED ON

10  APPENDIX A TO COMPLAINT and

    JOHN AND JANES DOES 1-1000,

11

             Defendants.

12  ****************************

13          Remote Deposition of EDWIN K.

14  KUFFNER, MD, commencing at 10:03 a.m., on the

15  30th of October, 2021, before Maureen

16  O'Connor Pollard, Registered Diplomate

17  Reporter, Realtime Systems Administrator,

18  Certified Shorthand Reporter.

19

20

21                  - - -

22

         GOLKOW LITIGATION SERVICES

23     877.370.3377 ph/ 917.591.5672 fax

             deps@golkow.com

24

1    made out of the State of North Carolina?

2          A.     I have been to North Carolina

3    in my duties as the -- within the company in

4    the time that I've been here I've used

5    information that I've gathered from

6    discussions that I've had in North Carolina

7    to actually shape my understanding of topics

8    and issues.

9          Q.     When is the last time you were

10   in North Carolina?

11         A.     Probably over ten years ago.

12         Q.     Okay.  And you were chief

13   medical officer for JJCI over the past

14   four-plus years, correct?

15         A.     Correct.

16         Q.     And you were chief medical

17   officer in charge of talc for the past

18   four-plus years, correct?

19         A.     Correct.

20         Q.     And all safety decisions that

21   you made with respect to the safety of talc

22   did not occur in North Carolina, true?

23         A.     I would say that would be true.

24         Q.     Okay.  And in fact, you haven't

# Exhibit 4

1                UNITED STATES BANKRUPTCY COURT

            WESTERN DISTRICT OF NORTH CAROLINA

2                   CHARLOTTE DIVISION

3    -------------------------

     IN RE:                   :Case No. 21-030589

4                             :

     LTL MANAGEMENT LLC,       :

5                             :

            Debtor.       :

6    -------------------------

7

8                   OCTOBER 31, 2021

9

10            C O N F I D E N T I A L

11

12           Remote deposition of JOHN KIM,

13       ESQUIRE, conducted via Zoom

14       videoconference, at the location of the

15       witness, commencing at 10:05 a.m., on the

16       above date, before Margaret M. Reihl, RPR,

17       CRR, CCR - NJ.

18

19

20

            GOLKOW LITIGATION SERVICES

21       877.370.3377 ph | 917.591.5672 fax

                 Deps@golkow.com

22

23

24

1          A.       You are talking about the meetings

2     to prepare for this deposition, right?

3          Q.       Sure, right now I am.

4          A.       No.

5          Q.       Was any other J&J employees

6     present?

7          A.       No.

8          Q.       Other than the attorneys?

9          A.       No.  I think I listed everyone I

10    can remember being present.

11         Q.       Did you speak to any LTL employees

12    in connection with your proposed testimony

13    either -- well, let's break it down, first at the

14    first hearing last week?

15         A.       I reported to LTL employees about

16    what was going on in the bankruptcy, including my

17    testimony.

18         Q.       And who did you speak with with

19    regards to LTL employees?

20         A.       I spoke to Rich Dickinson and Rob

21    Wuesthoff.

22         Q.       And Bob Wuesthoff, where is he

23    located?

24         A.       He actually was visiting the

1   offices for LTL business.

2          Q.     They are in New Jersey, right?

3          A.     In New Jersey, yes.  So I actually

4   had lunch with them.

5          Q.     Both Rich and Bob?

6          A.     Yes.

7          Q.     And are they -- where do they

8   reside, those two individuals?

9          A.     Mr. Wuesthoff resides in Florida,

10  he has a house in New Jersey as well but he splits

11  his time between New Jersey and Florida.

12  Mr. Dickinson lives in New Jersey, I'm not sure

13  where.

14         Q.     And Mr. Dickinson, before he was a

15  LTL Management employee, was he a J&J employee?

16         A.     He was employed by one of the J&J

17  companies, yes.

18         Q.     Which one?

19         A.     I'm actually not sure.  His role

20  was in the business development group.  I'm not

21  sure which J&J company actually employed him.

22         Q.     Bob, before he worked at LTL he

23  worked at J&J as well, correct?

