296

1          UNITED STATES BANKRUPTCY COURT
         WESTERN DISTRICT OF NORTH CAROLINA
2                CHARLOTTE DIVISION

3   IN RE:                    :    Case No. 21-30589-JCW

4   LTL MANAGEMENT LLC,       :    Chapter 11

5       Debtor,               :    Charlotte, North Carolina
                                   Friday, November 5, 2021
6                             :    9:04 a.m.

7   : : : : : : : : : : : : : : : : : : : : : : : : : : : :

8   LTL MANAGEMENT LLC,       :    AP 21-03032-JCW

9       Plaintiff,            :

10          v.                :

11  THOSE PARTIES LISTED ON   :
    APPENDIX A TO COMPLAINT and
12  JOHN AND JANE DOES 1-1000, :

13      Defendants.           :

14  : : : : : : : : : : : : : : : : : : : : : : : : : : : :

15
                        **VOLUME 2**
16              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE J. CRAIG WHITLEY,
17           UNITED STATES BANKRUPTCY JUDGE

18

19  Audio Operator:           COURT PERSONNEL

20
    Transcript prepared by:   JANICE RUSSELL TRANSCRIPTS
21                            1418 Red Fox Circle
                              Severance, CO  80550
22                            (757) 422-9089
                              trussell31@tdsmail.com
23
    Proceedings recorded by electronic sound recording; transcript
24  produced by transcription service.

25

```
 1   APPEARANCES:

 2   For the Debtor/Plaintiff:      Jones Day
                                    BY:  GREGORY M. GORDON, ESQ.
 3                                       DAN B. PRIETO, ESQ.
                                    2727 North Harwood St., Suite 500
 4                                  Dallas, TX  75201-1515

 5                                  Jones Day
                                    BY:  ROBERT W. HAMILTON, ESQ.
 6                                  325 John H. McConnell Blvd., #600
                                    Columbus, Ohio  43215
 7
                                    Jones Day
 8                                  BY:  JAMES M. JONES, ESQ.
                                    250 Vesey Street
 9                                  New York, NY  10281

10                                  Rayburn Cooper & Durham, P.C.
                                    BY:  JOHN R. MILLER, JR., ESQ.
11                                  227 West Trade Street, Suite 1200
                                    Charlotte, NC  28202
12
     For Johnson & Johnson and      Moore & Van Allen PLLC
13   Johnson & Johnson Consumer     BY:  HILLARY B. CRABTREE, ESQ.
     Inc.:                          100 N. Tryon Street, Suite 4700
14                                  Charlotte, NC  28202

15                                  White & Case LLP
                                    BY:  JESSICA LAURIA, ESQ.
16                                  1221 Avenue of the Americas
                                    New York, NY  10020
17
                                    White & Case LLP
18                                  BY:  LAURA FEMINO, ESQ.
                                    Southeast Financial Center
19                                  Miami, FL  33131-2352

20   For The Continental           Parker Poe
     Insurance Company:            BY:  ASHLEY A. EDWARDS, ESQ.
21                                       PHILLIP M. FAJGENBAUM, ESQ.
                                    620 South Tryon Street, Suite 800
22                                  Charlotte, NC  28202

23   For Certain Victims:           Burns Charest LLP
                                    BY:  DANIEL H. CHAREST, ESQ.
24                                  900 Jackson Street, Suite 500
                                    Dallas, TX  75202
25
```

```
 1    APPEARANCES (continued):

 2    For Imerys Talc America,       Blanco Tackabery
      Inc., Imerys Talc Canada,      BY:  ASHLEY S. RUSHER, ESQ.
 3    Inc., and Imerys Talc Vermont, 404 North Marshall Street
      Inc.:                          Winston-Salem, NC  27101
 4
      For Blue Cross Blue Shield     Cordes Law, PLLC
 5    of Massachusetts, Inc.:        BY   STACY C. CORDES, ESQ.
                                     1800 East Boulevard
 6                                   Charlotte, NC  28203

 7                                   Hill, Hill, Carter
                                     BY:  ELIZABETH B. CARTER, ESQ.
 8                                   425 South Perry Street
                                     Montgomery, AL  36104
 9
      For The Plaintiffs' Steering   COLE HAYES, ESQ.
10    Committee:                     601 S. Kings Dr., Ste. F PMB #411
                                     Charlotte, NC  28204
11
                                     Otterbourg P.C.
12                                   BY:  ADAM C. SILVERSTEIN, ESQ.
                                          MELANIE L. CYGANOWSKI, ESQ.
13                                   230 Park Avenue
                                     New York, NY  10169
14
                                     Levin Papantonio Rafferty
15                                   BY:  CHRISTOPHER V. TISI, ESQ.
                                     316 Baylen Street
16                                   Pensacola, FL  32502

17    For Certain Claimants:         Essex Richards, P.A.
                                     BY:  JOHN C. WOODMAN, ESQ.
18                                   1701 South Boulevard
                                     Charlotte, NC  28203
19
                                     Kazan McClain
20                                   BY:  JOSEPH SATTERLEY, ESQ.
                                     55 Harrison Street, Suite 400
21                                   Oakland, CA  94607

22                                   Fears Nachawati PLLC
                                     BY:  DARREN P. McDOWELL, ESQ.
23                                     NABIL MAJED NACHAWATI II, ESQ.
                                     5489 Blair Road
24                                   Dallas, TX  75231

25
```

```
 1   APPEARANCES (continued):

 2   For Maune Raichle, et al.:      Waldrep Wall
                                     BY:  THOMAS W. WALDREP, JR., ESQ.
 3                                        KEVIN L. SINK, ESQ.
                                          JENNIFER B. LYDAY, ESQ.
 4                                   370 Knollwood Street, Suite 600
                                     Winston-Salem, NC  27103
 5
     For Certain Talc Claimants:     Hamilton Stephens
 6                                   BY:  ROBERT A. COX, JR., ESQ.
                                     525 North Tryon Street, Ste. 1400
 7                                   Charlotte, NC  28202

 8                                   Robinson Calcagnie, Inc.
                                     BY:  MARK P. ROBINSON, JR., ESQ.
 9                                   19 Corporate Plaza Drive
                                     Newport Beach, CA  92660
10
     For Margaret Watson:            Hamilton Stephens
11                                   BY:  GLENN C. THOMPSON, ESQ.
                                     525 North Tryon Street, Ste. 1400
12                                   Charlotte, NC  28202

13   For Aylstock Witkin, etc.:      Offit Kurman
                                     BY:  PAUL BAYNARD, ESQ.
14                                   301 South College St., Suite 2600
                                     Charlotte, NC  28202
15
                                     KTBS Law LLP
16                                   BY:  ROBERT J. PFISTER, ESQ.
                                     1801 Century Park East
17                                   Los Angeles, CA  90067-2328

18   For Arnold & Itkin:             Moon Wright & Houston PLLC
                                     BY:  ANDREW T. HOUSTON, ESQ.
19                                   121 West Trade Street, Suite 1950
                                     Charlotte, NC  28202
20
     For Various Plaintiffs:         Meirowitz & Wasserberg, LLP
21                                   BY:  KUSH SHUKLA, ESQ.
                                     535 Fifth Ave, 23rd Floor
22                                   New York, NY  10017

23   For Aleathea Goodins:           D. Miller & Associates, PLLC
                                     BY:  ROCHELLE GUITON, ESQ.
24                                   2610 W. Sam Houston Pkwy. S #200
                                     Houston, TX  77042
25
```

```
 1   APPEARANCES (continued):

 2   For OnderLaw, LLC:            Parkins Lee & Rubio LLP
                                   BY:  LENARD M. PARKINS, ESQ.
 3                                      CHARLES M. RUBIO, ESQ.
                                   700 Milam Street, Suite 1300
 4                                 Houston, TX  77002

 5                                 J. C. WHITE LAW GROUP PLLC
                                   BY:  JAMES C. WHITE, ESQ.
 6                                 100 Europa Drive, Suite 401
                                   Chapel Hill, NC  27517
 7
     For Travelers Casualty &      FisherBroyles LLP
 8   Surety Company:               BY:  DEBORAH L. FLETCHER, ESQ.
                                   338 Sharon Amity Road, #518
 9                                 Charlotte, NC  28211

10   For Certain Claimants:        Andrews Myers, P.C.
                                   BY:  LISA M. NORMAN, ESQ.
11                                 1885 Saint James Place, 15th Flr.
                                   Houston, TX  77056
12
                                   The Layton Law Firm, PLLC
13                                 BY:  CHRISTOPHER D. LAYTON, ESQ.
                                   2701 Coltsgate Road, Suite 210
14                                 Charlotte, NC  28211

15   For Certain Insurers:         Katten Muchin Rosenman LLP
                                   BY:  KATHERINE A. SCHERLING, ESQ.
16                                 575 Madison Avenue
                                   New York, NY  10022-2585
17
                                   Ward and Smith, P.A.
18                                 BY:  PAUL A. FANNING, ESQ.
                                   Post Office Box 2020
19                                 Asheville, NC  28802-2020

20   For Kristie Doyle:            JD Thompson Law
                                   BY:  LINDA SIMPSON, ESQ.
21                                 Box 33127
                                   Charlotte, NC  28233
22
     For Certain Claimants:        Cohen, Placitella & Roth, P.C.
23                                 BY:  CHRISTOPHER PLACITELLA, ESQ.
                                   127 Maple Avenue
24                                 Red Bank, NJ  07701

25
```

```
 1   APPEARANCES (continued):

 2   For Sue Sommer-Kresse:        Higgins & Owens, PLLC
                                   BY:  Sara (Sally) Higgins, ESQ.
 3                                 524 East Boulevard
                                   Charlotte, NC  28209
 4
                                   Motley Rice, LLC
 5                                 BY:  NATHAN D. FINCH, ESQ.
                                   401 9th St., NW Suite 1001
 6                                 Washington, D.C.  20009

 7                                 Motley Rice, LLC
                                   BY:  DANIEL LAPINSKI, ESQ.
 8                                 210 Lake Drive East Suite 101
                                   Cherry Hill, NJ  08002
 9
     For Brandi Carl:             Golomb Spirt Grunfield
10                                 BY:  RICHARD M. GOLOMB, ESQ.
                                   1835 Market Street, Suite 2900
11                                 Philadelphia, PA  19103

12   For Certain Claimants:        Levy Konigsberg LLP
                                   BY:  JEROME BLOCK, ESQ.
13                                 605 Third Avenue, 33rd Floor
                                   New York, NY  10158
14

15   ALSO PRESENT:                 SHELLEY K. ABEL
                                   Bankruptcy Administrator
16                                 402 West Trade Street, Suite 200
                                   Charlotte, NC  28202
17

18   APPEARANCES (via telephone):

19   For The Continental           DAVID CHRISTIAN, ESQ.
     Insurance Company:            3515 West 75th Street, Suite 208
20                                 Prairie Village, KS  66208

21                                 Clyde & Co US LLP
                                   BY:  CLINTON CAMERON, ESQ.
22                                 55 West Monroe Street, Suite 3000
                                   Chicago, IL  60603
23

24

25
```

```
 1   APPEARANCES (via telephone continued):

 2   For Arnold & Itkin:              Pachulski Stang Ziehl & Jones
                                      BY:   LAURA DAVIS JONES, ESQ.
 3                                    919 North Market St., 17th Floor
                                      Wilmington, DE  19801

 4
                                      Pachulski Stang Ziehl & Jones
 5                                    BY    KAREN B. DINE, ESQ.
                                      780 Third Avenue, 34th Floor
 6                                    New York, NY  10017-2024

 7   For Certain Insurers:            Mendes & Mount LLP
                                      BY    EILEEN T. McCABE, ESQ.
 8                                          STEPHEN T. ROBERTS, ESQ.
                                      750 Seventh Avenue
 9                                    New York, NY  10019

10   For the State of Texas:          Office of Texas Attorney General
                                      BY:  AUTUMN D. HIGHSMITH, ESQ.
11                                    P. O. Box 12548 MC008
                                      Austin, TX  78711-2548

12
     For Bausch Health:              Simpson Thacher & Bartlett LLP
13                                    BY:  SANDEEP QUSBA, ESQ.
                                      425 Lexington Avenue
14                                    New York, NY  10017

15   For Cyprus Mines Corporation:   Northen Blue LLP
                                      BY:  VICKI L. PARROTT, ESQ.
16                                    1414 Raleigh Road, Suite 435
                                      Chapel Hill, NC  27517

17
                                      Kasowitz Benson Torres LLP
18                                    BY:  MICHAEL E. HUTCHINS, ESQ.
                                      1230 Peachtree St., NE, Ste. 2445
19                                    Atlanta, GA  30309

20                                    Reed Smith LLP
                                      BY:   PAUL M. SINGER, ESQ.
21                                    225 Fifth Avenue
                                      Pittsburgh, PA  15222-2716

22
     For Westchester Fire            Manier & Herod, P.C.
23   Insurance Company:              BY:  ROBERT W. MILLER, ESQ.
                                      1201 Demonbreun St., Suite 900
24                                    Nashville, TN  37203

25
```

```
1   APPEARANCES (via telephone continued):

2   For Rio Tinto America Inc.    Nexsen Pruet, PLLC
    and Three Crowns Insurance    BY:  HARRIS M. WATKINS, ESQ.
3   Company:                      P. O. Box 3463
                                  Greensboro, NC  27402
4
                                  WilmerHale
5                                 BY:  DANIELLE SPINELLI, ESQ.
                                  1875 Pennsylvania Avenue, NW
6                                 Washington, DC  20006

7   For Employers Insurance       The Shapiro Law Firm
    Company of Wausau, et al.:    BY:  JANET A. SHAPIRO, ESQ.
8                                 325 N. Maple Drive, #15186
                                  Beverly Hills, CA  90209
9
    For Certain Claimants:        Blossom Law PLLC
10                                BY:  RASHAD BLOSSOM, ESQ.
                                  301 S. McDowell St., Suite 1103
11                                Charlotte, NC  28204

12  For Barnes Law Group          JD Thompson Law
    Plaintiffs:                   BY:  JUDY THOMPSON, ESQ.
13                                Box 33127
                                  Charlotte, NC  28233
14
    For Imerys Talc America,      Latham & Watkins LLP
15  Inc., Imerys Talc Canada,     BY:  KIMBERLY A. POSIN, ESQ.
    Inc., and Imerys Talc Vermont,     JEFFREY E. BJORK, ESQ.
16  Inc.:                         355 South Grand Avenue, Suite 100
                                  Los Angeles, CA  90071-1560
17
    For Travelers Casualty &      Simpson Thacher & Bartlett LLP
18  Surety Company:               BY:  ANDREW T. FRANKEL, ESQ.
                                       KATHRINE A. McLENDON, ESQ.
19                                425 Lexington Avenue
                                  New York, NY  10017
20

21

22

23

24

25
```

304

1                                    INDEX

2                                                                  Further
                         Direct   Cross   Redirect   Recross   Redirect
3  WITNESSES FOR THE
     DEBTOR/PLAINTIFF:
4  John K. Kim                              312        344      358, 362
                            Further Recross   360
5
   Edwin Kuffner         366      389     436
6
   Charles Mullin        449      459
7

8  EXHIBITS:                                        Marked      Received

9      All exhibits admitted subject to
         objection
10

11 CLOSING ARGUMENTS:                                            Page

12     Mr. Hamilton                                               475

13     Mr. Gordon                                                 476

14     Mr. Silverstein                                            527

15     Mr. Waldrep                                                529

16     Mr. Pfister                                                549

17     Mr. Parkins                                                551

18     Ms. Cyganowski                                             552

19 RESPONSE: Mr. Gordon                                           560

20

21

22

23

24

25

1               P R O C E E D I N G S

2        (Call to Order of the Court)

3            THE COURT:  Have a seat, everyone.  Good morning.

4        (Counsel greet the Court)

5            THE COURT:  Hope everyone had a restful evening.

6   Somehow I suspect you might not have, but we'll, ready to go

7   again.

8            We are back in both the adversary and the base case in

9   LTL Management with prior hearings.  It looks like, basically,

10  the same group.

11           Do the parties feel a need to reannounce, or should we

12  just do an errata sheet of those who might have departed with

13  us?

14           MR. SATTERLEY:  I suggest we not reannounce.  It looks

15  -- everybody looks the same to me.

16           THE COURT:  But again, let me reiterate the

17  admonition.  Every time you speak for the court reporter's

18  benefit, which translated means I don't want to hear from the

19  court reporter complaining that she didn't hear who you were.

20  I don't want to hear from her after the fact to the effect that

21  we didn't announce and she can't tell who's whom.

22           MR. SATTERLEY:  Yes, your Honor.  I apologize.  Joe

23  Satterley for the creditors.

24           THE COURT:  Okay, very good.

25           Are we ready to proceed?

1          MS. ABEL:  Your Honor, I have a procedural matter that

2     if I could address before we got back into it.

3          THE COURT:  All right.

4          MS. ABEL:  I e-mailed Chambers last night.  I should

5     have known better.  I am the BA.  This is Shelley Abel for the

6     record.  Here we go again.

7          I -- in light of the fact that the Committee was just

8     formed yesterday and that there is a deadline that runs by the

9     end of today on your show cause order on venue --

10         THE COURT:  Uh-huh (indicating an affirmative

11    response).

12         MS. ABEL:  - I wanted to move the Court for an

13    extension of that deadline for the benefit of the Committee.

14    My understanding is that they are working hard to get up to

15    speed and get counsel engaged.  And I would request that they

16    be afforded through early Tuesday or mid-day Tuesday to file

17    something with the Court.

18         I would caution everyone listening that that should

19    not be a 25-page brief 'cause I'm sure you would rather not

20    spend your Tuesday reading that.  But I wanted to ask that for

21    the benefit of the Committee since, since they are not

22    represented.

23         THE COURT:  Okay.

24         How do the parties feel about that?

25         MR. GORDON:  Your Honor, Greg Gordon on behalf of the

1  debtor.

2        I, I think from the debtor's perspective we understand

3  the request.  We don't object to it.  The only issue for us is

4  that, to the extent new issues may be raised, we're not going

5  to be in a position to respond before the hearing, but we

6  obviously can respond at the hearing, so.

7        THE COURT:  Right.

8        MR. GORDON:  We're, we're not opposed, your Honor.

9        THE COURT:  Others?  Anyone feel differently?

10       MS. CYGANOWSKI:  On behalf of the MDL Steering

11  Committee, we're in accord.

12       THE COURT:  Okay, very good.

13       Well, I think that's the appropriate thing to do,

14  obviously, for all of us.  Since we're going to have limited

15  time to react to what is said, then we will all be on the fly

16  somewhat on Wednesday.  But that's the best we can do under the

17  circumstances and since they have a material role in the, in

18  the case, I'd like to hear what they think.  Who knows, maybe

19  they like the Western District of North Carolina, so.

20       MR. SATTERLEY:  There you go.

21       THE COURT:  All right.  Are we ready to proceed

22  otherwise?

23       MS. ABEL:  Thank you, your Honor.  Appreciate it.

24       THE COURT:  Okay.

25       MR. GORDON:  Your Honor, Greg Gordon again on, on

1   behalf of the debtor.

2        One, one preliminary matter I wanted to raise.  We

3   conferred this morning with Mr. Waldrep and Ms. Cyganowski

4   about the time --

5        THE COURT:  Uh-huh (indicating an affirmative

6   response).

7        MR. GORDON:  -- remaining and we're actually in

8   agreement --

9        THE COURT:  Okay.

10        MR. GORDON:  -- on the time.  And I don't have the

11   precise numbers and, and I know your Honor said you didn't need

12   precision, but I think --

13        THE COURT:  Right.

14        MR. GORDON: -- the, the other side has approximately

15   an hour and 30 minutes left.  It's -- it's --

16        THE COURT:  Uh-huh (indicating an affirmative

17   response).

18        MR. GORDON:  -- slightly over an hour and 30.  It

19   might have been an hour 37 and the debtor has about 2-1/2 hours

20   left.  It's right around that --

21        THE COURT:  Everyone in agreement?

22        MR. GORDON:  -- time frame.

23        MR. SATTERLEY:  Your Honor, Joe Satterley for some of

24   the creditors.

25        We agree with the time.  I did want to raise one

1  little issue.  We're going to work together and get this thing

2  done, first of all.  But we were just given a flash drive with

3  60 some, 60 some-odd new exhibits that I don't think were on

4  the exhibit list I think they're going to use in redirect.  And

5  we were just e-mailed just, this just came up on my e-mail at

6  9:04 a new PowerPoint that I've never seen before.

7          I'm not objecting to that, any of that right now.  I

8  just want to raise that issue on, on timing in case we need to

9  ask for leave from the Court for some, little bit of additional

10 time.

11         And then secondly, I'm sure the Court noticed that

12 some of the responses on cross-examination were nonresponsive.

13 We're not complaining about that right now, but we want your

14 Honor to take that into consideration should we ask for more

15 time later.

16         But, like I said, we're going to work and get this

17 thing done.

18         THE COURT:  Okay.

19         MR. BLOCK:  Your Honor, just a housekeeping issue.

20         THE COURT:  Uh-huh (indicating an affirmative

21 response).

22         MR. BLOCK:  When I was cross-examining Mr. Kim

23 yesterday, I used Exhibit 50 --

24         THE COURT:  Uh-huh (indicating an affirmative

25 response).

1          MR. BLOCK:  -- which is the 1989 agreement between

2    Johnson & Johnson and Cyprus Mines, and I used Exhibit 50-A and

3    Exhibit 50-B that were exhibits to the agreement.  And Mr., or

4    counsel for the debtor said that, you know, "We don't have a

5    full copy of the agreement."

6          THE COURT:  Right.

7          MR. BLOCK:  I do think that we should have a full copy

8    of the agreement.  It was just too large for the binder.  So I

9    printed it and it's --

10         THE COURT:  Okay.

11         MR. BLOCK:  -- Exhibit 50.1, Exhibit 50.1.  It's the

12   agreement, plus all the exhibits.

13         And might I pass one up to the Court?

14         THE COURT:  You may, Mr. Block.

15         MR. BLOCK:  Thank you.

16      (Exhibit 50.1 handed to the Court)

17         MR. BLOCK:  And I handed one to the debtor earlier.

18         And The Plaintiffs' Steering Committee, here's a copy.

19         MS. CYGANOWSKI:  Thank you.

20         MR. BLOCK:  Thank you, your Honor.

21         THE COURT:  Any objection to that?

22      (No response)

23         THE COURT:  Okay.

24         MR. JONES:  No objection, your Honor.

25         THE COURT:  All right, very good.

1          So, Ms. Abel, as to your request, it might be a good

2     thing to have something in the record just for the comfort of

3     all that the Committee can file a late response.  Now I don't

4     care if it's Tuesday morning or whether it's Tuesday at lunch.

5     From my vantage point, either one.  I think there's going to be

6     some evening reading going on, but from the parties'

7     perspective it may make a difference.

8          So anyone?  5:00 okay, or do you want 12:00?

9          MR. GORDON:  Your Honor, Greg Gordon on behalf of the

10    debtor.

11         We would prefer midday.  If we could have it by

12    midday, by noon on, on Tuesday.

13         THE COURT:  Okay.

14         MS. ABEL:  Beggars can't be choosers, your Honor.

15         THE COURT:  Well --

16         MS. ABEL:  Your Honor, would you like me to reflect

17    that in a, in a short order that I could submit to you?

18         THE COURT:  Yes.  Just a short -- you can represent

19    consent of the assembled group that this was raised on an oral

20    motion of the Bankruptcy Administrator and as the parties had

21    no objection nor did the Court, that we're affording that time

22    so that the Committee may participate, okay?

23         MS. ABEL:  Thank you.  I'll do so.  Thank you.

24         THE COURT:  All right?  Very good.

25         Any other preliminaries?

```
 1       (No response)

 2              THE COURT:  Ready to get the witness back on the

 3    stand?

 4              Mr. Kim, if you'll come around.

 5              MR. KIM:  Thank you, your Honor.

 6              THE COURT:  All right, Mr. Kim.  We're not going to

 7    have you resworn.  You remain under oath, of course.

 8              MR. KIM:  Thank you, sir.

 9       JOHN K. KIM, DEBTOR/PLAINTIFF'S WITNESS, RESUMED THE STAND

10              THE COURT:  All right, Mr. Jones.  Ready for redirect?

11              MR. JONES:  Thank you, your Honor.  Jim Jones on

12    behalf of the debtor.

13                         REDIRECT EXAMINATION

14    BY MR. JONES:

15    Q    Mr. Kim, thank you for coming back this morning.

16    A    No problem.

17    Q    We're going to visit with you here a little bit about some

18    things that you visited with our colleagues on the other side

19    of the table about yesterday.  We're going to try to do that as

20    swiftly as we can.

21    A    Okay.

22    Q    Do you understand that?

23    A    Thank you.  Yes.

24    Q    Thank you.

25         Mr. Kim, I'm going to ask you to look back with me real
```

1  quickly at an exhibit you've looked at a couple of times,

2  Exhibit 2, which I think you're going to tell me is the, what

3  we've referred to as the 1979 asset transfer agreement.

4  A    Okay.

5  Q    And hopefully, that's going to come up.

6       There it is.

7  A    Yeah.

8  Q    Do you recall Exhibit 2, sir?

9  A    I do.

10 Q    And I'm going to ask you to look with me quickly at a

11 paragraph I think Mr. Block referred to in his examination of

12 you yesterday and that is Paragraph 1, the paragraph we've

13 referred to as the asset transfer paragraph.

14      Is that, is that the paragraph, sir?

15 A    It is.

16 Q    And, in particular, I'm commending your attention and that

17 of the Court to some text in the middle of that paragraph that

18 indicates that, what, that the transfer was of what?

19 A    Transfer of "all the businesses, franchises, properties,

20 and assets of every nature and description, tangible and

21 intangible, wherever located which are now allocated on the

22 books or records of J&J to its Baby division."

23 Q    And did the Baby division, sir, at this time, as you

24 understand it, include the man, the assets that were involved

25 in the manufacture and sale of talc-containing products?

1    A    It --

2                 MR. BLOCK:  Objection.  Foundation.

3                 THE COURT:  Overruled.

4                 THE WITNESS:  It, it did.

5    BY MR. JONES:

6    Q    Thank you, sir.

7         Mr. Block referred you to some subparagraphs that included

8    words like "trucks" and, potentially, "sofas."  I'm not sure if

9    that's actually in the document.  You recall that testimony?

10   A    I do recall.  It's the document that -- it's the part of

11   the document that says without limitation of the foregoing

12   general stuff that, these are just specific examples that, that

13   it lists.

14   Q    Thank you, sir.

15        Let's stick with that exhibit.  You were asked some

16   questions about whether you'd seen any documents that referred

17   to cosmetic talc liabilities in respect of lawsuits that were

18   dated before 1979.  Do you recall that line of examination?

19   A    Well, I think the specific question's about books, books or

20   records, accounting books or records.  I think I said that

21   there are documents that relate to that time period and the,

22   and the liabilities.

23   Q    And what did you mean to refer to when you said that?

24   A    In the 1970s, there was a huge uproar about whether

25   asbestos was in, was in baby products, was in Baby Powder.  So

1   starting in the early '70s there was a Wall Street Journal

2   article by a doctor from Mount Sinai who alleged that he had

3   found like 1-to-2 percent asbestos in, in Johnson's Baby

4   Powder.  And so you can imagine that in the '70s that caused a,

5   a huge issue and throughout the '70s there was a ton of work by

6   the Baby Company being done on -- on trying to -- on, on

7   refuting that, that allegation.  At the end of the day, there

8   were, you know, the FDA got involved.  We hired, you know, the,

9   the Baby Company hired experts from around the world.  There

10  were hearings.  You know, the, and at the end of the day the,

11  the doctor at Mount Sinai admitted that he was wrong and, and

12  retracted the -- that -- that allegation.

13      But there was -- it's a -- was a ten-year saga of, of going

14  through all the testing, all the, the publicity, and, and the

15  end result was that they retracted.  And so, yeah, there was --

16  there's -- there's a -- as I think I had mentioned in my

17  deposition, there were a ton of documents relating to this

18  issue prior to 1970, '79.

19  Q   But, but is it right that there were no lawsuits before

20  1979?

21  A   There were no lawsuits, but, you know, frankly, even before

22  that there were issues that the Law Department was brought

23  into.  So, you know, it is, it was clearly a potential

24  liability that everyone knew about, including, for example, you

25  know, members of the board of directors who were involved with

1    this that are on the, the directors minutes that we saw.

2        So they were all involved.  They knew about, about these

3    issues.

4              MR. BLOCK:  Objection.  Move to strike for lack of

5    foundation.

6              THE COURT:  Noted, but overruled.  Let it go to

7    weight.

8              MR. JONES:  Thank you, your Honor.

9    BY MR. JONES:

10   Q    Mr. Kim, once the lawsuits started being filed -- and now

11   we're after 1979 -- did they allege exposure to talc-containing

12   products before 1979?

13   A    Yes.  The, the whole theory has been from the beginning of

14   -- any exposure.  So from the beginning of time when, when a

15   plaintiff used the product, which is, generally, in these cases

16   in the '60s and '70s up through the present, every exposure

17   contributed to their cancer.  That's, that's a general,

18   fundamental claim that they have.

19   QA   And there were defense costs and liabilities or indemnity

20   responsibility incurred, correct?

21   A    There were indemnity -- there were expenses due, you know,

22   in the litigation on account of these, these issues that arose

23   in -- in the -- in the '60s and '70s.

24   Q    And, and where were those expenses, costs, and liabilities

25   booked, sir?

1   A   They were all borne by and allocated to Old JJCI, not LTL.

2   Q   And that, that includes any costs, expenses, liabilities

3   for talc-containing products of any kind?

4   A   Of any kind, both the -- yeah.  It's all talc, talc-related

5   litigation costs from, from the beginning of time.

6   Q   You, you were asked a few questions, Mr. Kim, I think it

7   was by our colleague, Mr. Satterley, about contracts for the

8   payment of talc claims between J&J and JJCI.  Do you recall

9   that request?

10  A   I, I do.

11  Q   And you said you would not expect them.  What did you mean

12  by that?

13  A   Well, other than this agreement that we had that sort of

14  lays out the central/decentralized, you know, strategy of

15  putting the responsibility of products squarely within the

16  operating companies, there are no contracts between the, you

17  know, J&J and an operating company that says, oh, you know,

18  we're going to contract you for this liability to pay amounts.

19  It is -- it is -- you know, started out with the

20  decentralization.  There was an assumption.  There was

21  indemnification, and all, you know, from then on it was

22  standard operating practice, basically, that any product

23  liability expense gets charged to and borne by the operating

24  company that manufactures the -- the -- and distributes the

25  product.

KIM - REDIRECT                                                          318

1    Q    And that assumption and indemnification to which you just

2    referred you find in Exhibit 2 that you just discussed with us?

3    A    Yes.

4    Q    Thank you, sir.

5         And you made a diligent search for that exhibit or that

6    Exhibit 2, which is the 1979 asset and transfer agreement, and

7    a --

8              MR. BLOCK:  Objection.  Leading.

9              MR. JONES:  All right.

10   BY MR. JONES:

11   Q    Mr. Kim --

12             MR. JONES:  Thank you.  I will take care of that one,

13   but thank you.

14   BY MR. JONES:

15   Q    Mr. Kim, you, you testified before a search was made for

16   that document, Exhibit 2, correct?

17   A    I did.

18   Q    Can you tell us how long ago that search was first

19   undertaken, or the search you referred to --

20   A    Uh-huh (indicating an affirmative response).

21   Q    -- was undertaken and then can you tell us what you know

22   was done then?

23   A    So the search was undertaken about two years ago and a

24   request was made to the Corporate Secretary's office, which,

25   generally, would be the starting point of, of, of looking for

1    documents that are referenced in the corporate minutes.

2        So the Corporate Secretary's office did a search and, and

3    then, you know, through that the File Room did a search.  And,

4    you know, they did the search through, you know, the paper

5    files, the Corporate Secretary's books, and they also did a

6    search through the Memotech system.  And I think there -- oh.

7    And then they also looked again at the, you know, we had a vast

8    production in the, in the cases and so they also did a search

9    through the production documents to see if they can find it.

10   Q   Were there any offsite places searched?

11   A   They -- so many of the paper records were kept at Iron

12   Mountain.  So boxes and boxes of documents were, were brought

13   back from Iron Mountain to, to review.

14   Q   And did you learn, fundamentally -- I think you testified

15   that the document was found because, was found as mislabeled.

16   Is that, was that your testimony?

17           MR. BLOCK:  Objection.  Leading.  His own, his own

18   witness.

19           MR. JONES:  Just trying to move swiftly, your Honor.

20           MR. BLOCK:  It's his own witness.  Leading.

21           THE COURT:  It is.

22           MR. JONES:  I'll, I'll reframe the --

23           THE COURT:  Hang on, Gentlemen, okay?

24           I understand leading.  I'm not a jury, okay?

25           MR. BLOCK:  Thank you, your Honor.

1          THE COURT:  In the interest of time, try not to lead,

2     but let's not be picky about it, either, okay?

3          MR. JONES:  I'm doing my best, your Honor --

4          THE COURT:  Okay.

5          MR. JONES:  -- to, to move swiftly.

6     BY MR. JONES:

7     Q    Mr. Kim, did you form an understanding as to how, why it

8     was the document wasn't found in the search you just described

9     roughly two years ago?

10    A    Yeah.  In the earlier search what we discovered when we

11    found the document, in the Memotech system the document is

12    mislabeled under Johnson & Johnson Canada and what happened was

13    the, Susan Schirger-Ward, who is the person who found it, is --

14    is very -- is diligent and industrious and basically, even

15    though the -- the way you search the Memotech, they're not full

16    text searches.  There's an index.  It's an index search.

17         So even though -- so she, she decided to search every

18    document that had that date and basically, she looked at

19    documents that even were not related to what she was looking

20    for and when she saw this Canada document in the index, she

21    looked at that and discovered that was the document that we

22    needed.

23    Q    Was -- in the -- what -- what -- in the mislabeling was the

24    word "Baby Products" in the label, or do you, do you know?

25    A    I don't, I don't think it was.  I think it was Johnson &

1   Johnson Canada was, was in the label.

2   Q    Thank you, Mr. Kim.

3        Mr. Kim, Mr. Silverstein asked you a few questions about

4   the acceptances of tenders made by retailers who are named in

5   the underlying tort suits.  Do you recall that testimony?

6   A    I do.

7   Q    And you are familiar with the documents listed on the

8   summary exhibit that he reviewed with you?

9   A    I am.

10  Q    And, in fact, you, you know that all of the underlying

11  documents, tender acceptances, were produced in, in this

12  litigation that we're sitting in here today?

13  A    As many as we could find.  Any, everything that we had, we,

14  we produced.

15  Q    Same for the insurance policies that were the subject of

16  another of the summary exhibits, correct?

17  A    Yes.

18  Q    Do all retailers always submit tender letters?

19  A    No, no.  They -- it, it would be dependent on the retailer.

20  Sometimes they would call and, and, and, you know, depending

21  upon our relationship with them, or they would just send a

22  complaint and, you know, and, and call us with a tender

23  request.

24  Q    Do they sometimes submit their tender request at different

25  times in the litigation?

1  A    It -- it  -- it varies from, from retailer to retailer,

2  yes.

3  Q    Mr. Kim, I'm going to ask you to look at a few other things

4  for me.  In particular, I'm going to pull up some, a transcript

5  from the Olson trial that Mr., I think it was, Block reviewed

6  with you yesterday.

7           MR. JONES:  Slide No. 9.

8  BY MR. JONES:

9  Q    And you recall this testimony yesterday, or do you recall

10 giving testimony about this piece of the Olson trial transcript

11 with Mr. Block yesterday?

12 A    The, the subject matter, I remember, yes.

13 Q    All right.  So let's, ask you to look at a little bit more

14 of this testimony with me.

15     Let's look at the testimony a little farther down in the

16 same transcript of the same case, in any event.

17           MR. JONES:  And that's going to be Slide No. 10, Eric.

18 BY MR. JONES:

19 Q    This is Exhibit 6, Defendants' Exhibit 6.  And I'm going to

20 ask you to read the question and the answer that Dr. Hopkins

21 gave here.  This is Dr. Hopkins' testimony.

22 A    The question is:

23 "Q   If Johnson & Johnson tells Johnson & Johnson Consumer Inc.,

24 'We want a warning about cancer or asbestos on Johnson's Baby

25 Powder,' Johnson & Johnson has the authority to do that,

1   correct?

2   "A   No.   I think the origin of the guidance or the warning

3   would come from the Consumer Inc.   So they would be telling

4   themselves."

5       So this, this relates to yesterday Mr. Block showed me the

6   -- the -- the -- a statement that, that Johnson & Johnson

7   can -- can -- has the authority to, to put a warning on the

8   label.   And I said I disagreed with that.   And this confirms

9   that.   It's just not true.   Johnson & Johnson -- the, the, the

10  warnings on the product are controlled by the operating

11  company.   Johnson & Johnson may have a view.   They may have an

12  opinion.   They may give advice, but the -- putting a warning

13  on, on that product is the sole responsibility of the operating

14  company.

15  Q   Let me ask you to look at just a, one more snippet of this

16  testimony, Mr. Kim.

17          MR. JONES:   And that's Slide 11, which is, again, from

18  the same exhibit, defendants' exhibit, not debtor's exhibit.

19  BY MR. JONES:

20  Q   Can you share with the Court the, this question and answer?

21  A   (Reading):

22  "Q   If Johnson & Johnson tells the subsidiary, Johnson &

23  Johnson Consumer Inc., that they want a certain warning on

24  Johnson's Baby Powder, then the subsidiary, Johnson & Johnson

25  Consumer Inc., has to follow it, correct?

2484f5056c16317f

1       "Objection.  Asked and answered."

2       The court overrules it.

3       "The Court:  You may answer.

4  "A   I think that's a misinterpretation.  The ownership and

5  responsibility would be with Johnson & Johnson Consumer Inc."

6  Q    And that's Dr. Hopkins' testimony on that day given in the

7  <u>Olson</u> trial to Mr. Block?

8  A    That -- that's -- that's generally -- that's, that's the

9  way it works, yes.

10  Q   Thank you, sir.

11         MR. JONES:  You can take that down.

12  BY MR. JONES:

13  Q   Mr. Kim, yesterday, you talked about the kinds of claims

14  and how they're pursued in the underlying tort system regarding

15  J&J and JC, JJCI with respect to talc, correct?

16  A   Yes.

17  Q   And you talked about that some plaintiffs file suit after

18  bankruptcy, correct?

19  A   Yes.

20  Q   I want to now turn you to a couple slides that will show,

21  I, I hope, some information about how those claims were pursued

22  before and after.

23         MR. JONES:  So let's take a look at Slide 12.

24  BY MR. JONES:

25  Q   So, sir, side by side here, you're aware of, of the right-

1  hand side of the slide.  That is the McBride complaint that we

2  reviewed yesterday.  Do you recall the McBride complaint?

3  A    I do.

4  Q    And that's a complaint that only lists Johnson & Johnson as

5  a defendant?

6  A    It is.

7  Q    And on the left-hand -- and that complaint was filed after

8  the bankruptcy.  Do you recall that testimony?

9  A    It -- it -- that's true.

10  Q    And on the left-hand side of the case you see another

11  complaint.  And who's the plaintiff there?

12  A    It's Bethany Richards.

13  Q    And you see the filing dates at the bottom of the slide,

14  correct?

15  A    Yes.

16  Q    So one is in August of 2021.  That's before bankruptcy?

17  A    Yes.

18  Q    And the other, the McBride complaint, is after bankruptcy?

19  A    Yes.

20  Q    And the McBride complaint, I think Mr. Rasmussen is going

21  to confirm for me is Debtor's Exhibit 26.  And he just nodded

22  his head.

23      But you recall you reviewed it yesterday?

24  A    Yeah, I do.

25  Q    And I just mention that for the record.

1    Who are the defendants in the Richards case, sir?

2  A    Well, the, the ones that are listed for Johnson & Johnson

3  companies are Johnson & Johnson and Johnson & Johnson Consumer

4  Inc.

5  Q    And we already established that there was only one

6  defendant in the post-bankruptcy McBride case and that's

7  Johnson & Johnson, right?

8  A    Yeah.  One Johnson & Johnson defendant, yes.

9  Q    Let's look just briefly at a few of the allegations in

10  these complaints.

11          MR. JONES:  Let's look at Slide 13.

12  BY MR. JONES:

13  Q    On the left-hand side, we stick with the Richards

14  complaint, Mr. Kim, and on the right-hand side, the McBride

15  complaint, pre and post.  Are you with me?

16  A    I am.

17  Q    And can you share with me the namings of the two counts

18  we're referring to on each slide?

19  A    The names are, on the left slide, is fraud as to

20  defendants, Johnson & Johnson and Johnson & Johnson Consumer

21  Inc.  And on the right-hand slide, is fraud as to Johnson &

22  Johnson.

23  Q    And then can you look just briefly at the opening sentences

24  of each complaint about what they say about fraud both before

25  and after the filing of the bankruptcy?

1   A    They're identical pleadings, except for the fact that one

2   names both Johnson & Johnson and Johnson & Johnson Consumer and

3   one only names Johnson & Johnson.

4              MR. JONES:  Let's --

5              THE WITNESS:  It's, it's the same.

6              MR. JONES:  Let's --

7              THE WITNESS:  It's the same allegation.

8              MR. JONES:  Let's skip to the next slide.  Thank you.

9   BY MR. JONES:

10  Q    Thank you, Mr. Kim.

11        And here, we have a description of some of the factual

12  predicate, is that right?

13  A    Yes.

14  Q    Paragraphs 35 and Paragraphs 41, respectively, correct?

15  A    Correct.

16  Q    And this factual predicate refers to which things?

17  A    It's the -- the -- the testing protocol for, for J&J's talc

18  products.

19        So this is the under -- it's the -- you know, every

20  complaint, again, regardless of whether you're calling it fraud

21  by Johnson & Johnson or, or the typical complaint that we get,

22  the, the basis is, is always the same, which is the product was

23  defective.  It has, it's the same injuries.  So it's a cancer.

24  It's the same defect that the product either contains asbestos

25  or itself causes cancer and the, and the same harm.

1    So this is just -- this goes to the, the theory that it's

2   defective.  So the testing protocol is, is, is a defect theory

3   about asbestos.

4   Q   And, sir, one last slide from these two complaints.

5            MR. JONES:  That's the next one.

6   BY MR. JONES:

7   Q   And here, we have two slides that address, what?

8   A   The -- the -- again, this is the, the testing protocol

9   that's used by JJC, Old JJCI to test its product for asbestos.

10   So again, one, you know, and here -- the -- so again --

11  they made it easy because they just call it J&J, but, of

12  course, one of them includes JJCI.  One of them is just J&J.

13  But the allegation is identical, which is the test method that

14  we use was defective and, and led to, and led to the product

15  containing asbestos.

16   So again, it's, it's the identical core allegations that

17  make up every single complaint in the litigation.

18            UNIDENTIFIED SPEAKER:  What's the last one you used?

19            MR. JONES:  85.

20            So we're going to mark this as Exhibit 86, Debtor's

21  Exhibit 86.  That is the Richards complaint.

22  BY MR. JONES:

23  Q   Thank you, Mr. Kim.

24   Mr. Kim, you were also asked yesterday a, a few things

25  about Windsor Mine, or Windsor Minerals.  Forgive me.

1      Do you recall that testimony?

2  A    I, I do.

3  Q    What do you know that Windsor Minerals owned, if you do?

4  A    Windsor Minerals owned the talc mines.

5  Q    That's right.

6      You know what happened to Windsor Minerals?

7  A    Windsor Minerals was sold to Cyprus, which becomes,

8  eventually, the Imerys Talc America, part of the Imerys group

9  that filed bankruptcy in, in Delaware.

10 Q    So what do you understand about any purported claims

11 relating to Windsor at this moment?

12         MR. BLOCK:  Objection.  Foundation.

13 BY MR. JONES:

14 Q    Sir, have you been --

15         THE COURT:  Sustained.

16         Let's go ahead.

17 BY MR. JONES:

18 Q    Have you been involved in monitoring the Imerys bankruptcy?

19 A    I have been involved in the Imerys bankruptcy.

20 Q    Do you understand the, whether or not the Windsor, the

21 claims against Imerys regarding Windsor have been or have not

22 been stayed?

23 A    The -- the claims -- the claims against Imerys with respect

24 to Windsor has been, have been stayed, yes.

25 Q    Thank you, sir.

1    And, sir, you, you mentioned yesterday a little bit about

2    that bankruptcy in your testimony.  Has the Imerys bankruptcy

3    court raised any concerns about claims made in that proceeding?

4    A    Yes, in the voting procedures that was, that were done for

5    the plan confirmation.

6    Q    I'm going to ask you to look at another slide for me.

7            MR. JONES:  Slide 2.

8    BY MR. JONES:

9    Q    Sir, sir, have you seen this opinion in the Imerys

10   bankruptcy before?

11   A    I have.

12   Q    And, in particular, is this what you were referring to just

13   now about that bankruptcy?

14   A    Yes.  This is the -- the -- what I -- let me call them

15   improprieties in the, in the voting process for the plan

16   confirmation in the Imerys bankruptcy.

17   Q    Thank you, sir.

18       We're going to move on and talk about Windsor just a few

19   more moments.

20       Yesterday, you were shown a bit of testimony, or, rather, a

21   bit of, rather, a bit of a document suggesting that there was,

22   I think, a J&J manufacturing plant in Royston, Georgia in the

23   1980s that may have been related to the Windsor discussion.

24       Do you recall that?

25   A    I recall the slide.

1        MR. BLOCK:  Objection to the comment -- objection to

2   the commentary about what was suggested.

3        THE COURT:  I'll exclude that.

4        Go ahead.

5        MR. BLOCK:  Thank you.

6   BY MR. JONES:

7   Q   Mr. Block -- Mr. Kim, do you recall testifying about a

8   plant in Royston, Georgia in the 1980s?

9   A   I, I do recall that.

10  Q   And I'm going to show you a slide you were shown yesterday,

11  which is Slide 3.

12      Sir, do you recall this testimony about this slide?

13  A   I do recall.

14  Q   Do you recall the callout of Johnson & Johnson of the words

15  "Johnson & Johnson, Royston, Georgia"?

16  A   I, I do.

17  Q   And under the heading of Windsor Sold the Talc Used to Make

18  JBP in Royston," or, "J&J (Windsor) Sold the Talc," do you see

19  those language at the heading of the exhibit you were handed by

20  Mr. Block?

21  A   I, I do see that.

22  Q   Thank you.

23      And do you see the reference to "Johnson & Johnson,

24  Royston, Georgia," do you see that?

25  A   I, I do see that.

1  Q   And that was called out for you yesterday?

2  A   It was.

3  Q   Thank you.

4      And, sir, he -- and as a part of that examination you were

5  shown what was, what is now a full copy.  Yesterday was a

6  moderate, modestly excerpted copy of Exhibit 50, the 1978 sales

7  agreement, do you recall that?

8  A   I do.

9  Q   Let's look at what that agreement says.

10         MR. JONES:  Slide 4.

11  BY MR. JONES:

12  Q   And Slide 4 is Exhibit 50-A for the defendants and it's got

13  the Bates No. JNJNL 61, if my eyes are sufficiently accurate.

14      And can you review with us what the, what it says here

15  about the, the, the plant?

16  A   Yeah.  This -- it says, "The testing to follow the practice

17  as conducted for Windsor Minerals in the past.  A copy of the

18  resulting McCrone" -- McCrone is a testing lab -- "report is to

19  be provided directly from the McCrone organization to the

20  manager of Quality Assurance, Johnson & Johnson Baby Products,

21  Royston, Virginia."

22  Q   And could you say that last line again?

23  A   It's "Johnson & Johnson Baby Products, Royston" -- I'm

24  sorry -- "Georgia."  Georgia.

25  Q   Thank you, sir.

1    And what do you know about whether that plant was

2    transferred to Baby Products as a part of the '79 agreement?

3    A   It is, it's a Baby Products plant that bottles the product

4    in, in Georgia.  And I think the last exhibit -- again, I think

5    I mentioned there's always some -- sometimes you use Johnson &

6    Johnson as a general term when you, when you actually mean one

7    of the subsidiaries.  It's -- it's a loose -- you know, the,

8    the term is used loosely and often creates confusion, but it's

9    a Johnson & Johnson Baby Products plant.

10   Q   And what do you know about the transfer of that as part of

11   the 1979 agreement?

12   A   It would have gone, pursuant to the, to the transfer

13   agreement, to -- to the -- a subsidiary.

14   Q   I'm going to look at just a few more pieces of information

15   regarding this plant, sir.

16       I'm going to call this out.  It's Exhibit 44.  Is that

17   debtor's  exhibit?  It is.

18           UNIDENTIFIED SPEAKER:  No, it's not.

19           MR. JONES:  I'm sorry.  It's Defendants' Exhibit 44.

20   BY MR. JONES:

21   Q   And this is the 1979 Johnson & Johnson Annual Report.  Do

22   you see it, sir?

23   A   I do.

24   Q   And do you see under Johnson & Johnson domestic operations

25   Johnson & Johnson Baby Products Company?  Do you see that

1   reference?

2   A   I, I do.

3   Q   And can you read for me what Johnson & Johnson Baby

4   Products Company, what -- what -- what -- beneath that term is

5   set out on this Annual Report?

6   A   Yeah.  So it's a list of locations for the company.  It

7   says Piscataway and Skillman, New Jersey, Royston, Georgia,

8   Park Forest, South Illinois, Las Piedras, Puerto Rico.

9   Q   Royston, Georgia is where the plant is situated that we jut

10  mentioned?

11  A   It, it is.  That's the bottling facility that bottles

12  Johnson's  Baby Powder.

13  Q   Let's look just a little farther in the same Annual Report,

14  sir.

15          MR. JONES:  Next slide, Slide 6.

16  BY MR. JONES:

17  Q   And here, we have a reference to Johnson & Johnson's 1979

18  Annual Report and the property expansion and expenditures, do

19  you see that?

20  A   I do.

21  Q   Will you call out for his Honor what we have here?

22  A   It says, "Additions to property, plant, and equipment

23  increased substantially in 1979.  Domestic additions included

24  manufacturing and distribution facilities for Ortho

25  Pharmaceutical in New Jersey and Puerto Rico, manufacturing

1   facilities for Codman & Shurtleff in Massachusetts, McNeil

2   Consumer Products in Texas, and a Baby Products toiletries

3   plant in Georgia."

4   Q    Thank you, sir.

5        Let's look at one more document with respect to this plant.

6             MR. JONES:   Slide 7.

7   BY MR. JONES:

8   Q    You see this document, sir?

9   A    I do.

10  Q    Dated March 4, 1981?

11  A    Yes.

12  Q    Can you -- and it's to a distribution list and it's about

13  Plant Inspection, Royston, Georgia, is that right?

14  A    That is.

15  Q    And what does it say about the plant?

16  A    It -- it talks about -- well, it says, "On February 23th,

17  24th, and 25th, the Royston, Georgia Baby Products plant was

18  inspected for compliance with the Good Manufacturing

19  Practices."  So this is basically an audit, an audit of, of the

20  Baby Products plant.

21             MR. JONES:   And we'll mark this as exhibit next in our

22  order, which would be?

23             UNIDENTIFIED SPEAKER:   87.

24             MR. JONES:   87.

25             Thank you, sir.

1          I'm going to ask Patrick to kick us right back to

2   Exhibit 2 for a moment, Paragraph 1, little Romanette (iv).

3   BY MR. JONES:

4   Q    And this, again, is in the transfer of the assets

5   paragraph.  Do you, do you see little Romanette (iv), Mr. Kim?

6   A    Yes.

7   Q    And, in fact, deals with such things as plants and where

8   they're located, does it not?

9   A    It does.

10  Q    What does it say there?

11  A    It says, "All real estate, improvements, and appurtenances

12  thereto shall be transferred to be the property of the

13  subsidiary."

14  Q    Effective when, sir?

15  A    Effective January 1, 1979.

16  Q    Thank you, Mr. Kim.

17       I'm going to change topics and talk just for a moment about

18  the Ingham verdict.

19       You were asked yesterday about the verdict form in that

20  case, is that right?

21  A    Yeah, that is true.

22  Q    And you were asked, more specifically, about punitive

23  damages, am I right?

24  A    Yes.  I was, I was directed to the punitive damages lines.

25  Q    What do you know about what each of the 22 plaintiffs in

1  the Ingham case received as a matter of compensatory damages?

2  A    They all received the same amount.

3  Q    And did that matter -- did exposure period, that is, when

4  in time they were exposed to or alleged to have been exposed to

5  talc, matter?

6  A    No.  So there are 22 plaintiffs in one case ranging in, in

7  exposure time periods and, and ranging in what products they

8  used at what periods of time, you know.  There was differences

9  in their injuries in terms of how severe they were.  We had --

10 some were, had been deceased.  Others were in remission.

11 Regardless of all that, they, they were all awarded the same

12 amount in compensatory damages.

13 Q    We're going to pull up a slide here, sir, and ask you to

14 look at it with me, which will be a summary of the plaintiffs'

15 fact sheets in, in that case.

16      MR. JONES:  That's going to be new Exhibit, Debtor's

17 Exhibit 80 --

18          UNIDENTIFIED SPEAKER:  8.

19          MR. JONES:  - 8.  88.

20          THE COURT:  88?

21          MR. JONES:  88.  That was either Carl Eller or Jim

22 Page.  It'll come back.

23 BY MR. JONES:

24 Q    Sir, the -- here we have different years of exposure -- I'm

25 sorry -- reflected that you just discussed --

1  A    Yeah.

2  Q    -- but the same compensatory award, is that right?

3  A    Yes.

4  Q    And these are listing the plaintiffs on the left-hand side?

5  A    They are.

6  Q    The alleged period of exposure in the second column?

7  A    Yes.

8  Q    Whether or not they were exposed to Shower to Shower in the

9  third column --

10 A    Yes.

11 Q    -- on the left?

12      And then the total compensatory award you referred to, is

13 that right?

14 A    That's true, yes.

15 Q    And those numbers are all the same?

16 A    They are all the same.

17           MR. SILVERSTEIN:  Your, your Honor?  I'm sorry.

18 Just --

19           THE COURT:  Yes, sir, Mr. Silverstein.

20           MR. SILVERSTEIN:  Can -- can we -- we've, we've never

21 seen this before.  Can we get some foundation for what this is

22 that we're all looking at?

23           THE COURT:  I'll take that as an objection.

24           Sustained.

25           MR. SILVERSTEIN:  Yes.

1          THE COURT:  Go ahead.

2    BY MR. JONES:

3    Q    Mr. Kim, can you tell the Court what this --

4    A    Yes.

5    Q    -- a summary of?

6    A    Yes.

7         So, so I attended the trial of Ingham.  All the -- one of

8    the things that, that plaintiffs' counsel did was they asked

9    every, every plaintiff what years of exposure they were exposed

10   to and what products they used.

11        So this is a just a summary of the alleged -- and it's also

12   in the complaint and fact sheets.  And so this is just a

13   summary of the data from those sources that tell us what the

14   alleged use was of, of Johnson's Baby Powder -- and so that

15   would be the entire usage -- what was the alleged use of Shower

16   to Shower and, and, and the dates.  And then the award is just

17   from the verdict sheet, how much each plaintiff was awarded.

18   Q    And, and, sir, the fact sheets are documents generated by

19   the plaintiffs in the case?

20   A    They are.

21   Q    And they've been all provided to counsel for, our

22   colleagues on the other side of the table here today.

23   A    I -- I --

24   Q    I'm not asking you that question.

25   A    Okay.

1    Q    I'm letting the Judge know that.

2         Sir, I'm, I'm going to highlight the first three lines.

3    Can you tell us the period of exposures there?

4    A    The period of exposure for Baby Powder was, for Andrea

5    Thomas Schwartz, '90, 1995 to 2014; for Marsha Owens, 1989 to

6    2014; and for Sheila Brooks, 1990 to 2014.

7         And for the Shower to Shower use, Andrea Thomas Schwartz

8    had no Shower to Shower use; Marsha Owens alleged from 1989 to

9    2014; and Ms. Brooks, from 1990 to 2014.

10   Q    And was the compensatory award -- which, which parties were

11   the compensatory awards entered against?

12   A    It was both Johnson & Johnson and, and Old JJCI.

13   Q    And in, in that total $25,000 [sic] figure for all?

14   A    Twenty-five million.

15   Q    And no distinction about --

16   A    No.

17   Q    -- period of use?

18   A    No, none.

19   Q    Sir, you, you testified on cross a little more about Shower

20   to Shower, that product, correct?

21   A    I did.

22   Q    You were asked about, some questions about the missing

23   agreement, or a missing agreement regarding that product, is

24   that right?

25   A    That is.

1   Q   At all times after 1978 were the liabilities for Shower to

2   Shower ultimately charged to a company's books at J&J?

3   A   They were.

4   Q   And to whose -- who -- which --

5   A   Personal --

6   Q   -- company?

7   A   They were charged to the Personal Products Company.

8   Q   And after that?

9   A   After that, it eventually comes into JJ, Old JJCI.

10  Q   Thank you, sir.

11      You were asked a few questions, as we have already

12  discussed, about the Imerys bankruptcy on cross-examination, do

13  you recall that?

14  A   I do.

15  Q   And I think you started to tell us that J&J attempted to

16  resolve those claims in that bankruptcy, am I right?  And is

17  that, can you tell me what, what the position was?

18  A   Yeah.

19      So early in, in the Imerys bankruptcy case the, Old JJCI

20  and J&J, we decided, we tried to remove all the cases into the

21  bankruptcy, into the Imerys bankruptcy and, and at that time

22  the plaintiffs objected to that and, and filed an objection,

23  which the court -- and, and the debtor did not join in with us.

24  And so at that point the, the bankruptcy court in that case

25  ruled that we, we were not permitted to bring in our, our cases

1  into the Imerys bankruptcy.

2  Q    So the claims have not been resolved there?

3  A    Oh, no.   No.

4  Q    And then can you explain for us -- you were shown some

5  pleadings in that case about a motion to lift the stay.

6       Can you explain for us J&J's and JJCI's position about

7  returning to the tort system then?

8  A    Yes.

9       So at that time the, the debtor was trying to have, get a

10  plan of reorganization passed.   The, the feature of that plan

11  was that there were TDPs that were created and basically, the

12  plan was that they would try to foist those liabilities onto

13  J&J through the indemnity agreement that they had.

14      So, so basically, what was going on is, you know, and there

15  were, we found that there were, through discovery, there were

16  agreements between the debtor and members of the TCC that,

17  basically, gave full authority to develop the TDPs to the TCC

18  and we thought that that was unfair in the bankruptcy system.

19  And so we wanted to take those cases out of the bankruptcy

20  system, the Imerys bankruptcy and we said we would litigate

21  those cases in the tort system, rather than be faced with this.

22  I think yesterday I meant collusion.

23      So, you know, what we considered an unfair process that was

24  being used in the Imerys bankruptcy.

25  Q    Sir, one more topic.

1    You were asked a series of questions by one of our

2    colleagues on the other side of the room about MDL proceedings

3    over which you had some supervisory responsibility in the past.

4    Do you recall those?

5    A    I do recall those.

6    Q    And a series of them, correct?

7    A    Yes, a series of MDLs.

8    Q    Could you explain for us the difference between efforts to

9    resolve those proceedings on your part and the talc litigation

10   pursued against Johnson & Johnson and Old JJCI here --

11   A    So I think, as I --

12   Q    Let me finish.  -- whether -- my fault, not yours.

13   -- whether an MDL proceeding or otherwise?

14   A    So I think, as I explained at my deposition, just probably

15   -- I have settled a number of MDL cases, or mass torts, in

16   general, and the mass torts that have been settled are,

17   generally, for, you know, the prescription drug products or for

18   medical devices that have a very short latency period, right?

19   So basically, you take a drug and you get -- you -- and you

20   have a side effect or if you have an implant, it fails within a

21   couple of years.  And so in, in those mass torts it's, it's

22   much easier to try to figure out what the total potential

23   liability would be and come up with a reasonable negotiation

24   on, on that mass tort.

25   In these cases, in the, in the talc cases, there is a

1    latency period of, of 60 years.  And so what the MDL process

2    doesn't give you is an ability to deal with future claimants,

3    where in the bankruptcy process, there, there is a way to try

4    to deal with, with future claimants.

5        So the, the resolutions in MDLs are, are, are very

6    different than the situation that we have, have in this case.

7    Q    Thank you, Mr. Kim.

8            MR. JONES:  I have no other, other questions at this

9    time, your Honor.

10           THE COURT:  Ready to go?

11           MR. SATTERLEY:  May it please the Court, Joe Satterley

12   for some creditors.

13                      RECROSS EXAMINATION

14   BY MR. SATTERLEY:

15   Q    Mr. Kim, I'm just going to have a few follow-ups and then

16   Mr. Block and maybe others will follow me.

17       I heard you say that there was potential liability and

18   everyone knew about it.  Is that, is that your testimony, in

19   the 1970s?

20   A    I think in the '70s there was an uproar and that people

21   understood that, yeah, that there could be, could be some

22   potential liability.

23   Q    Is there a memo that we can go to within J&J that says

24   everyone knew about potential liabilities for talc exposure?

25   A    Well, when I say "everyone," the, there were newspaper

1   articles written.  So anyone that read the news, there -- so

2   those are those articles.  I --

3   Q   I, I didn't ask about the newspaper articles, sir.  I asked

4   is there an internal memorandum -- and all due respect --

5   A   Yeah.

6   Q   -- is there an internal memorandum within J&J in 1970s that

7   says, "We have liability and everybody knows about it"?

8   A   Well, I don't know that I saw a document with, with those

9   words, but I do know the extent that -- of the -- "popularity"

10  is the wrong word -- but, you know, the, the extent of, of

11  media exposure on, on that issue was great.

12  Q   And I'm not asking about your, your reading of media, you

13  know, 50, 40, 50 years later.  I'm asking is there an internal

14  document, sir, from J&J that says there's talc liability and

15  everybody knows about it?

16  A   I don't believe so, but, but I think plaintiffs' counsel --

17  Q   That's -- I'll take your "I don't believe so."

18      So even though it's your testimony here today in 2021 that

19  in 1970s everybody knew about talc liabilities, nobody from J&J

20  took the time to put it down in books or records in 1979,

21  correct, or December 1, 1978?

22  A   There are tons of records about this issue.

23  Q   You have not presented to this Court or to me or any of

24  these lawyers a single document in a book or record allocated

25  under that December 1, 1978 contract, true?

1  A    I'm sorry.  Can you -- allocating?

2  Q    Sure.

3      That 1978 contract, December 1st, says, with regards to

4  liabilities "allocated in the books and records," true?

5  A    "Or records."  It says "books or records."

6  Q    True?

7  A    It says --

8  Q    "Books or records"?

9  A    "Or records," yes.

10  Q    And you have not presented a single document of anything

11  allocated in the books and records on December the 1st, 1978?

12  A    I think at the deposition I think I told you that there are

13  tons of documents about this in, in the records of, of J, J&J.

14  Q    Okay.  Did you bring any of those tons of documents here

15  that's, that specifically allocated?

16  A    Again, I don't, I don't know the term, what "allocate"

17  means.  There are, there are tons of records on J&J Baby

18  Products Company letterhead, which you've seen and used

19  yourself in numerous trials, that have this whole issue of --

20  of -- and frankly, and you've said that people at J&J knew that

21  there was asbestos in the product from, from the '70s.

22      So I would say that, yeah, there are lots of records about

23  this incident.

24  Q    Oh, I see what you're doing.  I understand now what you're

25  doing.  You're saying that documents --

1          MR. JONES:  Your Honor?

2          MR. SATTERLEY:  Excuse me.

3          MR. JONES:  I don't think we need to have an argument

4   with the witness.

5          MR. SATTERLEY:  I'm not arguing.

6          THE WITNESS:  Yeah.

7          THE COURT:  I think both sides are arguing at this

8   point.  I get the point.

9          Try to answer his question --

10          THE WITNESS:  Yes, sorry.

11          THE COURT:  -- first.  If you need to explain, ask me

12   and I'll tell you whether you can or not, okay?

13          THE WITNESS:  Okay.  Thank you, your Honor.

14   BY MR. SATTERLEY:

15   Q    Let me --

16          THE COURT:  Go ahead.

17          MR. SATTERLEY:  Yes, your Honor.

18   BY MR. SATTERLEY:

19   Q    Let me see if I can summarize it real briefly.

20      So what you're saying now is that because there's some

21   documents showing that J&J's potentially negligent in the '70s,

22   that that, you're interpreting that as being something that's

23   allocated on the books or records, true?

24   A    Essentially --

25   Q    Okay.  Okay.

1    A    -- I'm saying that, yes.

2    Q    All right.  Two more, two more little sections here.

3         You were asked about indemnifications that J&J and J&JCI

4    created in these letters for the last few years and put on this

5    summary spreadsheet.

6         Do you recall being asked a few questions about that?

7    A    Are you talking about the retailer?

8    Q    Yeah, the retailers.

9    A    Yes.

10   Q    And, and I think I asked you a couple weeks ago that if a

11   plan is confirmed, those contracts that are created by your

12   lawyers just in the last couple years, all that does is create

13   those retailers to have an unsecured claim just like my

14   clients, right?

15   A    That's what you said.

16   Q    And you agree with that.  You -- you --

17   A    I said, I think I said I, I don't know the, the

18   underpinnings of how that would work.  But there are agreements

19   that we have.

20   Q    The PowerPoint that had the 25 people from Ingham on it and

21   you went through the exposures and the allocation, you

22   understand that in state laws, many state laws, the allocation

23   of fault is based upon the conduct of the parties, true?

24   A    I would have to see what the, I guess, individual state law

25   was.

1    Q    You know that the allocation is not based upon the years of

2    exposure.  It's based upon the conduct of the various

3    independent parties that are named as defendants, correct?

4    A    Yeah.  I disagree with that.  I disagree that years of

5    exposure has nothing to do with that.

6    Q    Well, I didn't say it had nothing to do with it.

7    A    Oh, okay.

8    Q    But the jury instructions quite frequently in the state

9    cause, state causes of action is based upon the conduct of the

10   parties at fault, true?

11   A    The conduct related to conduct -- so, no.  I, I disagree

12   with that.  If I could explain?

13            THE COURT:  You may.

14            THE WITNESS:  So the, the conduct is always linked to

15   responsibility.  So conduct that's not tethered to use of the

16   product is irrelevant to that.

17            So I would disagree that it's just conduct.  It has to

18   be tethered to responsibility.

19   BY MR. SATTERLEY:

20   Q    And so if the instructions in the various states where I've

21   tried, eight or nine states where I've tried, allocation of

22   faults talk about the conduct of the party and it doesn't

23   specifically say the years of exposure.

24            My question to you, have you researched the, the law of

25   each state on allocation of fault?

1    A    No.  I, I have not researched the -- the -- each state's

2    allocation of fault, but I have attended the trials.

3    Q    You will agree that an unincorporated division, such as the

4    Baby Products Company was prior to 1978, an unincorporated

5    division doesn't have the legal capacity for independent

6    liability, true?

7    A    I agree.

8              MR. SATTERLEY:  I'm going to pass the witness.

9    BY MR. SATTERLEY:

10   Q    Thank you, Mr. Kim.

11             THE COURT:  All right.  Thank you.

12             MR. BLOCK:  Your Honor, I, I just have about five

13   minutes.

14             THE COURT:  All right.  Whenever --

15             MR. BLOCK:  Thank you very much.

16             Can you --

17             UNIDENTIFIED SPEAKER:  Yes.

18             MR. BLOCK:  Thank you.

19             Steve, use the screen.  Thank you.

20             THE COURT:  And this is Mr. Block, again --

21             UNIDENTIFIED SPEAKER:  Is it working?

22             THE COURT:  -- for the record.

23             MR. BLOCK:  Yes.  May it please the Court, Jerome

24   Block from Levy Konigsberg.

25                            RECROSS EXAMINATION

1  BY MR. BLOCK:

2  Q    Mr. Kim, we -- you showed some testimony from Dr. Hopkins

3  from the Olson case in your exam today, you remember that?

4  A    I do.

5  Q    Okay.  And you're not disputing that in another portion of

6  that trial Dr. Hopkins said that Johnson & Johnson did have the

7  authority to require warnings?  And you can see it right there

8  from May 3, 2019 at 7752 of the transcript, Lines 15.  Do you

9  see that?

10  A    I see the testimony, yes.

11  Q    Okay.  And you also know because you were monitoring the

12  case closely that the jury in the Olson case got to consider

13  all of Dr. Hopkins' testimony, right?

14  A    It, it did.

15  Q    Okay.  And you know from monitoring the Olson case that the

16  jury found both Johnson & Johnson and Johnson & Johnson

17  Consumer Inc. negligent and imposed punitive damages on both.

18  You know that, right?

19  A    I do.

20  Q    And you know that the jury in the Barden case involving

21  four mesothelioma plaintiffs found both Johnson & Johnson and

22  JJC, JJCI liable.  You know that, right?

23  A    I do.

24  Q    And you know that in the Leavitt case that was affirmed by

25  the intermediate appellate court in California that both

1  Johnson & Johnson and Johnson & Johnson Consumer Inc. were

2  found liable in that case as well.  You know that, right?

3  A    I do.

4  Q    And you know that in the _Prudencio_ case tried in August of

5  2021 that both Johnson & Johnson and Johnson & Johnson Consumer

6  Inc. were both found liable in that case.  You know that,

7  right?

8  A    I do.

9  Q    And you know that in the _Prudencio_ case that Mr. Satterley

10 tried the jury actually found Johnson & Johnson 85 percent

11 liable and Johnson & Johnson Consumer Inc. 15 percent liable.

12 You know that, right?

13 A    I do, but could I explain that one?

14         MR. BLOCK:  Your --

15         THE COURT:  On your counsel's time.

16         THE WITNESS:  Okay.

17 BY MR. BLOCK:

18 Q    All right.  And so let's talk about what, let's talk about

19 the Royston, Georgia facility that manufactured Johnson's Baby

20 Powder, okay?

21     So you still agree, sir, that Johnson & Johnson through its

22 Windsor Minerals subsidiary sold the talc used to make

23 Johnson's Baby Powder in Royston, Georgia.  You still agree

24 with that, right?

25 A    I, I do.

1   Q    Okay.  And looking at the slide you were shown by your own

2   lawyer this morning, Exhibit 50-A, and the portion shown by

3   your lawyer actually confirms that Johnson's Baby Powder was

4   manufactured in Royston, Georgia by the Johnson & Johnson Baby

5   Products Company using talc that J&J through its Windsor

6   Minerals subsidiary supplied, right, sir?

7   A    I do.

8   Q    And so, so you agree, sir, that Johnson & Johnson through

9   the Windsor Minerals subsidiary mined and sold the talc to

10  Johnson's Baby Products for the manufacture of Johnson's Baby

11  Powder and Shower to Shower in Royston, Georgia from

12  approximately the late 1960s through 1989?

13  A    So can I clarify what you mean?

14       THE COURT:  That was a yes/no.

15  BY MR. BLOCK:

16  Q    Do you --

17  A    So I would disagree with this, the way that you

18  characterized it.

19  Q    Okay.

20       THE COURT:  I'll take that as a no, then.

21  BY MR. BLOCK:

22  Q    Okay.

23  A    It's a no.

24  Q    Do, do you agree that Windsor talc was used at the Royston

25  facility to make Johnson's Baby Powder and Shower to Shower

1   from the late 1960s through 1989?

2   A   I -- that, I agree with.

3   Q   Okay.  Sir, where is the agreement that you claim

4   transferred any liabilities from Windsor Minerals talc

5   operations to the Johnson & Johnson Baby Products Company or

6   JJCI?  Where is the agreement?

7   A   The -- the -- the talc mining operations was not

8   transferred there.  They were transferred to, to what winds up

9   to be Imerys.

10  Q   Sir, where is, where is the agreement that you claim that

11  Johnson & Johnson's Baby Products Company accepted the

12  liabilities for the Windsor Minerals talc operation?  Do you

13  have that agreement?  Yes or no.

14  A   There is -- no.

15  Q   There's no agreement, right?

16  A   The -- the --

17          THE WITNESS:  Can I explain that answer?

18  BY MR. BLOCK:

19  Q   Sir, sir, simple question.

20      Do you, do you have an agreement signed by Johnson &

21  Johnson's Baby Products Company or JJCI's predecessor of any

22  kind where they signed it and they accepted liabilities for the

23  Windsor Minerals talc?  Yes or no.

24  A   For the Windsor Minerals talc or for the business?

25  Q   Sir, do you have a signed agreement by Johnson & Johnson's

1   Baby Products Company or JJCI where they signed the agreement

2   and they accepted specifically the liabilities for the Windsor

3   Minerals talc that was sold for use in Johnson's Baby Powder or

4   Shower to Shower?  Do you have the agreement or not?

5   A    At what period in time?

6   Q    Anytime before 1989.

7   A    Before '89, no.

8   Q    Okay.  And what we know happened in 1989, sir, is that

9   Johnson & Johnson was still the 100 percent owner of Windsor

10  Minerals, right?

11  A    It -- until it sold it, it was the sole shareholder, yeah.

12  Q    That's right.  And so we know that in 1989 Johnson &

13  Johnson was still the 100 percent owner of Windsor Minerals

14  talc business and that Johnson & Johnson was the one who sold

15  it to Cyprus Mines in 1989, right?

16  A    That's true.

17  Q    All right.

18      So, sir, you've talked a lot about -- you've -- you -- you

19  keep citing back to this 1979 Transfer Agreement, which is

20  Exhibit 34, and I just want to make clear with all the

21  questioning and answering you did on redirect.  You still have

22  not looked for the specific liabilities that were allocated on

23  the books or records of J&J as pertaining to its Baby division

24  as of December 1, 1978 when the 1979 Transfer Agreement was

25  signed.  You still have not looked for that, right?

1   A    I have not looked for that.

2           MR. BLOCK:  No further questions.

3           THE COURT:  Anyone else this side?

4           MR. SILVERSTEIN:  Yeah.  Your Honor, just very

5   briefly.

6           THE COURT:  All right, Mr. Silverstein.

7                        RECROSS EXAMINATION

8   BY MR. SILVERSTEIN:

9   Q   Mr. Kim, on redirect --

10          MS. CYGANOWSKI:  Say, say your name.

11  BY MR. SILVERSTEIN:

12  Q   -- you, you were asked questions about Imerys?

13  A   Yes.

14  Q   Right.  When, when Johnson & Johnson filed a motion to

15  withdraw, to lift the stay there was no proposed plan on file

16  at that time, correct?

17  A   Well, they were working on a plan, yes.

18  Q   But --

19  A   I agree.  There's no, there was no proposed plan.

20  Q   Okay.

21  A   I'd have to go back to the chronology of what, at what time

22  they actually proposed the, the plan.

23  Q   Right.  The -- there was -- the -- the plan that you found

24  objectionable hadn't even been on record at that time when

25  Johnson & Johnson filed the motion to lift the stay, correct?

1   A   I'm, I'm not sure if the plan was filed at that time, but

2   yeah.  There were discussions about the plan prior to that,

3   yeah.

4   Q   Okay.

5       Quickly, Mr. Kim.  You were asked, you were shown a, a

6   caption and some allegations from a, a case filed against

7   Johnson & Johnson, either McBride or Richards, after the

8   bankruptcy?

9   A   Yes.

10  Q   Okay.  That case is being handled on a day-to-day basis by

11  Andrew White?

12  A   Partially.

13  Q   Well, Andrew White is at Johnson & Johnson?

14  A   He is.

15  Q   And he has not been seconded to the debtor, correct?

16  A   That's correct.

17  Q   And Johnson & Johnson has access to every document it needs

18  to defend itself in that case, correct?

19  A   It would have access to documents, yes.

20  Q   Right.  And Johnson & Johnson has the financial resources

21  to defend itself in that case, correct?

22  A   If it -- yeah.  Yes, it does.

23  Q   Okay.  And one, one last, one last series of questions,

24  Mr. Kim, while we're on the cases filed post bankruptcy.

25      Since yesterday, has the Pratt bankruptcy notice been

1   withdrawn?

2   A    Is that the one in New York?

3   Q    It's in, in New Jersey.

4   A    In New Jersey.  It, it may have been.  I'm, I'm not sure

5   what the status right now it is.

6   Q    Did you direct Mr. Garde yesterday to withdraw that notice?

7   Yes or no.  I don't want to know your conversations with

8   Mr. Garde.

9   Q    Yeah.  Not personally.

10  Q    Okay.  Do you know whether it -- you don't know whether

11  it's been withdrawn?

12  A    I don't know right now at this, at 10:00 in the morning

13  whether it's been withdrawn.

14          MR. SILVERSTEIN:  No further questions.  Thank you.

15          THE COURT:  Anyone else this side?

16      (No response)

17          THE COURT:  All right.

18          Re-redirect?

19          MR. JONES:  Thank you, your Honor.  Jim Jones for the

20  debtor.

21                  FURTHER REDIRECT EXAMINATION

22  BY MR. JONES:

23  Q    Very quickly, Mr. Kim.  I apologize for keeping you on the

24  stand --

25  A    Yeah.

1   Q   -- even a moment longer.

2       You wanted to share something about, I think it was, the

3   Pruvencio or Prudencio case?

4   A   Prudencio case was the first time -- so, you know, at

5   closing argument out of the blue Mr. Satterley started an

6   argument in closing about how, that most of the liability

7   should be attributed to, to Johnson & Johnson and really,

8   without going into, you know, any basis.  But that's, you know,

9   that's how fluid these, these allocations are, you know.  It

10  changes from, from case to case, depending upon the argument of

11  counsel.  Sometimes there's no argument, just a, a statement

12  made to the jury about how, how much they should allocate, so.

13  Q   So -- and one other question, Mr. Kim.

14      Share with us and just to reinforce it for me what was

15  Johnson & Johnson's relationship to Windsor Minerals when it

16  owned it.

17  A   So, so Johnson & Johnson owned the shares.  So these

18  questions that, you know, did Johnson & Johnson through Windsor

19  Minerals, you know, do something or other suggests that Johnson

20  & Johnson was controlling Windsor Minerals.  Windsor Minerals

21  was its own corporation.  It, it was a subsidiary.  And again,

22  consistent with the decentralized strategy, you know, the, the

23  subsidiary made its own decisions.  It -- it -- it had its own

24  responsibilities and, and it was the one that was mining and,

25  and milling talc, not, not Johnson & Johnson.  Johnson &

1   Johnson just owned the shares of Windsor Minerals.

2            MR. JONES:  That's all I have, your Honor.

3            THE COURT:  Okay.

4            MR. SATTERLEY:  Your Honor, could I --

5            THE COURT:  Mr. Satterley?

6            MR. SATTERLEY:  -- go from here?

7            THE COURT:  Go ahead.

8            MR. SATTERLEY:  Joe Satterley once again for some

9   creditors.

10                      FURTHER RECROSS EXAMINATION

11  BY MR. SATTERLEY:

12  Q    You just gave testimony that I "out of the blue" for the

13  first time in Prudencio made some crazy argument, all right,

14  sort of, right?

15  A    I did not imply that --

16  Q    You said "out of the blue" --

17  A    -- it was a crazy argument.

18  Q    -- right?

19  A    I, I did say it was a surprise to us.

20  Q    Out of the blue.  All right.  But you know that's not true

21  because in Leavitt I made the same argument in 2019 and the

22  jury put 78 percent responsibility on J&J and 20 percent

23  responsibility on J, JJCI.  You know that, right?

24  A    I, I don't recall the, the, the Leavitt.  I do recall when,

25  when seeing the, the argument in Prudencio that it was a

1  surprise to me.

2  Q   And, and so you, you know what you just, the testimony you

3  just gave here today about "surprise" in Prudencio was not true

4  because I did it not only in Leavitt, in Schmitz.  In the

5  Schmitz trial, I made the same argument and the jury put 30

6  percent responsibility on Johnson & Johnson and 10 percent

7  responsibility on JJCI, true?

8  A   I'd have to go back to the record on that.

9  Q   So this testimony you just gave today about "out-of-the-

10 blue" argument is completely false.

11 A   No.  It was --

12 Q   It was made up?

13 A   I -- it was a surprise to me when this came up in

14 Prudencio.

15 Q   Okay.  The record will, the record will speak for what it

16 is.

17         MR. BLOCK:  Your Honor?

18         THE COURT:  Uh-huh (indicating an affirmative

19 response).

20         MR. BLOCK:  A few questions from here?

21         THE COURT:  Yes.

22         MR. BLOCK:  Okay.

23                     FURTHER RECROSS EXAMINATION

24 BY MR. BLOCK:

25 Q   Mr. Kim, when J&J owned Windsor Minerals you were not

1    employed by J&J, right?

2    A    I was not.

3    Q    Okay.  But you, you remember, and I showed it to you, that

4    Johnson & Johnson referred to Windsor Minerals as one of its

5    domestic operations in its own Annual Reports that I showed you

6    yesterday, correct?

7    A    Along with all the other domestic --

8    Q    Right.

9    A    -- other subsidiaries.

10   Q    "Domestic" means in the United States, right?

11   A    'Cause it's located in Vermont.

12   Q    "Operations" means part of Johnson & Johnson's operations

13   right there in the Annual Report, correct?

14   A    "Operations" -- when you look at the -- I'm sorry.

15            THE WITNESS:  Could I explain that answer, your Honor?

16            THE COURT:  Start with a yes or no.

17            THE WITNESS:  That's exactly what it says in the, in

18   the 10-K.

19            MR. BLOCK:  I have no further questions.

20            THE COURT:  All right.

21            You want to clean that up?

22                      FURTHER REDIRECT EXAMINATION

23   BY MR. JONES:

24   Q    If you have a, if you have a moment of explanation,

25   Mr. Kim, please quickly.

1   A    The, the list in the 10-K lists all subsidiaries.  The word

2   "operations" doesn't mean that Johnson & Johnson is operating

3   them.  It owns these subsidiaries that are doing the

4   operations.  That's, that's what the 10-K shows.

5            MR. JONES:  I have no further questions, your Honor.

6            THE COURT:  And for the court reporter, that was

7   first, Mr. Block, and then Mr. Jones speaking, so.

8            All right.  Anything else of this witness?

9        (No response)

10           THE COURT:  You may step down.

11           MR. SILVERSTEIN:  Not, not from the creditors, no.

12           THE WITNESS:  Thank you, your Honor.

13           THE COURT:  All right.  It's ten minutes after 10:00.

14  Do you need a moment or are we ready to move forward with

15  whatever evidence is to be presented next?

16           MR. SATTERLEY:  We're ready.  This is Joe Satterley

17  saying we're ready.

18           THE COURT:  Leave the exhibits up there.

19           Are we ready to go?

20        (No response)

21           THE COURT:  Okay.  Let's move on.

22           MR. HAMILTON:  Your Honor, Robert Hamilton of Jones

23  Day on behalf of debtor.  As my eyesight declines, I find it

24  easier to read the materials from an elevated podium.  So I'm

25  going to be here.

1          Before we call our next witness, your Honor --

2          THE COURT:  Okay.

3          MR. HAMILTON:  -- I would like to take a few moments

4   to respond to the allegations or suggestions of bad faith by

5   the debtor yesterday by Ms. Cyganowski with respect to --

6          MS. CYGANOWSKI:  By me?

7          MR. SATTERLEY:  Your Honor, I object to --

8          MR. SILVERSTEIN:  Your Honor, seems like --

9          MR. SATTERLEY:  I'm going to object.  It -- right in

10   the middle of evidence a closing argument or some, something.

11   We agreed to a procedure yesterday.

12          MR. HAMILTON:  Your Honor, I intend to introduce some

13   additional debtor's exhibits and, as an officer of the Court,

14   give you a, an explanation of what we have determined has

15   happened in the last 24 hours as a result of those allegations.

16          THE COURT:  Well, present the evidence first.  We'll

17   argue about it later, okay?

18          MR. HAMILTON:  I, I wasn't going to make any

19   arguments, your Honor, and I'm just going to present what, what

20   we have determined --

21          MR. SILVERSTEIN:  Your, your Honor, I --

22          MR. HAMILTON:  -- in that regard.

23          THE COURT:  Is that evidence?  I mean, are you going

24   to authenticate your own documents or --

25          MR. HAMILTON:  I am, as an officer of the Court --

1          THE COURT:  -- are you asking me for judicial notice,

2  or what?

3          MR. HAMILTON:  As, as an officer of the Court, I'm

4  proffering the information of what we have determined.

5  Questions were asked of Mr. Kim about what he had, did over the

6  interim.  We did not involve Mr. Kim because, as Ms. Cyganowski

7  requested, we weren't supposed to discuss with him his

8  testimony while he was still on the stand.

9          THE COURT:  Right.

10          MR. HAMILTON:  So we did, we undertook as counsel, as

11  officers of the Court, to deal, to find out what happened and

12  deal with it and I will offer it as a proffer as an officer of

13  the Court what we learned and what we did.

14          MR. SATTERLEY:  Your Honor, Joe Satterley on behalf of

15  some creditors.

16          We object to this fellow being a witness.  He wasn't

17  on the witness list.  I -- we don't know what these documents

18  are.  They haven't been disclosed.  We don't know if they're on

19  the exhibit list.  We would request the -- the -- we were told

20  the next witness after Mr. Kim would be Dr. Kuffner and then

21  after Dr. Kuffner, there'd be Dr. Mullin.  We're prepared to

22  cross-examine those witnesses right now and we think we should

23  proceed with that.

24          We -- I propose we meet and confer at the first break

25  to find out what the heck's going on with regards to this

1   situation.  Because I don't believe this attorney has been

2   listed as a witness.

3           THE COURT:  All right.  You read my mind on that one.

4           I think we ought to go ahead and start the next

5   witness.  Y'all take a, the break to talk about what's being

6   proposed here, then I'll get arguments about whether it should

7   be used later on, okay?

8           MR. HAMILTON:  Okay.

9           THE COURT:  All right.

10          MR. HAMILTON:  All right.  In that case, your Honor,

11  the debtors call Dr. Kuffner to the stand.

12          THE COURT:  All right.

13          EDWIN KUFFNER, DEBTOR/PLAINTIFF'S WITNESS, SWORN

14          THE COURT:  Whenever you're ready.

15                          DIRECT EXAMINATION

16  BY MR. HAMILTON:

17  Q   All right.  You ready, Mr. --

18  A   I'm ready.

19  Q   -- Dr. Kuffner?

20      Can you tell the Court what your name is, sir?

21  A   Dr. Edwin Kuffner.

22  Q   Dr. Kuffner, prior to October 12th, were you employed by

23  what the debtors have referred to as Old JJCI?

24  A   Yes.

25  Q   All right.  And what was your title at that time?

1   A    Chief Medical Officer.

2   Q    Of what?

3   A    Of the Consumer Sector.

4   Q    And after October 14th, did you become employed by what the

5   debtors have referred to as New JJCI?

6   A    Yes.

7   Q    And what is your title at New JJCI?

8   A    Chief Medical Officer for the Consumer Sector.

9   Q    Same job, same title, same office?

10  A    Yes.

11  Q    Okay.  Are you licensed to practice medicine, sir?

12  A    Yes.

13  Q    Where?

14  A    In both Pennsylvania and New York.

15  Q    Okay.  Where and when did you go to medical school?

16  A    I, I went to medical school in 1991.  I started in SUNY

17  Downstate in Brooklyn, one of the New York state medical

18  schools.

19  Q    Okay.  And where and when did you do your residency?

20  A    I did my residency at NYU Bellevue Hospital in New York.

21  Q    Did you finish that around 1995 or so?

22  A    I did.

23  Q    All right.  In the summer of '95 did you pack up your

24  belongings and move to Colorado?

25  A    I did.  I went to Colorado to do a fellowship in medical

1   toxicology at the Rocky Mountain Poison and Drug Center in the

2   University of Colorado.

3   Q   Okay.  And did you have any emergency medicine positions

4   while you were in Colorado?

5   A   Yes.

6      So while I was doing my fellowship in medical toxicology,

7   I, I worked at the City and County Hospital, Denver Health.

8   Thereafter, I was in, in Colorado for about ten years.  I

9   worked in a number of private emergency departments where I was

10   a, a director of one of them in a private group.  Taught at the

11   Poison Center and continued to work at the public hospital as

12   well.

13   Q   Did -- do you have any certifications with respect to your

14   emergency medicine work?

15   A   Yes.  I'm, I'm Board Certified in, in emergency medicine.

16   I'm also Board Certified in medical toxicology.  So I'll dual

17   Boarded.

18   Q   Okay.  And what toxicology positions did you have while you

19   were out in Colorado?

20   A   I was the Assistant Director of the Rocky Mountain Poison

21   and Drug Center.  I taught at the University.  I had an

22   academic appointment at the University.  I taught medical

23   students, I taught residents, and continued to do research at

24   the Poison Center as well.  I had a position at the Poison

25   Center.

1   Q   Okay.  When did you leave Colorado?

2   A   I left Colorado in 2006.

3   Q   Where did you go?

4   A   I went to go work for McNeil Consumer Healthcare at the

5   time.

6   Q   What is, what was McNeil Consumer Healthcare when you went

7   to go work for it?

8   A   It was, it was part of the Consumer Sector within Johnson &

9   Johnson.

10  Q   Okay.  And what did it -- what -- what did McNeil do at

11  that time?

12  A   McNeil at the time essentially manufactured over-the-

13  counter medicines, things like Tylenol and Motrin, Benadryl,

14  Sudafed.

15  Q   What was your position when you started in 2006 at McNeil?

16  A   I was Senior Director of Medical Affairs responsible for

17  Tylenol.

18  Q   Did McNeil eventually become part of, of what we call JJCI,

19  or Johnson & Johnson Consumer Inc.?

20  A   Yes.

21  Q   So you said your current position is Chief Medical Officer

22  of, of Johnson & Johnson Consumer Sector, is that right?

23  A   Correct.

24  Q   Okay.  What is the Consumer Sector that you refer to?

25  A   The Consumer Sector is the sector that has responsibility

1   for the consumer products.  And so whether it's over-the-

2   counter products, cosmetic products, that's compared to the

3   Pharmaceutical Sector and the Device Sector.

4   Q   Okay.  So I was going to ask.  Are there -- what, what are

5   the other sectors?

6   A   The other sectors would, would be the Pharmaceutical Sector

7   and the, the Device Sector.  I'm the Chief Medical Officer for

8   the Consumer Sector.

9   Q   Have you ever heard the phrase used at Johnson & Johnson

10   the phrase Johnson & Johnson Family of Consumer Companies, or

11   JF, JJFCC?

12   A   Yes.

13   Q   What is that?

14   A   That, that's essentially the, another way to say it would

15   be the, the Consumer Sector, JJCI.  It's different companies

16   that make up and market the, and have authority for, the

17   products within the Consumer Sector.

18   Q   All right.  Are all the operating subsidiary companies of

19   Johnson & Johnson, both domestic and international, that

20   manufacture consumer products in the Consumer Sector?

21   A   Yes.

22   Q   Okay.  And they are all part of the Johnson & Johnson

23   Family of  Consumer Companies?

24   A   Yes.

25   Q   Okay.

1       Now you're employed, or up until October 14th, you were

2   employed by Old JJCI, is that correct?

3   A    Correct.

4   Q    But you were also the Chief Medical Officer for all of the

5   operating subsidiary companies that were in the Commercial

6   [sic] Sector, not just JJCI, is that right?

7   A    Correct.

8   Q    Okay.

9       When did you become the Chief Medical Officer for the

10  Consumer Sector?

11  A    I believe that was in June of 2017.

12  Q    Okay.  Can you tell the Court what your responsibilities

13  are as the Chief Medical Officer of the Consumer Sector?

14  A    I'm essentially the -- I lead the Safety Team and

15  essentially, we have a group of doctors and nurses and, and

16  pharmacists who are responsible for the safety of all of the

17  products with, within the Consumer Sector.

18      So it's our job to make sure that we're putting the

19  interests of patients and consumers first and making sure that

20  they're as safe as possible with, with our products.

21  Q    As the Chief Medical Officer of the Consumer Sector, do you

22  have the ultimate decision-making authority for all safety

23  issues regarding products made and sold by companies in the

24  Consumer Sector?

25  A    Absolutely.

1    Q    What is the Medical Safety Council for the Consumer Sector?

2    A    So we have a Consumer Medical Safety Council.  It's the

3    highest safety body within the Consumer Sector.  I chair the,

4    the Medical Safety Council.  It's a group of people from

5    different functions led by Safety led by me, but you'll have

6    people from Quality or Medical Affairs or Regulatory and we

7    bring in other people within the company depending upon what

8    the topic of discussion would be.

9    Q    If a safety issue for a consumer product has escalated to

10   the Medical Safety Council for the Consumer Sector and there's

11   no consensus on the Council as to what to do about it, how is

12   it resolved?

13   A    I make the decision.  Because at the end of the day, I have

14   ultimate responsibility for the safety of the products within

15   the Consumer Sector.  That lies with me.

16   Q    Okay.  Do the other sectors have their own Medical Safety

17   Councils?

18   A    Absolutely.  And they have Chief Medical Officers in the

19   other sectors who have the same level of responsibility for the

20   products within their sector.

21   Q    Is there a Chief Medical Officer for Johnson & Johnson, the

22   parent holding company?

23   A    Yes.

24   Q    Who is that?

25   A    That's Dr. Joanne Waldstreicher.

1   Q    Is there a Medical Safety Council for the parent holding

2   council --

3   A    Yes.

4   Q    -- holding company?  Excuse me.

5   A    Yes.

6   Q    And do you know who's on that Council?

7   A    So Dr. Waldstreicher is the Chair of, of that Council and

8   the Chief Medical Officers of all the sectors sit on that

9   Council as well.

10  Q    Do you have occasions, sir, as the Chief Medical Officer of

11  the Consumer Sector to consult with and seek advice from the

12  Chief Medical Officer and the Medical Safety Council for the,

13  for J&J parent corporation?

14  A    Yes.

15  Q    Do you notify the Chief Medical Officer for the parent

16  company and the Medical Safety Council for the parent company

17  of decisions that you make regarding safety issues with respect

18  to products made and sold by the Consumer Sector?

19  A    Yes.

20       MR. HAMILTON:  Patrick, can you bring up on the screen

21  Debtor's Exhibit 81?

22  BY MR. HAMILTON:

23  Q    You have on your screen, Dr. Kuffner, Debtor's Exhibit 81.

24  A    I see it.

25  Q    Can you tell the Court what this is?

1   A    This is the medical safety standard that was put in effect

2   officially in January 1st of 2014.

3   Q    Who issued this medical, this medical safety standard?

4   A    It, it was issued by the, the parent company, Johnson &

5   Johnson, and a number of people.  It's -- in the back you can

6   see who signed it.

7   Q    Okay.  And if I could ask you, sir, to focus your

8   attention.

9            MR. HAMILTON:  And, and, Patrick, if you could

10  highlight the, the first sentence of Section 1.0 in the

11  Overview.

12  BY MR. HAMILTON:

13  Q    Sir, it says, "Each sector within Johnson & Johnson,

14  notably, the Pharmaceutical Sector, the Consumer Sector, and

15  the Medical Devices and Diagnostic Sector, shall establish

16  policies and processes that adhere to the Johnson & Johnson

17  medical safety standard."

18       Do you see that, sir?

19  A    I do.

20  Q    Have you done that for the Consumer Sector?

21  A    Absolutely.  We have processes and procedures in place.

22  Q    Okay.  In Section 2.0, the second sentence --

23           MR. HAMILTON:  And, Patrick, if you could highlight

24  the second and third sentence.

25  BY MR. HAMILTON:

1   Q   -- it says, "In the spirit of our credo, the Johnson &

2   Johnson medical safety standard has been established to define

3   the requirements for medical safety governance at Johnson &

4   Johnson that must be met throughout the organization.  Each

5   sector and individual operating companies shall be responsible

6   for bringing their processes and capabilities into alignment

7   with the requirements expressed herein."

8        Do you see that, sir?

9   A   I do.

10  Q   Have you made sure that the Consumer Sector and the

11  individual operating companies within the Consumer, Consumer

12  Sectors have brought their processes and capabilities into

13  alignment with the requirements expressed in this document?

14  A   Absolutely.

15           MR. HAMILTON:  And if we can turn, then, to the next

16  page, Patrick, and if you could highlight the paragraph under

17  the heading Sectors at the top.  Yes.

18  BY MR. HAMILTON:

19  Q   The second sentence, Dr. Kuffner, says, "For the purposes

20  of the standard, the term 'Sector' may include the operating

21  companies which are responsible for identifying the needs of

22  patients, consumers, and health care professionals and

23  developing products to meet those needs."

24       The next sentence says, "Responsibilities and requirements

25  assigned to the Sector by this standard may be met through the

KUFFNER - DIRECT                                                        376

1   activities performed at the operating company level as

2   determined by the Sector Medical Safety Council."

3       Do you see that, Dr. Kuffner?

4   A   I do.

5   Q   And has, have you and the, the Medical Safety Council for

6   the Consumer Sector met, met the responsibilities that are

7   referred to in this paragraph?

8   A   Absolutely.

9   Q   All right.

10      I want to direct your attention to the Definitions on, in

11  Section 4.0, starting on this page, and, in particular, the

12  second one, there's a definition of the "Chief Medical Officer,

13  Johnson & Johnson."

14      Do you see that, sir?

15  A   I do.

16  Q   And that was the individual you just identified a few

17  moments ago.  That was who?

18  A   Dr. Joanne Waldstreicher.

19  Q   Okay.  And if we go down a little farther we see there's a

20  definition of a "Johnson & Johnson Medical Safety Council."

21      Do you see that, sir?

22  A   I do.

23  Q   And is that what you described earlier as the Council

24  that's at the parent holding company?

25  A   It is.

1    Q    Okay.

2         And if we turn the page, we go to the definition of "Sector

3    Medical Safety Council," and it says, "Highest medical safety

4    decision-making body within a sector."

5         Do you see that, sir?

6    A    I do.

7    Q    And is that, with respect to the Consumer Sector, is that

8    the Medical Safety Council for Consumer that you chair?

9    A    Yes.

10   Q    And then we have below that a definition of "Most Senior

11   Safety Leader for Sector."  Do you see that, sir?

12   A    I do.

13   Q    And that's you?

14   A    Absolutely.

15   Q    For the Consumer Sector?

16   A    It is.

17   Q    Okay.

18        And if we turn to the next page at the end of the -- on the

19   bottom of that page we go to 5.0, Standard Implementation

20   Responsibilities.

21        MR. HAMILTON:  And we go to Page 4, Patrick.  If you

22   could highlight the, at the top the paragraph that has the

23   heading The Most Senior Safety Leaders for Each Sector.

24        And it says, Dr. Kuffner, for each, "The most senior safety

25   leaders for each Sector in concert with the other members of

1   the Sector Medical Safety Councils shall be responsible for

2   overseeing the implementation of and adherence to the safety

3   standard within their respective Sectors, including relevant

4   standards and standard operating procedures," and it goes on.

5        Do you see that, sir?

6   A    I do.

7   Q    And have you overseen the implementation and herence, and

8   adherence to the safety standard within the Commercial Sector?

9   A    I have within the Consumer Sector, yes.

10  Q    Consumer Sector.  Excuse me.  Yes.

11  A    Absolutely.

12  Q    All right.

13       Section 6.0 in this is the Standard Requirements.  This

14  reflects the requirements of this safety standard issued by the

15  parent holding company, is that right?

16  A    It does.

17  Q    All right.  I want to direct your attention to Section 6.3,

18  which is several pages in on Page 7.

19           MR. HAMILTON:  Patrick, if you could go to Page 7 and

20  highlight the entire Section 6.3.1, including the subsections.

21  BY MR. HAMILTON:

22  Q    Dr. Kuffner, the, 6.3.1 at the top says that, "A body

23  called the Medical Safety Council shall be established within

24  each Sector and shall have cross-functional representation,

25  including, but not limited to, representatives from the Quality

1    organization.  Medical Safety Council shall have the following

2    accountabilities."

3         Do you see that, sir?

4    A    I do.

5    Q    And then it lists six accountabilities, right?

6    A    Yes.

7    Q    All right.  And the, the first one (a) says, "Where legal

8    and regulatory requirements permit, act as decision-making body

9    for medical safety issues that have been escalated from an SMT

10   to the Medical Safety Council."

11        Do you see that, sir?

12   A    I do.

13   Q    Does the Medical Safety Council for Consumer that you chair

14   act as the decision-making body for medical safety issues for

15   the products issued by companies within the Consumer Sector?

16   A    Yes.

17   Q    Okay.

18        Subpoint, or subsection (b) says it "oversees compliance

19   with the safety standard."  Does your Medical Safety Council

20   oversee compliance with the safety standard?

21   A    Yes.

22   Q    And then (c) says, "Establish and implement medical safety

23   policies and guidelines within the Sectors."

24        Has your Medical Safety Council done that?

25   A    Yes.

1   Q   All right.  I want to focus now on the next three

2   subsections, Dr. Kuffner.

3       (d) says that the Medical Safety Council shall "seek advice

4   from the JJMSC as necessary."

5       Do you see that, sir?

6   A   Yes.

7   Q   And the JJMSC is the Johnson & Johnson Medical Safety

8   Council at the parent holding company level, right?

9   A   Yes.

10  Q   Okay.

11      And then (e) says, "Provide timely notifications to the

12  JJMSC and CMO, J&J regarding all product decisions rendered."

13      Do you see that, sir?

14  A   Yes.

15  Q   And do you, in fact, as chairing the Medical Safety Council

16  for the Commercial Sector provide timely notifications to the

17  parent Medial Safety Commission [sic] and to the Chief Medical

18  Officer of the parent?

19  A   Yes.

20  Q   And then (f) says the Medical Safety Council for the Sector

21  shall "maintain documentation of decisions rendered, for

22  example, meeting minutes, and make documentation accessible to

23  regulators and internal stakeholders as needed."

24      Do you see that, sir?

25  A   Yes.

1   Q   And as Chairman of your Safety Council do you make the

2   documentations of decisions, including minutes, meeting

3   minutes, available to internal stakeholders as needed?

4   A   Yes.

5             MR. HAMILTON:  If I could ask you to turn to 6,

6   Section 6.6 of this document, which is on Page 10, Patrick.

7   And if you could highlight Sections 6.6.2 and 6.6.3.

8   BY MR. HAMILTON:

9   Q   Dr. Kuffner, Section -- this is -- 6.6 is labeled

10  Notification of Safety Signals and Section 6.6.2, the second

11  sentence says, "The most Senior Safety Leaders for each Sector

12  shall notify the CMO, JJ of urgent or serious safety issues for

13  products under their oversight."

14      Do you see that, sir?

15  A   I do.

16  Q   And Section 6.6.3 says, "The JJMSC and CMO, JJ shall be

17  notified of decisions rendered in the Sector Medical Safety

18  Councils and shall be provided meeting minutes in a timely

19  manner."

20      Do you see that, sir?

21  A   Yes.

22  Q   Is there any provision in this document that authorizes or

23  empowers the Chief Medical Officer of the parent holding

24  company or the Medical Safety Commission of the parent holding

25  company to veto, overrule, or change a product decision

 1   rendered by a Sector's Chief Medical Officer or Medical Safety

 2   Council?

 3   A    No.  At the end of the day, I have ultimate authority

 4   within the Consumer Sector as the Chief Medical Officer.  And

 5   that's what I do.

 6   Q    Is the, is the Chief Medical Officer of each sector the

 7   person with the ultimate responsibility and decision-making

 8   authority to make the final decision with respect to a safety

 9   issue regarding a product made or sold by a company within that

10   sector?

11   A    Yes.

12   Q    As the Chief Medical Officer of the Consumer Sector, are

13   you responsible for making all final decisions with respect to

14   any safety issue regarding talc-based products manufactured and

15   sold by companies within the Consumer Sector?

16   A    Yes.

17   Q    Are you familiar with something called a Draft Screening

18   Assessment by Health Canada issued in December of 2018?

19   A    I am.

20   Q    Can you describe for the Court what that is?

21   A    So Health, Health Canada, essentially, did an assessment of

22   talc, talc-based products and essentially at the end of their

23   assessment they came to the conclusion that, potentially, there

24   was a risk of ovarian cancer, potentially inhalational risks

25   from the use of talc-based products.  That's something that I

1   became aware of, their draft assessment report, in December of

2   2018.

3   Q   What did you do when you became aware of it?

4   A   Well, I've been the, the Chief Medical Officer for a number

5   of years.  I had been involved with some, reviewing some of the

6   talc-based literature, but at that point I said under my watch

7   as the Chief Medical Officer I wanted a full assessment of talc

8   safety.

9       And so at that point I commissioned a team within the

10  Consumer Sector to do a comprehensive review of the safety of

11  talc and I wanted that done under my watch as the Chief Medical

12  Officer.  I understood that assessments were done in the past,

13  but I wanted an independent review at that time under my

14  leadership.

15  Q   And when you say "independent review," sir, what do you

16  mean by the word "independent"?

17  A   I, I brought different people from inside the company

18  together.  We, we used some outside experts as well, but I said

19  to that group, "I want a review.  I don't care what people have

20  concluded in the past.  I want a review of the science and I

21  want it to be comprehensive and I want it to be documented."

22  Q   As a result of the review that you commissioned, did you,

23  sir, make a decision as to whether or not there is a safety

24  issue with respect to the baby products, Baby Powder products

25  sold by Old JJCI?

1          MR. BLOCK:  Your Honor, I object.  On Page 152, Line

2    20 of Dr. Kuffner's deposition going on to Page 153, Line 2,

3    Mr. Hamilton said, "I'll state for the record that he,"

4    Dr. Kuffner, "is appearing as a fact witness.  We are not

5    calling Dr. Kuffner as an expert witness."

6          If he gives an expert opinion about the safety of

7    talc, that's going to lead into a whole lot of other stuff and

8    we weren't prepared to cross-examine an expert.  He's supposed

9    to be here as a fact witness.  We asked about it at the

10   deposition.  That's what they said.

11         MR. TISI:  Yeah.

12         And, your Honor, I would just add on behalf of the PSC

13   he was designated primarily to testify to his role during the

14   period of time that he was Chief Medical Officer for J&J and he

15   was, he was Chief Medical Officer of J&J has been established

16   yet, but from 2017 to the present.

17         MR. BLOCK:  JJCI.

18         MR. TISI:  JJCI.

19         MR. BLOCK:  He was never Chief --

20         THE COURT:  Mr. Hamilton, you want to --

21         MR. SATTERLEY:  That's Mr. Tisi for the court

22   reporter.

23         THE COURT:  Thank you.

24         MR. SATTERLEY:  I'm just trying to help the court

25   reporter out.

1           MR. TISI:  Yes.

2           THE COURT:  Thank you.

3           MR. TISI:  Mr. Tisi, yes, your Honor.

4           MR. BLOCK:  Your Honor, I, I need to correct --

5           MR. TISI:  I'll correct it, sir.

6           MR. BLOCK:  Please correct it.

7           MR. TISI:  Yeah.  For JJCI and not Johnson & Johnson,

8    the parent corporation.

9           THE COURT:  Mr. Hamilton, you want to respond?

10          MR. HAMILTON:  I do, your Honor.

11          The, the issue here is not the merits of what his

12   decision was.  The issue is he made the decision, not the

13   parent.  I'm not offering it as to the merits of whatever

14   decision he made.  The only issue is who makes the decision.

15   Mr. Kim was cross-examined extensively on that.  They brought

16   in testimony from Dr. Hopkins about this issue.  I'm asking him

17   who made the decision.  First, I asked him, "Did you make it?"

18   I'm, I'm entitled to ask that.

19          THE COURT:  Okay.

20          Everyone understand that, that we're talking about who

21   made the decision, not the truth of the decision?

22          MR. BLOCK:  Correct.

23          THE COURT:  Okay.

24          MR. TISI:  That's fine.

25          THE COURT:  All right.  Go ahead.

1          I'll overrule the objection on that basis.

2          Let's keep it limited, though, as much as we can in

3    the interest of time.

4          MR. HAMILTON:  We're almost done, your Honor.

5          THE COURT:  If we're going to try to prove whether

6    baby products are safe, we will be here for the rest of the

7    year.

8          MR. HAMILTON:  I agree, your Honor.  We are not going

9    to do that and I would object to any effort to turn this

10   thing --

11         THE COURT:  All right.

12         MR. HAMILTON:  -- into that.

13         THE COURT:  All right.  Go ahead.

14         MR. HAMILTON:  All right.

15   BY MR. HAMILTON:

16   Q   Dr. Kuffner, based on the independent comprehensive review

17   that you commissioned, as a result of that review did you make

18   the decision as to whether there is a safety issue with respect

19   to the Baby Powder products sold by JJCI?

20   A   Yes.  I made the decision.

21   Q   What was your decision?  Is there a safety issue or not?

22   A   No.

23   Q   Okay.  Did you seek authority or permission from anyone at

24   the parent holding company to make that decision?

25   A   No.  It's, it's my decision as the Chief Medical Officer

1    for the Consumer Sector.

2    Q    Does anyone at the parent holding company, whether it's the

3    Chief Medical Officer of the parent holding company, the

4    Medical Safety Council of the parent holding company, or the

5    board of directors of the parent holding company, have

6    authority to veto or overrule your decision as to the safety of

7    the Baby Powder produced by JJCI?

8    A    Absolutely not.  That decision lies with me as the Chief

9    Medical Officer for Consumer Sector.

10             MR. HAMILTON:  Patrick, can you bring up Debtor's

11   Exhibit 28 on the screen and go to the bottom of Page 53 of the

12   transcript?  And if you could blow that up.

13   BY MR. HAMILTON:

14   Q    Dr. Kuffner, you were in the courtroom yesterday when

15   Mr. Kim was shown this interchange or this, this portion of the

16   transcript of Dr. Hopkins' trial testimony in the Hayes case

17   back on July 30th of 20, I think it was, 18 or '19.  I'm not

18   sure which.

19        Were you in the courtroom then?

20   A    Yes.

21   Q    All right.  Do you see his answer there, starting on Line

22   19?  It says, "We're getting into semantics of what you mean by

23   'parent company.'  The decisions on the safety of talc were

24   made by the individual operating companies, which would be, in

25   this case, Consumer Products, which is a separate company

1  within, as you call it, the 'mothership,' the parent company."

2      Do you see that answer, sir?

3  A   I do.

4  Q   Is that answer that he gave in that trial consistent with

5  your understanding and knowledge of how safety decisions have

6  been made regarding the products made and sold by the Consumer

7  Sector since you started at Johnson & Johnson Family of

8  Companies in 2006?

9  A   Absolutely.  The decisions are made within the sector.

10          MR. HAMILTON:  I have no further questions, your

11  Honor.

12          THE COURT:  All right.

13          Why don't we take our recess at this point.  Are you

14  ready?  You --

15          MS. CYGANOWSKI:  Yes, yes we are, your Honor.

16          Just for the record I wanted to introduce Mr., Mr.

17  Christopher Tisi.  He is with the firm of, the Levin -- and I'm

18  sorry.  I'm going to mispronounce an Italian name.  That's what

19  happens when you're of Polish lineage, so.  And my name is

20  always screwed up -- Papa, Papantonio.  He's a member of The

21  Plaintiffs' Steering Committee.  He has been admitted *pro hac*

22  and, perhaps more importantly, he was the, one of the gentlemen

23  who deposed Dr. Kuffner over the weekend.

24          THE COURT:  Okay, very good.

25          MR. TISI:  Thank you, your Honor.  It's nice to be

1   before you.  Yeah.

2              THE COURT:  How about we take a ten-minute recess and

3   then we will pick up with the cross-examination, all right?

4        (Recess from 10:39 a.m., until 10:56 a.m.)

5                           AFTER RECESS

6              THE COURT:  All right.  The witness will return to the

7   stand.

8        EDWIN KUFFNER, DEBTOR/PLAINTIFF'S WITNESS, ON THE STAND

9              THE COURT:  Ready to proceed?

10             All right.

11             MR. TISI:  Good afternoon, your Honor.  Chris Tisi for

12   the debtors.

13             THE COURT:  Okay.

14                         CROSS-EXAMINATION

15   BY MR. TISI:

16   Q   Dr. Kuffner, you comfortable?

17   A   Yes.  Thank you.

18   Q   Okay.  Nice to see you again.

19       You recall I took your deposition last Saturday?

20   A   Yes.

21   Q   Okay.  And you were in the courtroom over the past, over

22   the past day.  So you've heard much of the testimony, true?

23   A   Yes.

24   Q   Okay.  And having watched the testimony and the argument

25   yesterday, you understand that, generally, one of the questions

1    this Court has to decide is what role J&J, the corporate

2    entity, had with respect to the safety of products in the

3    Consumer division, including, including talcum powder products?

4    A    I understand that, yes.

5    Q    Okay.  And you understand that your lawyers represented

6    that you, as the CMO for Old JJCI since 2017, would give your

7    point of view as your role as Chief Medical Officer for JJC,

8    Old JJCI, correct?

9    A    Correct.  Not just my point of view, but I have ultimate

10   decision-making authority when it comes to safety issues.

11   Q    I understand and your, and your testimony was that the buck

12   stops at your desk, correct?

13   A    Correct.  When it comes to --

14   Q    It doesn't go any -- does --

15   A    When it comes to safety issues, yes.

16   Q    Doesn't go anyplace else?

17   A    It stops with me.

18   Q    Okay.  And you said that repeatedly last Saturday and

19   that's your testimony today?

20   A    Correct.

21   Q    Okay.  And now you've told us that what Old JJCI did and

22   what you, in particular, did, but I'd like to talk a little bit

23   about J&J, the parent company, which is the issue that the

24   Court is -- is -- is interested in today, okay?

25   A    Okay.

1  Q   All right.  Before I do that, though, sir, I'd like to back

2  up and talk a little bit about your responsibility within JJI

3  [sic] and what your role is and where you fit in the hierarchy,

4  if, if that's okay with you.

5  A   Sure.

6  Q   Okay.  The Court has been told that Johnson & Johnson Baby

7  Powder was sold in the U.S. for almost 130 years, from 1890

8  through 2019 when it was withdrawn from the, from the market,

9  true?

10 A   Yes.

11 Q   Okay.  And you were Old JJCI's Medical Officer in charge of

12 the safety for talc for two years, at the very tail end of that

13 time --

14 A   Correct.

15 Q   -- from mid, from mid-2017 until mid-2019, correct?

16 A   Correct.

17 Q   All right.  And so prior to becoming CMO in 2017 I think

18 your testimony was on Saturday that you may have had some

19 discussions about talc in your medical roles previous to that,

20 but your responsibility for safety really didn't begin until

21 2017 directly?

22 A   When, when I became the Chief Medical Officer, correct, for

23 talc.

24 Q   All right.  Now there were some questions over the past

25 couple of, past day about the science about talc and I don't

1   really want to ask you about the science 'cause that's for

2   another day and another time.

3        But you did mention the Health Canada issue.  That was when

4   -- that Health Canada Draft Assessment came out in December of

5   2018, correct?

6   A    Correct.

7   Q    Okay.  And that was, as, again, as I understand your

8   testimony, you started in mid-2017, but 2000, late 2018 was

9   when you really became focused on the issue of, of talc safety

10  as a primary, as an important, really important issue?

11  A    It's -- it's -- safety is always an important issue and

12  talc was always an important issue and there were people on my

13  team who were managing and responsible for talc, just like

14  there, there are today.  But in 2018, in December when I read

15  that Draft Assessment report, that's when I said, you know, as

16  the Chief Medical Officer, I want a full review under my watch

17  as the Chief Medical Officer.  I knew that reviews were done

18  previously and that's why I commissioned that comprehensive

19  review.

20  Q    Right.  So you became laser focused on the issue in 2019,

21  about the same time that the drug, the product was removed from

22  the market, true?

23  A    We, we started our, our review in Jan, January of 2019,

24  around, around that time frame.  I don't believe the, the

25  product was removed from the market for commercial reasons or

1  discontinued for -- I shouldn't say -- it wasn't removed from

2  the market.  It was discontinued and I don't, I don't believe

3  that decision was until sometime in, in 2020.

4  Q   Okay.  And you testified -- and, and just to be clear, the

5  Canadian -- Health Canada is the Canadian version of the Food &

6  Drug Administration in the United States, true?

7  A   Health Canada is, yes.

8  Q   Right.  And they concluded in their draft report in

9  December of 2019 that there was a likely, in their view looking

10  at the evidence, a likely causal relationship between talc and

11  ovarian cancer, true?

12  A   True.  And that was different from the FDA and many other

13  health authorities around the world and other organizations.

14        MR. TISI:  Move to strike.

15        THE COURT:  Overruled.

16  BY MR. TISI:

17  Q   In, in December -- in that report -- I'm sorry.

18      As a result of that report, you commissioned this what

19  you've called a deep dive into the science and you commissioned

20  this report, correct?

21  A   A comprehensive review, yes.

22  Q   Okay.  And the comprehensive review was done.  It's about

23  255 pages?

24  A   About that, yes.

25  Q   Right.  And you submitted it to Health Canada, true?

1    A    Yes.

2    Q    Okay.

3    A    I, I didn't submit it.  It, it was submitted to Health

4    Canada.  I, I knew that they had it.

5    Q    Okay.  And you are aware, sir, that Health Canada

6    considered your, your point of view -- and I don't want to,

7    again, debate the issue, but just so there's a complete record

8    on this -- Health Canada considered the position of Johnson &

9    Johnson and concluded that talc was a likely cause of ovarian

10   cancer?

11        MR. HAMILTON:  Your Honor, I'm going to object at this

12   point.  I thought we weren't going to get into the merits of

13   this.

14        MR. TISI:  I just want the record to be clear as to

15   what actually happened on his watch, your Honor.  I'm not going

16   to ask him any further questions about, about the basis or

17   anything like that.  I just want there to be an understanding

18   that as we sit here today Health Canada rejected their

19   position.

20        MR. HAMILTON:  I don't --

21        THE COURT:  You got a problem with that part?

22        MR. HAMILTON:  No, your Honor.

23        THE COURT:  Again, we're not talking about whether

24   it's right or not.  It's just whether it happened.

25        MR. TISI:  Correct.

 1            THE COURT:  Okay.

 2            MR. HAMILTON:  It -- we're just opening the door, your

 3   Honor.  Because there's going to be other bodies involved and

 4   have the other determination.

 5            So the issue is between the parent and the sub, not

 6   what Health Canada or the United States FDA have concluded, or

 7   not concluded.

 8            MR. TISI:  He, he raised it in his direct and I think

 9   it's important that you, that the Court --

10            THE COURT:  I ruled in your favor.  You keep arguing,

11   we, we can.

12            MR. TISI:  Thank you.  I have been, I have been

13   sometimes accused of trying to oversell my car.  So that's

14   okay.

15   BY MR. TISI:

16   Q   So Health Canada disagreed and, and concluded that talc was

17   a likely cause of ovarian cancer, true?

18   A   They, they disagreed.

19   Q   Okay.  Now --

20            MR. TISI:  And, and just for the record, your Honor,

21   that's Exhibit 174 in -- in -- that's been provided to you.

22            THE COURT:  Uh-huh (indicating an affirmative

23   response).

24   BY MR. TISI:

25   Q   Okay.  So let's turn to the issues that, that I think were

1   the focus of your testimony this morning.

2       We gave the Court a brief timeline of what happened during

3   your tenure, the Health Canada report.

4       By the way, let me ask you.  You also understand that Chief

5   Judge Wolfson in the District of New Jersey also concluded that

6   there was sufficient evidence to go to the jury on the question

7   of whether or not talc causes ovarian cancer --

8               MR. HAMILTON:  Your --

9   BY MR. TISI:

10  Q    -- during your tenure?

11              MR. HAMILTON:  Your Honor?

12              THE COURT:  Sustained.

13              MR. TISI:  Okay.

14  BY MR. TISI:

15  Q    Now we have given the Court a brief timeline of what

16  happened in your tenure.  Let's get back to discussing the

17  primary reason why we're here.

18      Your boss between 2017 and 2019 is someone who we've heard

19  about, Joanne Waldstreicher, correct?

20  A    Correct.

21  Q    Okay.  And, and she works for Johnson & Johnson, the

22  parent, true?

23  A    She is the Chief Medical Officer for J&J, the, the parent.

24  I'm not sure in terms of who signs her paycheck and what her

25  contract says now.

1   Q   And unlike you, she's an employee of, of that, or she's

2   designated as an employee of the parent, true?

3   A   She, she's the Chief Medical Officer for all of J&J.  As I

4   said, I don't know who signs her paycheck, what her contract

5   says.

6   Q   And she still works for, in that position, correct?

7   A   She's still the Chief Medical Officer for Johnson &

8   Johnson.

9   Q   And she's not here in the courtroom today to tell us what

10  the role of J&J was, is she?

11  A   She's not here today.

12  Q   Okay.  And can you think of any reason why she hasn't come

13  down to tell the Court about what the role of J&J is with

14  respect to the safety of consumer products?

15          MR. HAMILTON:  Your Honor, I'm going to object to --

16  how would he know?

17          THE COURT:  Well, it sounds like an argument.

18          And if you know the answer to the question to the

19  question, do you?

20          THE WITNESS:  I -- I -- I don't know.  I was asked to

21  come here and came.

22  BY MR. TISI:

23  Q   Okay.

24          THE COURT:  Okay.

25  BY MR. TISI:

1   Q   Well, the truth is --

2           THE COURT:  Go ahead.

3           MR. TISI:  I'm sorry, your Honor.

4           THE COURT:  I said go ahead.

5   BY MR. TISI:

6   Q   The truth is that separate from the JJCI Consumer Medical

7   Safety Committee that you testified on direct for Old JJCI,

8   there is a separate Medical Safety Council at the corporate

9   level, true?

10  A   Correct.

11  Q   Okay.  And these are two separate things.  There's the,

12  there's the Safety Council that you're Chair of and then

13  there's the Safety Council that Dr. Waldstreicher is the Chair

14  of, true?

15  A   Correct.

16  Q   And you are a member of the Safe, Safety Council that

17  Dr. Waldstreicher is the Chair of, true?

18  A   Yes.

19  Q   Okay.  And also on that Committee are, are the CMOs for

20  Medical Devices, true?

21  A   Yes.

22  Q   And the CMO for, for, for Pharmaceuticals, true?

23  A   Yes.

24  Q   And together, the four of you make, make up the core

25  membership of the J&J Medical Safety Committee?

1   A    Yes.

2   Q    Okay.  And -- all right.

3        So let's talk for a moment about the process for dealing

4   with safety issues at, separate from JJCI.  Because you covered

5   that with, with your lawyer.  I want to talk to you about what

6   goes on above your head, okay?  All right.

7        Now yesterday -- I'm going to show you what has been

8   marked, or at least referred to as Exhibit, Debtor's Exhibit

9   No. 164.

10            MR. HAMILTON:  I don't think so.  Do you mean

11  defendants?

12            MR. TISI:  I'm sorry.  Debtor's Exhibit No. 164.

13            THE COURT:  Okay.

14            MR. SATTERLEY:  He means defendant.

15            MS. CYGANOWSKI:  Claimant.  Defendant.

16            MR. SILVERSTEIN:  It would be defendants.

17            MR. BLOCK:  Claimants.

18            MR. TISI:  Claimants.

19            MS. CYGANOWSKI:  You said debtor's.

20            MR. TISI:  Oh, I'm sorry.  I apologize.

21            THE COURT:  Okay.  Claimants' 164.

22  BY MR. TISI:

23  Q    All right.  Are you familiar -- you weren't asked about

24  this CMO on your direct examination, were you?

25  A    No.

1    Q    Okay.  This is a CMO -- excuse me -- this is a, a policy

2    and procedure of Johnson & Johnson, the corporate entity, true?

3    A    That's what it says, yes.

4    Q    Okay.  And it's entitled Johnson & Johnson Medical Safety

5    Council, do you see that?

6    A    Yes.

7    Q    Okay.  And this is dated 2015, but I think Mr. Block asked

8    Dr. Kim, Mr. Kim yesterday whether or not this preceded 2015.

9        Do you remember that testimony?

10   A    I don't remember the specific dates, no.

11   Q    But there was -- this Council existed when you came on as

12   Chief Medical Officer for Old JJCI in 2017, true?

13   A    It did.

14   Q    Okay.  Now the description of this document, there's a

15   description here in the very top and it says, it describes how

16   the Johnson & Johnson Medical Safety Council is constituted,

17   how it operates, and how it relates to other key medical safety

18   and other governance bodies within each sector, do you see

19   that?

20   A    Yes.

21   Q    All right.  And so what this describes is what is the role

22   of the J&J Medical Safety Council and a relationship to what

23   you have already testified is the, is what happens at the

24   sector level, right?

25   A    Yes.

1   Q   Okay.  It says, going farther down, it says, "The purpose

2   of this Committee" -- it says, "Across the Enterprise, the J&J

3   Medical Safety Council is the highest body of J&J," "of Johnson

4   & Johnson engaged in setting the standards for medical safety."

5       Did I read that right?

6   A   Yes.

7   Q   Is that true?

8   A   It is.

9   Q   Okay.  And it comprises two parts, "setting medical safety

10  standards to protect the safety of patients, consumers, and

11  users of products marketed by Johnson & Johnson companies,"

12  correct?

13  A   It does.

14  Q   And the second part is "providing review and consultation

15  on matters of medical safety at the Enterprise level," correct?

16  A   Correct.

17  Q   Okay.  And so what they're saying here is they also review

18  safety issues that happen at the level, in your case, of

19  Consumer, true?

20  A   They -- they -- they would review matters that were

21  elevated up to them.  They do not review all, all matters.

22  Q   Well, we'll talk about that.  Because, because I think

23  there's a section of this, this policies and procedures that

24  deals with that question.

25      But this not only deals with standards across the entity,

1  but also medical issues and safety issues that may arise with

2  different products within the different sectors, true?

3  A    That -- that -- that were elevated to the, the J&J Medical

4  Safety Council.

5  Q    Okay.  And it says here the purpose of the, of this

6  Committee is to conduct the following activities.  And I'm

7  going to focus on No. 4.  It says, "Provide a forum for

8  discussions and consultation among the leaders of the Sector

9  Medical Safety Councils on medical safety matters that may be

10  escalated to the Sector level, including those arising from

11  quality GMP issues with potential to have impact on medical

12  safety products."

13     Is that true?

14  A    Yes.

15  Q    (Reading):

16     "Additionally, the JJMC may receive notifications from

17  Sector Safety Councils requesting medical safety decisions

18  rendered in those bodies."

19     Do you see that?

20  A    It's, it's "Medical Safety Council regarding medical safety

21  decisions rendered in those bodies."

22  Q    All right.

23     Now the next page talks about the scope of the JJMC.  This

24  is the Johnson & Johnson Medical Safety Council.  It says, "The

25  scope includes all product medical safety matters, including

1  those medical safety matters originating through the quality

2  GMP investigation process."

3      Do you see that?

4  A   I do.

5  Q   All right.  And so they, their jurisdiction, if we can use

6  a legal term, includes matters that -- that -- that occur at

7  the Sector level, true?

8  A   The decisions are made within the Sector and if a, if it's

9  discussed at the Sector Medical Safety Council, then those,

10 those decisions at the Sector Medical Safety Council will be,

11 once the decision is made, it will be raised to the J&J Medical

12 Safety Council for their awareness.

13 Q   Right.  Okay.

14     Well, it's not only for their awareness.  They, they

15 actually review some of the decisions, true?

16 A   It's -- it's -- it's for their awareness.  The decision has

17 already been made.

18 Q   Okay.

19 A   And then it, it will be elevated to them.  The decisions at

20 the Medical, at the Sector Medical Safety Councils.

21 Q   Sure.  A decision has been made at the Medical Safety

22 Council for the Sector, but it can be elevated to the Medical

23 Safety Council for J&J, true?

24 A   So all, all decisions that have been made at the -- the --

25 the Sector Medical Safety Councils will be made, made aware to

1   the J&J Medical Safety Council.

2   Q   Okay.  We'll talk about that in a moment.

3       And the core members, as we talked about before, were the

4   four people that we talked about, Dr. Waldstreicher as Chair

5   and then the three Sector heads across the Enterprise, correct?

6   A   The Chief Medical Officers for the, the, the operating

7   companies, the Sectors.

8           MR. TISI:  Let's go to the next page, if we could.  I

9   see two pages after this.

10  BY MR. TISI:

11  Q   Section 2, it talks about the review of Sector activities,

12  do you see that?

13  A   I do.

14  Q   So it says, "Through the Sector level representations of

15  the J&JMC, the JJMSC will review medical safety activities at

16  the Sector level and operating company level assuring the

17  medical safety activities are in accordance with Enterprise

18  standards and policies."

19      Do you see that?

20  A   I do.

21  Q   Okay.  So they will review decisions made at the Sector

22  level to make sure that they are in accord with the overall

23  safety standards of the company, true?

24  A   Yes.

25  Q   Procedures.

 1          THE COURT:  Mr. Tisi, we need to get you closer to a

 2   mike.  We're not picking you up clearly.

 3          MR. TISI:  I am sorry.

 4          THE COURT:  There you go.

 5          MR. TISI:  I am sorry.

 6          THE COURT:  No.  I'm glad to see you using the

 7   projection equipment.  We had that for years and no one did

 8   anything with it, so.

 9          MR. TISI:  Your Honor, anybody over, anybody over 50

10   can't deal with this stuff and, and ask questions at the same

11   time.

12          MR. SATTERLEY:  Mr. Satterley here for other

13   creditors.  There's a zoom button there, also --

14          MR. BLOCK:  Yeah.

15          MR. TISI:  Oh.

16          MR. SATTERLEY:  -- if you want to zoom in.

17          MR. TISI:  I appreciate that.  Thank you very much.

18          Okay.  That's much better.  Thank you.  All right.

19   BY MR. TISI:

20   Q   Now it says, it says here, "The procedure to request

21   consideration of a policy, standard, or oversight matter by

22   this J&J Medical Safety Council is as follows," and it lists

23   three ways in which an issue can get escalated to the Safety

24   Council, correct?

25   A   Yeah.  If you could just pull it up a little bit.  I can

1    see the first two on the screen.

2    Q    First two?

3    A    You said three ways.  It looks like there's --

4    Q    And it goes on to the next page.

5    A    Right, yeah.

6    Q    I'll show you.

7         (Pause)

8    BY MR. TISI:

9    Q    Okay?

10   A    Uh-huh (indicating an affirmative response).

11   Q    So this --

12   A    Yes.

13   Q    -- this document gives three ways in which an issue can,

14   can be escalated to the J&J Medical Safety Issue, Medical

15   Safety Committee, correct?

16   A    Yes.

17   Q    All right.  And, and I'm just summarizing.  It can either

18   be brought --

19            UNIDENTIFIED SPEAKER:  I'm sorry.  Can you --

20            MR. TISI:  I'm sorry.

21            UNIDENTIFIED SPEAKER:  (Inaudible.)

22            MR. TISI:  I apologize.

23   BY MR. TISI:

24   Q    It can either brought, be brought there by you or by

25   another member of the Sector, correct?

1    A    Correct.

2    Q    Okay.  Another member of the Sector for whom the issue

3    might impact can raise a question, true?

4    A    True.

5    Q    And the Medical Safety Offer [sic], Dr. Waldstreicher in

6    this case, can ask that it be raised, true?

7    A    I, I imagine she could ask that it be raised as well, yes.

8    Q    Well, let's read it together, okay?  (Reading):

9         "The decision of the JJMSC whether or not to review

10   individual requests will be made by the Chief Medical Officer

11   with input from the Sector of the, the Sector CMO," true?

12   A    True.

13   Q    But it then says, "Additionally, the Chief Medical Officer

14   for Johnson & Johnson may request review of any policy,

15   standard, or oversight matter at any time," true?

16   A    True.

17   Q    So she can on her own say, you know, "We understand that

18   there's a talc issue involved.  I'd like to see it on my desk."

19   She has the ability to do that, according to the CMO, this

20   policy and procedure?

21   A    Yes.

22   Q    Okay.

23        Then it says, Developing Recommendations.  It says, "The

24   JJMSC develops recommendations by consensus of the core

25   members," right?

KUFFNER - CROSS                                                          408

1    A    That's what it says.

2    Q    Okay.  And so if a safety issue is escalated, you all try

3    to, to reach consensus about what needs to be done at the

4    Johnson & Johnson corporate level, true?

5    A    That's what it says, yes.

6    Q    All right.  Then it says, "If the Committee fails to reach

7    consensus, the Chief Medical Officer for Johnson & Johnson will

8    make the final recommendation in consultation with the Chief

9    Medical Officer," "Chief Scientific Officer at Johnson &

10   Johnson and other senior medical leaders," true?

11   A    True.

12   Q    Okay.  So according to this Johnson & Johnson policy and

13   procedure, this Johnson & Johnson Committee, Safety Committee

14   has four primary members.  They try to reach -- the, the

15   Chairperson has the ability to bring a matter to the Committee

16   and she has the ability to say, "I know you all agree on a, on

17   a plan of action, but I as the Johnson & Johnson Chief Medical

18   Officer, there's no consensus.  What I say is the final

19   determination," true?

20   A    She has the ability to do that, yes.

21   Q    Okay.  And so the buck really doesn't stop at your desk,

22   does it?  In the end of the day, this Committee and, in

23   particular, Dr. Waldstreicher, can reach out to an important

24   safety issue, bring it to the attention of the Council, and

25   overrule of you?

1  A   The, the buck stops with me when it comes to, to, to safety

2  decisions with, within the Sector and Dr. Waldstreicher has

3  made that clear to myself, to the CMO of Pharmaceuticals and

4  the CMO of Devices.  And that is how it operates.

5  Q   Right.  But within this Johnson & Johnson policy, she has

6  the ability, the power to bring the, bring the issue to Johnson

7  & Johnson and say, "My decision and the, the decision of my

8  office is the rule," true?

9  A   If -- if -- if an issue is brought to the J, the J&J

10 Medical Safety Council and it was not consensus, she can make

11 decision.

12 Q   All right.  Now let's, let's go one step farther.

13     Do you know that at, from time to time Johnson & Johnson

14 releases public statements either in, in the form of press

15 releases or, in some cases, videotapes of its employees and

16 senior medical people on important issues?

17 A   I'm aware of that, yes.

18 Q   Okay.  And do you know that Dr. Waldstreicher has been

19 asked to prepare a video that was, that was broadcast to the

20 public about her role and what her role really is with respect

21 to the safety of, of products within the different Sectors?

22 A   I, I understand that at some point she might have made a

23 video.  I don't under, don't have knowledge of discussions

24 that, you know, you're talking about, who asked her or how that

25 was done.

1    Q    But you do understand that she actually made a video that

2    was, that was released to the public, to medical people, to

3    doctors, to everybody?

4    A    I do understand that.

5    Q    All right.  And I have a, we have that video here where she

6    talks about her role and the role of her office.  And she is

7    your boss, true?

8    A    She's my boss, yes.

9    Q    Right.

10            MR. TISI:  And I'd like to play that, your Honor, so

11   you can see it.  It's about two minutes.  And I, I have

12   prepared for your Honor -- and it is my -- it is Exhibit No. --

13            What exhibit is it, Cole?

14            MR. HAYES:  It's 160.

15            MR. TISI:  160.

16            THE COURT:  Okay.

17            MR. TISI:  And I prepared a transcript of it from my

18   office.  It's not an official transcript, but at least you can

19   follow it, if you don't mind?

20            THE COURT:  Show them, first.

21            MR. TISI:  May I approach, your Honor?

22            THE COURT:  You may.

23            MR. HAMILTON:  Well, your Honor, mine isn't

24   highlighted.  If you're getting a highlighted version, I want

25   to see what he's highlighted.

1          MR. TISI:  He's not getting a highlighted.

2          MR. HAMILTON:  Okay.

3          THE COURT:  I do get an exhibit stamp, though.  Perks

4   of being the Judge.

5      (Document handed to the Court)

6   BY MR. TISI:

7   Q   First of all, is this Dr. Waldstreicher?

8   A   Yes.

9   Q   Okay.

10         MR. TISI:  Would you start playing it, please, Cole?

11     (Video played of Dr. Waldstreicher, as follows):

12         -- "Waldstreicher, Chief Medical Officer at Johnson &

13         Johnson.

14         At Johnson & Johnson, the safety of the patients and

15         consumers we serve every day is our highest priority.

16         As a demonstration of this commitment, the Company

17         established the Office of the Chief Medical Officer,

18         or OCMO in 2013.  The OCMO is a global team

19         encompassing all safety colleagues from across all

20         sectors of Johnson & Johnson.  Functionally

21         independent from commercial interests, we focus

22         entirely on the safety of all products of the Johnson

23         & Johnson Family of Companies.  We assess and evaluate

24         questions through scientific medical excellence,

25         bioethics, and values-driven decision making.

1            Empowered with the ability to make decisions that are

2            solely based on safety and scientific considerations,

3            the OCMO's impact includes changes to development

4            programs, labeling updates, warnings, and, when

5            necessary, product withdrawals."

6   BY MR. TISI:

7   Q   I just want to stop it here for a, for a moment and ask you

8   a couple questions about that.

9   A   Sure.

10  Q   First of all, she says very clearly, when she talks about

11  the OCMO, she's talking about the Office of Chief Medical

12  Officer.  She's talking about herself?

13          MR. HAMILTON:  Your Honor, I'm, I'm going to object.

14  If he's going to play the video, he should play the entire

15  video.

16          MR. TISI:  I'm, I'm, I'm happy to do that.  I want to

17  stop and ask a question about what she just said, but I'm going

18  to --

19          THE COURT:  I think he's using the exhibit to question

20  the witness.  So that's appropriate.

21          Overruled.

22          MR. HAMILTON:  Okay.  Thank you.

23  BY MR. TISI:

24  Q   First of all, she identifies herself as the Office of Chief

25  Medical Officer established in 2013, correct?

1   A    Correct.

2   Q    All right.  And she says quite clearly -- I'm going to

3   quote her -- "The Office of Chief Medical Officer's impact,"

4   she's talking about her impact, correct?

5   A    The Office's impact.

6   Q    Okay.  At the Johnson & Johnson corporate level, true?

7   A    She's talking about the Office of the Chief Medical

8   Officer's impact.

9   Q    Okay.  And including "changes in programs, labeling

10  updates, warnings, and, when necessary, product withdrawals,"

11  correct?

12  A    Correct.

13  Q    Okay.  And -- all right.

14          MR. TISI:  You may finish it, please.

15      (Video played of Dr. Waldstreicher, as follows):

16          -- " the safety of our products requires

17          collaboration.  Understanding the basis for questions,

18          fears, and concerns is critical.  We don't have all

19          the answers, but we make it our job to find them.  We

20          work collaboratively with key stakeholders, internally

21          and externally, to identify the best possible

22          solutions.  We seek to learn from the past so we can

23          improve on it.  When questions are raised regarding

24          the safety of our products, members of the OCMO team

25          are dedicated to understanding the concerns.  We look

1          at the data, we share our own clinical trial data

2          transparently, and we work together until we are

3          completely confident that we're doing everything in

4          our power to enhance the safety of our products.

5          Johnson & Johnson's Office of the Chief Medical

6          Officer was founded on a mission to break new ground

7          and compassion, just as we break new ground in

8          technology through innovation.  We're guided by

9          science and data in our efforts to enhance the safety

10          of everyone we touch every day.

11          Thank you."

12   BY MR. TISI:

13   Q   Okay.  And she's talking about the Office, and I use the

14   quote, "Johnson & Johnson Office of Chief Medical Officer,"

15   correct?

16   A   That's what she, that's what she's talking about,

17   absolutely.

18   Q   Okay.  And she's also talking about the process established

19   in Exhibit No. 164, the Medical Safety Council, in which she

20   has the ability to reach out on a decision made at the Consumer

21   level and make -- and -- and -- and make the ultimate decision

22   on questions of safety, true?

23   A   That's incorrect.

24   Q   Okay.  The document says, says that they have the ability

25   to do that and she -- she can -- she, if there's not agreement,

 1 | she can overrule the members of the Committee, true?

 2 |         MR. HAMILTON:  Your Honor, I object.  If he's going to

 3 | ask a question about what the document says, he should put the

 4 | document in front of the witness.

 5 |         MR. TISI:  I'm happy to put the document.  Do you have

 6 | a copy?

 7 |         THE COURT:  Please do.

 8 |         MR. TISI:  I'll give him my copy.

 9 |         May I approach, your Honor?

10 |         THE COURT:  You may.

11 | BY MR. TISI:

12 | Q    I have a copy for you to use.  (Counsel hands document to

13 | the witness.)

14 | A    Great, thank you.

15 | Q    Yep.

16 |      On Page 5 of the document under the section Developing

17 | Recommendations, it says, "The JJMSC develops recommendations

18 | by consensus of the core members.  If the JJMSC fails to reach

19 | consensus, the Chief Medical Officer, Johnson & Johnson, will

20 | make the final recommendation in consultation with the Chief

21 | Scientific Officer, Johnson & Johnson, and other senior

22 | leaders," true?

23 | A    That's what it says.

24 | Q    Okay.

25 |      Dr. Kuffner, you do not dispute anything that

1    Dr. Waldstreicher just said in that video, do you?

2    A    No, I absolutely agree with it.

3    Q    Okay.  All right.  Let me just go to one last thing before

4    I turn, turn the questioning over to my colleagues.

5         Last Saturday when we spoke, we talked about what you can

6    and cannot testify to from firsthand knowledge, do you remember

7    those questions?

8    A    I do remember that.

9    Q    Okay.  And just to refresh the record here on this, you

10   began as Chief Medical Officer in 2017, true?

11   A    Correct.

12   Q    But the issue of talc safety and, in particular, talc and

13   ovarian cancer, was an issue that, that preceded your tenure as

14   Chief Medical Officer by decades, true?

15   A    Correct.

16   Q    And you would agree for at least a half century before you

17   became CMO for Old JJCI in 2017 there were questions raised in

18   the medical and scientific community about the safety of talcum

19   powder, true?

20   A    Yes.

21   Q    Okay.  And there really were, primarily, two issues we've

22   talked about over the past couple days, whether or not talc

23   used by women and whatever is in that bottle, including

24   asbestos, can cause ovarian cancer, true?

25   A    That's one of the allegations, yes.

1  Q    And the other one was whether or not talc was contaminated

2  with asbestos and caused mesothelioma, true?

3  A    That's another allegation, yes.

4  Q    And both of these diseases are typically fatal, true?

5  A    Both of them are typically fatal, yes.

6  Q    And Johnson & Johnson's Baby Powder is a, is a product that

7  is a, that is a cosmetic, true?  It's not a medicine.  It's not

8  a medical device, true?

9  A    It's a cosmetic in the U.S.

10  Q    All right.  And when I deposed you on Saturday I asked you

11  a series of questions concerning the relative roles of Johnson

12  & Johnson Consumer Inc. and Johnson & Johnson, the parent, with

13  relationship to events that happened before you became CMO.  Do

14  you remember those questions?

15  A    I do.

16  Q    Okay.  And in the interest of time I'm not going to re-ask

17  all of them, but as a general matter you know that the first

18  epidemiology study linking talc and ovarian cancer occurred in

19  1970 -- in 1982, correct?

20  A    I believe that was the Kramer article.

21  Q    Correct.  And at that time when that article, first

22  epidemiology study was published in 1982 linking talc and

23  ovarian cancer, you were still in high school, right?

24  A    Correct.

25  Q    Okay.  And so you could not provide this Court with any

1   understanding whatsoever about the relative roles of Johnson &

2   Johnson and Johnson & Johnson Consumer Inc. with relationship

3   to the reaction of, of these two entities to that article,

4   true?

5   A    True.

6   Q    Okay.  And would you agree, again summarizing, between 1982

7   and 2017 when you became Chief Medical Officer there were

8   multiple epidemiology studies of different types, designs, and

9   by different researchers in different countries addressing that

10  question?

11  A    There have been.

12  Q    Okay.  And as a general matter, it was not your job to, it

13  was not your job to deal with those issues from a safety

14  perspective, true?

15  A    Not until 2017.

16  Q    And so you cannot tell this Court one way or the other

17  whether the relative roles of J&J and JJCI played in addressing

18  those questions, true?

19  A    Not prior to -- the specific safety questions when I became

20  Chief Medical Officer in 2017.

21  Q    Okay.

22         MR. TISI:  I don't have any other questions.  Thank

23  you very much.

24         THE COURT:  All right.

25         MR. BLOCK:  Let me switch.

1        THE COURT:  I'm sure the parties are aware on this

2   side you're running low on your time at this juncture.

3        MR. SATTERLEY:  Chris, does he still have 164 up

4   there?

5        MR. TISI:  Yes, he does.

6        MR. SATTERLEY:  Thanks.

7        Your Honor, we appreciate your guidance in that and

8   we're going to work hard to drive through this thing --

9        THE COURT:  Okay.

10       MR. SATTERLEY:  -- get it accomplished.

11     (Exhibit binder handed to the witness)

12       THE WITNESS:  Thank you.

13       THE COURT:  And for the court reporter's benefit, that

14   was Mr. Satterley speaking.

15       MR. BLOCK:  And, and, your Honor, may it please the

16   Court, Jerome Block from Levy Konigsberg.  I'm mindful of the

17   time as well.

18       THE COURT:  Uh-huh (indicating an affirmative

19   response).

20       MR. BLOCK:  And Mr. Tisi and I are, are here

21   representing different groups of, of claimants.  We agreed to

22   split up the time.  I hope to be less time --

23       THE COURT:  Okay.

24       MR. BLOCK:  -- than Mr. Tisi and hopefully, we can get

25   through this as quickly as possible.

1        MR. SATTERLEY:  And I'm going to forego any questions

2   of this witness in the interest of time.

3        THE COURT:  Okay, very good.

4        MR. BLOCK:  Thank you, Mr. Satterley.

5                        CROSS-EXAMINATION

6   BY MR. BLOCK:

7   Q   Dr. Kuffner, I've handed you a binder and I will be showing

8   you some documents on the screen and if you could focus on the

9   documents on the screen.  If you feel like you need to go to

10  the binder, please do.  I'll be focusing my questions on the

11  documents on the screen or, or the testimony.

12       So just to be clear, sir, you understand you're here

13  testifying as a fact witness, correct?

14  A   Correct.

15  Q   And you understand that in courts of law fact witnesses

16  testify as to matters of their personal knowledge?

17  A   If, if that's the legal definition, then  -- I'm, I'm not a

18  lawyer.

19  Q   Okay.  And you, Dr. Kuffner, have no personal knowledge as

20  to any interaction between J&J and JJCI prior to the time you

21  became employed by JJCI.  That's true, isn't it, sir?

22  A   That's correct.

23  Q   And that would be 2017, right, sir?

24  A   No.  I -- I -- I became -- I was employed in 2006.

25  Q   Well, sir, you have to admit, you would have to admit that

1  you had absolutely no responsibility for talc-based products

2  prior to 2013.  Do you admit it?

3  A    Prior to 2013, yes.

4  Q    You have no personal knowledge, sir, of any issues relating

5  to talc-based products prior to 2013 because that wasn't your

6  responsibility, correct?

7  A    It wasn't, correct.

8  Q    And, sir, the Court has heard a lot about Dr. Hopkins and

9  Mr. Kim shed some light on Dr. Hopkins' background yesterday.

10       And, sir, do you generally understand that Dr. Hopkins is a

11  toxicologist who was employed by the Johnson & Johnson

12  companies in the 1970s, 1980s, and 1990s?

13  A    I, I don't know his exact employment history, but it says

14  here that he was a toxicologist.  My, my understanding is that

15  he was involved over a number of decades, but I don't know the

16  exact dates.

17  Q    In fact, in preparation for giving the testimony you've

18  given today you have not even spoken to or met Dr. Hopkins in

19  your entire life, right?

20  A    Correct.

21  Q    In preparation for giving this sworn testimony to this

22  Court, sir, you didn't even bother to read any of Dr. Hopkins'

23  sworn deposition testimony or any of his sworn trial testimony.

24  That's true, isn't it, sir?

25  A    That's true.

1  Q   And, sir, when your, when your deposition was taken in this

2  case you didn't even know that Dr. Hopkins had testified as a

3  corporate representative both for Johnson & Johnson and JJCI,

4  the company you currently work for, isn't that correct?

5  A   That's correct.

6  Q   And, sir, I put up Dr. Hopkins' trial testimony where

7  Dr. Hopkins says, that, "The company in New Jersey is the

8  parent company.  For all the global companies, made those

9  decisions, yes."  From the Barden case, July 22, 2019.

10      Do you see where Dr. Hopkins testified that it was Johnson

11 & Johnson, the parent company, that made all health and safety

12 policy decisions with regard to asbestos and talc products, do

13 you see that testimony?

14 A   I see that.  I was also in the courtroom when other

15 testimony was presented where it contradicts this statement.

16 Q   Sir, do you see that testimony I have on the screen?  Yes

17 or no.

18 A   I do.

19 Q   Okay.  And just so it's clear for the Judge, at, in 2019

20 when Dr. Hopkins gave this testimony on behalf of Johnson &

21 Johnson and JJCI, that Medical Safety Council you talked about

22 in your testimony, that existed at that time, right?

23 A   It did.

24 Q   And, sir, the Court -- Dr. Hopkins also testified -- and,

25 and the Court has seen the testimony of Dr. Hopkins -- that

1  Johnson & Johnson had the authority to require warnings on

2  products, do you see that?

3  A    That's what it says.

4  Q    And, sir, you have never testified as a corporate

5  representative for either Johnson & Johnson or JJCI in a

6  mesothelioma case, have you?

7  A    No.

8  Q    You do know, sir, from being at JJCI when the Reuters

9  article came out, you know that Alex Gorsky, the CEO of Johnson

10 & Johnson, made statements to the public and he told the public

11 that the Baby Powder never contained asbestos.  You know that,

12 right?

13 A    I, I didn't see the specific testimony, but I would

14 imagine, if you have the testimony, that's likely what he said.

15 Q    Has anyone ever told you that on January 27, 2020 the CEO

16 of Johnson & Johnson, Alex Gorsky, gave sworn testimony in a,

17 in four mesothelioma cases in New Jersey?  Did you know that

18 Mr. Gorsky gave testimony in 2020 in a court of law?

19 A    No.

20 Q    And I'm referring you to the screen where Mr. Gorsky was

21 asked:

22 "Q    And we're going to talk in a minute about the team that you

23 assembled in the wake of the Reuters article, but was

24 Dr. Waldstreicher one of the doctors at Johnson & Johnson that

25 was involved in informing you about scientific and testing

1   issues?

2   "A   Yes, she was."

3       Do you see that testimony by the CEO of Johnson & Johnson

4   in January of 2020?

5   A   I do.

6   Q   And do you see where Mr. Gorsky said, "I relied primarily

7   on Dr. Joanne Waldstreicher"?  Do you see the CEO of Johnson &

8   Johnson said that in January of 2020?

9   A   I see that, yes.

10  Q   And, sir, the fact is you come into court here and say the

11  buck stops with you, but unlike Dr. Waldstreicher, you've never

12  even spoken to Mr. Gorsky about talc, true?

13  A   I haven't.  And what I said during the deposition was that

14  there were other members of the Consumer Safety Team who have.

15  Q   Okay.  I just showed you Mr. Gorsky's sworn testimony that

16  he spoke to Joanne Waldstreicher, the Chief Medical Officer of

17  Johnson & Johnson.  Did you see that testimony?

18  A   I did.

19  Q   But you, sir, admit here in this court that you have never

20  spoken to Alex Gorsky about the issue of talc a single time,

21  right, sir?

22  A   I, I haven't.  And like I said in my deposition --

23          MR. BLOCK:  Move --

24          THE WITNESS:  -- other people on the, on the Consumer

25  Safety Team have.

1          MR. BLOCK:  Move to strike everything after "I

2   haven't."

3          THE COURT:  Overruled.

4   BY MR. BLOCK:

5   Q   And, sir, you, you talked about Dr. Waldstreicher.  She's

6   your supervisor, right?  She's your supervisor --

7   A   She -- she --

8   Q   -- Dr. Waldstreicher?

9   A   She is.  I -- I'm -- I'm a member of the Office of the

10  Consumer, the Office of the Chief Medical Officer.

11  Q   Okay.  Can I --

12  A   She -- she -- she --

13         THE COURT:  Answer the question he asked you.

14  BY MR. BLOCK:

15  Q   Sir --

16         THE COURT:  Your, your counsel will ask --

17  BY MR. BLOCK:

18  Q   Sir --

19         THE COURT:  -- redirect.

20         THE WITNESS:  Okay.

21  BY MR. BLOCK:

22  Q   -- yes or no question.

23      Is Dr. Waldstreicher your supervisor?

24  A   Yes, she is.

25  Q   And did you know, sir, that in addition, in addition to the

1   video that Mr. Tisi just showed in court, that in April of 2016

2   Dr. Waldstreicher did a separate video about talc safety that

3   was sent out to the public and is still on YouTube to this day?

4   A   I'm aware there was a video.   I don't know if I've ever

5   seen it.

6   Q   Right.   And the video -- and we can see Exhibit 14-H, which

7   is the final transcript of the video and we can see a

8   screenshot from the video -- Dr. Waldstreicher, Chief Medical

9   Officer of Johnson & Johnson, and she tells the public, "No

10  causal association between talc and ovarian cancer," and she

11  tells the public as the Chief Medical Officer of Johnson &

12  Johnson, "I want to reassure anyone who may have questions or

13  concerns related to talc that product safety is and will

14  continue to be our highest priority."

15      Do you see where Dr. Waldstreicher said that in a video

16  that was sent out to the public in 2016?

17  A   I do.

18  Q   And that's Joanne Waldstreicher, the Chief Medical Officer

19  of Johnson & Johnson, that we see on the screen, not Dr. Ed

20  Kuffner, correct?

21  A   Yeah.   I wasn't the Chief Medical Officer in 2016.

22  Q   Right.   You weren't even the Chief Medical Officer back

23  then, right, sir?

24  A   I wasn't.

25  Q   And the logo behind Dr. Joanne Waldstreicher in the video

1   for the world to see is what logo, sir?

2   A   It looks like it says Johnson & Johnson.

3   Q   And, sir, do you know about Project Fortis, Johnson &

4   Johnson's Product, Project Fortis, which was a stakeholders'

5   engagement communication guide that was used by Johnson &

6   Johnson?

7   A   I don't believe I'm familiar with that.

8   Q   You've never even heard about Project Fortis, right?

9   A   I, I don't independently recall that today, no.

10  Q   Did, did you know, I mean, it says here in the Product

11  [sic] Fortis guide, Exhibit 14-I, did you know that Dr. Joanne

12  Waldstreicher also did a blogpost for the public discussing the

13  four most important facts about the safety of talc for the

14  public to hear about?

15  A   That's what it says there, yes.

16  Q   Okay.  And it talks about the video, a two-minute explainer

17  video by Dr. Waldstreicher, not you, that "focuses on the

18  science behind the product," do you see that?

19  A   I do.

20  Q   And, sir, as to this Safety Council, this Johnson & Johnson

21  Medical Safety Council, referring to Exhibit 14-O, that Medical

22  Council came into existence in 2013, right?

23  A   Correct.

24  Q   So, sir, Johnson's Baby Powder had been sold for a hundred

25  years before there was even a Johnson & Johnson Medical Safety

1   Council that you talked all about, right?

2   A   That was before this specific Medical Safety Council was

3   formed, yes.

4   Q   Okay.  And, sir, it says the Johnson & Johnson Medical

5   Safety Council has been established under the leadership of the

6   Chief Medical Officer, Johnson & Johnson, do you see that?

7   A   I do.

8   Q   And, and that leadership is Dr. Joanne Waldstreicher,

9   correct?

10  A   Correct.

11  Q   And, sir, she was, she's the Chair of the Medical Safety

12  Council, right?

13  A   The Johnson & Johnson Medical Safety Council and I'm the

14  Chair of the Consumer Medical Safety Council.

15  Q   Right.  And, and let's look at the people who signed this

16  charter in 2013 starting this Medical Safety Council.  We have

17  three people from Johnson & Johnson, the Chief Scientific

18  Officer, the Chief Medical Officer, and the Chief Regulatory

19  Counsel, right?

20  A   That's what it says, yes.

21  Q   All right.  So are you telling me that there's a Johnson &

22  Johnson lawyer on the Medical Safety Council?

23  A   The Chief Regulatory lawyer?

24  Q   Yeah.

25  A   They -- they -- they signed this.  They certainly signed

1   this document.

2   Q   Wait.  So you're telling me there is a Johnson & Johnson

3   lawyer on the Medical Safety Council, as we could see here on

4   the screen.

5   A   That -- that --

6   Q   Is that what you're saying?

7   A   That -- that -- that's not what this says.  This was who

8   approved the document.

9   Q   Okay.  So are you saying that a lawyer from Johnson &

10  Johnson has to actually approve the Medical Safety Council

11  document?

12  A   This -- this is -- these are the people who approved the,

13  the SOP.

14  Q   Right.  And no lawyer from JJCI is listed there as an

15  approver, right?

16  A   Because this was the -- for the --

17  Q   Yeah.

18  A   -- the J&J --

19  Q   Sir?

20  A   -- Corporate Medical Safety --

21  Q   Sir, I didn't ask --

22  A   -- Council.

23          MR. HAMILTON:  Your Honor, I'm going to ask that he be

24  allowed to answer the question.

25          MR. BLOCK:  Sure.

1          THE COURT:  Yes, sir, you may finish.

2          THE WITNESS:  'Cause, 'cause this is for the, the J&J

3   Medical Safety Council.

4   BY MR. BLOCK:

5   Q   Okay.  And, sir, I didn't ask why, but for the J&J Medical

6   Safety Council there is a J&J lawyer that had to approve the

7   whole document, right?

8   A   They were one of the approvers, yes.

9   Q   And, sir, you, yourself, have received e-mail

10  communications from Johnson & Johnson's Corporate Communication

11  Department about talc issues, correct?

12  A   I have, yes.

13  Q   And we're looking at Exhibit 14-J and this is an e-mail

14  from Johnson & Johnson's Corporate Communication Department to

15  you, Dr. Kuffner, July of 2018, and it's a message from Mike

16  Ullmann about talc powder lawsuits, right?

17  A   Yes.

18  Q   And that is the General Counsel of Johnson & Johnson, the

19  parent company, do you see that?

20  A   Yes.

21  Q   And that's true, right?

22  A   I believe Mike Ullmann is.

23  Q   Right.  And, and the lawyer from Johnson & Johnson, the

24  parent company, is telling you, Dr. Kuffner, to "Click Here to

25  see some facts that you can share, if asked," do you see that?

1    A    That, that's what it says.

2    Q    And we see another e-mail, Exhibit 14-K, which is from

3    Johnson & Johnson, the parent company's Corporate Communication

4    Department to Dr. Kuffner, December 14, 2018, and it says, "In

5    response to these Reuters stories, J&J," the parent company,

6    "issued the following statement," do you see that?

7    A    I do.

8    Q    And what the J&J Corporate Communications Department, the

9    parent company, told you, Dr. Kuffner, a doctor, "The Reuters

10   article is one sided, false, and inflammatory.  Johnson &

11   Johnson's Baby Powder is safe and asbestos free."

12        Is that what it says?

13   A    That, that's what it says on --

14   Q    And -- and --

15   A    -- on the slide.

16   Q    And you were even e-mailed by News from Alex, News from

17   Alex Gorsky, even though you had never talked to him, and do

18   you see this e-mail, Exhibit 14-L, dated December 17, 2018, to

19   you, Dr. Kuffner?

20   A    I do see it.

21   Q    And, and Alex Gorsky tells you, a medical doctor, that

22   Johnson's Baby Powder is asbestos free.  Do you see that in the

23   e-mail he sent you?

24   A    I, I do.  And at the end of the day, he can say that,

25   right?  Because he's been informed of all the work that our

1   Safety Team had done on it.

2       So Alex Gorsky isn't making determinations of whether the

3   product is safe or not.  That is being made within, because

4   it's a consumer product, within the Consumer Sector and I have

5   ultimate responsibility for that.  So to suggest that Alex

6   Gorsky is telling me about the safety of the product, that is

7   incorrect.

8   Q   Sir?

9   A   At the end of the day, I and our team are making those

10  decisions.

11  Q   Sir, you never talked to Alex Gorsky in your entire life

12  about talc?  Yes or no.

13  A   I said I didn't, but --

14  Q   Okay.

15  A   -- members of our Safety Team have.

16  Q   Sir, Dr. [sic] Gorsky said he relied primarily on

17  Dr. Waldstreicher.  You saw that testimony, right?

18  A   That -- that -- that's what he said.

19          THE COURT:  I think y'all are arguing now.

20          MR. BLOCK:  Okay.

21          THE WITNESS:  But --

22  BY MR. BLOCK:

23  Q   Sir, Exhibit 14-M, is another e-mail to you, Dr. Kuffner,

24  from Michael Sneed, who is the highest level person in

25  Corporate Communications for J&J, the parent company, correct?

1   A    I, I believe he leads the, the Corporate Communications

2   Group, yes.

3   Q    Right.  And, and Mr. Sneed from the Johnson & Johnson

4   parent company tells you in an e-mail, "Last night, Alex was

5   featured on CNBC's Mad Money."  And Mr. Sneed says, "Today, we,

6   Johnson & Johnson," the parent company, "is launching our

7   second advertisement called 'What We Know About the Safety of

8   Talc,'" right?

9   A    That's what it says.

10  Q    And, sir, you received other e-mails from J&J Corporate

11  Communications Department from a Kathy Wangel from J&J's parent

12  company talking about the issue of asbestos that J&J did the

13  recall on, correct?

14  A    Correct.

15  Q    All right.  Now, sir, you, you were sent an e-mail in

16  January of 2019 about a letter that Senator Patty Murray from

17  Congress sent to Johnson & Johnson.  Do you see your name on

18  that e-mail?

19  A    I do.

20  Q    All right.  So January 28, 2019, Exhibit 13-A, is an e-mail

21  to you and others regarding a letter from Congress.  And do you

22  see that lawyers from Johnson & Johnson, including Andrew White

23  and Patricia Villani, are also on that e-mail?

24  A    I do.

25  Q    All right.  And looking at Exhibit 13, it wasn't you,

1  Dr. Kuffner, that wrote Congress back.  It was Johnson &

2  Johnson.  Do you see that on the screen?

3  A    That's, that's what it looks like, yes.

4  Q    And with the Johnson & Johnson logo, signed Sincerely,

5  Johnson & Johnson.  It was the parent company that told

6  Congress on March 11, 2019 that, "Johnson's Baby Powder are

7  safe and not contaminated with asbestos and do not cause

8  cancer," right?

9  A    Yes.  Likely based upon the work that we did and the

10  assessments that we did within the Consumer Sector.

11  Q    Right.  And, sir, you didn't write the letter to Congress.

12  Johnson & Johnson did, correct?

13  A    I didn't write the letter to Congress, no.

14  Q    Okay.

15  A    But they used the information from our assessments done by

16  the physicians and myself within the Consumer Sector.  'Cause

17  those were our, our conclusions.

18  Q    All right.  Sir, are you mentioned in the letter to

19  Congress?  Does it say anything about the Consumer Company or,

20  or Dr. Kuffner?

21  A    I haven't read the whole letter.  It's not up here.  I, I

22  don't know.

23  Q    Right.  So you've never even read the letter.  So, so

24  Johnson & Johnson, the parent company, wrote a letter to

25  Congress saying Johnson's Baby Powder is safe in March of 2019

1  and you did or did not read the letter before I presented it to

2  you today?

3  A   I -- I -- I may have read the letter.  What I'm saying is I

4  can't see the whole letter --

5  Q   Okay.

6  A   -- on the screen here.  And you're asking me to comment on

7  what's in the letter.  I, I don't remember exactly what is in

8  the letter.

9          THE COURT:  You're about out of time now.

10 BY MR. BLOCK:

11 Q   Sir, I, I just have a few more questions.

12     You have never discussed the issue of talc with the Johnson

13 & Johnson board of directors, correct?

14 A   To the best of my recollection, correct.

15 Q   Have you discussed other issues involving safety of other

16 products with the Johnson & Johnson board of directors?

17 A   Yes, I have.

18 Q   Okay.  So even though you've discussed the safety of other

19 products with Johnson & Johnson's board of directors, when it

20 comes to talc, you've never had any discussion with the, with

21 J&J's board of directors about talc, true?

22 A   True.

23 Q   All right.

24         MR. BLOCK:  And I'll just move this in as a separate

25 exhibit.  I'm done questioning, your Honor.  Exhibit 13-D are a

1   series of J&J board of directors meetings where J&J's talc

2   liabilities and talc issues were regularly discussed.  It's

3   Exhibit 13-D and I will offer that into evidence when we offer

4   evidence at the end, your Honor.

5           MR. JONES:  Your Honor, we'll reserve our rights on

6   objections until we see --

7           THE COURT:  Okay.

8           MR. BLOCK:  Thank you.

9           MR. JONES:  -- and have the proffer.

10          THE COURT:  Any redirect?

11          MR. HAMILTON:  Yes, your Honor.

12          THE COURT:  Mr. Hamilton.

13          UNIDENTIFIED SPEAKER:  Could you give her your name?

14          MR. HAMILTON:  Robert Hamilton of Jones Day on behalf

15  of the debtor, your Honor.

16                      REDIRECT EXAMINATION

17  BY MR. HAMILTON:

18  Q   Dr. Kuffner, we're bringing up on the screen Exhibit 164 by

19  the defendants that you were questioned about and, in

20  particular, it's Page 6, not, not Page 5 as counsel suggested.

21  There's a, a heading that says Developing Recommendations.  Do

22  you see that, sir?

23  A   I do.

24  Q   All right.  So if there is not a consensus at the Medical

25  Safety Council at that parent holding level and, as to what to

1   recommend, and the Chief Medical Officer has to make a final

2   decision as to what to recommend, she can make that decision,

3   is that right?

4   A   Correct.

5   Q   All right.  When she makes that decision as to what to

6   recommend, who does she recommend it to?

7   A   It would be, if it was a, within the sector, it would go to

8   the Sector CMO.  So if it was a Consumer topic, then she would

9   make that recommendation to me.  But the ultimate decision

10  making authority belongs to me.

11      And she, she heads the Office of the Chief Medical Officer.

12  I am part of the Office of the Chief Medical Officer.  I am the

13  CMO for the Consumer Sector.  Those decisions lie with me, but

14  I am part of the Office of the Chief Medical Officer.

15  Q   So the parent CMO can make a final decision to recommend

16  something to the Sector CMO that should be done, is that

17  correct?

18  A   She can make a recommendation.  The ultimate decision

19  within the sector lies with me.

20  Q   Is it unusual in your experience for the CEO of a major

21  organ, enterprise to comment to the public about the safety of

22  the enterprise's products?

23  A   No.

24  Q   All right.  Does Mr. Gorsky have the authority to overrule

25  or veto or change any safety decisions you make with respect to

1    talc products produced by JJCI?

2    A    Absolutely not.

3    Q    Okay.  And the -- were decisions about the safety of

4    products produced by the Consumer Sector prior to the creation

5    of the official Medical Safety Commission or Council in 2013

6    made at the sector level or at the parent level?

7    A    They were made at the sector level.

8    Q    How do you know that?

9    A    Because I, I've been part of Johnson & Johnson Consumer

10   Sector for almost 16 years and --

11   Q    Did you make, did you make final decisions regarding

12   Tylenol in 2006 and 2007 when you were at Johnson -- Johnson --

13   at McNeil?

14   A    Absolutely.

15   Q    All right.  And those decisions, were they overruled or

16   changed in any way by anybody at the parent holding company?

17   A    No.

18   Q    Did they --

19   A    Medical -- medical --

20   Q    Did they have the authority to change your rule -- your --

21   your decisions on Tylenol at the time?

22   A    No.  Medical safety decisions are made within the sector.

23   Q    Thank you.

24        MR. HAMILTON:  No further questions, your Honor.

25        THE COURT:  All right.  That got it?

1          MR. BLOCK:  No questions, your Honor.

2          THE COURT:  Okay, very good.

3          Now it's almost 12:00.  I don't know if you need a

4    regrouping time before we talk about what's admitted, what's

5    not, what other evidence is to be presented.  We're --

6          MR. HAMILTON:  We have one more witness, I think, your

7    Honor.

8          THE COURT:  Okay.  I wasn't sure between declarations

9    how many live witnesses you had, so.  All right.

10         MR. HAMILTON:  Yeah.  Let me say we have one more live

11   witness.

12         THE COURT:  One live.

13         MR. GORDON:  Your Honor, Greg Gordon on behalf of the

14   debtor.

15         The time's, obviously, getting away from the parties

16   at this point, I think.  And so at some point we're going to

17   have to visit with the other side and, and obviously, we're

18   going to have to talk to your Honor to figure out how we're

19   going to do this.  Our, our working assumption is we're going

20   to be done today and we're going to have to work together to

21   figure out how --

22         THE COURT:  How to do that?

23         MR. GORDON:  -- to make that happen.  We're getting

24   concerned that things are elongating now where we're putting

25   that in jeopardy.

440

1          MS. CYGANOWSKI:  If, if I-- Melanie Cyganowski for --

2          THE COURT:  Uh-huh (indicating an affirmative

3    response).

4          MS. CYGANOWSKI:  -- for the Committee.

5          Does Mr. Gordon have a sense of just the timing of, of

6    the direct?

7          MR. JONES:  Your Honor, Mr. Gordon may not -- Jim

8    Jones for the debtor -- but I do.  And, and I believe that the

9    timing is less than 20 minutes.

10          THE COURT:  Okay.

11          MR. SATTERLEY:  And Mr. Satterley for the creditor.

12          I'm going to be the primary cross-examination.  It's

13    going to be 15, 20 minutes for me.  I think there might be

14    somebody else in the audience that might have a little bit of

15    time.

16          What I would request, your Honor, we're going to meet

17    and confer over lunch.  We're going to work to get this done.

18    I think it's, it's the last witness.  We come back at 1:00 or

19    1:15.  We'll have that witness finished by 2:00, 2:15,

20    probably, and then have time to do closing arguments.  That's

21    what I'm proposing.

22          THE COURT:  Okay.

23          Here's what I think, folks.  It might be a good time

24    to take a break.

25          You can step down by the way, sir.

1            THE WITNESS:  Thank you.

2            THE COURT:  Might be a good time to call our lunch

3    recess.  If y'all can do it, I know that some of you have to go

4    out to eat, but if we can keep this to 45 minutes, it would be

5    better than an hour.  And I'd like to finish today.  We have

6    the same problems as before.  I can't keep the guards and the,

7    and the building staff here late on a Friday afternoon.  5:30's

8    going to be about what we can do.

9            As I mentioned last week -- I would hate to do it --

10   but we can come back on Tuesday, if need be.  You're going to

11   be here on Wednesday for the venue matter.  I'd rather not.

12   I'd prefer that y'all talk this out as to how we're proceeding.

13           By my count, I've got the, the plaintiffs' side,

14   basically, the claimants' side, just about out of time.  So

15   you're going to need to figure out what is doable.  I don't

16   want to have artificial restrictions, but at the same time we

17   need to figure out how to use --

18           MR. BLOCK:  Yes.

19           THE COURT:  -- what's left.

20           MR. BLOCK:  And, your Honor.  Thank you.  I appreciate

21   not wanting to have artificial restrictions.  And I just want

22   to say that we are really doing our best to work together with

23   The Plaintiffs' Steering Committee.  They're representing tens

24   of thousands of people in the MDL, whereas Mr. Satterley and I

25   are, are representing a relatively fewer --

1          THE COURT:  I understand.

2          MR. BLOCK:  -- mesothelioma victims.  And we're doing

3    our best to cooperate in good faith and, and we really are.

4    We're communicating.  But, but it's difficult, you know, for us

5    to get a firm grip on the time.

6          THE COURT:  Sure.

7          MR. BLOCK:  And, and so I apologize to the Court if

8    we're sort of running over on time.  We've done the best we

9    can.

10         MR. SATTERLEY:  And, your Honor.  Joe --

11         THE COURT:  That's why I said I don't --

12         MR. BLOCK:  Thank you.

13         THE COURT:  -- appreciate -- I don't prefer artificial

14   restrictions.  I -- and I'm trying to keep all of you within

15   the spirit of what we're doing --

16         MR. BLOCK:  Thank you.

17         THE COURT:  -- without being too precise about it, but

18   we need to finish, if we can.

19         Can we come back at 45 -- let's see -- 45 after the

20   hour, quarter till?

21         MR. SATTERLEY:  Yes, your Honor.  Joe Satterley again.

22         I think me and Mr. Gordon will talk and I think we're

23   going to be able to get this done.  We -- none of us in here

24   want to come back next week and finish it.  We want to finish

25   it today.

1          MR. BLOCK:  Right.

2          MR. SATTERLEY:  And so we're going to get that done.

3          THE COURT:  Okay, very good.

4          Let's take a recess --

5          MR. BLOCK:  Thank you.

6          THE COURT:  -- then.

7          Thank you, all.

8      (Lunch recess from 11:57 a.m., until 12:48 p.m.)

9                          AFTER RECESS

10     (Call to Order of the Court)

11         THE COURT:  Have a seat, everyone.

12         Okay.  It looks like we're a little bit light on the

13  numbers.  I imagine we'll have a few trickle in.

14         Do we have a critical mass where we're ready to

15  proceed?

16         MR. SATTERLEY:  Yes, your Honor.

17         MR. BLOCK:  Yes, your Honor.

18         THE COURT:  Okay.

19         MR. GORDON:  Your Honor, Greg Gordon on behalf of the,

20  the debtor.

21         If I could, we did confer.  I think we have an

22  agreement on the timing --

23         THE COURT:  Okay.

24         MR. GORDON:  -- subject to your Honor's approval.

25         So what we've agreed is on Dr. Mullin, each side will

1  take 15 minutes.

2           THE COURT:  Uh-huh (indicating an affirmative

3  response).

4           MR. GORDON:  So we'll complete him in a half an hour.

5           And then on the closing argument, we've agreed that

6  the, the debtor will have an hour and a half.  The other side

7  will have an hour and 15 minutes with respect to, to that.

8           And then we're going to talk again, probably about

9  exhibits, but I think there's an agreement that's coming

10  together where the parties may just be stipulating to the

11  admission of all the agreements [sic] for what they're worth.

12  It would just --

13           MR. JONES:  Issues --

14           MR. GORDON:  Issues would go to weight.

15           MR. BLOCK:  Your, your Honor, I, I think from our --

16  it's not -- from our standpoint, I think we agree that the

17  Court is free to consider all the evidence that's, that's come

18  into this courtroom in this preliminary injunction hearing and

19  that we're reserving rights on both sides as to the technical

20  admissibility issues.

21           So, for example, we don't think the summaries are

22  admissible, but your Honor heard the evidence.

23           THE COURT:  Uh-huh (indicating an affirmative

24  response).

25           MR. BLOCK:  It's part of the record.  There may be

1    things that we've referred to that they don't agree is

2    technically admissible, but we understand that your Honor,

3    we're going through this process so your Honor can reach a

4    decision.

5        Is that basically --

6        THE COURT:  Okay.

7        MR. GORDON:  Yes, that's accurate, your Honor.

8        MR. BLOCK:  Okay.

9        MR. GORDON:  Thank you.

10       THE COURT:  All right.  So effectively, we're not

11   going to sweat the small stuff?

12       MR. GORDON:  Correct, your Honor.

13       THE COURT:  All right.  Okay, very good.

14       MR. HAMILTON:  And --

15       THE COURT:  All right.  We ready to proceed?

16       MR. HAMILTON:  Your Honor, also, I think I  have an

17   agreement with Mr. Silverstein that they're going to number and

18   enter, and offer into evidence the Pratt exhibit --

19       THE COURT:  Uh-huh (indicating an affirmative

20   response).

21       MR. HAMILTON:  -- that, that was handed to us at the

22   beginning of the hearing.  And we have one document, which is

23   another Notice of, of Bankruptcy and, and Suggestion of Stay

24   that was filed in the Hill case, and they would agree that we

25   could add that to our exhibits.  I have a copy here.  I can

1   provide it to you.

2          THE COURT:  Is that what you were referencing earlier?

3          MR. JONES:  Yes.  Yes.

4          THE COURT:  Okay.

5          Mr. Silverstein.

6          MR. SILVERSTEIN:  Your Honor, just one, one

7   housekeeping issue.

8          I think, as we're talking about the stipulation, I, I

9   think what we're agreeing to, what the reservation is, all the

10  exhibits on each respective side's exhibit list coming in,

11  whether it was referred to on testimony or not.

12         MR. GLOCK:  Yeah.  And also, your Honor -- this is

13  Jerome Block for Levy Konigsberg.

14         Both sides, obviously, submitted briefing --

15         THE COURT:  Uh-huh (indicating an affirmative

16  response).

17         MR. BLOCK:  -- and there is a lot of exhibits to that

18  briefing on the preliminary injunction motion.

19         So I, I think both sides, I'm sure, want and, and

20  agree that their exhibits should be considered as part of your

21  Honor's decision.

22         Thank you.

23         MR. HAMILTON:  That's fine, your Honor.

24         MR. JONES:  One, one last fine point.  The

25  declarations as well.  We didn't say that specifically, if we

1   did.  But it's the declarations that we've, that we've

2   proffered and your, and your cross-examination and --

3          MR. SATTERLEY:  So here -- so --

4          MR. JONES:  -- depositions.

5          THE COURT:  Hang on.  Hang on.

6          That was Mr. Jones.

7          Mr. Satterley?

8          MR. JONES:  Mr. Jones referred -- I'm sorry, your

9   Honor --

10          THE COURT:  Uh-huh (indicating an affirmative

11   response).

12          MR. JONES:  -- to agreeing to the admissibility of, or

13   admission, rather, of the declarations submitted to the Court,

14   first day, supplemental, Lisman, Ms. Schirger-Ward, and your

15   testimony elicited on, in deposition of those, of those two

16   deponents that were submitted only by declaration.

17          MR. BLOCK:  Right, right.

18          MR. SATTERLEY:  Joe Satterley for certain creditors.

19          With regards to everything except the, the Lisman

20   declaration, we've got short excerpts.  We stipulated they

21   didn't have to call Mr. Lisman --

22          THE COURT:  Uh-huh (indicating an affirmative

23   response).

24          MR. SATTERLEY:  -- as long as the deposition itself

25   was admissible.  But we don't want to burden your Honor with

1    reading a 200-page deposition.

2         So we could either give your Honor the page numbers or

3    show your Honor the testimony that we would cross-examine

4    Mr. Lisman, once again, so that your Honor can --

5         THE COURT:  Uh-huh (indicating an affirmative

6    response).

7         MR. SATTERLEY:  -- see the evidence and not be

8    burdened with a thick deposition.  And -- but I don't want to

9    eat up courtroom time doing that.

10        So maybe we'll have to talk about how to do that to

11   get your Honor that information.

12        THE COURT:  If push comes to shove, we can get on the

13   phone Tuesday and talk about it, but --

14        MR. SATTERLEY:  Yes, your Honor.

15        MR. HAMILTON:  Your Honor, may I approach with the

16   additional exhibit?

17        THE COURT:  Yes, sir.

18     (Document handed to the Court)

19        THE COURT:  All right.

20        MR. JONES:  Your Honor, while -- this is Jim Jones for

21   the debtor.

22        And while your Honor is receiving the exhibit

23   Mr. Hamilton is walking up with, I'd like to ask Mr. Mullin to

24   take the stand.

25        THE COURT:  Okay.  Let's get him --

1          MR. JONES:  Dr. Mullin.  Forgive me.

2          THE COURT:  Let's get him around and get sworn.

3     CHARLES MULLIN, DEBTOR/PLAINTIFF'S WITNESS, SWORN

4          THE COURT:  Whenever you're ready.

5                        DIRECT EXAMINATION

6     BY MR. JONES:

7     Q   Good afternoon, Dr. Mullin.  Thank you for joining us.

8         And you understand we're under a fairly short time frame

9     stricture here.  So we're going to move quickly.

10        Could you state your name for the record?

11    A   Charles Henry Mullin.

12    Q   Where are you employed today, sir?

13    A   Bates White.

14    Q   What's your position there?

15    A   Managing Partner.

16    Q   Can you just tell us your academic background very briefly

17    by degree?

18    A   My undergraduate degrees are in mathematics and economics

19    from the University of California at Berkeley.  I have a Ph.D.

20    in economics from the University of Chicago.

21    Q   And you've testified before as an expert witness?

22    A   I have.

23    Q   You actually testified before as an expert witness in this

24    courtroom, is that, or this courthouse, is that right?

25    A   Remotely, but yes.

1   Q   Electronically.  It was feeded to this courtroom, correct?

2   A   Correct.

3   Q   And that was in a proceeding known as Aldrich and Murray?

4   A   Correct.

5           MR. JONES:  And, and, your Honor, I think we have an

6   agreement that I am, that Mr., rather, Dr. Mullin can testify

7   as an expert in statistical and econometric analysis and

8   economic modeling as it relates to mass tort personal injury

9   claims.

10          MR. SATTERLEY:  So for, for this case only, we will

11  stipulate in the interest of time not to cross-examine him on

12  his qualifications for the matters so suggested.

13          THE COURT:  In the case or in the, this proceeding?

14          MR. BLOCK:  In this hearing.

15          MR. SILVERSTEIN:  In this hearing.  Adam Silverstein.

16  For this hearing.  This proceeding.

17          THE COURT:  Okay..

18          MR. SATTERLEY:  This proceeding.  I apologize.

19          Thank you, Counsel.

20          THE COURT:  Understood?

21          MR. SATTERLEY:  And that's Joe Satterley once again

22  for the debtor --

23          THE COURT:  Okay.

24          MR. SATTERLEY:  -- or for the creditors.

25          MR. JONES:  Your, your Honor, I'll speak for the

1  debtor and we agree.

2         THE COURT:  Thank you.

3         MR. SATTERLEY:  Is that a job offer?

4         MR. HAMILTON:  No.

5  BY MR. JONES:

6  Q   Dr. Mullin, could you briefly describe for his Honor what

7  you understood to be your charge in this case?

8  A   My charge was to compare and contrast the economic

9  efficiency and equity of resolving the talc personal injury

10 claims in the tort system versus through a bankruptcy and the

11 types of trusts that typically emerge from a bankruptcy

12 process.

13 Q   And you did that work?

14 A   I did.

15 Q   What is it at a summary level did you -- that you -- what

16 is it at a summary level that you concluded?

17 A   The trusts that typically emerge from a bankruptcy process

18 are both economically more efficient and more equitable in

19 terms of the payments to claimants.

20 Q   And let's then address quickly the first part of that

21 conclusion and opinion, which is efficiency.

22     Can you tell us, generally, the work you did and how you

23 concluded that the trust system is more efficient than the tort

24 system in this regard?

25 A   So at a, at a very high level it's two main points.  One is

1  through a bankruptcy process the parties will litigate or

2  negotiate once and develop a common set of rules which are then

3  applied through a trust to all pending and future claimants,

4  while in the tort system you end up relitigating the same

5  issues over and over again as opposed to just doing it once.

6  So there's a large duplication of cost in that regard.

7       Two, once you have a trust, the economic incentives of all

8  the parties are aligned to minimize the administrative costs

9  while in the tort system those economic incentives aren't

10  aligned and it, when you look at the law and economics

11  literature, you actually have an economic incentive to drive

12  the other side's costs up in the tort system 'cause it can give

13  you settlement leverage.

14  Q    And is it fair that, essentially, those opinions are that

15  it's faster in the trust system and at least administratively

16  cheaper?

17  A    I didn't say faster that time, but it is --

18  Q    Okay.

19  A    -- and administratively cheaper.

20  Q    And then tell me about faster.

21  A    So there's a codified set of rules that comes out with the

22  trust.  There's a set of trust distribution procedures that

23  could go by slightly different acronyms, but a set of

24  procedures that are codified.  There's typically a claim form

25  where all the information is solicited to evaluate a claim

1  under that, those set of codified rules.

2      So that can be provided to the trust in electronic format

3  and those can be processed very rapidly as a result.

4  Q   And then skipping back to cheaper or cost, tell me how the

5  administrative costs or other costs are minimized in a trust

6  system versus the tort system.

7  A   So once the trust is established, the set of rules aren't

8  revisited with each claim.  They're set.  So it becomes an

9  administrative process of when you get the factual inputs from

10 the claim form for most claims go through an expedited review-

11 type process where that information is sufficient to determine

12 the payment to the claimant.  There may be some that get

13 individual review, but the majority will go through that

14 expedited review process and that typically results in 90 plus

15 percent of the money put into a trust getting paid out towards,

16 to claimants and less than 10 percent of the money going to the

17 overhead of administering the system.

18 Q   And how does that compare to the tort system?

19 A   The tort system varies defendant-by-defendant, but in the

20 tort system a much larger fraction of the fees than 5 or 10

21 percent is going from defendants to, it's not really

22 administering, but litigating the claims and going through that

23 process.

24 Q   And what is the differential impact, if any, upon claimants

25 with respect to -- to -- whether they get to keep more or less

1    of the money?

2    A    It -- so there's less administrative costs, but if the

3    payment is the same many trusts will cap the fees that go to

4    plaintiffs' attorneys, not all, and under the theory that it's

5    an administrative process, it's not risky.  High-contingency

6    fees on the ones that get paid to make up for the ones that

7    don't get paid, that economic rationale's really lacking in the

8    trust basis 'cause there's a preset of rules.

9        So if that is done and those, then the claimant them self

10   gets to keep a larger percentage of the total recovery.

11   Q    And that's in the trust system?

12   A    That's in the trust system.

13   Q    Thank you, sir.

14       Is there anything more about your -- still at a high level

15   because of the time period in which we're working here -- about

16   your efficiency opinion that you think we should share?  I have

17   one exhibit I'm going to share with you, but without the

18   exhibit is there anything more?

19   A    As I said, it's really just the speed.  I think the one

20   exhibit speaks to that speed, the ability of the trust to clear

21   large inventories of claims quickly.

22   Q    Exhibit -- we're going to show you an exhibit now about

23   speed, I believe.

24            MR. JONES:  Exhibit 77.

25   BY MR. JONES:

1   Q   First, Dr. Mullin, this has been marked as  --

2              MR. JONES:  Exhibit 31.

3              UNIDENTIFIED SPEAKER:  31?

4              MR. JONES:  Yeah.

5   BY MR. JONES:

6   Q   Do you recognize what we've marked as Exhibit, Debtor's

7   Exhibit 31, Dr. Mullin?

8   A   It's a copy of my expert report.

9   Q   And within it, your CV is an appendix, is that right?

10  A   Correct.

11  Q   And within it you've put together a few figures that

12  support your conclusions, is that also right?

13  A   Correct.

14  Q   In fact, Figure 1 addresses the point you and I were just

15  discussing with respect to swiftness of resolution, is that

16  right?

17  A   Correct.

18  Q   Let's turn to Figure 1, which is Exhibit 77, separately

19  pulled out.

20      Is this Figure 1 from your report, sir?

21  A   Yes.

22  Q   And could you tell the Court what this depicts and how it

23  informs your opinion on, on efficiency?

24  A   So this is a set of administrative trusts and it's the

25  count of claims that the trust was able to process in its first

1   three years of operation and it selects all the trusts that, to

2   date, have processed at least 250,000 claims.

3   Q    And these --

4   A    So it's a comprehensive list within that group.

5   Q    And these are trusts involving claims for, regarding

6   exposure to asbestos?

7   A    Correct.

8   Q    And we see tens of thousands of claims paid in the time

9   frame you referenced, is that right?

10  A    Tens or hundreds of thousands, correct.

11  Q    And that compares to the tort system how?

12  A    The tort system varies, but at least the pace of resolving

13  claims in the tort system to date for Old JJCI was

14  substantially slower.  They weren't resolving tens of thousands

15  of claims annually.

16  Q    Let me ask you now to turn, very briefly again, to your

17  equity opinion.  And you've also depicted in your report -- and

18  we have pulled out into separate exhibits a few figures or

19  tables that address that, is that right?

20  A    Correct.

21  Q    Let me ask you to look, in particular, at Table, Tables 2

22  and 3 in that order.  They are Exhibits 78 and 79.

23       Can you tell us what Table 2 is and how it informs your

24  decision, or, rather, your opinion?

25  A    So Table 2 is a summary of all of the verdicts to date

1   regarding ovarian cancer claims against, they call it, LTL, or

2   Old JJCI.

3   Q   And what -- have you also depicted what is in this table

4   fundamentally in a different form?

5   A   I did it in more of a scatter-block format.

6   Q   So let's look at that next.  I believe we'll find that at

7   Exhibit -- he said pausing, hoping someone will help him.

8            MR. JONES:  What's the scatter --

9            MR. RASMUSSEN:  80.

10            MR. JONES:  80?

11            MR. RASMUSSEN:  8 0.

12   BY MR. JONES:

13   Q   -- 80.

14            MR. JONES:  Thank you.

15   BY MR. JONES:

16   Q   And is this the scatter chart to which you just referred,

17   Dr. Mullin?

18   A   Right.  It -- it -- so -- correct.  The "X" axis or the

19   horizontal axis is looking at plotting things temporally and

20   the vertical axis is the magnitude of the verdict and it shows

21   -- you have a lot of zeros, you have a lot of what are large

22   numbers, and a couple of very large numbers.

23   Q   And have you also looked, then, Dr. Mullin at outcomes from

24   trials in mesothelioma claims against Old JJCI?

25   A   I have.

1  Q   And is that depicted in Figure 3 of your report?

2  A   It is.

3         MR. JONES:  Let's pull that up just for a moment.

4  That would be 70 --

5         MR. RASMUSSEN:  79.

6         MR. JONES:  -- 79.

7  BY MR. JONES:

8  Q   Is this, indeed, as Mr. Rasmussen just aided me, Figure 7,

9  Exhibit 79, Figure 3 from your report?

10  A   It is.

11  Q   And again, we have -- what, what does this depict for his

12  Honor?

13  A   It, it's qualitatively similar.  It's showing, again, all

14  the verdict outcomes and, again, a large number of zeros, but

15  also some verdicts that had, you know, quite substantial

16  numbers at the same time.

17  Q   So can you just frame for us as a matter of concluding your

18  equity opinion having reviewed the data that, at least in part,

19  underlies it?

20  A   The equity really comes from the same fundamental mechanism

21  as the efficiency.  Once you've codified a set of rules, two

22  claimants with the same underlying fact pattern will receive

23  the same compensation.

24      So in essence, similarly situated claimants get similar

25  compensation, while in the tort system there is a high degree

```
 1   of volatility to that.  So you're replacing a system where

 2   there's a lot of uncertainty for a claimant with a certain

 3   amount of money, which most people prefer to remove risk.  So

 4   it's better for a claimant to get the expected value as opposed

 5   to have to get a draw from a highly volatile system.

 6   Q   And in which of the two systems, then -- I think I

 7   understood it -- but in which of the two systems is the outcome

 8   more predictable?

 9   A   It's more predictable in the trust-based system.

10           MR. JONES:  I have no other questions at this time,

11   your Honor.

12           THE COURT:  Okay.

13           Cross?

14           MR. SATTERLEY:  May it please the Court, Joe Satterley

15   for certain creditors.

16           THE COURT:  All right.

17           MR. SATTERLEY:  May I proceed, your Honor?

18           THE COURT:  You may.

19                        CROSS-EXAMINATION

20   BY MR. SATTERLEY:

21   Q   Dr. Mullin, my name is Joe Satterley.  You and I have never

22   met before, correct?

23   A   I think we met briefly in my deposition, at least you were

24   on the screen, but you  --

25   Q   Okay.
```

1    A    -- didn't ask me questions.

2    Q    Okay.  Other than, other than your deposition this weekend,

3    you and I have never met in any of the trials I've tried over

4    the last 24 years?

5    A    That's correct.

6    Q    Okay.  Because your, your focus has been for the last

7    several years on bankruptcy-type issues, correct, with regards

8    to asbestos?

9    A    That's a large fraction of the work I do.  I also do a lot

10   of work in insurance-related actions.

11   Q    Okay.

12        Now you're not offering any opinions today about whether

13   J&J has independent liability, J&J, the parent company,

14   correct?

15   A    Correct.

16   Q    And you're not offering any expert opinions about whether

17   any third parties have independent liabilities with regards to

18   talc and talc exposures, correct?

19   A    Correct.

20   Q    And you're not offering any opinions about intercompany

21   agreements between J&J, the parent company, and any other

22   companies, correct?

23   A    Correct.

24   Q    And you're not an expert here to talk about J&J or JJCI

25   with regards to asbestos and whether their product contained

1   asbestos?

2   A    Definitely not doing that today.

3   Q    Okay, good.

4        And, and you've not been asked to, to opine on the

5   propriety of granting a preliminary injunction to J&J, correct?

6   A    Correct.

7   Q    Okay.  And you've not been asked to opine or give any

8   opinions about granting a preliminary injunction to any third

9   party, third parties, correct?

10  A    All right.  And you're not giving any opinions about the

11  likelihood that, of what LTL Management, the likelihood that

12  they may prevail and attempt to get a trust, true?

13  A    So I said the trusts that typically emerge, the track

14  record of trusts emerging from these type of bankruptcy

15  proceedings, to the best of my knowledge, basically everyone

16  has, to date.

17       So that is embedded within the opinion that that is a

18  likely outcome.

19  Q    Sure.  But you've not been asked to form any opinion about

20  the likelihood of this particular debtor, LTL Management, and

21  how likely it is that they will prevail in getting the trust

22  set up, true?

23  A    I wasn't asked to provide a probability for that, that's

24  correct.

25  Q    And you've not been asked to give any opinions about

1  Johnson & Johnson succeeding in getting a channeling injunction

2  in the context of a confirmation plan, true?

3  A    Correct.

4  Q    And you've not examined the harm to the debtor with regards

5  to this preliminary injunction issue, true?

6  A    Harm to the debtor?

7  Q    Yes.

8  A    I don't think what I'm offering opinions on speaks to that.

9  Q    And, and you have not been asked to evaluate the harm to

10 the potential creditors, true, with regards to this preliminary

11 injunction?

12 A    I think some of the opinions I have speak to that.

13 Q    I'm sorry?

14 A    I believe some of the opinions I had do speak to that

15 issue.

16 Q    And I'm going to talk with you in a minute about efficiency

17 and equity just for a couple of minutes, but I, in this

18 particular situation with regards to the preliminary injunction

19 you've not examined the harm to the, the creditors with regards

20 to the preliminary injunction matter, true?

21 A    As I said, some of the opinions I have I think do speak to

22 that issue, but it's not something I was asked to, beyond the

23 two opinions I'm offering and how they speak to it, I wasn't

24 asked to address that comprehensibly.

25 Q    You've not offered any opinions about whether any harm to

 1   either the debtor or the creditor would be irreparable harm,

 2   true?

 3   A    That's correct.

 4   Q    As a matter of fact, I read your report dated October 29th

 5   and the word "irreparable harm" appears nowhere in your expert

 6   report, true?

 7   A    I -- to the best of my recollection, that's true.

 8   Q    And you've not engaged in any type of balancing of harms

 9   with regards to the debtor and a balancing with regards to

10   creditors and any equities that exist in a balancing context,

11   true?

12   A    Beyond the opinion on equity that I'm offering, which would

13   speak towards that question and efficiency, no.

14   Q    And you've not examined any harm that may affect other tort

15   defendants that are in lawsuits if claims against Johnson &

16   Johnson are enjoined by a preliminary injunction, true?

17   A    True.

18   Q    And you've not examined or opined on the public interest

19   with regards to a preliminary injunction extending the stay to

20   Johnson & Johnson, the parent company, correct?

21   A    Only to the degree that equity and efficiencies are part of

22   the public interest consideration, but beyond that, no.

23   Q    But beyond just saying equity's a public consideration, you

24   haven't done a, a detailed, in-depth analysis of the public

25   interest and whether it weighs in favor of an injunction or

1   whether it weighs against an injunction?

2   A    Beyond the two issues I've looked at, I have not done that.

3   Q    Okay.  Now I don't know how much time I got left, but I

4   just want to talk about equity and -- and -- for -- and

5   efficiency for a few minutes.

6        You -- you --

7             THE COURT:  I think you've got seven or eight minutes

8   left.

9             MR. SATTERLEY:  Oh, good, good.  Thank you, your

10  Honor.  I appreciate it.

11            THE COURT:  Do you disagree?

12  BY MR. SATTERLEY:

13  Q    You talked about -- I saw a chart up there on outcomes of

14  various trials.  You've not sat through any of those trials

15  like Mr. Kim has done, have you?

16  A    No.

17  Q    And you don't know the differences presented at those

18  trials, correct?

19  A    Say that, again.

20  Q    You don't know the differences, the differences of evidence

21  that was presented at those various trials?

22  A    No.

23  Q    'Cause you haven't examined, you haven't done an in-depth

24  analysis of, of the reasons why a particular verdict occurred,

25  right?

1   A    That's correct.

2   Q    Okay.  And other than  -- I think you got the verdict

3   information from Law360.  You went on line and found out the

4   verdict information, right?

5   A    Most are that.  Some are verdict sheets.

6   Q    Okay.  And, and other than the Law360 articles or a few

7   verdict sheets, you haven't done any in-depth analysis of the

8   verdicts and what occurred at the various trials, true?

9   A    That's correct.

10  Q    And the verdict sheets that you've seen -- I don't, I don't

11  know which verdict sheets you've seen -- but you've seen

12  verdict sheets of the Leavitt and Prudencio and Schmitz cases?

13  A    I don't remember them by the claimants' names.  So I don't

14  know for sure if I've seen that verdict sheet or not.

15  Q    What about the Ingham verdict sheet?

16  A    That I'm familiar with the Ingham verdict?  I likely have

17  seen that verdict sheet.

18  Q    And each of those cases, the Ingham, the Prudencio, the

19  Schmitz, the Leavitt cases, the jury in each of those four

20  trials assigned individual responsibility to Johnson & Johnson

21  and individual responsibility to Johnson & Johnson Consumer,

22  true?

23  A    I, I know generically there's been partitioning.  I don't

24  have the recollection to tell you if it's true for those three,

25  in particular.  But your point generically, I agree with.

1    Q   And, and you call it "partitioning."  I call it allocation

2    of fault or apportionment.  Is that the same thing?

3    A   Yes.

4    Q   Okay.  All right.

5        Now with regards to equity, it would be, it would be

6    inequitable or unfair to award money damages to someone that

7    has a, a horrible claim that's not, that has no merit, right?

8    A   It would -- so a claim with no merit, that, that would not

9    weigh in favor of equity from an economist standpoint, I agree.

10   Q   And it would be horribly unfair to give a very little

11   amount of money in compensation to somebody that was horribly

12   damaged from a, from a tortfeasor, true?

13   A   Assuming the tortfeasor was liable for the damage --

14   Q   Sure.  Assume --

15   A   -- that could be true.

16   Q   Assuming liability, that'd be unfair, right?

17   A   That could be.

18   Q   All right.  Now I want to talk about efficiency just for a

19   moment.

20       It would be efficient, it would be efficient within our

21   justice system to do away with criminal trials and put people

22   in jail if they're arrested.  That would be efficient, true?

23   A   No.

24   Q   It wouldn't?  It would cost a lot less money, right?

25   A   But that's -- so it goes relative to your definition.

1    So if putting an innocent person in jail just as paying a

2   non-meritorious claimant zero would be an inefficient outcome.

3   You're deviating from the ideal outcome.

4   Q    But -- but --

5   A    So efficiency has two components:  How close do you get to

6   the truth and what does it cost you to get there.

7   Q    And so -- but if we're just looking at the cost, doing away

8   with criminal trials and just putting people in jail would be

9   much cheaper than going through a criminal justice system and

10  have juries make decisions, true?

11  A    Many things are cheaper, yes.

12  Q    Okay.

13        MR. SATTERLEY:  I'm going to cede the remaining

14  portion of my time to any other attorneys that --

15        THE COURT:  Okay.  Thank you.

16        MR. SATTERLEY:  I don't have know how many minutes I

17  gave.

18        Thank you, your Honor.

19        MR. CHAREST:  Please the Court, Daniel Charest on

20  behalf of the MDL Committee.  In the honor, in the interest of

21  efficiency, I'll jump right into it.

22        THE COURT:  Go ahead.

23                      CROSS-EXAMINATION

24  BY MR. CHAREST:

25  Q    Doctor, your firm worked for Johnson & Johnson in the

1  Imerys bankruptcy starting in 2019 to the present, correct?

2  A    Correct.

3  Q    And here you are talking about, to the Court, about how, in

4  your view, the estimation of mass tort claims and settlement is

5  appropriate in (indiscernible), correct?

6  A    The estimation of mass tort claims --

7  Q    Yes.

8  A    -- is appropriate?

9  Q    Resolving claims through an estimation process and the

10  funding of a trust, that's, that's what you're fundamentally

11  espousing, correct?

12  A    Well, resolving claims through a trust, it's usually a

13  negotiated settlement where an estimation hearing or proceeding

14  may assist in reaching that settlement.  But --

15  Q    Okay.

16  A    -- the estimation proceeding itself doesn't create it.

17  Q    So in Johnson -- what Johnson & Johnson said about the

18  estimation of mass torts and settlement through a trust in the

19  Imerys proceeding, while your firm was employed by Johnson &

20  Johnson, said, "It's not appropriate when there's a

21  creditworthy party standing ready to take over the claims and

22  pay proven claims in full," right?

23  A    That was in the context of the Imerys bankruptcy?

24  Q    Yes, sir.  That's -- that's -- Johnson & Johnson said that

25  to the bankruptcy court in Imerys, right?

1        MR. JONES:  Excuse me, your Honor.  Jim Jones for the

2   debtor.

3        Could you just identify what you showed the witness,

4   sir?

5        MR. CHAREST:  Sure.  It's opposing parties in interest

6   Exhibit 136, their reply brief in Imerys for the motion to do

7   away with the stay in Imerys.

8        THE WITNESS:  What they -- you correctly read what

9   they wrote.  The "pay in full," I think, is a material

10  component there 'cause in the Imerys bankruptcy the plan

11  proponents assert that the claims aren't being paid in full.

12  And contrasting being a partial payment in a bankruptcy versus

13  a full payment in the tort is a very different question from a

14  full payment from a bankruptcy and a full payment from a tort.

15  BY MR. CHAREST:

16  Q   Right.  It said -- Johnson & Johnson said claimants would

17  get paid in full because they have Johnson & Johnson to stand

18  by they'll pay in full.  And that's why the process you're

19  suggesting Johnson & Johnson said was inappropriate in this

20  circumstance, right?

21  A   When you're talking about a partial payment in a bankruptcy

22  versus a full payment in the tort system, that's my

23  understanding of the context of that filing.

24  Q   Okay.  And you understand that the effect of this

25  injunction, if the debtors are, are successful, is to provide

1    protections to the affiliates of the debtor, right?

2    A    I don't know the full effect of the injunction.

3    Q    That's all right.  We know it.  It's okay.

4        In the Imerys bankruptcy Johnson & Johnson told that

5    bankruptcy court that, "Whatever interest the debtor has to

6    protect affiliates don't outweigh the, the interests of the

7    thousands of ordinary claimants and the potential for a full

8    recovery and Johnson & Johnson's own interest in defending its

9    products in the tort system," right?

10   A    Correct.  Again, it's emphasizing the full recovery versus

11   a --

12   Q    Because the claims go against Johnson & Johnson, right?

13   A    Well, because it was a partial recovery being put forward

14   in the bankruptcy versus a full recovery in the tort system.

15   Q    And the proposition by Johnson & Johnson was to remove all

16   of these claims and take them back into the tort system and

17   Johnson & Johnson was going to stand there as the deep pocket

18   that will take care of everything, right?

19   A    There were a lot of --

20   Q    I'm not asking about this yet.

21   A    -- words in there --

22   Q    I'm not asking about it.

23   A    -- that aren't on the page.

24   Q    I'm not asking about that yet.  I asked my question.

25       That's what they wanted to do, was take the cases out of

1    the bankruptcy in Imerys and, and proceed against Johnson &

2    Johnson in the tort system, right?

3    A    Well, against both Imerys and Johnson & Johnson.

4    Q    Well, let's tease --

5    A    They were already proceeding against Johnson & Johnson in

6    the tort system.

7    Q    Let's tease that out because --

8    A    I think they were talking about taking --

9             THE COURT:  One at a time.

10            THE WITNESS:  I think they were talking about taking

11   the claims against Imerys out of the bankruptcy.  The claims

12   against Johnson & Johnson were already in the tort system.

13   BY MR. CHAREST:

14   Q    Right.  And in, on Paragraph 41 on Page 22 of this reply

15   brief Johnson & Johnson said that it was "absurd to suggest

16   that there was not sufficient capitalization."  Because Johnson

17   & Johnson has a market cap of $385 billion, right?  That's what

18   it said, right?

19   A    Yes.

20   Q    Okay.  And then it said -- here's the part I like the

21   most -- "Johnson & Johnson can provide the claimants far

22   greater protection than the debtors or bankruptcy claim could

23   ever give."  Because as Johnson & Johnson -- the Johnson &

24   Johnson people were saying to the Imerys court that it was

25   going to stand up for these claims.  And what you may or may

1   not have heard -- 'cause I don't think you were here the whole

2   time -- is that JJCI is saying, "Oh, no, no.  We have it, not

3   Johnson & Johnson."

4       So do you know why in the <u>Imerys</u> case Johnson & Johnson was

5   talking about Johnson & Johnson's market cap and Johnson &

6   Johnson's ability to cover when everyone here is saying, "Oh,

7   it's just JJCI," do you know?

8   A    No.

9   Q    Okay.  Thank you.

10          THE COURT:  That it?

11      (No response)

12          THE COURT:  Any redirect?

13          MR. JONES:  No, your Honor.

14          THE COURT:  You may step --

15          MR. JONES:  Jim Jones for the debtor.  No.

16          THE COURT:  You may step down, then.  Thank you.

17          THE WITNESS:  Thank you.

18          THE COURT:  All right.  We had some submissions that,

19  beyond this.  We've already talked about the declarations.

20  Have we got everything now?

21          MR. JONES:  I think so, your Honor.

22          THE COURT:  Do you need a break before we start

23  arguing?

24          MR. SATTERLEY:  Oh, oh, your Honor.  I apologize.

25          I did want to just move into evidence the verdict

1  sheets.  I don't know if we already -- for Prudencio, Leavitt,

2  and Schmitz.  Those as 201, 202, and 203 just showing the

3  apportionment.

4          MR. JONES:  I think we're moving all of our exhibits

5  as identified in our exhibit list.

6          MR. SATTERLEY:  Well, I just want to mark or for the

7  record say Exhibit 201 will be the Schmitz verdict form with

8  the apportionment; 202 will be Leavitt verdict form with the

9  apportionment; and 203 will be Prudencio.  And we can clean up

10  the, submit them at the break.

11          THE COURT:  Identified as such.

12          MR. JONES:  Your, your Honor, as I said before, we're

13  moving all of our declarations and our exhibits as identified

14  both in court and in our list.

15          THE COURT:  Right.  All we're doing at the moment is

16  identifying these additional verdict sheets.

17          All right.  Do you need a moment or are we ready to

18  argue?

19          MS. FLETCHER:  Your Honor, could I get some clarity on

20  the redacted Travelers exhibits that were in the, I believe,

21  the, the plaintiff's exhibit list, that it will be the redacted

22  exhibits that will be tendered for admission?

23          MR. SATTERLEY:  Joe Satterley for certain creditors.

24          We did not use it during the course of this trial.  So

25  I think it's a moot issue.

1        MS. FLETCHER:  Okay.  If --

2        THE COURT:  Okay.

3        MS. FLETCHER:  So long as --

4        THE COURT:  So they're not coming in at all.

5        MS. FLETCHER:  Thank you.

6        THE COURT:  Everyone agree?

7     (No response)

8        THE COURT:  Very good.  All right, very good.

9        Again, do you need a moment or are we ready to argue?

10        MR. JONES:  I'm sorry.  We have on our list some of

11   the Travelers policies and they, I believe now, have been fully

12   redacted as -- as -- consistent with what insurance counsel as

13   requested, is that right?

14        UNIDENTIFIED SPEAKER:  She's asking (inaudible.)

15        MR. JONES:  The reservation of rights letters I am now

16   told are not on our exhibit list and I will speak further to

17   them no more.

18        THE COURT:  Ms. Fletcher, does that satisfy?

19        MS. FLETCHER:  I'm very satisfied.  Thank you.

20        THE COURT:  Okay.  Thank you.

21        Okay.  Again, are we ready to argue or do we need a

22   moment?

23        MR. GORDON:  We're ready, your Honor.

24        THE COURT:  Okay.

25        MR. GORDON:  Your Honor, Mr. Hamilton is, is going to

1    start and he promises to spend one minute on the issue of that

2    document he, he tendered right after lunch --

3          THE COURT:  Right.

4          MR. GORDON:  -- to address the, the unclean hands

5    statements that were made.

6          THE COURT:  I assume no objection to splitting

7    arguments.  Under the circumstances, it might elevate form over

8    substance.

9          Go ahead, Mr. Hamilton.

10          MR. HAMILTON:  Thank you, your Honor.

11          We learned for the first time about the Pratt Notice

12    of Bankruptcy and Suggestion of Stay filing yesterday when

13    Ms. Cyganowski raised it.  We immediately during the hearing

14    investigated it and determined that it, it was filed

15    erroneously as a result of miscommunication between law firms

16    for the parent, Johnson & Johnson.  No one at the debtor or at

17    debtor's counsel, Jones Day or Rayburn Cooper, and no one at,

18    at the parent company was aware that the, the erroneous Notice

19    of Bankruptcy Filing had been filed in the Pratt case until we

20    heard about it from Ms. Cyganowski.

21          When we investigated, we determined it was filed in

22    error and we also determined in that investigation that a

23    similar erroneous filing of the original Notice of Bankruptcy

24    had been filed in three other cases across the country for the,

25    as a result of the same miscommunication.  We immediately

1    instructed the counsel involved to correct the mistake by

2    filing the revised Notice of Bankruptcy and Suggestion of Stay

3    based on the reservation of rights that we discussed with your

4    Honor on the Monday conference call after the TR ruling, TRO

5    ruling.  And all of those corrected filings have occurred this

6    morning or at some point today.  So the mistakes have been

7    corrected.

8              Thank you.

9              THE COURT:  Anyone got anything else to say about

10   that?

11      (No response)

12             THE COURT:  Okay.

13             All right.  Mr. Gordon?

14             MR. GORDON:  Good afternoon, your Honor.  Greg Gordon,

15   Jones Day, on behalf of the debtor.

16             We have a slide presentation.  I have some hard

17   copies.

18             May I approach, your Honor?

19             THE COURT:  You may.

20      (Slide deck handed to the Court)

21             THE COURT:  Okay.  Thanks.

22             MR. GORDON:  Thank you, your Honor.

23             And we did hand out hard copies to the other side as

24   well.

25             THE COURT:  Okay.

1          MR. GORDON:  We're going to try this with me with the

2     clicker here.  That -- we, we may have to get in a substitute

3     clicker, though, after a while.

4          So, your Honor, I wanted to start with just setting

5     some fundamentals for the Court.  Because, obviously, your

6     Honor's heard a lot of testimony and a lot of evidence over the

7     course of several days and I -- I -- we thought it was

8     important to, more or less, reset.

9          So looking at the list, your Honor, from the debtor's

10    perspective we came into this Court with the goal to deliver a

11    fair and equitable solution for all the patties.  When I say

12    "all the parties," I'm including the, the claimants and our

13    intent was to do that as quickly as we can and as efficiently

14    as we can.  As I indicated on, on the first day we started

15    these hearings, we're prepared to start negotiations

16    immediately and I, we just point out on the slide that, from

17    our perspective, that is a valid reorganizational purpose for

18    the proceeding.

19          The second fundamental, from our perspective, is in

20    making the filing we tried to be responsive to concerns raised

21    by the Court in other proceedings.  This debtor, this company,

22    has been following proceedings in this Court and is aware of

23    concerns that your Honor has raised with respect to some of the

24    other cases that are similar.  And accordingly -- and I went

25    through this to some extent on the first day -- we've modified

1   approaches.  We've made changes in an effort to try to

2   ameliorate concerns that were raised.  And I'll, I'll talk

3   about that more in a minute.

4        The third fundamental is, from our perspective -- and

5   I believe the evidence established this -- the situation

6   prebankruptcy simply wasn't tenable and it wasn't tenable even

7   for a company of this size and it wasn't tenable for the

8   claimants, either.  Because, as your Honor just saw from the

9   testimony of Dr. Mullin and the charts that accompanied his

10  testimony, the results in the tort system have been extremely

11  wide ranging.  We've called them "lottery like," which I think

12  is fair, and the majority of the claimants have been receiving

13  nothing.  And this is a company that wants to resolve this

14  litigation and it wants to move on and conduct its business and

15  the entire Enterprise, as your Honor knows, is engaged in, in a

16  business that, that's very important to people around the

17  world, frankly, and there's a lot of research and development

18  costs that the company has to expend and litigation like this

19  for companies like this is problematic.

20       The fourth point is that, you know, part of the

21  rationale here was that we believe -- and we also think that

22  Dr. Mullin's testimony showed this -- that there are serious

23  inefficiencies and inequities in the tort system.  And again,

24  we believe bankruptcy provides the only opportunity for these

25  issues to be resolved in a way that's efficient and it's

1    equitable for everyone.

2         And then the last thing -- I'm, I'm going to skip the,

3    the second-to-last 'cause I've already said it, but the last

4    one is we submit, your Honor, that we've acted in good faith

5    and with clean hands.  And I'm, and I'm going to come back to

6    that.  Because, obviously, a lot has been said in the remarks

7    of counsel on the other side that this is all a bad faith

8    maneuver, it's not appropriate, it's designed to harm the

9    claimants, it's intended to escape liability.  And we dispute

10   all of that and we, we believe and we strongly believe this

11   will actually be to the benefit of everyone.

12        And, your Honor, this, this slide is intended to,

13   basically, sum up the bottom-line reasons why we believe a stay

14   of all the litigation against all the protected parties is

15   warranted.

16        No. 1, the debtor, LTL, has assumed the liability for

17   all talc claims related to Johnson's Baby Powder.  And again,

18   I'll come back to this, but we think the evidence now has been

19   clear and it's confirmed that there was an assumption of

20   liability back in 1979, an assumption of J&J's liability for

21   the pre-'79 period.  We know that the predecessors to the

22   debtor manufactured and sold the talc products post-'79 and

23   because of that, a stay is warranted against all the companies

24   and, and all the protected parties.

25        The second major point that supports a stay of all

1   litigation is the fact that, in the end, the claims against all

2   these protected parties are the same.  In every case, it's the

3   same plaintiff, it's the same product, it's the same alleged

4   injury, and it's the same damage.  And you've heard a lot of

5   testimony over the last several days to the effect that, no,

6   there's independent claims against Johnson & Johnson.  They're

7   independent claims based on misrepresentations, based on, you

8   know, alleged influence on safety decisions, and I would just

9   say to your Honor that none of that matters.  It doesn't change

10  the analysis at all.  Because there can't be a claim against

11  Johnson & Johnson unless  there's a claim against Old JJCI.  In

12  other words, if the product is safe and doesn't cause damage,

13  then there's no basis for liability against Johnson & Johnson.

14  And that, to me, your Honor, is enough, in and of itself, for

15  the Court to conclude that the automatic stay applies and that

16  a preliminary injunction should be granted.

17         The next major point, your Honor, I want to make based

18  on the evidence is that the claims at issue here have been

19  indemnified by the debtor.  There's been significant evidence

20  in the record about this.  You, you've seen -- and I'm, I'm

21  going to come back to this -- you've seen, for example, with

22  retailers copies of the indemnification agreements.  You've

23  seen tenders.  You saw a summary chart showing a number of

24  tenders that were accepted by the company from the retailers.

25  You have indemnities running to New JJCI and affiliates.  And

1    there's other protected parties, your Honor, other agreements

2    that the evidence references where there are indemnities.

3         The next point, your Honor, is the evidence clearly

4    shows, in our view, that the insurance is shared.  It's shared

5    between Johnson & Johnson, the parent company, and the debtor,

6    LTL, and if the litigation isn't stayed, then there's the risk

7    or the problem that that insurance will be diminished.  And it

8    doesn't matter, your Honor, that there's coverage in dispute

9    with the carriers with respect to this.  Because the question

10   is can the rights of the debtor to insurance be harmed and

11   whether there's currently a litigation dispute or not, we would

12   submit that the answer to that question is unequivocally yes.

13        And then lastly, your Honor, and, you know, perhaps,

14   most important, in our view, continued litigation of these

15   claims against any of these protected parties outside of this

16   Court will effectively end this reorganization effort in its

17   infancy.  And I think, your Honor, you already saw from the

18   evidence that's been submitted -- and again, I'll come back to

19   it -- what's happened in the interim since the bankruptcy case

20   was filed.  And I'm going to go back and show you, again,

21   what's been happening in the tort system.  Because what's been

22   happening is that the plaintiffs are telling the court, the

23   various state courts that notwithstanding the ruling on the

24   TRO, notwithstanding there's a stay in place with respect to

25   Old JJCI, nothing has changed, that the same evidence is

1   allowed to come in, the same amount of damages, everything is

2   the same.  The recoveries and everything is the same.  And

3   honestly, your Honor, we're not surprised by that because the

4   claims are exactly the same.

5        And I think, your Honor, the other thing I'll mention

6   about this is you saw from the evidence, even though the issue

7   of the, the Court's ruling was raised in at least a couple of

8   state courts, those courts based on arguments by the plaintiffs

9   decided that there was no reason to change anything.  There

10  wouldn't be any limitation in the evidence.  It would basically

11  be business as usual and that's the chaos that will occur and

12  continue to occur if a stay is not recognized by this Court or

13  a preliminary injunction's not issued by the Court.

14       So, your Honor, I've moved on to Slide 6.  This is a

15  slide that reflects the restructuring of Johnson & Johnson that

16  occurred in 1979 and it was effective as of January 1, 1979 and

17  there, obviously, was a great deal of time spent over the last

18  several days focusing on this.  This first slide comes from the

19  minutes.  And again, what's important to recognize with this

20  slide, your Honor, is the intent of this transaction, which is,

21  is picked up in the minutes -- and Mr. Kim testified about

22  it -- which is there, there was a focus on decentralization and

23  the, as a result there was a decision made to move a number of

24  operating divisions, divisions that were all operating inside

25  the parent company, down into subsidiaries.

1          And, your Honor, consistent with that -- and this is

2   also reflected in the minutes of that December 12, 1978 board

3   meeting -- this decentralization was to be accomplished or

4   effectuated through these transfers of businesses and assets to

5   various subsidiaries and in connection with those transfers,

6   those subsidiaries would assume the liabilities of the

7   respective divisions.  And you can see, your Honor, in yellow,

8   we've highlighted the Johnson & Johnson Baby Products Company

9   division, which is one of the ones that was restricted in this

10  way at the time of this transaction.

11         Now, your Honor, this slide comes from the actual

12  agreement itself and as your Honor knows, again, a significant

13  amount of time was spent on this.  And in the Recitals you can

14  see that the subsidiary "is wholly owned by J&J and J&J is

15  desirous of transferring to the subsidiary all assets and

16  liabilities which are now allocated to the Baby division on the

17  books or records of Johnson & Johnson."

18         So what's important to focus on there, your Honor, is

19  the fact there is a clear intent to transfer all assets and

20  liabilities to this corporation.

21         And then in connection with that, your Honor, the

22  subsidiary, again in the same document, "agrees to assume all

23  indebtedness, all liabilities, all obligations of every kind

24  and description which are allocated on the books or records of

25  J&J as pertaining to its Baby division."  And then it goes on.

1    There's an indemnity that says, "And the subsidiary hereby

2    covenants and agrees with J&J that the subsidiary will forever

3    indemnify and save harmless J&J against all the indebtedness,

4    all the liabilities, and all the obligations that have been

5    assumed."  And it's really important, your Honor, we believe,

6    to focus on the breadth of that language.

7         Now the other side is obviously arguing to you that

8    this is extremely limited because of the language of, the

9    allocation language based on liabilities "allocated on the

10   books or records," but, your Honor, I just ask you to think

11   about that, and we obviously have cases that support our

12   position on this.  But in a situation where the company was

13   intending to decentralize and send its businesses to the

14   subsidiaries and have those subsidiaries assume all the

15   obligations, why would there be a carveout of product liability

16   liabilities, is what's being suggested by the other side, and

17   certainly, why would there be a carveout that's not specified

18   anywhere?  And I would submit that the answer to that question

19   is because it wasn't necessary.

20        THE COURT:  Uh-huh (indicating an affirmative

21   response).

22        MR. GORDON:  And again, if you think about the

23   context, it's not surprising that there's a reference to

24   allocation on the books or records because you're talking about

25   divisions that up until that time were all part of the company

1   and this is just saying anything, basically, in the company

2   that was allocated to this business --

3           THE COURT:  Uh-huh (indicating an affirmative

4   response).

5           MR. GORDON:  -- was being moved to the subsidiaries.

6   Any other interpretation that suggests that this wasn't

7   decentralization, that this was something different, it was, it

8   was a partial movement of assets and liabilities, it seems to

9   me is inconsistent with every bit of evidence that your Honor

10  has seen and heard over the last few days.

11          So, your Honor, this slide just has short summaries of

12  two cases that we cited in our brief and these, to me, were

13  interesting because they're very similar to our case, if not

14  even -- there could even be, have been made a more compelling

15  argument in those cases, I think, that these particular

16  liabilities weren't transferred.

17          So the first one, this Bippus case, there was an

18  agreement to assume and pay all liabilities and obligations

19  reflected on the balance sheet.  So that's more narrow than

20  what we have.  We have books or records.  That's like anything

21  in the books or records anywhere.  This is reflected on the

22  balance sheet.  And the court concluded there that that still

23  included product liabilities claims despite the fact there was

24  no specific reference to those claims in the balance sheet.

25  And again, 'cause the court was focusing on the "all

1 | liabilities, all obligations."

2 | Very similar situation in the Bouton case.

3 | Purchaser's assumption of "all liabilities whether accrued,

4 | absolute, contingent, or otherwise, to the extent, and only to

5 | the extent, that same are reflected or reserved against in the

6 | financial statements as supplemented."  The court concluded it

7 | still included future product liability claims that were not

8 | enumerated in those financial statements.  And look at what the

9 | court said, the absence of a specific reference to future

10 | product liability claims was "not significant" because the

11 | agreement "referred to broad categories of liabilities, not

12 | narrow specifics."  And I, I would say, your Honor, that that's

13 | common sense, that that makes sense.  And, and it's, that

14 | common sense would apply here as well, we believe, with respect

15 | to the 1979 agreement.

16 | Obviously, your Honor, there's been a fair amount of

17 | criticism leveled at the debtor for not having been able to

18 | locate the, the actual agreement.  We didn't have it in hand

19 | two weeks ago.  I'm not going to really spend any more time on

20 | this other than to say that we submitted to your Honor the

21 | declaration of Ms. Schirger-Ward, which explained how she found

22 | the document, and then Mr. Kim, I think, explained yesterday

23 | and today, to the best of his knowledge, what happened, why

24 | that document wasn't found before.  But I think the important

25 | point, your Honor, is the document has been found.  And the

1    criticism of the other side has now moved from, "Well, you

2    don't have the document and, therefore, there can't be an

3    assumption," to, "Well, you now have the document and there

4    still can't be an assumption."  And again, I would submit that

5    the document on its face makes clear that these liabilities

6    were assumed by the Baby Products Company in 1979.

7           Your Honor, this is just an effort on our part to try

8    to simplify the corporate restructurings that occurred on, over

9    the years with respect to the predecessors to Old JJCI and

10   then, ultimately, LTL.  I don't really plan to spend any more

11   time on this.  I, I think your Honor's heard the evidence, but

12   hopefully, your Honor will find this helpful in, in seeing

13   these various developments on a timeline chart.

14          And, your Honor, I wanted to talk about Shower to

15   Shower.  There was a fair amount of back and forth on this

16   issue and, you know, whether or not, in fact, the Shower to

17   Shower business did, in fact, end up in Old JJCI and whether or

18   not liabilities of Shower to Shower before 1978 were assumed.

19   And I would just acknowledge at the outset, as your Honor

20   knows, we weren't able to find an agreement, an assumption

21   agreement equivalent to what we found with respect to the Baby

22   Products business, but what we did find was that this letter

23   that indicates that, "Personal Products Company will take full

24   responsibility for Shower to Shower on January 1, 1978."  So

25   there -- that seems to be a clear intent that that's what was

1    supposed to happen.  And then, in addition to that, your Honor,

2    we have -- we -- we have this language from the December 30,

3    1979 Johnson & Johnson 10-K.  So this is in 1979 that describes

4    the business of Personal Products Company and specifically

5    references Shower to Shower brand body powder as being one of

6    the principal products of this company.  And then, your Honor,

7    you have this snippet from the 1986 Annual Report from Johnson

8    & Johnson, again referring, now referring to Johnson & Johnson

9    Baby Products Company and indicating that it's, it's producing

10   Shower to Shower Baby Powder.

11            I don't think at this point there's any dispute that

12   this business ended up, ultimately, in Baby Products, Johnson &

13   Johnson Baby Products Company, ultimately into Old JJCI, and

14   into, the liabilities into the debtor.  I think the only issue

15   that exists, potentially, is the, the absence of an assumption

16   for the, the period pre-1978 and we don't' think that makes a

17   difference.  And I'm going to come back and explain why.

18            But having said that, we do believe the evidence is

19   sufficient for this Court to, to conclude that, in fact, there

20   was an assumption, that that's what the parties were intending.

21   And I think that's reinforced as well by the testimony of

22   Mr. Kim.

23            Now, your Honor, you heard evidence as well about

24   course of performance following the 1979 transaction and we had

25   the testimony of Mr. Lisman, testimony of Mr. Kim indicating

1  that the costs for all talc-related litigation claims,

2  including Shower to Shower, were charged to and paid by Old

3  JJCI, the only exception being in cases where insurance paid

4  the claims.  And further from the declaration of Mr. Lisman we

5  know that J&J and Old JJCI were part of a centralized cash

6  management system.  Your Honor's seen those in other cases.

7  The Old JJCI cash was swept into a J&J concentration account.

8  Again, I know your Honor's seen cash management systems --

9          THE COURT:  Uh-huh (indicating an affirmative

10 response).

11         MR. GORDON:  -- like these.  The costs were then paid,

12 talc litigation costs were paid through that J&J concentration

13 account, but then charged back in full, charged 100 percent

14 back to Old JJCI through intercompany charges.  As Mr. Lisman

15 testified in his declaration, he was able to find general

16 ledger entries in their SAP accounting software -- and that

17 software went back to 2007 -- that showed in every instance

18 that the talc litigation costs from 2007 through the date of

19 the petition were all charged back to Old JJCI.  And then the

20 last point, again, he testified to is that the accounting

21 reserve that exists for talc-related litigation on the J&J

22 consolidated financial statements is reported in the Consumer

23 segment, which your Honor now knows includes Old JJCI.

24         Your Honor, this is just a -- I, I said I would do

25 this in the opening.  This is just a copy of -- of a general --

1    of a, of a transaction in the general ledger just to show you

2    what a general ledger entry looks like.  Your Honor's probably

3    seen these before, maybe not.

4              THE COURT:  Uh-huh (indicating an affirmative

5    response).

6              MR. GORDON:  I, I've seen them from time to time.

7              But you can see there's a code reference at the

8    bottom, 6101.  That's JJCI.  And if you go down towards the,

9    the bottom of the entry, you'll see 6101 referenced, an amount

10   of approximately $2.5 billion.  This is the intercompany charge

11   that was made with respect to the payment of the Ingham

12   verdict.  That's, you know, the $2.5 billion verdict your Honor

13   heard about.

14             THE COURT:  Uh-huh (indicating an affirmative

15   response).

16             MR. GORDON:  So I just wanted to show you what the

17   actual documentation looks like when these intercompany charges

18   are created under the centralized cash, or in connection with

19   the centralized cash management system.

20             So, your Honor, I, I have here a series of slides

21   which we believe show very clearly that the claims against JJCI

22   and J&J are one and the same.  They're basically, they've

23   basically been pleaded and argued as a single unitary claim.

24   Now this one's significant, I think, because this comes out of

25   the Master Complaint in the New Jersey MDL litigation and you

1   can see from the paragraphs we enumerate here how these claims

2   are pled and this is consistent, as Mr. Kim testified today,

3   with how these claims are pled in all the cases:

4               "Defendant, Johnson & Johnson Consumer Inc., is and

5               has been at all relevant times a wholly owned

6               subsidiary of defendant, Johnson & Johnson, under the

7               complete dominion and control of defendant, Johnson &

8               Johnson, hereinafter, unless otherwise delineated,

9               these two entities together shall be referred to as

10              'the Johnson & Johnson Defendants.'"

11          And then as you go down to some of the more specific

12  substantive allegations,  Paragraph 304, "At all relevant times

13  the Johnson & Johnson Defendants knew or should have known."

14  See, they're, they're pled together.  385, "The Johnson &

15  Johnson Defendants," those are the two companies, no

16  distinction, "misrepresented to consumers."  Next one, 385(e),

17  "Despite actual knowledge of health risks, the Johnson &

18  Johnson Defendants."  That's the way these claims are pled.

19  That's the reason why, notwithstanding the fact your Honor

20  entered a TRO that said claims couldn't proceed against LTL,

21  the claims went ahead and proceeded in the exact same way they,

22  they did before.  There was no change in the conduct of the

23  plaintiffs and there was no change in the conduct of the

24  courts, or at least some of the courts.

25          Here's another example, your Honor.  The Anderson

1    case, June 27, 2017, look at these allegations.  "Defendants,

2    their alternate entities and each of them, suppressed from all

3    consumers, including plaintiffs, medical and scientific

4    information."  18(d), "Defendants, their alternate entities and

5    each of them, failed to warn."  Again, they're just pled as a

6    single claim.  There's no distinction being drawn and that's

7    because they're the same claim.

8            This is from the McBrayer case.  And again, I think

9    this was pointed out by Mr. Kim.  So this was after the TRO was

10   entered.  This was after Mr. Bernardo, who is counsel for the

11   defense, pointed out that the TRO was entered and argued that

12   the evidence needed to be limited, that the claims were not to

13   go forward as to Old JJCI, but only as to Johnson & Johnson and

14   Johnson & Johnson had manufactured and sold the product only up

15   until January 1, 1979.  And this was the judge's response:

16           "I tell you one thing, Mr. Bernardo.  If you think

17           anybody in any of these cases is going to allow the

18           stay against liability on behalf of Old Johnson &

19           Johnson Consumer Inc. to somehow affect the evidence

20           that is going to be received, whether that evidence

21           was from Johnson & Johnson, Old Johnson & Johnson, or

22           New Johnson & Johnson, that is a very different kettle

23           of fish and I can tell you right now that is not going

24           to happen in this case, as far as I'm concerned."

25   And he let the case go forward in the same form and fashion it

1   would have gone forward in the absence of the Court's ruling.

2          Same thing happened in <u>Vanklive</u>, your Honor.  And your

3   Honor remembers the <u>Vanklive</u> case because that's the one that

4   Mr. Satterley and others pleaded with your Honor to allow go

5   forward at the hearing we had two weeks ago.

6          So you may recall that it was reported to you that the

7   trial had been paused as of that earlier hearing by the court

8   to await guidance from the TRO hearing.  That hearing occurred

9   -- there was then, I believe it was a subsequent telephone

10  conference.  It might have been the same day or the following

11  day.  And this was Mr. Satterley's position in the wake of your

12  Honor's ruling, "We absolutely disagree with the statement that

13  our case as against J&J, the parent company, J&J, ceases as of

14  1979."  Going down farther, "And J&J absolutely bears

15  independent liability from the inception, you know, of

16  Ms. Vanklive's use through the present time."

17         Again, I'm not putting this up to criticize

18  Mr. Satterley.  I'm simply putting this up to show this

19  confirms that these are the same claims.  That's the position

20  that's been taken.  That's the position that will be taken if

21  the Court doesn't confirm that the automatic stay applies to

22  J&J and the other defendants.

23         MR. SATTERLEY:  Your Honor, I -- I -- I hate to

24  interrupt a closing.  I very rarely, if ever, do this.  But

25  counsel's just taking out of context the argument --

1          MR. BLOCK:  Missed two sentences.

2          MR. SATTERLEY:  -- miss, missing the rest of the

3  sentence.

4          MR. GORDON:  Well, I'll read the rest of it.

5          MR. BLOCK:  The two sentences, please.

6          MR. SATTERLEY:  And -- and --

7          MR. GORDON:  I'll read it.

8          MR. BLOCK:  "J&J parent corporation".

9          MR. SATTERLEY:  And there's a difference between

10  evidence being limited and claims being stopped.  And --

11          THE COURT:  Understood, but it's his closing.

12          MR. BLOCK:  Right.

13          MR. SATTERLEY:  It is, your Honor.

14          MR. BLOCK:  If, if you just read from "The J&J parent

15  corporation."

16          MR. SATTERLEY:  For completeness, please.

17          THE COURT:  Go ahead.

18          MR. GORDON:  So what I didn't read, your Honor -- and

19  I'm going to explain why later:

20          "The J&J parent corporation is responsible, as in the

21          attested-to, in its interrogatories and by the

22          corporate representative for all health and safety

23          decisions, period, for all time and independently

24          marketed.  It branded on the product in the -- when

25          there were questions about the safety of the talc, it

1          was the one that assured the public it was safe

2          without warning."

3          You've obviously heard a ton of evidence about that.

4   And what I would say to your Honor, that doesn't change

5   anything.  Because that liability that they're trying to pin on

6   J&J doesn't exist if the product wasn't defective, if the

7   plaintiff wasn't harmed.  It's the same claim.  And that's all

8   being offered in an effort to recover on the exact same claim.

9          So they -- they're not suing -- they're not saying J&J

10  should have some independent, some liability independent of the

11  talc claim.  They're just trying to come up with a way to say

12  to your Honor, "Well, that's a different claim, which shouldn't

13  be enjoined," but what I'm telling you, your Honor, this just

14  confirms it's the exact same claim.  It's just dressed up

15  differently.

16         And then again from Vanklive.  And again, I'm not

17  criticizing him.  I'm just making the point.  Mr. Satterley

18  went on to say, "J&J again has attempted to create an

19  artificial deadline for when J&J's 'liability cutoff is of 1979

20  and this is absolutely false.'"

21         This is the chaos that we're experiencing and will

22  experience in the tort system absent a ruling from your Court,

23  from the Court and this is exactly what's going to happen.

24  They, they will argue in every case that it's the same, it's

25  the exact same case, it's the exact same plaintiff.  That, that

1  will adjudicate the claims that we've brought to your Honor to

2  resolve through this process.

3          I'm going to go through these fairly quickly, your

4  Honor, 'cause we spent a lot of time on this.  But there's

5  obviously been a lot of back and forth on this.  We heard the

6  testimony of Dr. Kuffman [sic].  There was a lot of cross-

7  examination on this point, but I think your Honor has heard

8  from us what our position is.  We believe strongly that the

9  decisions as to safe, the safety of talc products manufactured

10 by Old JJCI were made by Old JJCI.  They were not made by the

11 parent company and this is evidenced here in this, this Medical

12 Safety document, "Each sector within Johnson & Johnson," and it

13 references, "The Consumer Sector shall establish policies and

14 processes."  And again, I think Mr. Hamilton went through this

15 with Dr. Kuffner and I'm not going to spend any more time on

16 that.

17         There was also, your Honor, a considerable amount of

18 back and forth with respect to Dr. John Hopkins.  Our view was

19 that the plaintiffs were very selective in the testimony that

20 they presented to your Honor on the first day and we tried to

21 clarify through this testimony in the <u>Hayes</u> case that

22 Dr. Hopkins came back and he himself clarified what he was

23 saying, which is, if you look at the answer, he says:

24         "We're getting into semantics of what you mean by

25         'parent company.'  The decisions on the safety of talc

1          were made by the individual operating companies, which

2          would be, in this case, Consumer Products, which is a

3          separate company within, as you call it, the

4          'mothership,' the parent company."

5          And we believe the testimony shows, clearly shows that

6     that's, that, in fact, is accurate.  It's consistent with

7     Mr. Kim's testimony.  It's consistent with Dr. Kuff --

8     Kuffman's -- Kuffner's -- excuse me -- testimony.

9          And then again, this is just a very brief summary of

10    what we heard from Dr. Kuffner and you heard that not long ago.

11    So I'll just pass through that.

12         Now this Windsor Minerals issue has just come up and

13    this, again, I think, is an effort by the other side to try to

14    come up with a claim that, arguably, wouldn't be within the

15    scope of, of the automatic stay or within the scope of a

16    preliminary injunction.  To our understanding, the first time

17    this claim was ever raised was in this case.  It's not been

18    raised otherwise and to us, first of all, there's no basis for

19    a claim against J&J, which is what they're suggesting, because

20    notwithstanding all the questions from Mr. Block about this

21    mine was mining talc through, through Johnson & Johnson, kept

22    using the words, I think, "through Johnson & Johnson," in fact,

23    this mine was owned by a subsidiary.  Windsor was a subsidiary.

24    The mine was not owned by Johnson & Johnson.  As you know, a

25    parent company's not generally liable for the acts of its

1 subsidiary.  And just to think about this further, to go on,

2 your Honor, Windsor, as Mr. Kim testified, is now Imerys.

3 Imerys Talc Vermont, which is in, which is a debtor in

4 Delaware.  The claim that's being made by the plaintiffs is

5 that J&J dominated Windsor to the extent that it should have

6 liability.  I would submit to your Honor that's an alter ego

7 claim.  That claim based on your Honor's early rulings would be

8 property of the Imerys estate and would be stayed.  That's not

9 a -- this, to us, isn't even relevant to this proceeding

10 because this is a, this is an entity that basically went

11 through -- it was ultimately sold and is now in bankruptcy

12 itself.

13    Your Honor, indemnification.  So again, I won't spend

14 a lot of time on this, but -- the evidence is in the record --

15 but we showed, we showed through this evidence the fact that

16 there are indemnification obligations running to the retailers.

17 This slide shows the operative language in one of the, in one

18 of these agreements, which states that:

19    "Old JJCI agrees to indemnify and save Buyer harmless

20    except as hereinafter provided, from and against any

21    and all claims, demands, actions, and causes of action

22    which are hereafter made or brought against Buyer by

23    any person for the recovery of damages for the injury,

24    illness, and/or death of any person or domestic animal

25    which is caused or alleged to have been caused by the

1           handling or use of any article shipped or delivered by

2           Seller to Buyer."

3   That's an example of, of an indemnification agreement and

4   there's many of these, your Honor.

5           We also showed you this summary chart which has, which

6   had a list of 1500 tenders of indemnity that were accepted by

7   Old JJCI.  Obviously, there were pages of this, your Honor.

8   The reason we picked this particular page is you may remember

9   that Mr. Silverstein complained yesterday that he couldn't find

10  Smith's Food or Drug anywhere on the list.  It is on the list,

11  or Smith's Food & Drug.  You can see it.  It's under Kroger at

12  the top.  And obviously, Mr. Kim testified yesterday that the,

13  the company did the best it could collecting as many of these

14  as it was able to in the time frame allowed and, frankly, came

15  up with approximately 1500 in the short time frame that we had.

16          And then here's, here's typical language in a, in a

17  tender acceptance:

18          "JJCI will accept Albertson's tender for defense and

19          will indemnify Albertson's in the above-referenced

20          matter with regard to the products that were

21          manufactured by JJCI, subject to and contingent upon

22          Albertson's acceptance of the terms and conditions set

23          forth below."

24          Your Honor, the next is the existence of shared

25  insurance.  We presented another summary chart into evidence.

1   We produced approximately 450 insurance policies, all of which

2   are shared with Johnson & Johnson.  Indemnity payments under

3   those policies erode coverage.  Well, I should say, be more

4   precise.  Indemnity payments by J&J would erode coverage as

5   would retailers.  And I'll, I'll cover both those points in a

6   moment.

7          So you can see here that the named insured, your

8   Honor, is J&J and it's also "any affiliated, associated, or

9   subsidiary company in any tier as now or hereafter may be

10  formed, acquired, or constituted," etc.  And it's basically so

11  long as it remains an affiliate.  So that's just to show, your

12  Honor, that in these, these policies, the policies are shared.

13          And then if you go down to the next provision:

14          "Any person or organization herein referred to as a

15          vendor is an insured, but only with respect to bodily

16          injury or property damage arising out of the

17          distribution or sale in the regular course of the

18          vendor's business of a named insured's product,

19          subject to the following additional provisions."

20          Again, very typical provision.  Vendors are picked up.

21  This is why the retail -- this -- this -- this shows that the

22  retailers are covered by the same insurance that's available to

23  the debtor, but subject to disputes at the moment with the

24  carriers regarding coverage.

25          A lot's been said by the other side, again, about the

1   company's bad faith and that it has no business being in

2   bankruptcy.  This is an abuse of the process, an effort to

3   escape liability, an effort to pay the claimants less, and none

4   of that is true.  And this slide, first of all, shows there

5   were very few cases relating to Johnson's Baby Powder before

6   2010 and I thought Mr. Kim's testimony, if I recall correctly,

7   was that there was nothing at all before, I think, 2013.  That

8   can't be right.  Never mind.  We'll stick with the 2010.  Since

9   that time there's just been a tidal wave of cases.

10          So you went from 46 ovarian cancer cases in 2014,

11   nearly 5,000 in 2017, and then in this year to date, 12,300

12   ovarian cases, $3-1/2 billion spent on indemnity payments in

13   the last five years alone.  And your Honor obviously has

14   background information about at least the two other asbestos

15   cases pending in this District and this is, I mean, this tidal

16   wave is much more recent.  And look how steep this is, $3-1/2

17   billion in indemnity in five years alone and that doesn't cover

18   the defense costs which approximate, approximated $1 billion.

19   And, of course, the plaintiffs' point of view is that the

20   latency periods will allow these claims to be asserted for the

21   next 50-to-60 years.  So you can imagine what that might look

22   like in one year, five years, ten years.

23          We've just had -- the company has been subject to some

24   astronomical verdicts.  Notwithstanding that it's generally

25   been prevailing on both meso claims and ovarian cancer claims,

1   it suffered some astronomical verdicts.  Obviously, <u>Ingham</u> is

2   at the top and <u>Ingham</u>, of course, was appealed.  The verdict

3   was reduced, but it was, you know, it was, it was reduced

4   significantly, but it was still to a gigantic number of 2.245

5   billion.  You had three other large verdicts in single-

6   plaintiff -- plaintiff -- mesothelioma cases.

7          And I should point out, by the way, that <u>Ingham</u> was 22

8   claimants, as your Honor knows.

9          THE COURT:  -Uh-huh (indicating an affirmative

10   response).

11          MR. GORDON:  These others were single.  I mean, look

12   at the range, 6.22, 17.5, 25.75.  And then on the meso side,

13   nine large verdicts that are all under appeal ranging from 12

14   to 120 million.  It's -- it's -- it's literally like playing

15   the lottery.

16          So again, your Honor, as I said at the outset, from,

17   from our perspective, the situation is just simply untenable.

18   At this point in time we have 38,000 pending ovarian cancer

19   cases, 430 meso cases, and they're escalating.  And any one,

20   any one of those cases based on experience could result in a

21   multi-million dollar or even a multi-billion dollar verdict.

22   We're seeing that.  And there's -- the defense costs run there,

23   your Honor, 10 to $20 million per month.  And again, latency

24   period extending out for 50 years or more.  That's what brought

25   this company to this Court to seek an equitable resolution of

1   the claims, in our view, our strong view, for the benefit of

2   everyone.

3          Now I don't, I don't want to spend too much time on

4   this, your Honor, on jurisdiction, because I know that this is

5   an issue you've ruled on before.

6          THE COURT:   -Uh-huh (indicating an affirmative

7   response).

8          MR. GORDON:   But I also anticipate the other side may

9   spend some time on this because I think in the mesothelioma

10  claimants' brief this was a centerpiece.  We, we think it's

11  very, very clear the Court has subject matter jurisdiction to

12  grant the relief we're seeking.  We believe you can do that

13  under arising under principles or arising in or related to

14  principles.  Obviously, there are many courts, your Honor, that

15  have agreed that they have jurisdiction and this is just a

16  listing of a number of cases where similar injunctions were

17  granted and we, at least, haven't been able to find any case

18  where a court found that it lacked jurisdiction to either

19  extend the automatic stay or enjoin claims against nondebtors.

20         Arising under jurisdiction applies 'cause the

21  declaratory relief we seek invoke, seeks to invoke a

22  substantive right under the Bankruptcy Code, which is the

23  automatic stay.  Arising in jurisdiction applies because this

24  relief only exists by virtue of the bankruptcy case.  The

25  reason we need the relief is because of the bankruptcy filing.

1  That makes it arising, arising in.  And then the related to

2  jurisdiction, as your Honor knows, is generally viewed as a

3  very low bar.  The question is whether the outcome of the

4  proceeding for which an injunction is sought could conceivably

5  have any effect on the estate.

6           And here, as we point out on this slide, this

7  litigation would have a number of effects, adverse effects on

8  the estate.  It's going to inhibit, if not eliminate, our

9  ability to resolve the claims in the bankruptcy case because,

10 instead, they're going to be litigated in the tort system.  We

11 have the indemnification obligations which are going to put,

12 which are going to liquidate the claims right back against the

13 estate.  We have shared insurance which will be depleted.  We

14 have collateral estoppel issues as well, again largely because

15 they're the same claims.

16          All right.  So let's talk about the automatic stay.

17 So I, I think -- and the Court knows this better than I do --

18 in the -- in the -- in this District we seem to largely come

19 down or certainly focus on the Piccinin decision.  And there,

20 the Fourth Circuit referred to the "unusual situation" that

21 "arises when there is such identity between the debtor and the

22 third-party defendant that the debtor may be said to be the

23 real party defendant and that a judgment against the third-

24 party defendant will in effect be a judgment or finding against

25 the debtor."

1    So here again, your Honor, I went through these.  The

2 debtor is the real party in interest.  Old JJCI assumed the

3 liabilities.  They're the same claims.  There are indemnities

4 that run to these parties.  So if, if the claim is liquidated

5 against those parties, it's liquidated against the debtor.  And

6 we have shared insurance and we know, ultimately, the, the

7 liability of Old JJCI with respect to talc-related claims was

8 allocated to the debtor through the pre-petition restructuring.

9 And you can just see from this <u>Ms. Kipps</u> case plaintiffs'

10 allegations against JJCI and J&J are, you know, based on this

11 case are inextricably intertwined seeking the same damage and

12 relief against both.  That is, as this court said, "One wrong,

13 one injury, and one recovery."  That's a Southern District of

14 New York case.

15    And then, your Honor, I want to address, obviously,

16 this issue that's been the subject of considerable focus of the

17 other side, which is this argument, "Well, the claims are

18 direct against J&J or they're independent; therefore, there's

19 no basis to enjoin these claims."  And I, I just wanted your

20 Honor to recognize at the outset that's not a basis to deny the

21 requested relief.  Claims have been enjoined in any number of

22 cases, regardless of whether they were considered as derivative

23 or direct or independent.

24    <u>Mallinckrodt</u>, given indemnification obligations,

25 denying leave to appeal decision enjoining independent

1  conspiracy claims against non-debtor distributors there.  So

2  the leave to appeal the decision was denied, you know, arguing,

3  your Honor, based on this argument these claims are

4  independent.

5      The W. R. Grace case, given indemnification

6  obligations and collateral estoppel concerns, extending

7  automatic stay the actions against non-debtor railroad with

8  alleged independent liability, and so on.

9      You see the Am. Film Techs. case, Technologies case

10 and the Ms. Kipps case, again, all situations where there are

11 arguments made like they've been made here that the claims are

12 direct or indirect.

13     Also, your Honor, you know, we have, obviously, two

14 prongs of the automatic stay.  And again, your Honor knows

15 these better than I do, but (a)(1) and (a)(3).  (a)(1) is

16 attempting to recover on a claim either against the debtor or

17 on a claim of the debtor.  (a)(3) is there's a stay preventing

18 claims that would otherwise be treated as estate property.  And

19 your Honor, I thought, was very clear in your ruling in DBMP

20 and also in Aldrich on this point.

21     And the reason we put this up, your Honor -- and I'm

22 going to come back to this in a second -- is that we've been

23 the subject of considerable criticism for including in the

24 protected party list a number of affiliates, but the reason for

25 that, your Honor, is none of these affiliates -- I'm putting

1  aside J&J -- ever manufactured or sold a talc-related product.

2  Therefore, the only basis on which a claim could be made

3  against those entities would be something like successor

4  liability, alter ego liability, fraudulent transfer liability.

5  Those are all property of the, the estate and those claims

6  would all, all be stayed.

7         I kind of wanted to sum up on the automatic stay

8  'cause there's, there's several parties to consider, your

9  Honor.  So your Honor's already covered in, in the prior ruling

10  -- and I think the evidence fully supports it -- that the stay

11  should apply to Old JJCI and the debtor, LTL.  We would submit,

12  your Honor, that the stay also applies to any claims against

13  New JJCI essentially based on the exact same rationale that

14  your Honor relied on in your DBMP and Aldrich/Murray opinions

15  and it basically applies because of (a)(1) due to the indemnity

16  claim and also (a)(3) because New JJCI, like the other

17  affiliates, never manufactured or sold a talc-related product.

18  So the claims that would have to be made would be property of

19  the estate.

20         I've just covered the affiliates.  And then that

21  leaves J&J.  So with J&J we have the 1979 agreement with

22  respect to the Baby Products business and with that agreement

23  we have an assumption.  That means that LTL is liable for all

24  talc-related claims related to Baby Products for all time.

25  That makes any lawsuit against J&J based on Johnson's Baby

1  Powder an action to collect on a claim against LTL and that's

2  stayed by (a)(1).

3       Shower to Shower, we believe it's the same argument

4  because we believe the evidence is sufficient for the Court to

5  conclude that, in fact, there was an assumption there and that

6  there's full liability or a full -- the full liability related

7  to Shower to Shower for all time is in LTL.  But alternatively,

8  your Honor, even if you don't accept that there was an

9  assumption, the Court should extend the stay under 105 for

10 Shower to Shower products, again because they're the exact same

11 claims, and LTL is subject to collateral estoppel risk and

12 record taint, which many, many cases -- and we've cited them in

13 the brief -- have found sufficient to extend the stay to a

14 third party.

15      So we believe, your Honor, in short, that for all the

16 protected parties the stay applies with the possible exception,

17 although we think we're right on this, with the possible

18 exception of Shower to Shower.  But in that case, you know, and

19 just for that period of time before 1978.  But there, if the

20 Court decides there's no coverage for pre-'78, the 105

21 injunction should be extended.

22      So, your Honor, turning to the preliminary injunction

23 standards.  I'm at 51 minutes.  I think I'm doing reasonably

24 well here.

25      Your Honor, the Fourth Circuit has made clear -- and

1  this is in the -- this is from the Brier Creek case -- that

2  "the critical, if not decisive, issue over whether injunctive

3  relief should be granted is whether and to what extent the non-

4  debtor litigation interferes with the debtor's reorganization

5  efforts."  We also have the McKillen case, "The standard for

6  the grant of a stay is generally whether the litigation could

7  interfere with the reorganization of the debtor."

8          Here, we submit it clearly will.  I think your Honor

9  reached that conclusion in DBMP and Aldrich/Murray and the same

10  conclusion applies here.  These are the same claims.  We know,

11  since we've had two weeks to see what would happen in the tort

12  system, based on the prior ruling we know exactly what's going

13  to happen if we don't receive the relief that we're seeking.

14          This slide just shows -- and I think you've seen this

15  before, your Honor.  I guess we've added your cases on here --

16  but that multiple courts have issued similar injunctions in

17  mass tort cases.

18          Now, your Honor, turning to the factors.  Likelihood

19  of success on the merits.  And again, I think your opinions

20  have covered this.  As Judge Beyer said, "Establishing that a

21  reorganization is likely to be successful is not intended to be

22  a particularly high standard."  Judge Beyer found in Bestwall

23  in the context of the asbestos -- oh -- on the context of

24  524(g) that, "Seeking to resolve claims through section 524(g)

25  is a valid reorganizational purpose, especially in the context

1   of an asbestos or mass tort case, need not be due to

2   insolvency."  And then your own opinion in DBMP:

3           "Under controlling Circuit precedent, DBMP is entitled

4           to try to reorganize.  Section 524(g) provides the

5           debtor with a unique mechanism to resolve its asbestos

6           liabilities in a single forum through a consensual

7           plan of reorganization process."

8        And that's what we're seeking here as well, your

9   Honor, with both, with respect to both the meso claims and the

10  ovarian cancer claims as well.

11       We believe this, this element is satisfied because

12  again, we submit we entered this case in good faith.  We had

13  good reason to do it based on our experience in the tort

14  system.  We have attempted to do it in a way that actually paid

15  attention to rulings of and concerns raised by your Honor.  And

16  I don't think there's any dispute by any party -- indeed, it's

17  the opposite -- that the debtor has sufficient financial means

18  to successfully reorganize.  And as we said before, we're

19  prepared to work with the claimant representatives and your

20  Honor knows, I think, from the evidence that, in fact,

21  negotiations have been occurring in, in the Imerys case

22  involving J&J.

23       And I thought your Honor's comments in DBMP with

24  respect to this standard were applicable here.  "It's simply

25  too early to tell whether or not the claimants would ever agree

1   to a plan or not."  You found -- you were unable to conclude

2   the parties could not do it and would not prejudge the outcome.

3   And we think that same rationale applies in this situation as

4   well.

5           So, your Honor, this, I made this point a couple of

6   times, you know.  If the litigation proceeds, we submit it

7   would greatly harm the reorganization effort.  As your Honor

8   said in the DBMP case, "would gravely harm and almost certainly

9   end the debtor's reorganization efforts."  And again, it's

10   largely because the claims are one and the same.

11           This is just a calendar to depict what's happened in

12   the tort system since the bankruptcy filing on October 14th.

13   You can see there were, I think the total was around 274

14   claims, if I have my numbers right.  I guess somebody will

15   check my math.  And you can see there are even a number that

16   were filed around the period when we were having the hearings

17   on the, the TRO between the 20th and the 22nd.  And there have

18   been four filings in November so far, at least as of the time

19   this slide was prepared.

20           Here's another example from the Prudencio case.  This

21   was in August of 2021.  This is, you know, this was

22   foreshadowing what we've seen happen since the TRO where

23   counsel argued:

24           "I don't know if you've seen the news lately.  Johnson

25           & Johnson Consumer might be thinking about filing

1          bankruptcy.  They're two separate entities.  So, you

2          know, obviously, if one files and the other doesn't,

3          then, you know, we have to go after the other one."

4          That fore --

5          MR. SATTERLEY:  Your Honor, I would object.  This --

6    this -- this transcript is not in evidence.  So I don't know

7    that I've seen this be introduced.  I mean, if so, the entirety

8    of the transcript should be introduced.

9          MR. GORDON:  Well, it's Exhibit 24.

10         THE COURT:  Have we all agreed that those were to be

11   in?

12         MR. GORDON:  I thought we agreed they were all coming

13   in.

14         MR. SATTERLEY:  I'll, I'll sit down, stand, and stand

15   on -- if it's into evidence, it's into evidence.  I didn't know

16   it was in evidence.

17         THE COURT:  Thank you.

18         MR. GORDON:  Again, another example, the McBride case,

19   October 15, the day of the filing, the firm of Dean Omar filed

20   a new mesothelioma case against traditional asbestos defendants

21   and some talc defendants, but not either J&J or JJCI.  On

22   October 25th, they amended that complaint to add J&J alleging

23   claims for fraud, fraudulent misrepresentation, and fraudulent

24   concealment, but the damages sought are the same personal

25   injury damages sought in all the cases filed against J&J and

1   Old JJCI.

2          Quickly, your Honor, on balance of harms.  We would

3   submit, your Honor, that without the injunction the debtor

4   would not have the ability to globally or fully resolve the

5   claims in the bankruptcy case.  We submit based on the evidence

6   you've heard, including from Dr. Mullin, that the resolution in

7   bankruptcy would be more efficient and equitable to the, to the

8   debtor and the parties.  And, of course, again based on the

9   testimony, we believe the resolution of claims in the tort

10  system would be subject to substantial uncertainty and delay.

11  And again, I, I just continue to be struck by the fact that

12  there's so many claimants that get nothing in the tort system.

13          Again, this is largely attested to by Dr. Mullin, but

14  the, the trust system is just more efficient.  Resolving 38,000

15  claims and an additional 10,000 new claims each year in the

16  tort system would take decades and as your Honor probably

17  gathers from what you've seen so far, these cases are lengthy,

18  they're expensive, and there are serious disputed issues,

19  including causation.  Maybe first and foremost, causation.  And

20  as Dr. Mullin testified, trust resolution resolves the claim

21  much more quickly at much more lower cost.  It's more of an

22  administrative process and it's a process that can clear a

23  backlog of claims relatively quickly.  And as he pointed out

24  also, there's no need to retry the same issue dozens and dozens

25  or hundreds and hundreds of times.

1          And again, you saw this through Dr. Mullin's

2     testimony, but again, I'm just struck by this chart.  And these

3     are the initial jury awards in ovarian cancer trials against

4     the debtor and its predecessors in millions and you can see

5     along the bottom, those are the zero claims and then otherwise,

6     you can see the wide dispersion in the verdicts.  That, to me,

7     is the posterchild for a system that doesn't treat claimants

8     equitably.  And again, just another way to look at that on the

9     ovarian cancer side by defense verdicts, mistrials.  You can

10    see the various plaintiff verdicts, then you have the one

11    Ingham verdict at the end.

12         This chart was also put up prepared by Dr. Mullin.  It

13    shows very similar outcomes with respect to meso, mesothelioma.

14    Defense verdicts, reversals, mistrials, plaintiff verdicts

15    reversed, plaintiff verdicts under appeal.  And you can see the

16    dollars are all over the place.  And, and it's not only the

17    total dollars that vary significantly, but you can see the

18    compensatory versus the punitive damage dollars vary

19    significantly, too.  There's one plaintiff verdict under appeal

20    that shows 26 million in compensatory and a hundred thousand in

21    punitives.  Then there's one below that, three from the bottom,

22    21.7 in compensatory and 4 million in punitives.  It's just --

23    again, it's like, it's like playing the lottery.

24         And in contrast to that, again you have trust

25    resolution that's more equitable.  You have the procedures that

1    Dr. Mullin talked about.  You have established criteria.

2    Claimants who have, who are in similar circumstances receive

3    similar, if not the, similar compensation, if not the identical

4    compensation.

5         And Judge Beyer recognized the benefits of a trust in

6    Bestwall, "Will provide all claimants, including future

7    claimants who have yet to institute litigation, with an

8    efficient means through which to equitably resolve their

9    claims."

10        So, your Honor, on public interest, much has been said

11   and written about the Texas divisional merger statute.  It's

12   been derided as the "Texas  twostep."  I guess maybe that's not

13   so bad, but --

14        THE COURT:  It's not as good as the "Kentucky Double-

15   Barrel Question," is it?

16        MR. SATTERLEY:  I agree, your Honor.

17        MR. GORDON:  It's definitely not as enjoyable.  I'm

18   sure that's true.

19        So, your Honor, this, this is just -- I wanted to

20   reset one thing on this.  Because, you know, there -- there --

21   there's been statements made from time to time that this is

22   something that's absolutely brand new, never been done before,

23   it changes everything, and that's not really true.  And, and

24   you remember this article by Mr. Huff.  You, you asked us some

25   questions about this during the DBMP hearing.

1          THE COURT:  -Uh-huh (indicating an affirmative

2    response).

3          MR. GORDON:  But what he's saying basically

4    fundamentally here is -- and I'll show you another slide or two

5    -- the, the Texas divisional merger statute didn't really allow

6    companies to do things that they couldn't do before.  It just

7    allowed them to do them in ways that were more efficient, that

8    were easier.  And he talks about the:

9               "Traditionally, a transaction had to be effected

10              through multiple steps using common law conveyancing

11              of assets, assumption of liabilities, and

12              distributions to shareholders.  The new provision will

13              no longer require the many complications previously

14              attendant to those transactions."

15         And then effectively, what he was saying is you can

16    get to the same place, but the intent of this statute is to

17    allow you to do it in a way that's less complicated.  So says:

18              "The amendments that would permit these transactions

19              directly through statutory mergers reflect the

20              recognition.  Because no significant substantive

21              distinction between the two forms of transactions

22              exist, corporations and their shareholders can

23              accomplish these transactions through a merger if a

24              merger provides the most efficient or desirable means

25              of accomplishing the transaction."

1          So I think that's important to note because I think

2     with all the press coverage and the like and what's happening

3     in Washington, people have lost sight of the fact that, that

4     this doesn't allow a company to do anything differently from

5     what it could do before.  It just that it enables it to do it

6     in a way that's easier to, to accomplish.

7          And obviously in this case, your Honor, you've seen

8     this before.  This is how the division was done using the Texas

9     divisional merger statute in this case.  And I'm not going to

10    spend a lot of time on this because you've seen this before.  I

11    will point out here that the one thing that certainly

12    differentiates this case from the others is the fact that we

13    have a green vertical line which is intended to show, of

14    course, that the parent company has agreed to obligate itself

15    under the funding agreement as well.  And you hadn't seen that

16    before.

17         Briefly, on the funding agreement.  Again, we took

18    into account concerns raised by the Court in this case.  Here,

19    we've added the parent company as a payor.  This agreement

20    provides for funding up to the fair market value of New JJCI.

21    You heard from evidence that was elicited during this hearing

22    that the fair market value of New JJCI is 60 billion.  There

23    are no conditions on the funding uses or the funding

24    obligations and the payors and the payee have agreed to submit

25    to the jurisdiction of this Court for any proceeding to enforce

1   the terms of the funding agreement.

2         I'm not going to run through all these.  This was just

3   an effort to show you graphically changes that were made in the

4   agreements, in this funding agreement, to address concerns that

5   your Honor raised in the other cases.

6         So in the payment provision we have the "for the

7   avoidance of doubt" language to make clear that there doesn't

8   have to be a plan that's acceptable to either the payors or

9   the, that's acceptable to the payors.  There's the submission

10  to jurisdiction.

11        MR. BLOCK:  Excuse me.  Can you identify the exhibit

12  number?  It's just not on the slide.

13        MR. SATTERLEY:  Of the, of the previous one, the --

14  we're trying to figure out, follow along with you.  I'm sorry.

15        THE COURT:  Slide 77?

16        MR. SATTERLEY:  Yeah, Slide 77.  All the redline

17  stuff.  What exhibit number is that?

18        MR. BLOCK:  What document is this?

19        MR. GORDON:  Well, this is just a, this is a

20  demonstrative for use in the closing.  It's the funding

21  agreement, but it's been blacklined against the funding

22  agreement in the CertainTeed, or in the DBMP case.

23        MR. SATTERLEY:  Thank you.  Appreciate it.

24        THE COURT:  -Uh-huh (indicating an affirmative

25  response).

1          MR. GORDON:  Your Honor, we have a -- again, I think

2    this, I think, clearly shows the good faith here.  Right out of

3    the box in this case J&J and New JJCI have agreed to advance $2

4    billion into a qualified settlement fund.  This is subject to

5    your Honor's approval.  It hasn't been up for hearing.  So

6    that's $2 billion.  This is -- I want to be clear again because

7    I see press reports and other statements that suggest that

8    we're saying this is all the company would ever pay.  This is

9    simply an advance payment under the funding agreement and it's

10   a, it's a commitment by these two companies to, at the outset,

11   set aside $2 billion.  It's dedicated exclusively to the

12   payment of talc claims.  That compares to the billion dollar

13   QSF in Bestwall and I think it's 270 million in the Aldrich

14   case.

15         And these other terms about the qualified settlement

16   fund, I think you have some familiarity with and generally,

17   the, these funds can only be used to pay the claims. They're

18   going to be held by an independent trustee.  It's an

19   irrevocable trust.  And again, it does not cap the liability.

20         And then, your Honor, just following up on the slides

21   earlier from the Texas divisional merger statute, the idea that

22   the company, or a company would engage in a transaction to

23   isolate liabilities is not a new concept.  It hasn't been done

24   by Texas divisional merger, but again, that's just a different

25   vehicle to get to the same result.  Your Honor knows from the

1  <u>Garlock</u> case what was done with respect to Coltec in connection

2  with a plan and the end result, although the transaction was

3  done differently, were assets were transferred out and then the

4  old entity was then put into bankruptcy.  Pretty much ended up

5  in the same place.  Limited assets in the entity that filed,

6  but there was what was called there a keepwell agreement and

7  there was not hue and cry in that case about any unfairness,

8  any fraudulent transfer, or any concerns about that particular

9  transaction.  And in fact, the <u>Garlock</u> disclosure statement

10  said that:

11          "This was done to avoid disruption and damage to

12          Enpro's businesses.  If Coltec were to file for

13          chapter 11 without first consummating the

14          restructuring, it would not provide any additional

15          compensation to pay asbestos claims under the plan and

16          Coltec would not have agreed to the settlement

17          embedded in the plan."

18          <u>Owens Illinois</u>, your Honor, is another one.  You've

19  heard about this from time to time, that somehow this was a

20  very different situation.  It wasn't.  On the left, you can see

21  all the assets lined up in a straight line underneath the

22  parent company.  They did a different kind of transaction, a

23  holding company restructuring.  I'm not going to go through the

24  details, but ended up in exact the same, same place.  Look, it

25  created two branches.  The Owens Illinois assets ended up on

1   the left.  Paddock on the right with the limited assets and the

2   asbestos liability.  Paddock's the one that filed.  Paddock's

3   the one that in the last few months reached an agreement with

4   the plaintiffs in that case.  Fundamentally, where it ended up,

5   it looks just like this.  I just tried to simplify it.  There,

6   they don't call it a funding agreement.  It's called a support

7   agreement.  And you can see what the Chief Restructuring

8   Officer of Paddock said about this:

9        "The transaction was undertaken to structurally

10        separate the legacy liabilities from the active

11        operations while fully maintaining the debtor's

12        ability to access the value of those operations to

13        support its legacy liabilities."

14        That was done.  There was no objection to that.  The

15   claimants in that case had reached an agreement on a plan.  To

16   my knowledge, no plan has been filed yet, but the agreement was

17   announced.

18        And, your Honor, I would submit -- and again, I'm, I'm

19   kind of running out of the time I wanted to take -- we would

20   submit that doing it this way is preferable to what's been done

21   in other cases that created all kinds of problems.  Your

22   Honor's familiar with the G-I case, probably, to some extent,

23   from briefing, that assets were moved down into a subsidiary.

24   The subsidiary only assumed a portion of the liability.  The

25   liability, the remaining liability was up at the top at GAF,

1  which became G-I and G-I filed.  And there was a great hue and

2  cry by the, the claimants, "That's not fair.  You've --

3  you've -- you've diminished our ability to recover."  Well,

4  contrast that to a divisional merger where you split, but then

5  you put in place a funding agreement that makes available to

6  the claimants the exact same assets that were made before.

7  Here, there was an effort to reduce the amount of assets.

8        Next one, Babcock & Wilcox, same thing, a 1998

9  restructuring.  Three operating subsidiaries transferred to a

10  non-debtor parent.  So they were moved out of the ownership

11  chain.  Those represented 80 percent of the book value.

12  Fraudulent transfer claim was raised by the representatives for

13  the claimants.  You can see why, why that would happen.

14  Because, again, the amount of assets that were available were

15  greatly diminished.  I think maybe in that case the company

16  prevailed.  I'm not sure, but you had a big argument as to

17  whether or not the remaining assets were sufficient to cover

18  the liability.  In this case, we tried to structure this in a

19  way there shouldn't even be a question about that because not

20  only are the same assets still available, but they're now

21  backed up by the, the support of J&J to the full extent of the

22  value of New JJCI.

23        And then one last one is Keene, very similar.  A

24  spinout of five divisions to newly created subsidiaries.

25  Representatives challenged as a fraudulent transfer and massive

1   scheme to shield assets from asbestos creditors and then there

2   was litigation.  That's, again, not what happened, what

3   happened here.

4          So we would submit that a situation where you use a

5   divisional merger in a way that ensures that the claimants'

6   interests are not harmed, that assets are not taken away, that

7   they remain available is far preferable to what's been tried in

8   other circumstances.  And I said to you before, your Honor, I

9   think, there could have been different ways to do this where,

10  you know, a company could say, "Fine, I'll do a divisional

11  merger, but any funding agreement, I want to cap it at $1

12  billion because there's no way the liabilities could be more

13  than 1 billion," and then we'd be litigating over whether 1

14  billion was enough.  That didn't happen here.  Or we could have

15  done it without a divisional merger where we spin assets out,

16  but we, you know, we leave behind, say, 250 million.  That's

17  what these, these companies did.  Is that sufficient?  Again,

18  the idea here was to say, "No, we have 60 billion available now

19  through this, through this process.  There's still $60 billion

20  available," now even better backstopped by J&J.

21         And, your Honor, on this one, it really comes down to,

22  whether it's a divisional merger or not, how were the assets

23  and liabilities allocated.  And if you take a divisional

24  merger, your Honor, any divisional merger's going to involve a

25  separation.  And the other side is suggesting that because

1    there's been a separation, there's been harm because the whole

2    Enterprise didn't file.  What's been filed is less.  "I've been

3    harmed," but if you accept that argument, to me, your Honor,

4    that means every divisional merger is a problem, that there's

5    no way to do one because every divisional merger or any one of

6    these spin transactions, you're always going to have a smaller

7    company afterwards.  And I, and I think the way to evaluate

8    those is to say, "Okay.  What's left and how does that contrast

9    with the liabilities?"  It's not that you would say because

10   it's smaller, it's clearly a fraudulent transfer or it's bad

11   faith.  That -- that can't be -- that, that just can't be the

12   law.  That doesn't make sense.

13          I mean, think about it, your Honor.  We've been

14   talking about the 1979 restructuring.  All those divisions were

15   spun out.  Let's suppose that restructuring occurred in 2018.

16   We'd, we'd be litigating, I guess, whether that was a

17   fraudulent transfer.  But it happened in '79.  And so you start

18   to think about a moment in time.  So I think about with the

19   divisional mergers.  You know, we've been criticized that "you

20   didn't wait long enough."  Well, if a divisional merger when it

21   was done wasn't a fraudulent transfer because the assets that

22   were remaining to pay claims were sufficient, why would it

23   become a fraud or a fraudulent transfer if it gets closer in

24   time to the filing date?  And I would submit to your Honor it

25   doesn't.  The transaction's the same either way.  And the

1  reason I'm emphasizing this is I believe what you're really

2  hearing is an argument that the case should be dismissed as bad

3  faith, as a bad faith filing.  The issue isn't the

4  restructuring or the harm of the restructuring.  The issue is

5  that the claimants don't think the case should have been filed

6  at all.  And that's not an issue for today.  I think through

7  their arguments they're asking your Honor to prejudge that

8  issue in the wrong context.

9        And then, of course, we've said this before, your

10  Honor, but there's always been a suggestion, well, it's not

11  fair.  The new company should have filed, but the point is from

12  the perspective of this proceeding the claims would still be

13  stayed, there would be no further assets available to fund

14  'cause they're all there, already, and the, the extent of the

15  liability, the underlying merit of the claims would still have

16  to be addressed in the case.

17        So from the claimant perspective, in our view, it

18  doesn't change anything.

19        And, of course, here -- I'm going to go through this

20  quickly -- I think your Honor recognized this, to some extent

21  in DBMP and Aldrich, that there are negative consequences to

22  the solvent business if it has to file not only for that

23  business -- and we listed some of the problems here -- but also

24  for the bankruptcy case itself and for the claimants because

25  that would make the bankruptcy case considerably more complex,

1  protracted, and costly.

2         So, your Honor, we believe the injunction will enable

3  a fair and efficient resolution of claims for all the reasons

4  I've indicated, or we've indicated here on the slide.  You've

5  heard these before.  And just in conclusion, to, to kind of sum

6  up here, your Honor, from our perspective, the situation

7  prebankruptcy was not tenable.  We believe the filing of

8  bankruptcy was in good faith.  We had good reason for it.  We

9  had a valid reorganizational purpose.  We would submit that if

10 we don't get the relief we're seeking, that the opportunity we

11 have now to resolve this case in this Court will be lost.  And

12 we believe, your Honor, the stay applies and a preliminary

13 injunction is warranted because of the assumption, because the

14 claims are the same, because the claims are indemnified, and

15 because the insurance is shared and will be diminished.

16         THE COURT:  Okay.

17         MR. GORDON:  Thank you, your Honor.

18         THE COURT:  Thank you.

19         How about we take a ten-minute recess and then get the

20 closing arguments from the plaintiffs, all right?

21    (Recess from 2:44 p.m., until 2:55 p.m.)

22                     AFTER RECESS

23    (Call to Order of the Court)

24         THE COURT:  Okay.  Have a seat, everyone.

25         Ready to hear from the plaintiffs, the claimants.

1       Okay.

2               MR. SILVERSTEIN:  Good afternoon, your Honor.  Adam

3   Silverstein from Otterbourg P.C. for The Plaintiffs' MDL

4   Steering Committee.

5               Mr. Waldrep and Ms. Cyganowski will be delivering the,

6   the closings for the -- the -- for the claimants, in general.

7               I wanted to just highlight two pieces, three pieces of

8   testimony that they've asked me to do from a witness your Honor

9   has heard mentioned, but has, has not appeared here.  And

10  that's Mr. Lisman, the Johnson & Johnson Controller.

11              So at Page 46, Line 2, Mr. Lisman was asked:

12              "Q    And so, to the best of your knowledge and

13              understanding, all of the cash in all of the operating

14              subsidiaries of Johnson & Johnson at the end of each

15              day are swept into one or two centralized accounts

16              maintained by the ultimate parent company, Johnson &

17              Johnson, is that correct?

18              A     Correct."

19              Then beginning at Line 12:

20              "Q    How those cash sweeps are recorded as, for

21              example, debt repayment or dividend or some other

22              means of treatment, that is reflected in the general

23              ledger?

24              A     Absolutely, yes."

25              Continuing to Page 117, at Line 4:

1    "Q    And the, and other than the fact that the entry

2    is booked from JJCI to Johnson & Johnson, is there

3    some other basis on which you can conclude that

4    there's an underlying obligation by JJCI to have paid

5    Johnson & Johnson or to have booked these entries to

6    Johnson & Johnson?"

7    There was an objection.

8    "A    It would go back to the fundamental concept that

9    I've talked about where if there are costs associated

10   with a product or a franchise that is owned and

11   managed by an operating company or sub, those costs

12   required by GAAP need to be recorded on the ledgers of

13   that company as a fundamental accounting GAAP

14   requirement.

15   Q    Okay.  And that is, that fundamental GAAP

16   requirement is at the root of these entries?

17   A    Absolutely."

18   Continuing on Page 134, at Line 7:

19   "Q    Have you ever seen any written document

20   reflecting a legal responsibility by Johnson & Johnson

21   Consumer Inc. to pay talc expenses, judgments, and

22   fees expended by Johnson & Johnson?"

23   There was an objection.

24   "I have not seen any documents pertaining to what

25   you've described."

1        Your Honor, we'll have the transcript and, and

2   Mr. Satterley will have highlighted portions.

3        Thank you.

4        THE COURT:  Thank you.

5        All right.  Mr. Waldrep?

6        MR. WALDREP:  Good afternoon, Judge.

7        Should the Court grant the extraordinary relief of a

8   preliminary injunction that shields hundreds of entities from

9   litigation?  That's the question before the Court.  So it's

10  been repeatedly stated by us that this case is different.  The

11  debtor seeks relief related to over 700 parties, affiliates,

12  vendors, insurance companies, and the like and most

13  importantly, Johnson & Johnson.  Two weeks ago, the Court ruled

14  the debtor had not proven its case and you denied a TRO except

15  for the debtor and its predecessor, Old JJCI.  After two more

16  days of hearings, nothing has changed.  You heard some

17  repackaged arguments.  You -- the debtor put on some more

18  evidence and the evidence and the arguments are no more

19  availing or convincing than they were before.  The debtor has

20  still not carried its high burden and proven its case.

21       So let's look at the evidence.  LTL pretends that J&J

22  is just like every other affiliate.  LTL pretends that J&J

23  should be treated in this Texas twostep like every other

24  affiliate.  LTL ignores that J&J was not a direct party to the

25  Texas twostep.  LTL was the result of a divisive merger with

1    Old JJCI.  Despite this, LTL asserts that J&J's a protected

2    party based on an indemnification theory.  The evidence

3    demonstrates that J&J's direct liability for talc-related

4    cancer claims prevents this relief.

5           Mr. Gordon said if the product is safe and doesn't

6    cause damages, there's no basis for independent liability of

7    J&J.  Is the product safe?  Many have found it was not.

8    Liability that is independent of and not derivative of the

9    debtor's liability, that's what we're talking about.  That is a

10   fact that is fatal to the debtor's entire position.  J&J made

11   all the health and safety policy decisions regarding talc and

12   asbestos.  That was the testimony of Dr. Hopkin repeatedly as

13   late as 2020.  In rebuttal, the debtor offers up some self-

14   serving medical safety procedures issued in 2014, long after

15   the testimony of Dr. Hopkins, their corporate representative,

16   and J&J then set up a Medical Safety Council chaired by a J&J

17   employee, Dr. Joanne Waldstreicher.

18          So if medical safety is the responsibility of the

19   operating company, as Mr. Kim and Dr. Kuffner say, then why is

20   J&J making medical decisions as stated by Mr. Hopkins and by

21   Dr. Waldstreicher?

22          Dr. Kuffner admitted that Dr. Waldstreicher can

23   overrule him.  Now neither Dr. Hopkins nor Dr. Waldstreicher

24   came today or yesterday to defend, in his case, his testimony,

25   or, in her case, to explain her position.  Mr. Gordon said we

1  tried to clarify that.  They didn't try very hard.  J&J had the

2  authority to require warnings on Johnson's Baby Powder and

3  despite knowing that it contained asbestos, they never did.

4  The prestigious J&J logo was on every container and it was J&J

5  who affirmatively misrepresented to the public that its talc

6  was safe and never contained asbestos.  The debtor didn't

7  attempt to rebut this.  It was J&J who did that.  You had

8  plenty of evidence on that.  Representatives of J&J gave sworn

9  testimony and news conferences, published articles, made videos

10  that Johnson's Baby Powder never contained asbestos.  In the

11  last six mesothelioma trials the juries in those cases

12  determined that was a lie.

13         There was no mention of Old JJCI or any other

14  subsidiary in these news conferences, articles, and videos.  It

15  was J&J.  The point is that J&J engaged in its own tortious

16  conduct.  Courts have determined that juries must separately

17  consider the liability of J&J and Old JJCI for this tortious

18  conduct.  Juries have apportioned fault to these separate

19  corporations and each company has been assessed punitive

20  damages, often for different amounts.  Each company secures its

21  separate obligations with separate bonds on appeal.  Appellate

22  courts have affirmed the separate liability findings against

23  those two companies and we gave you examples of that.

24         The evidence also showed that J&J bore independent

25  liability for the Shower to Shower line of products and it

1    showed that J&J has not asserted in litigation that Old JJCI

2    assumed any of J&J's talc-related liabilities.  Mr. Kim could

3    not think of a pleading in which either J&J or Old JJCI

4    asserted that J&J had agreed to indemnify Old JJCI.  When

5    asked, there were no such examples.  In fact, J&J and Old JJCI

6    have asserted the opposite.  There's no basis to enjoin

7    lawsuits seeking to hold J&J to account for its own liability.

8           Mr. Kim testified that J&J searched for months or

9    years, not quite sure, for an agreement that said that JJCI

10   took over the liabilities of J&J.  Could not be found after

11   even six months of planning and due diligence, but after its

12   loss at the TRO hearing debtor miraculously found the

13   agreement.  Mr. Gordon says at that point our argument changed.

14   Well, sure it did.  Before, they had no document.  Now they

15   have one.  That's what we're looking at.  And we all

16   immediately realized why it had not been produced before.  The

17   relevant language is that Old JJCI agreed to assume all the

18   indebtedness, liabilities, and obligations of every kind and

19   description which are located on the books and records of J&J

20   as pertaining to its Baby division.  The debtor made no attempt

21   to explain what was in the books and records, let alone produce

22   any books and records.  Why?

23          Mr. Kim acknowledged the need to look at the books and

24   records, but he never did.  This issue was created by J&J.  The

25   Senior Legal Documents Coordinator for J&J identified by the

1   debtor as the person responsible for document searches was not

2   even asked to look for the books and records as to these

3   liabilities.  No lawsuits had been filed in 1978.  The first

4   one, you heard testimony, was filed in 1983.  There is only one

5   inference to draw.  There was no talc liability on the books

6   and records.

7          Now Mr. Gordon just urged you a little while ago to

8   focus on the intent of the agreement.  Well, that's not how we

9   interpret contracts.  We look at the words.  We look at the

10  four corners of the document, this Court knows that.  The

11  limiting language is J&J's language.  There is no evidence of

12  J&J's intent.  The debtor could have shown us.  They didn't.

13  They chose not to and they expect you to accept their argument

14  of intent, rather than what any court would do, look at the

15  four corners of the document.

16         So their argument about intent is not evidence.  This

17  is a court of law and it's decided based on evidence.

18         The debtor stated that our demands for evidence of the

19  books and records ignores the New Jersey broad application of

20  the parol evidence rule.  Well, we've been demanding parol

21  evidence of what "books and records" means and just having

22  gotten it.  Mr. Kim testified that although he had never looked

23  at the books and records, the debtor then wants the Court to

24  interpret books and records as a mere catch-all phrase.  And

25  they cite the Bippus case, B-I-P-P-U-S, from the Eastern

1  District of Pennsylvania, and Bouton v. Litton, which is a

2  Third Circuit case.  Bippus interprets broad categories of

3  liabilities under Pennsylvania contract law and Bouton

4  discusses catch-all phrases like "all other contracts and

5  commitments" under New York law.

6      The words "books and records" have meaning.  They

7  refer to reviewable documents.  And here's a case that I will,

8  a new case, your Honor, that I will cite for you, Feuer v.

9  Merck County, F-E-U-E-R v. M-E-R-C-K County.  It's a New Jersey

10  case, 187 A.3d 873.  And it says that New Jersey law literally

11  interprets "books and records" as reviewable financial

12  documents.  The same interpretation was reached in the D.C.

13  Circuit case of Deutsche Bank v. FDIC, 109 F. Supp.3d 179.  And

14  there, the D.C. Circuit cited the Fifth, Sixth, Eighth, and

15  Eleventh Circuit opinions discussing the use of books and

16  records and in each of those cases they found that it meant

17  "reviewable asset and liability records in financial industry

18  transactions," reviewable asset and liability records.

19      The debtor has produced no books or records that show

20  talc liabilities on the books of its predecessor in 1978 or in

21  any other time.  Absent evidence of a contractual assumption of

22  liability, New Jersey common law would not impose successor

23  liability on the debtor.  And there, I will refer you to

24  Ramirez v. Amsted Industries, 431 A.2d 811, and Nieves,

25  N-I-E-V-E-S, v. Bruno Sherman Corporation, 431 A.2d 826.  They

1  establish New Jersey's corporate successor liability doctrine.

2  And there, they say successor liability is only imposed as a

3  matter of law when the predecessor is -- and here I quote --

4  "virtually destroyed leaving claimants with no viable

5  recovery."  Kind of makes sense.  That's not the case here.

6       J&J was and always remained a source of recovery for

7  its own torts, including pre-1979 Baby Powder.  Mr. Kim said

8  the claims against J&J are the same claims as against the

9  debtor.  That was repeated many times.  He says harm will come

10  to the debtor if claims against J&J go forward.  Well, every

11  chapter 11 bankruptcy has co-obligors, guarantors, affiliates,

12  equity holders, and others who are harmed by the filing of the

13  case, but the automatic stay isn't extended to them.  There's a

14  test, a standard, and it must be met for such relief.  The

15  debtor simply hasn't met it.

16       The debtor wants a channeling injunction, an extension

17  of the automatic stay.  The debtor wants to be free of these

18  pesky lawsuits against it.  That's the type of relief that a

19  debtor gets in a plan at the end of the case.  The debtor may

20  get there once it goes through a reorganization, but the debtor

21  can't get it in the first few days.  To obtain the relief it

22  seeks, the debtor has to first demonstrate by clear and

23  convincing evidence -- that's a standard -- clear and

24  convincing evidence that the commencement or continuation of

25  litigation against J&J and other affiliates necessarily

1   implicates the assets of the debtor's estate or insurance

2   policies or agreements that Old JJCI had with retailers, all

3   through some form of assumption or indemnification.

4        First, the debtor hasn't demonstrated that this Court

5   has subject matter jurisdiction to issue orders affecting

6   proceedings against these third parties.  Unless the debtor

7   demonstrates a statutory or contractual right of

8   indemnification, non-derivative actions against nondebtors for

9   their individual liabilities are not related to the debtor's

10  case.

11       Second, the debtor hasn't demonstrated that litigation

12  against suppliers, insurance companies, and affiliated

13  companies is litigation to "recover a claim against the debtor

14  or an act to possess or exercise control over property of the

15  debtor," as is required to extend the automatic stay.

16       Third, the debtor hasn't demonstrated entitlement to

17  the extraordinary relief of a preliminary injunction under

18  either section 105 or Rule 7065.

19       So now I want to talk about subject matter

20  jurisdiction.  The debtor showed you citations to many courts

21  that have found subject matter jurisdiction.  Well, that's kind

22  of an old trick.  You mischaracterize your opponent's argument

23  and then you knock that argument down.  The Fourth Circuit's

24  decision in A. H. Robins is what is controlling here.  It does

25  not support prohibiting or enjoining non-derivative litigation

1    against nondebtors for their independent tort liability.   The

2    Fourth Circuit requires "such identity between the debtor and

3    the third-party defendant that the debtor may be said to be the

4    real party defendant, that a judgment against the third-party

5    defendant will in effect be a judgment or finding against the

6    debtor."   These are words the Court knows well.   The Fourth

7    Circuit also said:

8            "An illustration of such a situation will be a suit

9            against the third party who is entitled to absolute

10           indemnity by the debtor on account of any judgment

11           that might result against them in the case."

12   That's a quote also from Robins.

13           Another quote from Robins:

14           "If the non-debtor party is independently liable as,

15           for example, where the debtor and another are joint

16           tortfeasors or where the nondebtor's liability rests

17           upon his own breach of duty, the automatic stay would

18           clearly" -- it's their word -- "clearly not extend to

19           such debtor."

20           The Third Circuit applied the same principle in an

21   asbestos bankruptcy context to reverse a section 105 order

22   stressing that the claims involved "third-party actions against

23   nondebtors where the liability alleged is not derivative of the

24   debtor."   That's exactly what the debtor seeks to do here,

25   enjoin actions against third parties for the independent, non-

1  derivative liability of those third parties.  There's no

2  evidence that non-debtor affiliates hold an absolute or

3  automatic right of indemnification from the debtor for the

4  defense of their own independent tort liability.

5       J&J has never asserted in litigation that Old JJCI

6  assumed any of J&J's talc-related liabilities.  In fact, it's

7  represented just the opposite and you saw examples of it.  Nor

8  has the debtor produced any evidence demonstrating the

9  prosecution of claims against non-debtor affiliates implicate

10  insurance coverage in which the debtor holds a beneficial

11  interest or agreements with retailers to which the debtor is a

12  party.  J&J knows how to specifically assume liabilities in

13  mergers and acquisitions.  We gave examples where they, they

14  use the words "tort liability" and "product liability."  They

15  didn't here.  Again, they have to be held to their own

16  documents, but when J&J wanted to limit the assumption of

17  liabilities to those stated on the books and records it did so

18  and we gave examples of that.  Mr. Gordon showed you a list of

19  cases where independent claims were enjoined, but we're in the

20  Fourth Circuit.  Robins is our guide.

21       The debtor says it's contractually obligated to

22  indemnify the non-debtor affiliates, including J&J and New

23  JJCI, and they referred to the merger support agreement, but

24  affiliates -- and this is an argument they made in their -- in

25  their -- their -- their papers, Judge -- affiliates in this

1   agreement doesn't include J&J.  Section 3 titled

2   Indemnification of the merger support agreement should be

3   limited to an indemnification duty regarding derivative

4   liability that might otherwise flow from Old JJCI to New JJCI

5   and its sibling affiliates based on wrongdoing by Old JJCI.

6   Section 3 doesn't mean that LTL would indemnify J&J for J&J's

7   own independent liability.  That's not indemnification at all,

8   but a, a gratuitous assumption of liability for J&J's own

9   torts.  Under LTL's theory, the debtor could justify extending

10  the automatic stay to a third party by assuming an

11  indemnification obligation for the third party's own

12  independent wrongdoing.  It could do that on the way to the

13  courthouse.  Well, why limit that indemnity to J&J?  Why not

14  have LTL indemnify Purdue Pharma or Philip Morris or Bank of

15  America?  There's just no limiting principle to LTL's absurd

16  interpretation of the merger support agreement.  It makes no

17  sense.  You can't make, manufacture or extend, you can't

18  manufacture an extension of the automatic stay on the eve of

19  bankruptcy and that's what they want you to accept.

20          There's a second reason that the debtor's argument

21  fails.  J&J's Shower to Shower talc products were not part of

22  J&J Baby Products division as of September, rather, December

23  1978 and, therefore, J&J's liabilities arising from Shower to

24  Shower could not have been included in the 1979 transaction.

25  These are not the same claims.  Shower to Shower was a product

1   line manufactured and sold by a separate J&J subsidiary known

2   as Personal Products Company.  You heard plenty of evidence on

3   that.  Shower to Shower continued with the Personal Products

4   Company until the 1980s.  There's no agreement.  We asked.  You

5   heard the testimony.  There's no agreement showing Personal

6   Products Company assumed liabilities for Shower to Shower in

7   1978.  There's also no agreement that the Baby Products assumed

8   the Personal Products Company's liability in 1986.  That's also

9   missing.  I think Mr. Kim said, "We haven't found it yet."

10           There is a third reason that the debtor's argument

11  fails.  The talc liabilities arising from J&J's Vermont talc

12  mining subsidiary, Windsor Minerals, was never a part of J&J's

13  Baby Products division and thus couldn't have been passed on to

14  Old JJCI or its predecessor as part of the 1979 transaction.

15  J&J owned Windsor Minerals until 1989.  You heard that.  And by

16  the way, that allegation is part of every single mesothelioma

17  trial and in the MDL litigation.

18           So, no, it's not new.  Even if the debtor were able to

19  produce evidence that the 1979 transaction explicitly assumed

20  the talc-related liabilities of the debtor's predecessor, it

21  would still fail to provide the Court with related to subject

22  matter jurisdiction over non-derivative actions against

23  nondebtors for their independent tortious acts.

24           J&J can't discharge liability for its torts against

25  third parties through contract.  The debtor suggested that J&J

1    assigned talc-related legal expenses to Old JJCI through

2    intercompany exchanges.  That's not what J&J asserted in

3    litigation and we gave you examples of that.  Even if

4    intercompany charges were paid by JJCI, it still does not

5    demonstrate that such charges were a legal liability of JJCI.

6    You heard testimony -- and there are transcripts that you

7    probably haven't seen, but you will -- that intercompany

8    charges were made according to GAAP and that Mr. Lisman never

9    saw the 1979 agreement and had nothing to do with the

10   intercompany charges.

11          Regarding insurance agreements, the debtor admits that

12   insurance carriers for Old JJCI and/or J&J have never admitted

13   coverage for talc-related liabilities in decades of litigation

14   and have always asserted defenses to such coverage.  In

15   litigation, J&J has taken the position that it is "self-

16   insured" and that tort claims are unlikely to implicate its

17   insurance policies.  Of course, that's different than what they

18   argue here.  There was no insurance issue in DBMP because

19   insurance coverage had been exhausted.  Unlike Aldrich Pump,

20   there are no suits by tort claimants against the debtor's

21   insurers, none.  In A. H. Robins there was no dispute that

22   there was insurance coverage.  There was no dispute that the

23   policies were property of the bankruptcy estate.

24          Here, all the insurance companies have repeatedly and

25   consistently denied coverage.  The terms of the policies

1   actually explain why.  Multiple insurers are now seeking a

2   declaratory judgment in New Jersey that they owe no coverage to

3   the debtor.  Nothing on the record supports the debtor's

4   assertions of coverage.  Now Debtor's Exhibits 8 through 14

5   refer to dozens of policies.  The debtor asserts that the

6   insurers' denials of coverage are irrelevant.  But again,

7   Robins was different.  Here, the insurers except for Middlesex

8   -- Middlesex is a captive insurer of J&J whose coverage is

9   exhausted. -- except for that, they've never paid a penny.  Why

10  is an injunction needed?

11          The debtor also ignores J&J's consistent

12  representations in litigation that it was self-insured and that

13  litigation was unlikely to implicate any of its policies.

14          Let's talk about retailers.  Old -- the debtor has

15  produced tender letters sent to retailers by J&J or, and/or Old

16  JJCI.  The debtor's Exhibits 15 through 19 refer to

17  indemnification agreements and tender letters.  All of them

18  contain conditions.  Many involve J&J, rather than JJCI.  And

19  the tender letters are revocable.  This is a far cry from the

20  absolute entitlement to indemnity that Robins said would

21  warrant extending the stay.  In responding to this, the debtor

22  cites some Court of Appeals cases from the Second and Third

23  Circuits, but not Fourth Circuit cases like Robins and Credit

24  Alliance v. Williams.  Credit Alliance held that even an

25  ordinary guarantor of a debtor's obligation to a third party,

1  not even that ordinary guarantor can claim the protections of

2  the automatic stay.  And the debtor's own evidence contradicts

3  its assertion that Old JJCI assumed all of J&J's talc-related

4  liabilities in 1979.  Those tender letters to which Old JJCI

5  alone is a party don't support the extension of the stay to

6  non-debtor J&J.

7          Second, in many states a strict liability statute for

8  product defects would hold the retailer independently liable,

9  not just the manufacturer.  Did the debtor show you the law in

10  the various states?  We never saw anything like that.

11          Third, the agreements with retailers do not show,

12  again, what Robins required, which was an absolute entitlement.

13  We showed you the language of the agreements.

14          Extending the automatic stay, your Honor, is improper.

15  362 tells that the stay stops the commencement or continuation

16  of actions against the debtor or acts to obtain possession or

17  control of the property of a debtor's estate.  Well, let's

18  examine the reasons given by the debtor for extending the stay

19  to 710 additional parties.

20          The debtor begins by relying on Colonial Realty and

21  the premise that in 1979 Old JJCI assumed all J&J's talc-

22  related liabilities.  So if they had a claim against J&J, it's

23  a claim to recover a claim against the debtor, who's,

24  obviously, a successor of Old JJCI.  We have shown that premise

25  is wrong.  Claims against J&J are independent of any claims

1  against the estate, not claims against the debtor.  The

2  automatic stay simply doesn't apply to them.

3       Now the debtor compares its request for an extension

4  of the stay to Aldrich Pump and DBMP.  Obviously, this Court

5  knows them very well, but the Aldrich and Murray entities in

6  Aldrich Pump were themselves parties to a Texas divisional

7  merger with Trane Technologies, successor by merger to

8  Ingersoll-Rand and Trane USA.  DBMP was itself a party to a

9  Texas divisional merger with CertainTeed Corporation.  In both

10  cases the debtors assumed the liabilities of their predecessor

11  through a divisional merger.  Neither case involved a separate

12  parent entity seeking the benefit of a divisional merger to

13  which it was not a party.  That's what's going on here.

14       Fourth Circuit has held that even an ordinary

15  guarantor of a debtor's obligation to a third party, not even

16  that, that party can claim the protections of the debtor's

17  automatic stay.  And here, there's no evidence that J&J or any

18  other non-debtor affiliate is even a guarantor of the debtor's

19  liabilities.

20       Finally, the debtor argues that the debtor's estate is

21  the rightful owner of derivative claims, alter ego claims,

22  successor liability claims against its predecessors in interest

23  or its parent company, J&J, but such claims aren't relevant to

24  the assertion of non-derivative claims, non-derivative claims

25  against non-debtor affiliates for individual liability.  The

1    debtor is not a successor for liability purposes to any entity

2    other than Old JJCI.

3          So we're here for a preliminary injunction.  The

4    movant has to prove likelihood of success on the merits,

5    irreparable harm, balance of the equities favors the

6    injunction, and a public interest favors the injunction.

7          The likelihood of success on the merits turns on the

8    likelihood of a successful reorganization.  The debtor states

9    that the case was filed in good faith to pursue an equitable

10   resolution of tens of thousands of talc claims.  However, the

11   debtor's informational belief, brief asserts that J&J is the

12   victim of a baseless, scientifically unfounded smear campaign

13   headed by a profit-motivated plaintiffs' bar.  Such statements

14   are inconsistent with the pursuit of an equitable resolution.

15         The debtor proposes a qualified settlement fund of $2

16   billion, but this is less than half of the amount that J&J, a

17   company worth close to a half a trillion dollars, offered to

18   resolve talc-related claims a few months ago.  It was March of

19   this year.  We cited that to you in our brief.

20         The debtor can't show irreparable harm by showing you

21   litigation against affiliates, insurance companies, and

22   retailers that in no way implicate the debtor.  The debtor

23   can't be distracted by litigation that has no bearing on its

24   case.  The debtor argues that unequal results in the tort

25   system merit an injunction, but at this stage of the case the

1  debtor is not a party with authority to defend or settle non-

2  derivative claims assertable against affiliates, insurance

3  companies, and retailers.  Your Honor, we have no need to talk

4  about the tort system.  Tort system is not on trial here.  It's

5  irrelevant to this hearing.

6          Of course, J&J is using, and I meant to say J&J is

7  using exactly the same tactic that it excoriated in Imerys.  We

8  thoroughly explained the Texas twostep.  Old JJCI, a New Jersey

9  entity, redomesticates itself in Texas through a merger with a

10  newly organized Texas entity and that new entity divides into

11  two separate Texas LLCs that become New JJCI and the debtor.

12  The debtor obtained all the talc-related liabilities held by

13  Old JJCI, about $6 million, and some other assets, and Old

14  JJCI's rights under a funding agreement with J&J and New JJCI.

15  By the way, that funding agreement is not predicated on an

16  injunction issued by the -- the funding agreement still works.

17          So the debtor seeks the unprecedented step of

18  extending the benefits of the Texas twostep to a parent company

19  and other non-debtor affiliates not involved in the divisional

20  merger.  No --

21      (Extraneous talking)

22          THE COURT:  But not now.

23          Go ahead, Mr. Waldrep.

24          MR. WALDREP:  All right.

25          No court has ever ordered such relief.  In Owens

1  Corning there was no attempt to stay actions against the parent

2  company

3          The public interest does not favor unprecedented legal

4  maneuvering as shown in this case and the debtor acting on

5  behalf of J&J seeks to bootstrap the statutory benefits of its

6  petition to shield the independent tort liabilities faced by

7  J&J.  Meanwhile, J&J bears none of the burdens of bankruptcy,

8  no financial reporting or administration, and no disruption of

9  its ordinary relationships.  Cases like Federal-Mogul Global

10 and Purdue Pharma are no support for the debtor.  They cited

11 that to you.  They are not support because in those cases the

12 actual tortfeasors put themselves into bankruptcy.  Big

13 difference here.  The only parties with any identity of

14 interest with the debtor is Old JJCI and the debtor and Old

15 JJCI are the only parties in whose favor the Court has issued

16 the TRO.

17         So this preliminary injunction should be denied for

18 several reasons.  Court lacks subject matter jurisdiction to

19 enter orders extending the automatic stay or enjoining the

20 litigation of claims against third parties for their

21 independent liability and thus they are not related to.  I'm

22 going to spare the Court a discussion of Stern v. Marshall.

23 There is, there is no evidence that the debtor assumed the talc

24 liability of J&J.  There is no evidence of any insurance

25 coverage risk.  They've all said they're not covering them.

1   And there's no evidence that retailers have all liability for

2   J&J's defective products.

3          The debtor's statements in this case demonstrate

4   hostility toward talc claimants, not support for a consensual

5   plan.  Litigation against affiliates, insurance companies, and

6   retailers can't harm the debtor.  The equities don't favor

7   enjoining litigation in which a debtor has no interest.  I know

8   you heard Mr. Kim say, "Oh, we're going to have to step in."

9   He didn't explain why, didn't explain how.  I'd loved to have

10  heard that part, but he didn't tell us why he would have to

11  step in.

12         The public interest isn't served by rewarding

13  elaborate corporate maneuvering at the expense of many

14  thousands of victims.  As Ms. Cyganowski said in her opening,

15  the debtor and JJ [sic] have unclean hands.  They seek equity,

16  but they have not done equity.  The debtor and JJ do not

17  respect the rulings of this Court.  They announced to the world

18  that the stay applied to J&J before they filed anything.

19  Immediately after the Court's TRO ruling and after the Court

20  spelled it out again in a status conference and as late as two

21  days ago J&J was still telling state and federal courts that

22  the stay prevented lawsuits against it.  Now I understand that

23  particular mistake two days ago has been corrected.  But again,

24  I say they have not respected this Court's ruling.

25         J&J's clearly orchestrating this entire process.  J&J

1  knows how to guarantee that it will benefit from the automatic

2  stay in bankruptcy, but they sure don't want to file a

3  bankruptcy to get it.  J&J -- your Honor, this was a theme in

4  this case and J&J wants it both ways.  Mr. Kim testified that

5  J&J wanted to decentralize.  You heard that said many times.

6  Mr. Gordon echoed that thought in his remarks not very long

7  ago.  They want to be separate.  Mr. Gordon said any divisional

8  merger involves a separation, but here, they want you to think

9  of J&J and the debtor as one and the same.  They're not.  They

10  can't have it both ways.

11        This is, at bottom, just an attempt of one of the

12  largest companies in the world to obtain the benefits of

13  bankruptcy without any of the responsibilities and I'd ask the

14  Court not to let that happen.

15        THE COURT:  Okay.  Thank you.

16        All right.  Go ahead.

17        MR. PFISTER:  Good afternoon, your Honor.  Rob Pfister

18  from KTBS on behalf of the Aylstock Witkin Law Firm, which

19  represents thousands of claimants with claims against Johnson &

20  Johnson.  I'd like to make two points in five minutes.

21        First, to, to quote F. Scott Fitzgerald, "The test of

22  a first-rate intelligence is the ability to hold two opposed

23  ideas in the mind at the same time and still function."  And by

24  that measure, the debtor's position here is, indeed, first

25  rate.  On the one hand, they have created, as they claim, a

1  hermetically sealed entity with all the bad stuff and none of

2  the good stuff.  On the other, there's such an identity of

3  interests that suing Johnson & Johnson is effectively

4  equivalent to suing the debtor.

5       The inquiry here is resolved by the statutory language

6  of section 362(a).  That statute prohibits claims "against the

7  debtor," claims "to recover a claim against the debtor," and

8  then actions to obtain possession of the debtor's property.  On

9  these facts, as presented to the Court two weeks ago today and

10 yesterday and today, no one, no one thinks that claimants who

11 are suing Johnson & Johnson have a secret goal or desire to

12 establish a claim against or to get at the assets of something

13 called LTL Management LLC, which was just created several weeks

14 ago, nor does anyone believe that any imposition of liability

15 against Johnson & Johnson will affect LTL one iota.  And that

16 is because of the funding agreement where J&J has promised

17 unlimited funding to LTL.  To the extent there's an

18 indemnification obligation that counsel has created prepetition

19 via these, this corporate paper shuffling, all of that round

20 trips through the unlimited funding obligation.

21       That's the first point.

22       The second point, I want to briefly address equities

23 and balance of harm.  The debtor says that they need to halt

24 litigation so that they can negotiate.  Well, parties to

25 litigation negotiate all the time.  That's why cases settle

1  while the jury is out deliberating.  A plaintiff's sole and

2  exclusive leverage is his or her ability to use the legal

3  process to seek compensation for a harm.

4        Here, the relief that the debtor seeks halting all of

5  these lawsuits is J&J's attempt to cut these plaintiffs off at

6  the knees to deprive them of all their leverage.  That's not

7  fair, that's not equitable, and we ask the Court to deny all

8  relief requested.

9        THE COURT:  Okay.  Thank you.

10        MR. PFISTER:  Thank you.

11        MR. PARKINS:  Good afternoon, your Honor.  Lenard

12  Parkins for OnderLaw.

13        When we started this hearing, I anticipated we'd be

14  right where we were.  I think the debtor has failed to prove

15  its entitlement to injunction.  What it has shown is a very

16  convincing argument why J&J ought to go into chapter 11, but

17  not the debtor.

18        I think the predicate -- and, your Honor, they cited

19  your DBMPP [sic] case for the reason why they are justified in

20  getting an injunction and getting basically, your Honor

21  basically said the debtor was entitled to get a long runway

22  because 524(g) entitles a debtor to try to seek that kind of

23  relief.  But here, the payors have waived 524(g).  The payors

24  will fund the bankruptcy case.  The payors will fund a plan of

25  reorganization and pay talc claimants without the requirement

1   of a 524(g).

2          So the predicate for the injunction you granted in

3   <u>DMBP</u> and a pred, which existed there fails here, and because it

4   fails as a predicate, they're not entitled to injunction.  And

5   I, I don't need to repeat what other counsel have said here,

6   but if the, the predicate fails, the injunction fails and it

7   has.

8          Thank you.

9          THE COURT:  Thank you.

10         All right.  Ms. Cyganowski.

11         MS. CYGANOWSKI:  Polish names are easier than Italian

12   names.  Your Honor, Melanie Cyganowski, counsel for The MDL

13   Steering Committee.

14         The Court has now heard testimony, received evidence,

15   and we've done so over four days of hearings.  We have all

16   watched the demeanors of the witnesses.  We've had the

17   opportunity to weigh their credibility.  We heard the arguments

18   of counsel, many of whom, perhaps all of whom were quite

19   eloquent.  We are now at the climax of the hearing where the

20   Court will rule on the central question:  Has LTL proven by

21   clear and convincing evidence that here, as in <u>Aldrich</u> and

22   <u>DBMP</u>, the automatic stay should be extended to embrace and

23   thereby shield the debtor's parent, Johnson & Johnson, and all

24   of its affiliates as well as the hundreds of suppliers and

25   insurers, all of whom are nondebtor, nonaffiliates?

1          The question is not, as Mr. Gordon presented, can or

2     will LTL reorganize by virtue of the Texas twostep.  They can

3     do so, but they cannot and should not get the benefit of the

4     extended stay for Johnson & Johnson and these other parties

5     without meeting the requisite test.  The relief which the

6     debtor seeks is extraordinary.  This is not what typically

7     happens.  The Court routinely administers cases, as Mr. Waldrep

8     pointed out, with co-obligors, co-tortfeasors, co-judgment

9     debtors, and co-guarantors.  Only in rare occasions will any of

10    these non-debtor parties be embraced by the automatic stay, yet

11    here LTL cavalierly maintains that Johnson & Johnson should be

12    protected by the very stay because it created the corporate

13    artifice by which LTL, the debtor, is obligated to indemnify

14    one of the wealthiest companies in the world, namely, its

15    parent, Johnson & Johnson.

16         The debtor cited to the _Ira Haupt_ decision in _Imerys_

17    at, in its brief and it's -- the case is cited at 361 F.2d 164,

18    168.  And Mr. Kim proudly agreed during his examination that,

19    "The conduct of bankruptcy proceedings not only should be

20    right, but must seem right."  We agree.  There is no urgency or

21    necessity for the automatic stay to be extended to insurers,

22    whereas here not one insurance company has agreed to

23    acknowledge any coverage to date.  There is no urgency or

24    necessity for Johnson & Johnson to be shielded by the automatic

25    stay, especially here when, in stark contrast, Johnson &

1  Johnson moved to lift the stay in Imerys because it believed

2  that the very tort system that it now condemns offered, in

3  Mr. Kim's words, "a fair and equitable path to resolution of

4  claims."  There is no urgency or necessity for the suppliers to

5  be protected by the stay at this early stage of the bankruptcy

6  case.  According to Mr. Kim, the stay should include suppliers

7  who have not yet even been sued, much less presented a tender

8  to any -- to -- to the -- to, I guess, to the parent, all

9  because it might happen.

10        This is not the law.  This is not what we do.  The

11 debtor is trying to achieve the ultimate result found in a

12 confirmed plan now at this early stage of the case.  It wants a

13 channeling injunction and the equivalent of a third-party

14 release now in the form of a blanket stay that reaches far

15 beyond anything that was envisioned by Aldrich or the

16 circumstances in DBMP.

17        Extraordinary equitable relief demands clean hands.

18 Our maxim, our maxim is that bankruptcy is for the honest, but

19 unfortunate debtor.  And we do not hesitate to apply this maxim

20 to an individual debtor in chapter 7 or chapter 13.  Here, one

21 of the wealthiest companies in the world should be held to that

22 same standard.  Since Day 1, Johnson & Johnson has orchestrated

23 this bankruptcy for its own benefit, not for the benefit of its

24 creditors.  It engaged one of the most prominent law firms in

25 our field to plot a path by which it, the parent, could reap

1   all of the benefits of bankruptcy, a blanket stay of all

2   litigation without the stigma of chapter 11, and they proudly

3   announced this in their Form 8-K on October 19th.  Lest there

4   be no doubt, Mr. Gordon essentially told us that if the -- in

5   fact, he did tell us -- that if the PI is not issued, it will

6   end this case in its infancy.  If this is what they wanted,

7   then they should have filed chapter 11 for the parent.

8            They filed Notices of Bankruptcy and Stay of

9   Litigation in a form we have never seen before and that is

10  because they are not entitled to any of the relief that they

11  proclaimed without an order of the Court, which, as of today,

12  they still do not have.  They created confusion in the courts

13  and in the face of this Court's October 22nd ruling denying the

14  expansive stay which they sought they arrogantly turned a blind

15  eye.  I am heartened that they have since taken steps to remedy

16  the confusion that they created, but they do not get rewards

17  for this.  This is our job.  As court officers, it is our duty

18  to properly and accurately reflect the rulings of the courts in

19  which we appear.

20           Significantly, however, as of 2:30 today when I last

21  checked the docket of the United States Supreme Court they

22  still have not done anything to remove or change or modify the

23  notice that they filed in that very court, the highest court in

24  our land, in the context of defending against a petition for

25  *certiorari* in <u>Johnson & Johnson and JJCI v. Lynn Fitch</u>, the

1    Attorney General of the State of Mississippi.  LTL filed on

2    October 18th the Notice of Bankruptcy and Stay of Proceedings

3    in the same form we have seen before.  And at the close of my

4    remarks, Mr. Hayes will share it with the Court, but it's the

5    same one we've seen, only now with the United States caption.

6    But this notice, again, baldly asserts a blanket stay for all

7    Johnson & Johnson companies and 600 others.  Fourteen days

8    after this Court said in plain words, "No stay, only as to LTL

9    and Old JJCI," this debtor has still not corrected the record

10   before the United States Supreme Court.

11           And even more, when we look at what they've done,

12   there still remains a challenge.  If the Court looks at what

13   was marked as LTL 83, what was handed up to the Court shortly

14   before arguments began, the so-called notice correcting the

15   record, once again it states an erroneous term.  It first is

16   self-serving in terms of setting forth its contentions as to

17   what it's arguing in this Court, but then it concludes and I

18   quote:

19              "In the event that the bankruptcy court determines on

20              November 5, 2021, or thereafter, that talc-related

21              claims against Johnson & Johnson or any of the other

22              protected parties are automatically stayed, any

23              actions taken in the interim, namely, the intervening

24              period until that ruling, are in violation of the stay

25              and will be null and void as a matter of law."

1              That's not the law.  There's no stay.  The actions

2     that were taken by parties consistent with your Court's ruling

3     are not subject to being declared null and void, even if they

4     get the relief they seek today.

5              I listened carefully to Mr. Kim yesterday and today

6     when he coldly described what he -- and obviously Johnson &

7     Johnson -- believe is an unfair, unwarranted onslaught of

8     baseless litigation against a wealthy target.  In Mr. Kim's

9     words, all the plaintiffs are the same, non-existent litigants

10    asserting the same claims against any and all of the Johnson &

11    Johnson companies baselessly claiming that there was some

12    defect in a Johnson & Johnson product causing cancer and injury

13    or death.  In his words, they are all the same and argued that

14    this alone cried out for the blanket stay.  He points -- and so

15    did Mr. Gordon -- to mirror-like allegations in different

16    pleadings by different plaintiffs to support his worldview that

17    it is the plaintiff bar against Johnson & Johnson, a deep

18    pocket.  He ignores that when there is an MDL the protocol,

19    indeed it is an order of the MDL Court, for all complaints post

20    MDL to follow the model pleadings.  The fact that there are

21    model pleadings with identical allegations does not take away

22    the reality that these are separate torts asserted by different

23    plaintiffs.

24             But perhaps most importantly, these are not faceless

25    victims and ambulance chasers.  These are men and women,

1    predominately women, suffering from ovarian cancer and

2    mesothelioma, which even Dr. Kuffner agreed is deadly and

3    terminal.  The victims believe, and some juries have agreed,

4    that this results from asbestos-like fibers in the talc in the

5    Shower to Shower and Baby Powder products.  They have a right

6    to be heard.

7           More importantly, Johnson & Johnson does not have the

8    right as a solvent parent of a self-manufactured insolvent

9    subsidiary to unilaterally proclaim blanket stays and disregard

10   the judicial process of laws and court orders.  Mr. Kim may

11   have adopted the Johnson & Johnson worldview of complete

12   absolution that the company has done no wrong and has never

13   produced or manufactured or sold a product that was unsafe, but

14   this view is not shared by sophisticated neutral parties, such

15   as the Public Health Agency of Canada and juries in many of

16   these cases.  Time will tell.  Today is not the day to prove

17   the talc litigation cases, but today is the day for these

18   voices to be given the opportunity for them to have their day

19   in court against non-debtor affiliates and non-debtor, non-

20   affiliated entities.

21          Mr. Kim said that their goal was to achieve a fair and

22   equitable process.  They could have easily done that by simply

23   filing Old JJCI without doing a divisive merger, or they could

24   have filed a chapter 11 for Johnson & Johnson itself.  Again,

25   as we've heard before -- and I don't mean to repeat it -- but

1   if Johnson & Johnson truly wants the benefits of chapter 11 --

2   and Mr. Gordon certainly outlined a need why they may want to

3   file with all the litigation against it -- then Johnson &

4   Johnson, the parent, should file.  Mr. Gordon pointed to all

5   the many lawsuits filed against non-debt parties since the

6   Court's ruling on October 22nd.  He didn't state that those are

7   not against the debtor.  Again, if Johnson & Johnson or the

8   other affiliates want the stay, they should file for chapter

9   11.

10        The words of the court in Haupt were correct.  "The

11  cognitive bankruptcy proceedings should not only be right, but

12  they should seem right."  Simply stated, LTL is not entitled to

13  a blanket stay of all litigation against its parent and

14  hundreds of, of affiliates or the hundreds of non-affiliated

15  parties who themselves have not even joined in asking for this

16  extraordinary relief.  LTL should follow the process.  They

17  should propound a plan.  They could put it out for a vote.

18  They could have a channeling injunction or whatever they

19  believe is appropriate and then, perhaps in the form of that

20  confirmed plan, Johnson & Johnson will get its third-party

21  releases and stay of litigation, but not now.  LTL has not met

22  is burden and has not come before this Court in good faith.

23        Thank you.

24        THE COURT:  Okay.  Thank you.

25        Anyone else on the plaintiffs' side?

1          MR. HAYES:  May I approach with the --

2          THE COURT:  Mr. Hayes?

3          MR. HAYES:  -- notice that Ms. Cyganowski referenced?

4      (Document handed to the Court)

5          THE COURT:  Okay.  Thank you.

6          That got it from the plaintiffs' side?

7      (No response)

8          THE COURT:  How about any rejoinder from the debtor?

9  I'm not inviting -- I'm, I'm inviting, not asking you for it,

10 but are we done?

11         Mr. Gordon, got something else?

12         MR. GORDON:  I have a sense you're sending me a strong

13 signal that maybe I'm done.

14         THE COURT:  Not at all.  It's only 4:00.  We don't

15 have to be out of here for at least another hour, so.

16         MR. GORDON:  I'm not sure why I'm bringing my phone up

17 here.

18         THE COURT:  At the same time I'm not encouraging the

19 use of the whole hour.  I'm worried about what y'all might meet

20 at the airport trying to get home.

21         MR. GORDON:  Yeah.

22         THE COURT:  American --

23         MR. GORDON:  Your Honor, Greg Gordon again on behalf

24 of the debtor.

25         I -- I think -- I think I only have about ten minutes

1  left and I'm not intending to --

2         THE COURT:  Okay.

3         MR. GORDON:  -- exceed that.

4         One of the last points Ms. Cyganowski made was that we

5  pointed out a number of cases have been filed, she said, since

6  the last hearing.  I think what I was focused on was since the

7  petition date, but I didn't say they were filed against J&J.

8         THE COURT:  -Uh-huh (indicating an affirmative

9  response).

10        MR. GORDON:  And it reminded me what I, what I think I

11  failed to say to the Court, which was in our brief, that there

12  are about 271 cases that have been filed since the petition

13  date, 266 of them were filed against both the debtor, or both

14  Old JJCI and J&J with no distinction being drawn between the

15  two.  So 271 cases filed, 266 against both, which is 98

16  percent, were filed against both.  And again, to me, that's

17  just confirmation that we're talking about one and the same

18  claim.

19        Ms. Cyganowski said that there was no real urgency for

20  the relief, no real urgency with respect to insurance, or with

21  respect to J&J with respect to the retailers.  And we disagree.

22  There, there is urgency for the relief because every day that

23  goes by without the injunction, we have claims against the

24  debtor that are being liquidated elsewhere in other courts

25  around the country.  And again, we know very clearly that the

1   intent is to litigate these claims to the full extent, that

2   simply acknowledging that the debtor has a stay will not impact

3   the litigation at all.  It will be just the same as before.

4         And I was struck, your Honor, by the fact that there

5   was no answer to, really, the core argument that we have, which

6   is the claims are exactly the same.  What you heard were

7   arguments to the effect that these entities are joint

8   tortfeasors, things of that nature.  They're -- they have -- I

9   think Ms. Cyganowski said they're like co-obligors or co-

10  guarantors.  She used the tortfeasors, as did Mr. Waldrep, but

11  that, that's, that's wrong.  Because it's not like other

12  defendants, say, in asbestos litigation or talc litigation

13  where they have their own responsibility.  You could have two

14  defendants, co-defendants in that context, and you could

15  recover nothing from one, but you could recover something from

16  the other.  That's not the case here and that's, that's why

17  they're wrong in saying that Robins doesn't apply.

18        Again, here, there can't be any recovery by, against

19  J&J unless the underlying product that was manufactured and

20  sold by Old JJCI was defective.  And that's the problem.

21  That's what differentiates this case from those and that's the

22  fundamental reason why the stay applies in this case and they

23  haven't addressed that and, and they can't address that.  And

24  that's also the fundamental reason why the claims, as we've

25  said, the claims are the same.  They again seek to recover on

1   the same, for the same plaintiffs, for the same exposure, for

2   the same injury, and for the same damages.

3        Mr. Pfister said that the injunction's not warranted

4   because the funding agreement's in place and there's no impact

5   on the estate if this litigation continues.  That's incorrect.

6   As the Court knows from this funding agreement and the others,

7   is they operate as a backstop against the, the, the debtor's

8   liability.  In other words, it's not until the debtor's are

9   basically exhausted or its cash flow is exhausted that the

10  funding agreement obligation kicks in.

11       Again, we heard a number of statements to the effect

12  that the claims are completely independent of each other.

13  That's another way of saying these are joint tortfeasors.

14  That's simply not the case.

15       And I was just going to point out, your Honor, one of

16  the cases that we cited -- and we cited many -- but one of them

17  was the Colonial Realty case.  And in that case the court,

18  well, he said a couple of things.  The court said a couple

19  things that I think are noteworthy.  And this is the Second

20  Circuit, your Honor, in 1992, again in our brief.  First, the

21  court says:

22       "Section 362(a)(1) provides that actions against the

23       debtor or to recover a claim against the debtor are

24       subject to the automatic stay.  The latter category

25       must encompass cases in which the debtor is not a

1           defendant.  It would otherwise be totally duplicative

2           of the former category."

3      Then in talking about a fraudulent transfer case in

4 this context, the court cites another court and says:

5           "While a fraudulent transfer action may be an action

6           against a third party, it is also an action to recover

7           a claim against the debtor.  Absent a claim against

8           the debtor, there's no independent basis for the

9           action against the transferee."

10      That's true with a fraudulent transfer.  That's true

11 with any claim here.  Because, again, there can't be any

12 liability for J&J if the, if the product is safe and there are

13 no damages alleged to have been caused by, by the product.

14      Mr. Waldrep said to you that more research had been

15 done on the issue of books and records.  And I do want to just

16 remind the Court that the operative language in the agreement

17 is "books or records."

18      THE COURT:  -Uh-huh (indicating an affirmative

19 response).

20      MR. GORDON:  And I do think that's a significant

21 distinction.  It's "books or records," not "books and records."

22 But nonetheless, he cited to your Honor the Feuer case.  That's

23 the way we're pronouncing it.  It's probably as good a

24 pronunciation as any, the F-E-U-E-R case.  And in taking a

25 quick look at that case, that appears to be a case that

1   involved the interpretation of, of a New Jersey statute

2   regarding shareholder rights and the rights of shareholders, in

3   particular, to inspect corporate records.  And what the court

4   was asked to interpret was the phrase "books and records of

5   account."  That's what, the operative language, as I understand

6   it, in the legislation and the -- the -- the question was what

7   did that phrase "books and records of account" mean or what did

8   the legislature intend that to mean and the determination was

9   it was intended to be narrow and relate to financial documents

10   in contrast to another part of the statute that referred to

11   books and records more generally.

12         So at least on a quick read we don't see that that,

13   that case is applicable.  And we did in our brief, as your

14   Honor knows and I showed on a slide, that we cited at least two

15   cases that stood for the proposition that it's not appropriate

16   to look at language that, that purports to limit liabilities

17   to, in those cases, financial statements and conclude that that

18   must mean that it will only include financial liabilities

19   specifically enumerated on the financial statements.  Instead,

20   you have to look at the broader language or other language to

21   see if it's broad or not.  In our case, as I showed from the

22   slides, our language is exceedingly broad, "all liabilities, I

23   think, "of every kind and nature."  That was in connection with

24   the transaction that transferred all the businesses and

25   operations to the subsidiaries, you know, the most broad terms

1    you can imagine, your Honor, both for, both for the assets

2    being transferred and the liabilities being assumed.

3         There, there was, also, your Honor, an attack on the

4    testimony of Mr. Lisman and a suggestion that the inter, the

5    intercompany charges reflected on the general ledger, I think

6    for some reason, ought to generally be disregarded and that was

7    because of testimony by him that those charges were consistent

8    with GAAP.  And from my perspective, all that testimony

9    confirmed was that, in fact, as Mr. Kim testified, for as long

10   as Mr. Lisner [sic] is aware the costs of the litigation,

11   payments for settlements, for verdicts, for defense costs, were

12   all charged through this intercompany process to Old JJCI and

13   were reflected there and whether that was consistent with GAAP

14   or not is beside the point.

15        There was a statement made in connection with his

16   testimony that he couldn't produce an agreement.  Well, in

17   fact, we have produced the agreement and the agreement is the

18   1979 assumption agreement and this, the evidence, I think,

19   adduced by Mr. Lisman is that consistent with that agreement,

20   in fact, these charges were all consistently and for a long

21   period of time charged to and paid by Old JJCI.

22        So, your Honor, you know, in the end, obviously a

23   lot's been said by the other side that we haven't made our

24   case.  I would submit that we have conclusively made our case.

25   We've proved the assumption.  I think we've proved that the,

1    that there was a course of performance that was consistent,

2    consistently carried out and consistent with the agreement.

3    We've proved that the claims are the same by the, the

4    plaintiffs' own pleadings.  We've proved to you that there are

5    indemnities in place running to these protected parties.  We've

6    proved the existence of the shared insurance.  And we've also

7    showed, I think, the chaos that will ensue and has ensued

8    without the relief we seek.

9         Ms. Cyganowski says we shouldn't get the relief.

10   Instead, we should propose a plan, but she's suggesting that we

11   would propose a plan in an environment where although we're

12   attempting to resolve the claims in this Court, we're

13   litigating those claims elsewhere, having to deal with that,

14   having the claims liquidated elsewhere, having collateral

15   estoppel issues, record taint, and the like, and I would submit

16   that that's backwards.  I think your Honor got it right before,

17   that we should have an opportunity to reorganize.  Again, I

18   heard in the argument statements that are akin to this case

19   should be dismissed as a bad faith filing.  I think that's

20   should be brought separately and by an appropriate motion.

21        But we would submit, your Honor, that on this record

22   the automatic stay, in fact, applies to this litigation against

23   the protected parties and/or the entry of a preliminary

24   injunction is appropriate to stay the litigation.

25        Thank you, your Honor.

1      THE COURT:  Anything else?  That got it?

2    (No response)

3      THE COURT:  All right.  As you would expect, these are

4  fairly complicated matters and you've got exhibits that I have

5  not had the occasion to look at and cases I have not had the

6  occasion to look at.

7      So my inclination, we've got to be back here on

8  Wednesday.  I'd like to take the time intervening to, to review

9  all this before I start announcing any more rulings, contrary

10  to what I've said before.  I'll live with that until such time

11  as, as I'm able to get to the Wednesday hearing and hear the

12  venue matter.  'Cause it could have an impact on what I do and

13  how, what we do with the injunction and how long it might last,

14  depending.

15      So I'm leaving the, the temporary -- we didn't really

16  grant an injunction except as to the debtor and that was, and

17  Old JJCI, and that was, effectively, a stay.  So not an

18  extension.  Effectively, I'll try to give you a ruling on, on

19  that question at the end of the hearing on venue if, assuming

20  that I know what I want to do about venue.  And we'll do so as

21  quickly as possible.  If I were to announce something more in

22  the way of interim relief until I can get through that hearing

23  with you, I'm afraid we might create more chaos than what we've

24  had so far.  So that's, that's the inclination.

25      For those of you who don't want to travel back to

1   Charlotte to get that ruling, I will gladly extend the

2   opportunity for you to participate by telephone, that's parties

3   and lawyers.

4          But bottom line is that I think we need to hear that

5   last motion before anything else happens in this case, all

6   right?

7          So with that, I will take this under submission.

8          And hope you all travel safely.  The day is long.

9   I --

10         MS. CYGANOWSKI:  Your, your Honor?

11         THE COURT:  I appreciate your work.

12         MS. CYGANOWSKI:  Right.

13         THE COURT:  Yes, Ms. Cyganowski?

14         MS. CYGANOWSKI:  If, if I may impose, I don't believe

15  it's burdensome.  My request would be that the debtor be

16  directed to modify these Notices of Stay that they've issued in

17  all the courts, including the Supreme Court of the United

18  States, saying that any actions taken by the courts during the

19  intervening time between any order, further order of this Court

20  is null and void.

21         THE COURT:  Uh-huh (indicating an affirmative

22  response).

23         MS. CYGANOWSKI:  I believe that misstates the law and

24  the record and given that they filed in the first instance, it

25  should not be that burdensome to modify it.

1        THE COURT:  Well, I understand, but at the same time I

2 don't want further confusion about what I'm saying and what I'm

3 not.  The Supreme Court might regret that <u>Celotex v. Edwards</u>

4 decision and the notion of whether an Article I court can join

5 Article IIIs.  But we'll see.

6        I think between now and Wednesday afternoon that we'll

7 just live with the, the current situation.

8        Any other matters that need to be addressed?

9 Gentlemen?

10    (No response)

11        THE COURT:  Okay.

12        All right.  Please don't stand on circumstance.  I'm

13 going to recess court, but you can see what we have to haul

14 away.  I don't want you to have to stand here and watch me

15 gather books and, and files.

16        Travel safely.

17        MR. SATTERLEY:  Likewise, your Honor.

18    (Proceedings concluded at 4:14 p.m.)

19

20

21

22

23

24

25

1                          <u>CERTIFICATE</u>

2           I, court approved transcriber, certify that the

3    foregoing is a correct transcript from the official electronic

4    sound recording of the proceedings in the above-entitled

5    matter.

6    /s/ *Janice Russell*                    November 12, 2021

7    Janice Russell, Transcriber                   Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25