24         A.     He was at one of the J&J companies

# Exhibit 5

1

```
 1                  UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF NORTH CAROLINA
 2                        CHARLOTTE DIVISION

 3   IN RE:                      :     Case No. 21-30589-JCW

 4   LTL MANAGEMENT LLC,         :     Chapter 11

 5        Debtor.               :     Charlotte, North Carolina
                                       Wednesday, October 20, 2021
 6                               :     9:30 a.m.

 7   : : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 8                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE J. CRAIG WHITLEY,
 9                   UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:

11   For the Debtor:            Jones Day
                                 BY:  GREGORY M. GORDON, ESQ.
12                                    DAN B. PRIETO, ESQ.
                                      AMANDA RUSH, ESQ.
13                                    MARK W. RASMUSSEN, ESQ.
                                 2727 North Harwood St., Suite 500
14                               Dallas, TX  75201-1515

15                               Jones Day
                                 BY:  ROBERT W. HAMILTON, ESQ.
16                               325 John H. McConnell Blvd., #600
                                 Columbus, Ohio  43215
17
                                 Jones Day
18                               BY:  JAMES M. JONES, ESQ.
                                 250 Vesey Street
19                               New York, NY  10281

20   Audio Operator:            COURT PERSONNEL

21
     Transcript prepared by:    JANICE RUSSELL TRANSCRIPTS
22                               1418 Red Fox Circle
                                 Severance, CO  80550
23                               (757) 422-9089
                                 trussell31@tdsmail.com
24
     Proceedings recorded by electronic sound recording; transcript
25   produced by transcription service.
```

1   to Old JJCI.  They've each filed an adversary proceeding

2   against Old JJCI and J&J in the Imerys bankruptcy case and they

3   seek declaratory judgments with respect to certain indemnity

4   agreements.  The debtor and J&J contest the claims in those

5   adversary proceedings.

6        I also want to mention, your Honor, with respect to

7   the Imerys and Cyprus filings that JJCI and J&J attempted to

8   negotiate an agreement with the parties in those cases to

9   resolve the talc claims against Old JJCI and J&J as part of a

10  plan in that case, or in those cases and although progress was

11  made, the parties were not able to reach an agreement.  And one

12  challenge, frankly, in reaching an agreement in Imerys was that

13  most of the claims related to Johnson's Baby Powder were

14  asserted against Old JJCI and not Imerys.  In fact, of the

15  38,000 pending talc lawsuits against the debtor as of the

16  petition date only about 18,000 of them were also against

17  Imerys.

18       Imerys also has claims related to talc-containing

19  products of other companies and it's my understanding, your

20  Honor, that about 20 percent of the Imerys mesothelioma claims

21  are unrelated to Old JJCI's talc-containing products.

22       As to the status of the Imerys case, your Honor,

23  there's been no estimation either sought or authorized in that

24  case.  While Imerys proposed a plan of reorganization in that

25  case, based on a recent ruling by the Delaware Bankruptcy Court

1  -- and it came out either this week or last.  I can't remember.

2  It might be last week -- the court found that the plan did not

3  receive the requisite votes that were needed and as it turned

4  out, through discovery voting, voting irregularities were

5  discovered that resulted in the rejection of about 15,000 votes

6  and that was enough to turn the outcome of the vote from what

7  appeared to be an acceptance to a rejection of the plan.by the

8  talc claimants.  Old JJCI and J&J opposed that plan because,

9  among other things, in the view of Old JJCI and J&J through the

10  trust distribution procedures under that plan the proposal was

11  to liquidate claims at amounts that J&J and Old JJCI viewed as

12  grossly inflated and then sought to basically enforce those

13  inflated values against Old JJCI and J&J through alleged

14  indemnification obligations.  As far as we know as a result of

15  the failed vote, Imerys is no longer pursuing a plan, but I

16  can't say that with certainty.

17        But nonetheless, having said all that, we believe that

18  the commencement of this chapter 11 case, which would address a

19  resolution of all the talc claims against LTL, presents the

20  best and only viable alternative for fully addressing LTL's

21  talc claims.

22        Then, your Honor, I want to talk briefly about the

23  company's decision to file.  The decision to file was made to

24  permanently and equitably resolve all current and future talc-

25  related claims.  The company chose to file bankruptcy because,

# Exhibit 6

1              UNITED STATES BANKRUPTCY COURT
           WESTERN DISTRICT OF NORTH CAROLINA
2                    CHARLOTTE DIVISION
3

   ***************************
4  In Re                          Chapter 11
5  LTL MANAGEMENT LLC,            Case No.
         Debtor.                  21-30589(JCW)
6

   ****************************
7  LTL MANAGEMENT LLC,
8            Plaintiff,
         v.                       Adv. Pro. No.
9                                 21-03032(JCW)

   THOSE PARTIES LISTED ON
10 APPENDIX A TO COMPLAINT and
   JOHN AND JANES DOES 1-1000,
11

             Defendants.
12 ****************************
13           Remote Deposition of SUSAN
14 SCHIRGER-WARD, commencing at 1:03 p.m., on
15 the 31st of October, 2021, before Maureen
16 O'Connor Pollard, Registered Diplomate
17 Reporter, Realtime Systems Administrator,
18 Certified Shorthand Reporter.
19
20
21                    – – –
22
           GOLKOW LITIGATION SERVICES
23               877.370.DEPS
             deps@golkow.com
24

Susan Schluter Ward

1    Q.    Where are you located right
2  now?

3    A.    In New Jersey.

4    Q.    Where do you live?

5    A.    In Stewartsville.

6    Q.    New Jersey?

7    A.    That's correct.

8    Q.    And how long have you lived in
9  New Jersey?

10    A.    Pretty much all my life.   In
11  Stewartsville, it will be almost 28 years.

12    Q.    And did you attend college?

13    A.    Yes, I did.

14    Q.    Where did you attend college?

15    A.    I went to Stockton College --
16  it's now Stockton University -- in Pomona,
17  New Jersey.

18    Q.    And what year did you graduate?

19    A.    In December of 1977.

20    Q.    What's your degree in?

21    A.    Biology.

22    Q.    When did you first go to work
23  for any company that has any relationship to
24  Johnson & Johnson?

Susan Schildger-Ward

1    A.    Senior legal records

2    coordinator.

3    Q.    And as of today, you remain in

4    the position of senior legal records

5    coordinator for Johnson & Johnson?

6    A.    Yes.

7    Q.    How many Johnson & Johnson

8    employees are there in the legal records

9    department?

10   A.    Well, currently, due to the

11   pandemic situation, some contractors have

12   been furloughed.  There's -- there is one

13   other person who is actually an agreement

14   coordinator, and then my manager also has

15   other employees.  But specifically related to

16   the work that I do, I would have one

17   colleague.

18   Q.    Okay.  And what's that person's

19   name?

20   A.    Ellen Buechel-Whyte.

21   Q.    Okay.  Allen --

22   A.    Ellen, E-L-L-E-N.

23   Q.    Ellen.  And the last name,

24   could you spell it?

Susan Schilpferderd

1    A.     We have a records room where,

2    as we had our files scanned and filed into

3    the iManage system, the original paper

4    documents, original signed documents, have

5    been returned to our records room.

6           We also have a vault, an area

7    called the vault room.

8    Q.     Okay.  The records room at

9    Johnson & Johnson, is that located at J&J's

10   headquarters in New Brunswick, New Jersey?

11   A.     Yes.

12   Q.     And is the records vault at

13   Johnson & Johnson located at Johnson &

14   Johnson's headquarters in New Brunswick,

15   New Jersey?

16   A.     Yes.

17   Q.     Other than the records room and

18   the vault, do you have any knowledge as to

19   the location of any other paper records or

20   original paper documents of Johnson & Johnson

21   other than the records room and the vault?

22   A.     And the work -- my specific

23   work area, which is shared by others, with

24   others.  Paper setter in transition, I should

# Exhibit 7

```
                                                      Page 1

  1                 SUPERIOR COURT OF NEW JERSEY
                    LAW DIVISION - MIDDLESEX COUNTY
  2                 DOCKET NO. MID-1809-17AS
                    APPELLATE DOCKET NO._____
  3
  4    DOUGLAS AND ROSALYN BARDEN,        )
                                          )  TRIAL
  5              Plaintiff,               )
                                          )
  6              v.                       )
                                          )  (VOLUME 1 OF 2)
  7    BRENNTAG NORTH AMERICA, et al., )
                 Defendants.              )
  8    ----------------------------- )
       DAVID CHARLES ETHERIDGE AND        )
  9    DARLENE PASTORE ETHERIDGE,         )  MID-L-0932-17AS
                                          )
 10              Plaintiffs,              )
                                          )
 11              v.                       )
                                          )
 12    BRENNTAG NORTH AMERICA, et al., )
                                          )
 13              Defendants.              )
       ----------------------------- )
 14    D'ANGELA McNEILL-GEORGE,           )
                                          )  MID-L-7049-16AS
 15              Plaintiff,               )
                                          )
 16              v.                       )
                                          )
 17    BRENNTAG NORTH AMERICA, et al., )
                                          )
 18              Defendants.              )
       ----------------------------- )
 19    WILLIAM AND ELIZABETH RONNING,     )
                                          )  MID-L-6040-17AS
 20              Plaintiffs,              )
                                          )
 21              v.                       )
                                          )
 22    BRENNTAG NORTH AMERICA, et al., )
                                          )
 23              Defendants.              )
 24
 25    Job No. NJ3446610
```

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 2

1
2　　　　Place:　Middlesex County Courthouse
　　　　　　　　56 Paterson Street
3　　　　　　　New Brunswick, New Jersey 08903
4
　　　　Date:　Monday, July 22, 2019
5　　　　　　　9:24 a.m.
　　　　　　　(Volume 1 of 2)
6　　　　　　　(Pages 1 - 200)
7
8
9
10
11　Before:
12　　　　HON. ANA C. VISCOMI, J.S.C.,
13
14
15
16
17　TRANSCRIPT ORDERED BY:
18　　　　MOSHE MAIMON ESQ.
　　　　　LEVY KONIGSBERG
19
20
21
　　　　　SILVIA P. WAGE, CCR CRR
22　　　　PRIORITY ONE
　　　　　290 West Mount Pleasant Avenue
23　　　　Livingston, New Jersey 07039
　　　　　(718) 983-1234
24　　　　E-mail: P1steno@veritext.com
25

Page 4

1　　　　　I N D E X
2　WITNESS: JOHN HOPKINS　　　　　PAGE
3　DIRECT EXAMINATION BY MR. PANATIER　　12
4　　　　E X H I B I T S
5　NO.　　　　DESCRIPTION　　　　PAGE
6　Plaintiff's Exhibit 2064　　　　190
　　Plaintiff's Exhibit 2304　　　　199
7　Plaintiff's Exhibit 2345　　　　121
　　Plaintiff's Exhibit 2360　　　　107
8　Plaintiff's Exhibit 2364　　　　199
　　Plaintiff's Exhibit 2367　　　　199
9　Plaintiff's Exhibit 2368　　　　199
　　Plaintiff's Exhibit 2374　　　　199
10　Plaintiff's Exhibit 2381　　　　199
　　Plaintiff's Exhibit 2382　　　　199
11　Plaintiff's Exhibit 2385　　　　199
　　Plaintiff's Exhibit 2390　　　　199
12　Plaintiff's Exhibit 2391　　　　199
　　Plaintiff's Exhibit 2393　　　　199
13　Plaintiff's Exhibit 2403　　　　199
　　Plaintiff's Exhibit 2412　　　　199
14　Plaintiff's Exhibit 2413　　　　199
　　Plaintiff's Exhibit 2434　　　　199
15　Plaintiff's Exhibit 2594　　　　111
　　Plaintiff's Exhibit 2614　　　　197
16　Plaintiff's Exhibit 2738　　　　72
　　Plaintiff's Exhibit 2836　　　　90
17　Plaintiff's Exhibit 3162　　　　118
　　Plaintiff's Exhibit 3173　　　　139
18　Plaintiff's Exhibit 3378　　　　199
　　Plaintiff's Exhibit 3624　　　　148
19　Plaintiff's Exhibit 3695-14　　　82
　　Plaintiff's Exhibit 3695-15　　　59
20　Plaintiff's Exhibit 3695-8　　　51
　　Plaintiff's Exhibit 3695-22　　　199
21　Plaintiff's Exhibit 3695-23　　　161
　　Plaintiff's Exhibit 3695-27　　　178
22
23
24
25

Page 3

1 A P P E A R A N C E S:
2
　　CHRISTOPHER PLACITELLA, ESQ.
3　　COHEN PLACITELLA & ROTH
　　　127 Maple Avenue
4　　Red Bank, New Jersey 07701
　　　-and-
5　　MOSHE MAIMON, ESQ.
　　　LEVY KONIGSBERG
6　　800 Third Avenue
　　　11th Floor
7　　New York, New York 10022
　　　-and-
8　　CHRIS J. PANATIER, ESQ.
　　　SIMON GREENSTONE PANATIER
9　　1201 Elm Street
　　　Suite 3400
10　Dallas, Texas 75270
　　　Attorneys for Plaintiffs, Douglas and
11　Rosalyn Barden, Charles Etheridge and
　　　Darlene Pastore Etheridge, D'Angela
12　McNeill-George, William and Elizabeth
　　　Ronning
13
14　DIANE P. SULLIVAN, ESQ.
　　　JACK NOLAN, ESQ.
15　WEIL GOTSCHAL & MANGES LLP
　　　17 Hulfish Street
16　Suite 201
　　　Princeton, New Jersey 08542
17　　-and-
　　　JOHN C. GARDE, ESQ.
18　JOHN FLAHERTY, ESQ.
　　　McCARTER & ENGLISH
19　Four Gateway Center
　　　100 Mulberry Street
20　Newark, New Jersey 07102
　　　Attorneys for Defendants Johnson & Johnson,
21　and Johnson & Johnson Consumer, Inc.
22
23
24
25

Page 5

1　　　　THE COURT:  Good morning, Dr.
2　Hopkins.
3　　　　THE WITNESS:  Good morning, your
4　Honor.
5　　　　(Sidebar.)
6　　　　THE COURT:  So we are at sidebar and
7　we began argument on Friday.  I think all the
8　arguments were in relative to --
9　　　　(There is a discussion off the
10　record.)
11　　　　THE COURT:  I don't know.  Was there
12　additional argument that counsel wanted to make or
13　are we done with argument?  (INAUDIBLE.)
14　　　　MS. SULLIVAN:  And just to emphasize,
15　your Honor, Evidence Rule 701 and lay opinion from
16　fact witnesses can be permitted, if it's consistent
17　with your experience in product -- particularly, in
18　product liability case.
19　　　　And, specifically, citing the
20　Appellate Division's decision in Navarro v. George
21　Koch & Sons, 512 -- I'm sorry, 211 N.J. Super. 558
22　and, actually, the Court held it might be reversible
23　to not permit that kind of testimony.
24　　　　MR. MAIMON:  Just a moment, your
25　Honor.

2 (Pages 2 - 5)

Page 18

1   A.   They did, yes.
2   Q.   And they ran --
3   A.   Three or four years before.
4   Q.   Okay.  And they ran that mine through
5  a company called Windsor Minerals, right?
6   A.   The company that purchased the mine
7  was a subsidiary of Johnson & Johnson.  It was
8  purchased, I think, around about 1964, Windsor
9  Minerals did.  And it was not actually fully
10  approved and set in motion as a baby talc source
11  until the mid '60s, '67 and it was phased in and
12  Italian talc was phased out.  But the company that
13  owned the mine was a subsidiary called Windsor
14  Minerals.
15   Q.   Right.  And Johnson & Johnson used
16  the Vermont sourced talc for its -- all of its
17  domestic talc in the United States from,
18  approximately, 1967 or so until 2003; is that
19  correct?
20   A.   Correct.
21   Q.   Alright.  Now, there was some overlap
22  with the Italian talc and the Vermont talc, correct?
23   A.   Yes.  One was phased in and the other
24  was phased out during the 1967, '68 time frame.
25   Q.   Okay.  In 1980 there was a mine

Page 19

1  strike in Vermont, correct?
2   A.   There was.  And that was December
3  1980 and the mine was closed, so for about three
4  months until February '81.
5   Q.   Are you sure it wasn't --
6   A.   Sorry.
7   Q.   -- December 1979?
8   A.   Sorry.  December 1979 there was a
9  mine strike which ran into -- from 1980, January,
10  February, it was sourced from Italy.
11   Q.   Right.  And they went back to the
12  00000 Italian Val Chisone talc?
13   A.   Which is the same talc that they were
14  using in Europe at the same time, yes.
15   Q.   After 2003 all the talc that's been
16  sourced for Johnson's Baby Powder and Shower to
17  Shower sold here in the US is China, Guangxi,
18  correct?
19   A.   There is a mine in China, the Guangxi
20  mine, which is a, like a high grade cosmetic talc,
21  yes.
22   Q.   Johnson & Johnson owned the Vermont
23  mine until 1989 when it sold it to a company called
24  Cyprus, correct?
25   A.   Yes.

Page 20

1   Q.   And in 2012, we all know the Shower
2  to Shower product, that was sold by Johnson &
3  Johnson to a company called Valeant, right?
4   A.   It was, yes.
5   Q.   So Johnson & Johnson no longer owns
6  the Shower to Shower product line, right?
7   A.   Not since 2012, no.
8   Q.   It, obviously, still owns Johnson's
9  Baby Powder, correct?
10   A.   Yes.
11   Q.   Johnson & Johnson Corporate in New
12  Brunswick made all health and safety policy
13  decisions with regard to asbestos and talc products,
14  correct?
15   A.   The -- yes, the company in New Jersey
16  is the parent company for all the global companies
17  made those decisions, yes.
18   Q.   And testing results between Johnson &
19  Johnson and, for instance, Johnson & Johnson
20  Consumer, Inc., which I'm just going to call JJCI,
21  test results, health and safety information were
22  freely exchanged between those two companies,
23  correct?
24   A.   I've not seen any evidence that it
25  was not.  So, I guess, the answer is going to be,

Page 21

1  yes.  But I've not seen evidence that anything was
2  withheld.
3   Q.   Right.  Because you wouldn't want
4  Johnson & Johnson getting health and safety
5  information that was important to the products being
6  made and sold by JJCI and not given to them,
7  correct?
8   A.   Correct, yes.  Like I say, I've not
9  seen evidence that it was ever -- there was any ever
10  data withheld.
11   Q.   In fact, the evidence you've seen is
12  that any evidence -- any health and safety
13  information that Johnson & Johnson had was given to
14  JJCI and vice versa, correct?
15   A.   Yes.
16   Q.   Now, you have reviewed many thousands
17  of documents, correct?
18   A.   Yes.
19   Q.   And in this litigation, this talc
20  asbestos litigation, you have reviewed, I think,
21  you've told me, 10 to 15,000 documents?
22   A.   I guess it is, yes, yes.
23   Q.   Now, you know that Johnson & Johnson
24  has turned over around a million documents in this
25  litigation, correct?

6 (Pages 18 - 21)

# Exhibit 8

CONFIDENTIAL - DRAFT TRANSCRIPT - ADAM LISMAN - IN RE: LTL MGMT.

1          ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

2          THE FOLLOWING FILE IS NOT AN OFFICIAL

3          TRANSCRIPT.  IT IS INTENDED ONLY TO AID

4       IN CASE PREPARATION.  THE FINAL TRANSCRIPT

5     WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE,

6          FROM THIS ROUGH DRAFT TRANSLATION.

7        YOU MAY SEE ERRORS AND OMISSIONS DURING

8          THE REALTIME TRANSLATION  THIS IS NOT

9          AN UNUSUAL PROCESS AND THESE ERRORS AND

10         OMISSIONS WILL BE CORRECTED ON THE FINAL

11       TRANSCRIPT.  PLEASE DO NOT TRY TO BRING THESE

12     DISCREPANCIES TO THE ATTENTION OF THE REPORTER

13          DURING THE COURSE OF THE DEPOSITION.

14

15

16            UNOFFICIAL DRAFT TRANSCRIPT

17        THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!

18

19

20    This transcript has not been checked, proofread or

21    corrected.  It is a draft transcript, NOT a certified

22    transcript.  As such, it may contain

23    computer-generated mistranslations of stenotype code,

24    resulting in inaccurate or nonsensical word

1              **ROUGH DRAFT/UNCERTIFIED TRANSCRIPT**

2     combinations, or untranslated stenotype symbols which

3     cannot be deciphered by non-stenotypists.  Corrections

4     will be made in the preparation of the certified

5     transcript, resulting in differences in page and line

6     numbers, punctuation, and formatting.

7          THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON THE

8     CONDITION THAT UPON RECEIPT OF THE CERTIFIED

9     TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN

10    CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED.  THE

11    CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL TRANSCRIPT

12    WHICH MAY BE RELIED UPON FOR PURPOSES OF VERBATIM

13    CITATION OF TESTIMONY.

14

15

16

17

18

19

20

21

22

23

24

ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

1

2   any involvement in the creation of this company called

3   royalty A and M LLC?

4       A.    Yes, I knew it was being created in

5   parallel with LTL.

6       Q.    And what was your involvement in creating

7   the royalty at this A and M LLC?

8       A.    The same as LTL giving facts and

9   information, this is the structure of an entity, how

10  it is going to be call tall eyes had, what it's assets

11  are going to be, providing advice what the accounting

12  would, you know, look like.

13      Q.    And I think you were asked this earlier,

14  but you had no business relationship at all with North

15  Carolina in the past, correct?

16      A.    No.

17      Q.    And you are not aware of these other

18  individuals that are on the board of LTL having any

19  relationship to North Carolina, correct?

20      MR. RASMUSSEN:  Objection to the form,

21  foundation.

22  BY THE WITNESS:

23      A.    I'm not sure I know who the board members

24  of LTL are.

1        ROUGH DRAFT/UNCERTIFIED TRANSCRIPT

2   BY MR. SATTERLEY:

3        Q.    I mentioned them earlier, I think.

4   Russell Deyo, Robert Wuesthoff, Richard Dickinson?

5        A.    I am not aware.  I have no awareness of

6   their relationships with the state, no.

7        Q.    Did Mr. Kim talk to you about why North

8   Carolina?

9        A.    No.

10       Q.    Did you speak with anybody at J&J or J&J

11  Consumer about why North Carolina?

12       A.    No.

13       MR. SATTERLEY:  I think those are all of the

14  questions that I am going to have for you today.  I

15  appreciate your time.

16       THE WITNESS:  Thanks.

17       MR. RASMUSSEN:  I have just a couple of

18  questions for Mr. Lisman before we conclude, unless

19  anybody else has -- does anybody else have questions?

20  I hope not, but that was a pretty thorough examination

21  by Mr. Satterley and Silverstein, so hopefully there

22  aren't any more.

23       MR. SILVERSTEIN:  I guess we left a few things

24  off that you want to cover.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| In re: | ) |
| | )     Chapter 11 |
| **LTL MANAGEMENT LLC,**[1] | ) |
| | )     Case No. 21-30589 (JCW) |
| Debtor. | ) |
| ——————————————— | ) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **RESPONSE OF THE MESOTHELIOMA GROUP ON BEHALF OF CREDITORS IN SUPPORT OF MOTIONS OF BANKRUPTCY ADMINISTRATOR AND MDL PLAINTIFFS' STEERING COMMITTEE TO TRANSFER VENUE OF BANKRUPTCY CASE PURSUANT TO 28 U.S.C. § 1412 AND FED R. BANKR. P. 1014(a)(1) IN THE INTEREST OF JUSTICE OR FOR THE CONVENIENCE OF PARTIES** was filed electronically in accordance with the local rules and served electronically upon all parties registered for electronic service through the CM/ECF system.

Submitted this, the 5th day of November 2021.

                                        **WALDREP WALL BABCOCK
& BAILEY PLLC**

                                        */s/ Thomas W. Waldrep, Jr.*
                                        Thomas W. Waldrep Jr. (NC State Bar No. 11135)
                                        Kevin L. Sink (NC State Bar No. 21041)
                                        James C. Lanik (NC State Bar No. 30454)
                                        Jennifer B. Lyday (NC State Bar No. 39871)
                                        John R. Van Swearingen (NC State Bar No. 53646)
                                        Natalia L. Talbot (NC State Bar No. 55328)
                                        370 Knollwood Street, Suite 600
                                        Winston-Salem, NC 27103
                                        Telephone: 336-717-1280
                                        Facsimile: 336-717-1340
                                        Email: notice@waldrepwall.com

                                        *Attorneys for the Mesothelioma Group*

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.